# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **ROBERT ALLEN FRATTA,** | § | |
| | § | |
| **PETITIONER,** | § | |
| **V.** | § | |
| | § | |
| **WILLIAM STEPHENS, DIRECTOR** | § | **4:13-cv-03438** |
| **TEXAS DEPARTMENT OF** | § | |
| **CRIMINAL JUSTICE,** | § | |
| **INSTITUTIONAL DIVISION,** | § | |
| | § | |
| **RESPONDENT.** | § | |

_____

## PETITION FOR WRIT OF HABEAS CORPUS OF A PERSON IN STATE CUSTODY

_____

TO THE HONORABLE MELINDA HARMON, U.S. DISTRICT JUDGE:

Petitioner, Robert Allen Fratta, files this original petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 as follows:

## I.  JURISDICTION

This Court has personal jurisdiction pursuant to Title 28 U.S.C. § 2241(d) because Fratta was convicted of capital murder, on retrial, in 2009, in a Harris County, Texas, district court.  Subject matter jurisdiction is conferred by Title 28 U.S.C. § 2254.

## II.  INTRODUCTION

Fratta was first convicted of capital murder and sentenced to death in April 1996. The Texas Court of Criminal Appeals affirmed the conviction and sentence on direct appeal. *Fratta v. State*, No. AP-72,437 (Tex. Crim. App. June 30, 1999) (not designated

for publication) and later denied relief on his Article 11.071 application for a writ of habeas corpus. *Ex parte Fratta*, No. WR-31,536-02 (Tex. Crim. App. Sept. 22, 2004) (not designated for publication).

Fratta filed an application for a writ of habeas corpus in federal district court, where relief was granted based on violations of the Confrontation Clause of the Sixth Amendment to the Constitution of the United States. *Fratta v. Quarterman*, No. H-05-3392, 2007 U.S. Dist. LEXIS 72705 (S.D. Tex. Sept. 28, 2007) (not designated for publication).  The United States Court of Appeals for the Fifth Circuit affirmed the district court's judgment. *Fratta v. Quarterman*, 536 F.3d 485, 488 (5th Cir. Tex. 2008).

On retrial, the State proceeded on the capital murder theory advanced at the original trial that Fratta had violated Texas Penal Code 19.03(a)(3)("the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration").  The State also alleged a new theory of capital murder, namely, that Fratta had also violated 19.03(a)(2)("the person intentionally commits the murder in the course of committing or attempting to commit … burglary….").  In May 2009, Fratta was again convicted of capital murder.  The Jury once more answered special issues, such that on June 1, 2009, the trial court was constrained to sentence Fratta to death.

Fratta filed thirty-two points of error on direct appeal, but the TCCA found them meritless.  *Fratta v. State*, No. AP-76,188 (Tex. Crim. App. 2011) (unpublished).  Fratta also filed an Article 11.071 Application for a writ of habeas corpus.  The Article 11.071 writ did not contain a single claim for relief challenging the guilt-innocence phase.  On

February 12, 2014, the Texas Court denied relief in an unpublished opinion. *Ex parte Fratta,* 2014 WL 631218 (Tex. Crim. App. 2014) (not designated for publication).

In present federal proceedings, Mr. Fratta challenges the constitutional soundness of his trial foremost on grounds that he received ineffective assistance of counsel at the guilt innocence phase of his 2009 retrial.  As shown below, trial counsel also failed to challenge the sufficiency of the evidence by briefing and arguing a motion for a directed verdict and failed to object that the addition of law of the party charges to the jury instructions given at guilt innocence violated Mr. Fratta's Fifth Amendment and Due Process rights.  Mr. Fratta's conviction also depends on the testimony of key witnesses who were subject to intense and abusive police methods that trenched on Mr. Fratta's due process rights to a fair trial.  However, trial counsel did not take reasonably necessary steps to investigate police or prosecutorial misconduct.  Had trial counsel done so he would have been able to discredit the State's key witness as well as the integrity of the State's case.

AEDPA standards that ordinarily apply cannot be presumed at this point to pose an obstacle to Fratta's guilt innocence IAC claims.  Under *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), ineffectiveness of state habeas counsel permits a federal petitioner to raise trial IAC claims in Texas capital cases upon a showing that the claim is meritorious and that state habeas counsel should have, but did not, raise these IAC claims.

### III.  STATEMENT OF THE FACTS

#### *Crime Scene*

On November 9, 1994, Farah Fratta was shot twice in the head.  *See* exhibit notebook attached to Fratta's 11.071 Application (Autopsy Report).  One shot grazed her skull, the other was a shot to the back of the head that penetrated her brain. *Id.*  Neighbors heard the shots and looked out their window from across the street.  They saw Farah on the ground in the garage and saw a man, described as a black man flee the Fratta property and enter a sedan, which, they remembered, had only one working headlight.  The sedan sped away.  Neighbors then called 911 and crossed the street to see if they could help Farah.

Farah did not die immediately, and Fratta, who had been at church with the couple's three children that Wednesday evening, arrived before EMS transported her to hospital.  Farah's parents, the Bacquers, also arrived.  Lex Bacquer, Farah's father, testified he saw his child convulsing on the garage floor.  Fratta and the Bacquers followed the ambulance to hospital.  Emergency intervention was to no avail and Farah died.

#### *State's Evidence*

State's evidence showed that Mr. Fratta grew increasingly bitter toward his wife over the course of several months. 25 RR 92.  He asked fellow body builders at President & First Lady Gym in Northeast Houston if they knew anyone who could assassinate Farah Fratta. 25 RR 114, et seq.; 25 RR 168, et seq.  Robert Podhorsky testified that Mr. Fratta discussed a price of $1000.00 dollars upfront. *Id.*  Podhorsky said Mr. Fratta

mentioned more money after the murder which would come from a damage award he received in an auto injury case, from Farah Fratta's insurance, and from an overseas trust fund. *Id.* at 939. Although, Podhorsky said he thought Mr. Fratta was serious, he evidently did not think the danger warranted a phone call to police or a warning to Farah, and neither did anyone else who said Mr. Fratta propositioned them.

Mary Gipp's testimony connected Mr. Fratta and Mr. Prystash by placing them together at the President and First Lady Gym in Humble, Texas, several days prior to the murder. 27 RR 14. She testified that Mr. Fratta's and Prystash's friendship dated back six months prior to the murder. 27 RR 6. Gipp also testified that she lived with Prystash, 27 RR 7, and said Prystash knew Guidry, who resided in an apartment next door. 27 RR 16. On the night of the murder, Gipp said she saw Guidry sitting on the front step dressed in a black shirt and black pants. 27 RR 46. Prystash came home shortly thereafter dressed in a black shirt and jeans. 27 RR 47. Prystash left shortly and telephoned her a couple minutes after leaving. *Id.*

Around 8:30 or 9:00 p.m. – Gipp was not sure – Prystash returned to the complex. 27 RR 59. Gipp said Prystash walked through the apartment to the bedroom and unloaded a gun, taking two shells out. 27 RR 60. Gipp identified State's Exhibit 60 as the gun she saw Prystash handling. 27 RR 60. She testified, further, that Prystash threw the shells in the kitchen garbage. After Prystash left, Gipp said she took the shells out of the trash and put them in a zip-lock bag. 27 RR 142. Gipp said that after Prystash left, she got out the gun she had seen Prystash with and took the information off of the gun,

*id.*, writing the serial number and make on a blue slip of paper. 27 RR 87.  Gipp, through

her attorney, gave this information to police. *Id.*

On March 1, 1995, four months after the murder of Farah Fratta, police arrested

Guidry for robbery and recovered several guns.  Law enforcement traced one of the

weapons to Mr. Fratta.  The serial number on this weapon matched the number Gipp said

she wrote down off the gun she saw Prystash bring home the night of the murder.  State's

ballistic expert could not match the bullet that killed Farah Fratta to the weapon, but did

match it to a slug retrieved from a life-preserver jacket hanging on the wall of the garage

in which she was shot. 22 RR 625-26.  Gipp testified that Prystash received the weapon

in June of 1994, five months before Farah Fratta's death and nine months prior to the

time police found the gun on Guidry.  The State also introduced records demonstrating

that Prystash and Fratta contacted each other by pager and phone near the time of the

murder, and that Guidry placed calls around this time using a cell phone Prystash

borrowed off Gipp.  Apart from the confessions, the content of the calls was unknown.

Evidence showed that Prystash and Fratta had become acquaintances years before the

murder and spoke by phone in person on many other occasions.  They shared ordinary

interests, e.g., in working out at the gym, about which to converse.  On the other hand,

the State did not have evidence demonstrating that Mr. Fratta and Guidry ever contacted

each other by telephone or any means.  There was no evidence the two had ever met.

After the murder, Mr. Fratta again talked with Podhorsky.  Podhorsky advised him

to keep his mouth shut.  25 RR 137.  Although police investigated Podhorsky, he was not

involved.  Finally, police recovered $1050 in cash from a plain white envelope found in

Mr. Fratta's car. However, unlike at the first trial, where there was no witness to corroborate the defense's theory that the cash was partial payment for carpeting Fratta had recently bought, trial counsel sponsored substantial evidence, including receipts from Sears, confirming that Fratta had taken money out precisely for this reason. 25 RR 150 et seq.

## IV. PROCEDURAL POSTURE OF NEW FEDERAL CLAIMS

In Section V of this petition, Fratta raises claims that, in violation of Sixth Amendment, *see Strickland v. Washington,* 466 U.S. 688 (1984), Fratta received ineffective assistance of trial counsel at the guilt-innocence phase of his trial. State habeas counsel did not raise any guilt-innocence IAC claims. State habeas counsel inexcusably failed to challenge the constitutionality of Fratta's conviction at all, and raised punishment phase claims only. Nonetheless, despite state habeas counsel's failure to raise guilt innocence claims in state proceedings, none of Fratta's federal guilt-innocence IAC claims are defaulted or barred by the AEDPA.

In *Trevino v. Thaler*, 133 S.Ct. 1911 (2013), the Supreme Court created a narrow exception, whereby a federal habeas court may find "cause" thereby excusing a defendant's procedural default, if the underlying constitutional claim that state habeas failed to raise is an ineffectiveness of trial counsel claim. To qualify for the exception, the IAC claim must meet the following four conditions or elements:

> (1) the claim of "ineffective assistance of trial counsel" is a "substantial" claim; (2) the "cause" consist[s] of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state

7

law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

*Id.* citing *Martinez v. Ryan*, 132 S.Ct. 1309, 1318–1319 (2012).

As a matter of law, conditions (3) and (4) are satisfied in Texas cases. *See Trevino*, 133 S. Ct. at 1915.

*Trevino's* second condition, (2), "cause" due to ineffectiveness of state habeas counsel, is also satisfied, *inter alia*, for the following reasons. State habeas counsel did not have a strategic reason for not contesting guilt innocence. None of Fratta's present guilt-innocence IAC claims would have detracted in the least from the punishment phase claims that state habeas counsel actually did raise. State habeas counsel had virtually all the transcripts and extra record evidence relied upon to develop Fratta's present guilt-innocence IAC claims. In particular, state habeas counsel had at his disposal police reports, and transcripts and records from Fratta's original trial and the trials of Fratta's codefendants that Fratta relies upon in these federal proceedings to identify constitutional claims and to show that trial counsel, *inter alia*, (i) failed to impeach key witnesses, (ii) failed to exclude harmful testimony and evidence, (iii) failed to impeach the integrity of the State's case at trial in closing argument; and (iv) failed to challenge the sufficiency of the evidence or object to constructive amendments of, and variances from, the indictment.

State habeas counsel clearly should have investigated all the leads and developed all the other evidence that Fratta has discovered in federal habeas proceedings. First, state habeas counsel, like trial counsel, failed to seek search warrants, inventories, or

police reports related to the search of Gipp's apartment, or to identify witnesses, including police witnesses, to a search that turned up nothing.  However, the search warrant and inventory and/or police reports and witnesses are calculated to demonstrate that Gipp falsely testified about key evidence she claimed to have preserved in her apartment.  Second, state habeas counsel, like trial counsel, failed to investigate leads to witnesses that were calculated to confirm that Gipp's testimony was coerced by mental and physical abuse at the hands of Harris County Sheriff Office deputies and detectives.  For example, state habeas counsel failed to contact current federal habeas counsel, or his investigator, both of whom had litigated or investigated issues underlying Fratta's previous federal petition challenging his 1996 conviction, and failed to move the convicting court to allow state habeas counsel to depose Gipp and police witnesses regarding coerced testimony.  Third, state habeas counsel failed to investigate the accuracy and veracity of other key guilt-innocence witnesses, such as James Ray Thomas.  Fourth, state habeas counsel failed to challenge the sufficiency of the evidence and amendments to the indictment through trial IAC claims despite having all the means necessary to raise these claims and despite Fratta's exhortations to raise these claims.  In general, the litigation and investigation failures of state habeas counsel repeat the failures of trial counsel, which are detailed in Fratta's guilt-innocence IAC claims in order to demonstrate deficient performance of trial counsel under *Strickland*, and, for similar reasons, establish "cause" under *Trevino*.

*Trevino's* first condition, (1), is also satisfied.  This condition – that the claim of "ineffective assistance of trial counsel" must be "substantial" claim – is related to the

merits of the *Strickland* deficiency and prejudice arguments that Fratta makes below in each of his IAC claims.  Proof in Section V below of the merits of each IAC claim is therefore sufficient to satisfy the *Trevino's* "substantial claim" requirement.

## V.  GUILT-INNOCENCE CLAIMS FOR RELIEF

### <u>CLAIM ONE</u>

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, TRIAL COUNSEL ALLOWED THE STATE TO INTRODUCE FALSE, INCRIMINATING TESTIMONY THAT THE STATE CRAFTED TO CIRCUMVENT THE TRIAL COURT'S RULINGS AND RULES OF EVIDENCE.**

At Fratta's retrial in 2009, the State argued and the trial court (and later the TCCA found) that Prystash's statements were not testimonial.  As a result, the State at retrial sought to introduce Gipp's damaging hearsay testimony.  However, the trial court ruled that Prystash's statements, to the extent that they implicated other codefendants, was not admissible.  However, the State solicited testimony from Gipp that was designed to illegitimately circumvent the trial court's ruling as follows:

> 5 Q. And in that conversation with Joseph Prystash,
>
> 6 did he ever tell you anything about participating in the
>
> 7 murder of Farah Fratta?
>
> 8 MS. KING: Objection, Your Honor. That
>
> 9 violates the confrontation clause and it's hearsay.
>
> 10 THE COURT: Overruled. That's a yes or no,
>
> 11 ma'am.

12 THE WITNESS: Yes.

13 Q.  (By Ms. Bradley) In this conversation when he

14 was talking about when the murder was going to occur,

15 that it was going to occur on Wednesday, did he tell you

16 what his involvement was going to be in terms of what

17 his role was?

18     A.  Yes, he did.

19     Q.  And what was his role?

20     MS. KING:  Objection, confrontation clause

21 and hearsay.

22     THE COURT:  Overruled.

23     THE WITNESS:  He was the middle man to find

24 somebody that would kill Farah.

27 RR 41.

23   Q.  (By Ms. Bradley) When you had this conversation

24 with Prystash and he told you that Farah Fratta was

25 going to be murdered on Wednesday night, what was your

1 reaction to that?

2     MS. KING:  Objection, Your Honor, assumes

3 facts not in evidence.

4     THE COURT:  Overruled.

5     THE WITNESS:  What was my feeling on it?

6 Kind of disbelief, but he did it.

27 RR 43.

1    A.  I went into the bedroom, took the gun out of

2  the case and wrote down the information that was on the

3  gun.

4    Q.  And why did you do that?

5    A.  Because I knew he killed her.

6    Q.  So, even though he had talked about planning to

7  kill her and even though you saw him walk out of your

8  apartment that night, going to kill her, when did the

9  reality actually sink in with you that he done it?

10    A.  I saw it on the news, and then when he walked

11  into the apartment and he unloaded the gun I knew they

12  killed her and I asked him and he said yes.

13   MS. KING:  Objection, Your Honor, to

14  confrontation and hearsay.

27 RR 72.

### A.    Comparison of Gipp's 2009 Testimony (Fratta retrial) to Her Testimony Again, Fratta and, especially, Prystash at their Respective 1996 Trials, Shows Gipp was Testifying Falsely.

At Prystash's trial, the State did not have any confrontation clause problems regarding anything Prystash said to Gipp.  Because Prystash was the defendant, his statements to Gipp came into evidence as an admission of a party opponent.  The State,

12

therefore, had an unimpeded opportunity to introduce every detail of Prystash's conversations with Gipp, including every incriminating statement, regardless of whether the statement incriminated Prystash, Fratta or Guidry. Gipp testified that Prystash told her the murder would take place on Wednesday while Fratta was at church. *State v. Prystash* [1996 trial], __ RR 179. Gipp also testified that Prystash told her that Guidry was going to get $1000 dollars and that he (Prystash) was going to get a jeep as follows:

> Q. Did he [Prystash)] say what he and Guidry were going to get for doing that?
>
> A. Guidry was going to get a thousand dollars, and Joe [Prystash] was going to get a jeep.

*Id.*

This was the entirety of Gipp's account at Prystash's 1996 trial of the Prystash's pre-murder confession. *Id.*

**B.    Trial Counsel Failed to Demand a Hearing or Voir Dire of Gipp, Failed to Call Rebuttal Witnesses and Failed to Impeach Gipp and the Integrity of the State's Case With Proof Gipp Testified Falsely at the State's Direction, all in Violation of *Strickland's* Deficiency Prong.**

At Prystash's 1996 trial, Gipp did not testify that Prystash told her he was "the middle man" or that his job was "to find someone to kill Farah." However, trial counsel failed to challenge Gipp's 2009 testimony with these contradictions. Counsel failed to show that Prystash never used the term "middleman" and that Gipp, who was prying Prystash for information, never asked a questions such as, "What was your job or role in the murder? "

Trial counsel's failure to expose the State's manipulation of Gipp's testimony to circumvent evidentiary rulings at Fratta's 2009 retrial was not excusable.  Trial counsel had access to, and was obligated to review, Gipp's testimony in previous cases against Fratta, Prystash and Guidry.  Trial counsel therefore should have known that Gipp did not testify that Prystash said he was a "middle man" or that his job was "to find someone to kill Farah" at any of the earlier trials.

Trial counsel also knew, or should have realized, that the State had a motive to massage and manipulate Gipp's testimony and should have been prepared expose the manipulation.  Questions the State asked venire persons revealed the State's intentions:

4 Q. Okay. Okay. And, of course, the Judge talked

5 to you about the law of parties and said that more than

6 one person could be criminally responsible for the

7 crime. In other words, in the murder-for-hire scenario,

8 if you've got a person who hired somebody, you have a

9 person who's the middleman, and you have a person who's

10 the gunman, do you see how all three of those people

11 could be held responsible for that capital murder?

4 RR 90 (jury voir dire).

The trial court convened hearings and conferences with counsel on Confrontation Clause and hearsay (Rule 802) issues.  At these proceedings, that State expressly advanced the theory that a middleman was more blameworthy, so that testimony that reflected this role was admissible:

MS. BRADLEY: With regards to Proffer

16 No. 1, Ms. Gipp testified that during conversations that

17 she had with Joe Prystash he told her that he was going

18 to sub-contract the murder and get someone to kill Farah

19 for Bob Fratta. He also told her that Bob was supposed

20 to pay $1,000 to the shooter as part of that agreement.

21 And, you know, again, it's our position

22 that each person in a capital murder in a

23 murder-for-hire scenario is equally culpable regardless

24 of their role, unlike an aggravated robbery that turns

25 into a capital murder, the middleman is equally guilty

1 in a murder-for-hire scenario as the person who hires

2 him or -- and the person who shoots. He is the one who

3 puts the whole deal together. And it would be our

4 position that that statement also is a statement against

5 Joseph Prystash's penal interest because that says what

6 he is going to do to make the deal happen.

26 RR 46 (conference with trial court).

Given the enormous weight and importance that Prystash's pre-murder hearsay confession had for the State's case, it was incumbent upon trial counsel to demonstrate to the trial court using Gipp's prior testimony, particularly the unimpeded testimony at Prystash's trial, that the State was seeking to introduce misleading testimony in order to

fit within the trial court's ruling on admissibility.  To do this, trial counsel, in pretrial proceedings or at trial, should have (i) brought Gipp's prior testimony to the trial court's attention and (ii) moved to take Gipp on voir dire for the purpose of showing that (a) Prystash never used the term "middleman" and never told Gipp his "job was to find someone to kill Farah," (b) that Gipp was providing opinion based on hearsay statements that were inadmissible under the trial court's evidentiary rulings, and (iii) that testimony had been prepared by the State to make false and misleading alterations to her testimony in order to render it admissible at Fratta's retrial.  However, trial counsel failed to take these necessary steps.

Trial counsel's deficiency is underscored by failure to impeach Gipp and the State's case through obviously necessary cross-examination questions.  Trial counsel failed to ask Gipp whose idea it was to use the term "middle man" and whose idea was it to describe Prystash's job as "finding someone to kill Farah."  Trial counsel also failed to impeach Gipp with the fact that she had never testified before that Prystash used this language and these terms and, that, instead she was providing an opinion shaped by the State to fit its case.  Had trial counsel taken these steps, trial counsel would have been able to preclude Gipp's testimony about middlemen and Prystash's job, or would have been able to secure an instruction to disregard this testimony, and would have been entitled to effectively attack the integrity of the State's case in closing argument on the ground that the State sought to introduce false and misleading testimony through Gipp, and had done so to circumvent the trial court's rulings.

16

**C.    Trial Counsel Failed to Exclude or Impeach Gipp's Testimony, or the Integrity of the State's Case, Regarding Her Allegation that She Knew that "They" Had Killed Farah.**

Gipp did not witness the killing.  Gipp did not see Prystash leave with a weapon. Gipp's testimony was not based on personal knowledge that Prystash, Guidry and Fratta had killed Farah at all; it was based entirely on inferences and opinion drawn from the alleged hearsay comments of Prystash.  However, trial counsel failed to properly object under TRE 602 and Due Process to the State's elicitation of misleading testimony with questions that presupposed, and created the false impression, that Gipp had knowledge and became aware (*sic*, "reality sink[ing] in") that Prystash, Guidry and Fratta had killed Farah.  *See* 27 RR 43, 72 (reproduced in Section A above).  Trial counsel also failed to make the proper relevancy and Due Process objections to elicitation of testimony regarding Gipp's feelings, and therefore let Gipp falsely intimate she knew immediately and certainly that Prystash, Guidry and Fratta ("they") had killed Farah.

Trial counsel should have anticipated the State's attempts to circumvent Rule 602 with questions framed in terms of knowledge, reality, and feelings.  Review of transcripts available to trial counsel, demonstrates that the State used the same improper devices to circumvent evidentiary rules and violate Due Process when the State sponsored Gipp's testimony at Fratta's original trial and at Guidry's retrial.

**D.     Trial Counsel Failed to Exclude or Impeach Gipp's Testimony Regarding a Getaway Vehicle and Failed to Impeach the Integrity of the State's Case.**

The State sponsored testimony designed to mislead the jury into believing that Gipp knew that the vehicle Farah's neighbors saw leaving the murder scene, and described to news broadcasters, was the same vehicle that Prystash owned as follows:

13     Q.  After the murder, you said that on the night of

14  the murder there was a broadcast about the description

15  of **that vehicle that was used in the murder**; is that

16  right?

17     A.  Correct.

18     Q.  Did Joseph Prystash do anything with regard to

19  **that vehicle** after the murder?

20     A.  Yes, he did.

27 RR 79

15     Q.  (By Ms. Bradley) After the murder, Ms. McNeill,

16  did you ever see Joseph Prystash, I guess -- well, let

17  me put it in a timeframe?

18          You said that the news broadcast

19  information about the vehicle on TV and then the next

20  day Prystash was changing the head lamp on the car.

21  Shortly -

27 RR 82

18

Gipp did not see Prystash drive away, nor testify that Prystash told her he was leaving in the car he owned.  Gipp also was unsure of what type of car Prystash owned in 1994; Gipp thought Prystash owned a little Nissan but could not say if it was a hatchback or not.

> 16 Q. And what kind of car did he own back then?
>
> 17 A. (By Gipp) It was a little-- I think it was a four-door
>
> 18 little Nissan, a silver Nissan.
>
> 19 Q. Was it kind of like a hatchback Nissan or how
>
> 20 would you describe it?
>
> 21 A. I don't know if it was a hatchback. It was
>
> 22 just a small economy Nissan car, little silver car.

27 RR 10.

Gipp recalled, though, that the car had some body damage and a broken headlight.  27 RR 10-11.

Neighbors interviewed for TV the night of the murder were less definite in their descriptions.  Ms. Hoelscher said she saw a small silver car, and that was it.

> Q. Okay. You weren't able to give any description
>
> 1 of the car other than, I believe, on the tape that you
>
> 2 described it as a small silver car?
>
> A.     That is correct.

23 RR 130-131.

Mr. Hoelscher testified he saw a small silver or silver-gray car with a headlight out. 23 RR 145.  The Hoelschers did not notice damage to the body of the vehicle, or identify the make or model.  No one else saw a vehicle pull up to Farah's house at the time of the murder.  Hence, a broadcast of the Hoelschers' description of the car would not allow Gipp, or anyone else listening, to truthfully testify that he or she heard a broadcast singularly describing Prystash's car, as opposed to a thousand other small silver or gray cars with a headlight out.

However, trial counsel failed to voir dire Gipp and exclude her testimony pursuant to Rule 602 of the Texas Rules of Evidence on the ground that she lacked personal knowledge and was, instead, relating an opinion based on hearsay in order to fit the State's theory of the case.  Trial counsel failed to move the trial court to strike Gipp's testimony that she knew, from a TV broadcast, that the car used in the murder was Prystash's, and trial counsel failed to move for an instruction to disregard this testimony, on the ground that the State had solicited false and misleading testimony in violation of Fratta's due process rights.  Trial counsel also failed to demonstrate to the jury during trial on the merits, or in closing argument, that the State had attempted, once more, to skew and distort the evidence for the purpose of securing a conviction based on false, misleading, and inadmissible testimony.

**E.**   **Trial Counsel failed to Object to Introduction of the Note on Which Gipp Allegedly Wrote the Charter Arms Revolver's Serial Number and Brand, or Impeach Gipp's Claim that She Recorded the Information the Night of the Murder.**

The information on the blue sticky note was pure hearsay for which there was no exception.  The note was not a business record, for example, nor did it fall under any other provisions of TRE 803, which permit the introduction of written statements.  Even if the State had successfully argued that the blue sticky note was a recorded recollection under Rule 803(5), the State would not have been able to introduce the note, but could only have had Gipp read the information at trial.  *Id.*  Trial counsel, however, failed to keep the note out of evidence by making the proper Rule 802 and 803 arguments and objections.

Trial counsel failed to impeach Gipp's testimony about the circumstances of the recording by failing, inter alia, to establish that Gipp initially gave a different description of the gun, the information from which she claimed to record.  *See* Claim Four, below, Sections A-C, which are incorporated by reference, detailing trial counsel's failures to impeach Gipp's testimony about the gun).  Had trial counsel done, the State would not have been able to establish the authenticity of the note as a recorded recollection and Gipp would not have been able to even read from the blue sticky note.  Had the trial court nonetheless admitted the note, the foregoing impeachment, along with other evidence, impeaching Gipp's credibility and demonstrating her collusion with the prosecution to incriminate Fratta (*see* Sections A-E, above, of this first claim and Claim Four below, the argument and evidence of which are incorporated by reference), would have raised

21

serious doubts about the veracity of Gipp's tale regarding when, why and whether she actually wrote down information from the gun she said she saw Prystash return with.

Trial counsel should have been prepared to challenge the admission of the note and any information it contained pursuant to Rule 802 and 803.  Furthermore, trial counsel should have realized that the State was manufacturing stories about Charter Arms.  At Fratta's original trial, the State had a firearms examiner willing to falsely testify that a bullet found in Farah's garage was a ballistic match with bullets fired from the Charter Arms revolver recovered from Guidry when he was arrested March 1, 1995 (five months after the murder) for robbery.  (Testimony of C.E. Anderson).  Gipp's testimony that she wrote a serial number of the a gun that the State then matched to the Charter Arms provided the State with a neat and seemingly unassailable chain of proof demonstrating Guidry was involved in Farah's murder.  The State also argued at the original trial that Guidry received the Charter Arms as remuneration for Farah's murder.

At retrial, the *State's* new firearms examiner denied that the ballistic match alleged at trial could be made.  (Testimony of Robert Baldwin.)  The State abandoned its theory that Guidry got the gun for remuneration.  Competent trial counsel would have realize that the State had long been engaged in twisting gun evidence to show Guidry's involvement in capital murder scenarios for which it otherwise had no evidence. However, trial counsel did not impeach the State's case with the fact that the State was fishing for ways to incriminate Guidry, as it had to in order to convict Fratta for capital murder.  Furthermore, with the gun as payment theory discarded (and ordered struck from the indictment), Gipp's testimony about Prystash returning with a Charter Arms

22

falls apart.  While there is some sense to the story that Prystash might have paid Guidry with a gun, there is no reason why Prystash would take the alleged murder weapon from Guidry, return to the apartment with the alleged murder weapon, store it, and then give the gun back to Guidry to get rid of it.  (According to Gipp's testimony at other trials, but **not** at Fratta's retrial, Prystash told her he gave the gun to Guidry to throw in a lake.) The fact that Gipp initially placed a different gun in Prystash's hand the night of the murder underscores the implausible, concocted qualities of Gipp's testimony.  However, in violation of *Strickland*, trial counsel never impeached Gipp's testimony or the State's shifting theories about the Charter Arms.

### F.      Trial Counsel's Deficient Performance Resulted in Prejudice as Defined by *Strickland v. Washington*, 466 U.S. 688 (1984).

Competent counsel could have excluded the testimony excerpted in Section A above.  Without this testimony, the State would not have been able to demonstrate anything precise about Prystash's involvement in Farah's murder.  Trial counsel could have even cast doubt on the State's theory that Prystash was the driver by excluding or impeaching Gipp's identification of the alleged getaway vehicle from TV newscasts. Guidry's involvement in any crime whatsoever would have been indiscernible.

The trial court's evidentiary rulings prevented Gipp from relaying alleged statements from Prystash that clearly implicated Guidry as the shooter or the recipient of remuneration.[1]  The State new ballistic expert reversed the false testimony sponsored at

---

[1] The State blatantly violated the trial court's evidentiary ruling by quickly soliciting testimony (through curt leading question) as follows:
2 A. On Wednesday evening.

Fratta's original trial that purportedly showed the gun Guidry was found with months after Farah died was the murder weapon.   The State hopes to raise bare inferences that Guidry was the shooter depended on admitting the hearsay regarding Prystash's middleman role and job to find a killer, and on Gipp spreading blame through the false pretense of knowledge, i.e., comments about "reality sinking in" and "feelings" of certainty that "they," Prystash, Guidry and Fratta, had killed Farah.   The State's evidence that Guidry was involved at all, let alone what his role was, would have vanished from indiscernible to nothing, if trial counsel had eliminated Gipp's testimony, as they could have, or simply shown on cross examination that Gipp was making up terms and testimony she had never given before in order to fit the State's theory, and claiming knowledge and certainty when she really had none.

The State's evidence that Fratta was involved in a murder for higher scheme or a burglary/murder scheme is bare boned as it is.   (See Claim Eight below on *Jackson* insufficiency, the evidence and argument for which is incorporate by reference herein.)   Without Gipp's tendentious testimony about Prystash's middleman role, and without testimony contrived to create a false impression of personal knowledge about the identity of the getaway vehicle and the commission of the crime by all three codefendants (or

---

3 Q. All right. And did he tell you that he was
4 going to be involved in that murder?
5 A. Yes.
6 Q. And did he also tell you that Howard Guidry was
7 going to be involved in that murder?
8 A. Yes, he did.
27 RR 37.
But the trial court sustained defense counsel's objections and instructed the jury to disregard the testimony that Guidry was involved.  *Id.*

with this testimony effectively impeached), the record supporting the State's theories of capital murder would be even more devoid.  Without the blue sticky note's information, or with Gipp's testimony about her production of the note undermined, the state would not have a case against Guidry for murder, let alone a capital murder involving remuneration or burglary (for which, as shown below in Claim Eight, there was zero evidence at Fratta's retrial implicating Guidry, as required by the indictment).  Thus, failure to exclude or impeach the testimony discussed above in Sections A-E prejudiced Fratta under *Strickland.*

## CLAIM TWO

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, TRIAL COUNSEL FAILED TO PREVENT THE INTRODUCTION OF PRYSTASH'S HEARSAY TESTIMONY THAT THE STATE INTRODUCED THROUGH MARY GIPP.**

For the purpose of this claim "Prystash's Hearsay" refers to all out of court statements by Prystash that Gipp related to the jury, including, but not limited to, the testimony excerpted and discussed in Claim I above.  It also includes Gipp's testimony regarding Prystash's alleged statement that he gave Guidry a gun to throw in a body of water, 27 RR 78, statements that Prystash said he knew Farah was dead, that he saw Farah in the garage, statements that Prystash said he was going to "subcontract Howard Guidry, 27 RR 207, statements about going to the gym after the murder to meet Fratta, 27 RR 216-217, and statements that in which Gipp claimed that she "knew" or "felt" would

happen, *see* 27 RR 72, since these statements are all based solely on hearsay allegedly coming from Prystash.

## A.    BACKGROUND

By the time the State retried Fratta in 2009, the Supreme Court had delivered opinions in *Crawford v. Washington*, 541 U.S. 36 (2004) and *Whorton v. Bockting*, 549 U.S. 406 (2007).   *Crawford* drew a bright line rule prohibiting the introduction of testimonial statements.   *Crawford* also provided some general parameters or suggestions for determining whether a statement was testimonial.   *Bockting* clarified that if an out of court statement was not testimonial admitting the statement would not infringe upon a defendant's Sixth Amendment rights.

## B.    ARGUMENT

### 1.    Trial Counsel Failed to Present Readily Available Evidence that Gipp's Aim was to Obtain Testimony to Aid a Possible Prosecution.

*Crawford* narrowed the range of out of court statements subject to the Confrontation Clause to testimonial statements.   However, before Fratta's retrial, the Supreme Court issued opinions in *Michigan v. Bryant,* 131 S.Ct. 1143 (2011) and *Davis v. Washington,* 547 U.S. 813 (2006), that showed that a statement could be testimonial even though the statement was not made in custody by a declarant who intended to provide testimony to aid a prosecution.

Whether a statement is testimonial under *Bryant* and *Davis* depends significantly on the purpose of the questioner.   The same statements can be testimonial if the questioner's purpose is to elicit statements to aid in the prosecution of a crime –

26

regardless of the declarant's intentions, official status of the questioner or the situs of the statements – and non-testimonial if questioner has a different purpose.

In Fratta's case, Prystash's motives for describing the murder to Gipp were as indiscernible as was his credibility.  Discussing the reasons Prystash might have had for confessing to Gipp, the TCCA explained in an opinion disposing of Guidry's direct appeal that,

> "Prystash's statements to Gipp did nothing to advance the cause of or facilitate the conspiracy. The statements were not made in an effort to enlist Gipp's assistance or cooperation, elicit information that could be used in the conspiracy, or do anything other than report the status of the conspiracy to Gipp. Prystash was merely describing to Gipp what was occurring or what had occurred."

*See Guidry v. State,* 9 S.W.3d 133, 148 (Tex. Crim. App. 1999); *and see Guidry v. Dretke*, 397 F.3d 306 (5th Cir. 2005).

Gipp, on the other hand, had one reason only for asking Prystash to comment on details surrounding Farah's murder and that was to gather information for use against Prystash and Fratta in a prosecution.  Gipp's testimony at Guidry's 2007 retrial shows that Gipp's motive for obtaining and preserving information about the murder was to provide evidence for use by the prosecution.  From the beginning, Gipp said she wanted to serve as a State's witness.  When she was first contacted by deputies, Gipp was ready to testify about evidence she got from Prystash and told deputies that she would testify before a grand jury.  *State v. Guidry* [2007 Retrial], Testimony of Mary Gipp, 21 RR 44. When asked why she wrote down on a blue sticky note the serial number and make of the

gun she said she saw Prystash return to her apartment with the evening of November 9,

1994, Gipp answered:

> A.   (by Ms. Gipp) Because I knew that this was
>       evidence and that they needed this information.
>
> Q.   (By Ms. Siegler) By "they," you mean?
>
> A.   The police.

*Id.* at 61-62.

However, trial counsel failed to request a hearing in which to examine Gipp's

motives for soliciting information from Gipp, failed to take Gipp on *voir dire* at trial in

order to demonstrate her motives, and failed to present proof that Gipp's was probing

Prystash for information that police and prosecutors could use against Prystash and

Fratta.  As a result, trial counsel failed to show that the information Gipp procured from

Prystash qualified as testimonial and therefore should have been excluded under

*Crawford* as a violation of the Confrontation Clause.

### 2.   Trial Counsel Also Failed to Raise a Proper DUE PROCESS Objection in the Alternative and, Instead, Objected on Constitutional Grounds the Supreme Court Had Abrogated in *Bockting*.

Trial counsel sought to prevent the State from sponsoring Prystash's out of court

statement through Gipp by citing the trial court to *Ohio v. Roberts*, 448 U.S. 56 (1980)

and *Lily v. Virginia*, 527 U.S. 116 (1999). 19 RR 38.  However, in *Bockting* the Court

rejected the principles used in these cases – namely, (i) presence or absence of indicia of

reliability or (ii) falling under a historical exception, such as statement against penal

interest – to determine whether or not admission of hearsay violated the confrontational

clause.  Consequently, trial counsels' arguments in briefing and open court that the circumstances under which Prystash made his hearsay statements as well as their argument that Prystash's statements spread blame and were not against his penal interest were not backed by valid authority.

Instead of relying upon overturned or abrogated Sixth Amendment cases, trial counsel should have raised due process objections to the introduction of Prystash's incriminating hearsay.  This Court had already found that the circumstances under which Prystash's hearsay statements incriminating Fratta were made did not bear minimal indicia of reliability (or particularized guarantees of trustworthiness).  Summarizing this Court's analysis, the Fifth Circuit stated,

> In finding that the admission of Prystash's statements to Gipp was error, the district court reasoned that "[t]he record gives **no basis upon which to evaluate Prystash's credibility** when he allegedly made the statements." [The district court] also found persuasive this court's determination, in affirming a grant of habeas relief in Guidry's case, that similar testimony by Gipp in Guidry's trial constituted a violation of the Confrontation Clause. *See Guidry v. Dretke*, 397 F.3d 306, 328~30 (5th Cir. 2005) (affirming grant of habeas relief based on Confrontation Clause violation in admitting Prystash's statements to Gipp at Guidry's trial).

*Fratta v. Quarterman*, 536 F.3d 485, 498 (5th Cir. 2008).

Before this Court concluded that it was impossible to evaluate Prystash's credibility, the Texas Court of Criminal Appeals had come to a similar conclusion.  After Guidry's first trial, the CCA found it "'doubtful [Prystash's statements] possessed particularized guarantees of trustworthiness .... '" *State v. Guidry*, 9 S.W.3d 133, 151 (Tex. Crim. App. 1999).

      **a.**    **The Basis for a Due Process Objection that Trial Counsel Should have Made  was Obvious:  <u>No Defendant's Conviction Should Depend, as Here, on a Non-testifying Codefendant's Confession the Truth or Falsity of  Which Neither Court Nor Jury Can Ascertain.</u>**

The record on **re**trial in Fratta's case, as it pertains to Prystash's hearsay confession introduced through Gipp, also provides "no basis on which to evaluate Prystash's credibility."  This means that whether Prystash told Gipp the truth or not about Farah's murder simply cannot be ascertained, neither by a reviewing court nor by a jury (since the jury did not have an opportunity to listen and observe Prystash either).  The State did not introduce new evidence pertaining to the circumstance of Prystash's alleged confession to Gipp.  Prior rulings by federal and state courts declaring the impossibility of assessing Prystash's credibility and doubting the reliability of his confession to Gipp (which trial counsel was duty bound to know) therefore set the stage for a meritorious Due Process objection.  By admitting Prystash's hearsay declarations, the trial court was ensuring that conviction at trial would rest squarely on out of court statements the truth of which was impossible for the jury to rationally ascertain.

Since a devastatingly incriminating confession of a non-testifying codefendant, **the truth of which is indeterminable**, will obviously render a trial fundamentally unfair, it follows straightforwardly that admission of Prystash's confession through Gipp violated basic Due Process principles and called for an objection on Due Process grounds from trial counsel.  Trial counsel certainly did not need to engage in novel or obscure due process analysis in order to frame an objection.   As shown above, the fundamental unfairness of trial based on a confession the truth of which is unascertainable is obvious.

Furthermore, legal authority published by the time of retrial expressly notified any reasonable counsel that in the wake of *Crawford*, a Due Process objection to a codefendant's confession, such as Prystash's to Gipp, was essential. *See* Epstein, J., *Avoiding Trial by Rumor: Identifying the Due Process Threshold for Hearsay Evidence After The Demise of the "Ohio v. Robert" "Reliability" Standard*, 77 UMKC L Rev. 119 (2008); Taslitz, A.E., *What Remains of Reliability: Hearsay and Freestanding Due Process After Crawford v. Washington*, Crim. J. Mag., vol. 20, Issue 2 (2005); *cf. Chambers v. Mississippi*, 409 U.S. 95 (1972) (state court's exclusion, under state hearsay rules, of reliable exculpatory evidence violated defendant's right to due process).

### 3.      Failure to Exclude Prystash's Alleged Confession to Gipp Prejudiced Fratta.

The facts recited in section (2) above that demonstrate Due Process was violated because of the fundamental unfairness of introducing Prystash's confession, also demonstrates prejudice.

The same results – proof of prejudice – follows from Supreme Court pronouncements about the harm caused by non-testifying codefendant's confessions in the *Bruton* line of cases. Although the constitutional error is different, the prejudice analysis is relevant. In *Bruton v. United States*, 391 U.S. 123 (1968), the Court ruled that the "devastating" nature of the hearsay proof cannot dependably be kept from mind by the jury even by a limiting instruction. Where there is no limiting instruction, but instead the purpose of the confession is understood to be for the purpose of incriminating the defendant, the impact is magnified.

Furthermore, this Court and the Fifth Circuits analysis of the **harmfulness** of Prystash's hearsay confession to Gipp are dispositive.  This Court and the Fifth Circuit both found that admitting Prystash's hearsay confession to Gipp was harmful under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Fratta v. Quarterman,* 2007 WL 2872698, *21-*23 (S.D. Tex. 2005).

The fact that harm must be determined on retrial under *Strickland's* prejudiced standard and not pursuant to the *Brecht* test is of no moment.  The Supreme Court has stated that rarely will the outcomes of *Brecht*'s harm analysis and analysis for *Strickland* prejudice be any different.  This is not one of those rare cases.  Moreover, there are distinct differences between the original trial and retrial (and in the post-conviction posture with respect to trial and retrial) that **amplify** the harmfulness caused by the re-introduction of Prystash's out of court confession to Gipp, making the prejudicial effect at retrial deeper and more obvious.

**First**, in 1996, C.E. Anderson testified that a bullet pried from the lifesaving float hanging in Farah's garage was fired from the gun found on Guidry, traced to Fratta through its serial number, and allegedly seen and documented by Gipp (Gipp testified she saw Prystash carrying the night of the murder and wrote the serial number down on the blue sticky note that the State later introduced as an Exhibit).  At the 2009 retrial, the State was unable to prove a ballistic link at all.  Instead of C.E. Anderson, the State summoned firearms expert Robert Baldwin.  Baldwin testified he could not match any recovered slugs to the revolver found on Guidry.  Unlike C.E. Anderson, Baldwin

testified, too, that the shell casing found in the garage near Farah's body could not have been fired in a revolver.

This change in the background of the two trials against which Prystash's confession must be assessed is enormous.  At the 1996 trial, the State had highly incriminating expert testimony, independent of Prystash's confession, scientifically tying Guidry, Prystash and Fratta to the murder weapon.  At retrial, however, the State introduced an expert's testimony that (i) informed the jury that the slugs found in the garage could not be matched to the revolver Fratta once owned and (ii) supported an inference (because Baldwin testified the shell casing Sheriffs found near Farah's body could not have been fired in Fratta's revolver) that a different weapon, not linked to Guidry, Prystash or Fratta, was used to kill Farah.  This made Prystash's confession to Gipp more crucial to the State's case and more prejudicial to the defense.

**Second**, at the original trial, the defense simply alleged that the $1050 law enforcement seized from Fratta's car was for carpet, but did not, in 1996, present any evidence contradicting the State's theory that the $1,050 that law enforcement seized from the glove-compartment of Fratta's vehicle (24 RR 57) was to pay for Farah's murder.  At the 2009 retrial, the defense sponsored testimony through Ray Thomas showing Fratta had contracted to purchase and install carpet in the house in which he was living during the pendency of his divorce. 25 RR 150-155.  The defense also called the manager of the Sears store that sold Fratta the carpet. 29 RR 176, 180.

At the 2009 retrial, the State proceeded against Fratta under the same murder for hire theory without introducing any additional evidence of a payment scheme.  Once

more, Prystash's confession to Gipp was absolutely essential. The State did not have admissible proof that Fratta arranged to pay Guidry. There was no evidence the two – Fratta and Guidry – had ever met or communicated. The State introduced testimony that Fratta had offered other money to kill Farah; however, these offers were treated as ridiculous and rejected. The State therefore had to show that Fratta had arranged to pay Guidry through Prystash. Gipp's testimony that (i) Prystash told her that he was the middle man in the scheme and that (ii) Prystash's job was to find someone to kill Farah was therefore crucial to proving the murder for hire offense alleged in the indictment. Prystash's statements were also vital to any hope the State had of conviction on a burglary/murder theory. The State failed to prove anything about Fratta's relationship to Guidry or knowledge of his activities. Failure to provide significant evidence delineating Prystash's role as middleman or recruitment of Guidry to kill Farah make a legitimate conviction on a parties charge for burglary/murder inconceivable.

In light of the State's bare-boned case in support of either of its theories of capital murder, the harm caused by counsel's failure to exclude Prystash's hearsay testimony was correspondingly greater. After the *de novo* review of this claim, which *Tevino v. Thaler,* 133 S. Ct. 1911 (2013), permits, this Court should grant relief on Fratta's ineffectiveness of counsel claim.

## CLAIM THREE

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, TRIAL COUNSEL FAILED TO INVESTIGATE THE CONDITIONS UNDER WHICH GIPP WAS INTERROGATED AND FAILED TO CROSS EXAMINE GIPP ABOUT THE DURESS UNDER WHICH SHE AGREED TO PROVIDE STATE'S EVIDENCE.**

According to the lead prosecutor[2] at the original trial in 1996, Gipp was the State's most important witness.  Gipp's importance at the retrial was magnified several fold at the 2009 retrial, because this Court granted habeas relief on confrontation clause claims that prevented the State on retrial from introducing the highly incriminating custodial confessions of co-conspirators Prystash and Guidry. *Fratta v. Quarterman*, No. H-05-3392, 2007 U.S. Dist. LEXIS 72705 (S.D. Tex. Sept. 28, 2007) (not designated for publication).

**A.    Trial Counsel Failed to Impeach Gipp, and Failed to Impeach the State's Assembly of its Case, with Evidence of Police Misconduct that Included Harsh Interrogations, Physical Violence Against Witnesses, Deception of Witnesses and Deprivation of Sleep and Food.**

Law enforcement's investigation of Fratta's case is rife with misconduct.  Because of misconduct, Fratta's co-defendant's, Howard Guidry's, capital conviction was overturned.   Guidry was granted habeas relief and retried because the State used unconstitutional methods to extract a confession.   The other co-defendant's, Joseph Prystash's, federal proceedings were abated so he could exhaust claims related to illegal police interrogations.   The treatment of Mary Gipp by detectives and deputies displays a

---

[2] Kelly Siegler

similar pattern of deceptive and even violent action aimed at procuring evidence supporting the State's case.

## *Gipp*

The lead prosecutor at the original trial stated publicly on a 48 Hour CBS News program devoted to the Fratta case that aired February 5, 2011, that Mary Gipp was the State's most important witness.  *48 Hours: Thou Shalt Not Kill.*  Gipp's importance flowed from her relationship with codefendant Prystash with whom she was living part time when the murder took place.  The most damaging aspects of Gipp's testimony was her transmission of out-of-court statements (see record excerpts reproduced above) allegedly made by Prystash that connected Fratta to a murder for hire scheme involving Prystash who supposedly paid a man named Guidry to shoot Farah Fratta.

Because this Court determined that the prosecution use of non-testifying codefendant confession at the original trial violated Fratta's confrontation clause rights, the Gipp's importance as a key witness at retrial was magnified several fold.  Trial counsel was therefore obligated to attack the validity of Gipp's testimony, including investigating evidence that Gipp was harassed and physical abused by Deputies and Detectives until she gave a statement and produced physical evidence critical to the State's case.

The lead prosecutor revealed the State's outright hostility towards Gipp in the 48 Hour News cast.  The lead prosecutor publicly stated that Gipp "was a witch; she was a smart aleck; she was a bitch."  The prosecutor's caustic appraisal of the witness on whom

the State's case hinged was reflected in the treatment that deputies and detectives meted out to Gipp.

Detectives tried to interrogate Gipp at home on several occasions before she sought representation, showing up unannounced during inconvenient hours. Gipp initially denied that Prystash had left her apartment on the night of the murder. She insisted that he had remained at 2226 Millstone with her and her brother, Keith Gipp, watching a program on ice-skating.

In order to break Gipp's resistance, law enforcement determined to show Gipp they could gratuitously disrupt her life as it pleased. For example, there no evidence that Gipp ever refused to talk to police at all or refused access to her residence. Police had no reason to think that evidence they could have seized earlier through a consensual search near the November 9, 1995, date of the crime was still present more than a month later. However, as Christmas neared police either sought and obtained a search warrant, or obtained consent to search from Keith Gipp,[3] that evidently permitted them to conduct an unlimited search of Gipp's apartment, because officers proceeded not only to search the premises but also ripped open all the presents Gipp had place under her Christmas tree. The idea that Gipp had hidden evidence in Christmas packages was of course preposterous. The police maneuver was simply to harass Gipp into making statements supporting the State's case.

---

[3] Mary Gipp testified that she was away but Keith Gipp was present when HCSO searched her apartment in November or December of 1994.

Nonetheless, Gipp maintained her position – which was that she did not have knowledge about the murders – for five months, from November 10, 1995, until March of 1996. The evidence indicates, and further investigation and discovery is calculated to show that eventually police broke her down with threats of violence and prosecution and continued harassment, that, specifically (not only) that law enforcement took Gipp to the Lockwood station for interview, used force to extract information from Gipp, including physically assaulting Gipp. Police witness(es) who have come forth (but cannot be now identified) have provided information that indicate one or more detectives or deputies slapped Gipp in the face and that alcohol was present and consumed at one or more interrogation.

Trial counsel was on notice that Gipp, like other potential witnesses, had given testimony under conditions of physical and mental duress. However, trial counsel did not investigate any physical violence that lead to Gipp's turning state witness, including leads to evidence that Gipp assaulted at her residence or at the Lockwood station. The record reflects that Gipp was interviewed by multiple officers on multiple occasions; however, trial counsel did not discover the occasions, the identities of the officers or the circumstances of the serial interrogations. Trial counsel also failed to impeach Gipp with evidence that she agreed to testify, and was testifying, against Fratta because of physical abuse and/or mental duress. Trial counsel failed to inquire into the conditions under which Gipp talked to police, failed via research or cross to discover the number or identity of law enforcement personnel present during Gipp's interview, and failed to inquire into any threats made against Gipp's brother, whether Gipp feared for his safety

or that he – that is Keith Gipp – would be criminally prosecuted.  Trial counsel had good reason, because Keith Gipp was summoned to appear before a grand jury.  The summons was to compel testimony and Keith Gipp, like his sister, was threatened with criminal prosecution.  Police report show Keith Gipp asserted his Fifth Amendment rights and refused to testify.  However, trial counsel did not impeach Gipp on grounds that she was testifying not only to save her neck but out of fear her brother would be prosecuted.

In sum, trial counsel also had reason to investigate and cross examine Gipp about mental duress caused by abuse of police and prosecutorial power, which additional investigation and discovery in these proceedings is calculated to further establish, including, but not only including,

    i.      threats to prosecute Gipp for capital murder if she did not turn State's witness,

    ii.     invasions and gratuitous destruction of Gipp's property,

    iii.    unannounced and unmemorialized interrogations of Gipp at her home and at police stations, and

    iv.    threats to prosecute Gipp's brother, Keith,

the occurrence of which is documented in the pretrial and trial record available to trial counsel, and which can be further demonstrated through investigation and discovery in this present federal cause of action.

Trial counsel also had reason to investigate and cross examine Gipp about physical abuse and mental duress caused by State agents.  Before trial, trial counsel was notified by letter that former federal habeas counsel's investigator had discovered that one or

more Sheriff's deputy had disclosed that Gipp had been struck or otherwise assaulted or threatened by one or more of the detectives or deputies who interviewed Gipp.

### *Guidry*

A pattern of witness abuse was evident before trial and post-conviction records of codefendants prosecuted for Farah's murder.  Trial counsel had access to, and should have been familiar with this record, but did not conduct a reasonable investigation of abuse of witnesses in Fratta's case despite this pattern of illegal police and prosecutorial conduct.  The very same HCSO personnel who investigated and interviewed Gipp – namely, Billingsley, Valerio, Roberts and others – also investigated and interviewed Guidry.  Officers violated basic constitutional law by refusing to honor Guidry's request for an attorney.  Instead, HCSO detectives interviewed Guidry in waves and isolated him for hours in between even after Guidry requested to see the attorney, Michael Druery, assigned to represent him on robbery charges.

The Fifth Circuit opinion upholding habeas relief granted by Judge Nancy Atlas retails how the HCSO Detectives interviewed Guidry late at night, leaving him isolated for hours, only to return to try to extract a confession.  Faced with Guidry's persistent invocation of his Sixth Amendment right to speak with an attorney before answering police questions, detectives resorted to deceit.  Detectives told Guidry that they had contacted Druery and that Druery had asked them to pass on the message that Guidry should speak with the detectives.  Guidry then proceeded to confess involvement and agreed to a videotaped reenactment of the murder.

HCSO would have gotten away with the grotesque violation of constitutional rights. However, during state post-conviction proceedings held in chambers, Roberts was asked by assistant district attorneys why they questioned Guidry when they knew he had counsel. Roberts replied that he had contacted Druery and received Druery's permission to speak with Guidry. Prosecutors immediately contacted Druery who said no such events had transpired: Roberts had not called him, Druery said, and he did not give HCSO personnel permission to speak with Guidry. When Roberts backtracked and flatly denied stating that he had contacted Druery or telling Guidry that he had permission from his attorney for Guidry to speak with him, the assistant district attorneys in charge of post-conviction litigation realized they would be a witness against Roberts and withdrew.

Despite the obvious violations of constitutional right and obvious proof that Roberts was lying, the State took advantage of a longstanding ritual whereby trial courts sign off on any findings that the Harris County District Attorney's Office puts before them. Prosecutors drafted findings of fact and conclusions of law excusing Roberts' in chambers remarks and minimizing the materiality of Guidry's confession and recommended that relief be denied. The trial court, followed by the Texas Court of Criminal Appeals, duly adopted the State's proposed findings and upheld Guidry's capital conviction. However, an evidentiary hearing in federal court confirmed that both the prosecution and defense attorneys had heard Roberts state unequivocally, when asked why he insisted on speaking with a represented party, that he had contacted Druery and received permission to speak with Guidry. Druery also testified that he had done no such

thing.  Relief was granted by the federal district court and the Fifth Circuit upheld the judgment.

However, trial counsel failed to impeach the State's case with evidence that the State had violated constitutional law in order to procure evidence against Fratta.

### *Prystash*

Prystash also complained of harsh treatment by HCSO, including being struck, deprived of sleep and food and testifying under duress.  According to Prystash's 2005 federal petition, he was deprived of sleep and beaten during interrogation.

**B.    In Violation of the Sixth Amendment and Fratta's Due Process Rights Trial Counsel Failed to Impeach Gipp and the State's Case with Evidence that Law Enforcement Continued to Threaten Gipp with Charges of Capital Murder in Order to Extract Testimony.**

Over a period of five months, Gipp declined to provide the State with the type of incriminating evidence that State needed to convict Fratta.  To obtain incriminating evidence, the State threatened to prosecute Gipp.  However, the State realized that using the hammer of capital charges to extract incriminating evidence would undermine Gipp's credibility.  As a result, when the State brought Gipp before a Grand Jury, the State did not leave a record indicating that the Grand Jury was convened to consider capital charges.  The State then misleadingly announced in court in front of the jury that the Grand Jury Gipp allegedly appeared before was merely considering whether to indict Gipp for the third degree felony offense of tampering with evidence in order to defuse what should have been, in any event, a thorough, and devastating impeachment of Gipp. Trial counsel, however, failed to pierce this obvious ruse and discharge the Sixth

Amendment obligation to defend Fratta.  Instead, trial counsel allowed the State to minimize the threats Gipp was under despite un-controvertible evidence that the threats actually being made to extract incriminating information literally put Gipp's life at risk.

Trial counsel knew that the State considered Gipp a suspect in a capital murder scheme.  Trial counsel also knew and should have known that the State pressured Gipp with prospects of prosecution for capital murder to turn Gipp into a State's witness. Gipp, in fact, testified that she turned State's witness out of fear she would be indicted for capital murder.  This fear of capital charges appeared to be the exclusive motivation for her testimony against Fratta:

> 6 Q. (By Ms. Bradley) And I understand that, but
>
> 7 were you questioned by the grand jury in any way or did
>
> 8 you give a formal statement in response to that grand
>
> 9 jury subpoena?
>
> 10 A. I may have answered a question or two, I don't
>
> 11 know. They were basically going to, you know, charge me
>
> 12 with capital murder.

27 RR 85

However, on cross examination, trial counsel failed to press Gipp on why she felt she faced the possibility of capital murder charges, failed to ask who had threatened her with possible prosecution for capital murder and failed to impeach her for testifying in order to save her own skin.  Instead, trial counsel took that State's minimization of the threats levied against Gipp at face value, thereby inexcusably foregoing the opportunity

to impeach Gipp and impeach the integrity of the State's case with proof of prosecutorial misconduct.

> **C.      Trial Counsel Allowed the State to Mislead the Jury about Offers of Immunity and to Minimize Threats of Prosecution Against Key Witnesses depriving Fratta, thereby, of his Sixth Amendment Right to Effective Assistance of Counsel.**

In violation of Due Process, the State misled the jury and the court into believing that the State had only threatened Gipp with indictment for a third degree felony charge of tampering with the evidence.  The State also may have misled the jury into believing that the State had only offered Gipp immunity against this third degree felon charge of tampering.  However, documents available to counsel show that Gipp and her brother invoke the Fifth Amendment on the belief that that they might be implicate in Farah's capital murder.  Assistant DA Rizzo filed a motion to compel; Judge Mary Bacon ruled that Gipp and her brother had immunity only with respect to the tampering with evidence charges.  She did not afford immunity against the possibility of a capital prosecution. Gipp could therefore be forced to testify only about what she knew about tampering with the evidence.  The state file a motion and Court granted immunity against tampering. However, after the motion was granted, the State and Gipp came to an agreement that any oral statements she made would not be used against her, thereby, effectively immunizing her from prosecution for any offense arising from Farah's murder.

Gipp's own testimony at retrial (discussed above in Section B) and Gipp's statements to CBS news reporters after retrial confirm that she testified to avoid capital murder charges.  *48 Hours: Thou Shalt Not Kill*.  Trial counsel, however, allowed the

State to "correct" Gipp's testimony even though documents available to trial counsel before retrial (namely, HCSO incident reports) show that the State did not have evidence of tampering until after Gipp and her brother were summoned on March 1, 1995, to give testimony before the Grand Jury.

HCSO reports provided to defense counsel prove that the State had no reason to charge Gipp with tampering with the evidence before March 1, 1995. Before this date, the State did not have not have evidence that she had erase phone messages or hide destroyed physical evidence. HCSO reports show, instead, that Gipp was the sole source of information supporting a tampering charge (namely, for allegedly disposing of casings she said she saw Prystash empty from a revolver on the night of the murder), and that she provided this information after the March 1, 1995, Grand Jury session.

A report by Detective Roberts, confirms that on March 3, 1995, Gipp appeared at the office of Assistant District Attorney Dan Rizzo with her attorney, George Parnham. Also present was Detective G.R. Roberts. According to Roberts, Gipp "gave an oral statement as to what she would say before the Grand Jury" if she were ever summoned again. What Gipp said is unknown, because Roberts did not take any notes about what Gipp told prosecutor she would say. (The departure from usual HCSO practice strongly indicates that Rizzo instructed Roberts not to take notes.) However, Roberts **did** memorialize the fact that the Rizzo offered Gipp not only transaction immunity, but use immunity for all statements that she made and effective against all charges. According to Roberts, "[t]here was an oral agreement between the parties that everything she said orally to us would not be used against her." *Id.*

45

The meeting at Rizzo's office with Rizzo ended with Gipp agreeing to meet with Roberts and Rizzo the next day, March 4, 1996, at the Sheriff's Department. Gipp and the State agreed that if the State was satisfied with the written statement, Gipp would not have to testify in front of the Grand Jury. On March 4, 1996, Gipp, Parnham, Roberts and Rizzo gathered at the Sheriff's Department and Gipp provided a written statement, which her trial testimony later paralleled, that included the hearsay from Prystash implicating Fratta. The statement also contained Gipp's tales about seeing Prystash with a gun when he returned the night of the murder, about Gipp hiding and eventually discarding the casings Prystash removed from the gun, and about Gipp writing down the gun's serial number on a blue sticky note. At the March 4, 1995, meeting Gipp also produced the blue sticky note in the zip lock bag she later testified she had stored from the night of the murder until turning the blue sticky note over to her attorney shortly before her March 4, 1995, proffer.

There is no record indicating that Gipp was summoned after March 1, 1996, to appear before a Harris County grand jury. In fact, part of the deal she struck with prosecutors was that she would not have to testify before a grand jury if she signed a written statement memorializing her oral proffer of information about Farah's murder. Robert's HCSO report clearly documents this term of the deal. The timing of the March 1, 1996, grand jury appearance and Detective Roberts' and Wedgewerth's memorialization of the fact that Gipp *first* told her tale of disposing of evidence (namely, the shell casings) on March 3-4, 1996 (after the appearing before the grand jury), at ADA Rizzo's office and the Lockwood police station further solidifies the conclusion that Gipp

was offered broad immunity and that the State's assertions to the jury in open court that Gipp only got immunity against prosecution for tampering with the evidence were false and misleading.

Absolutely clinching the conclusion that the State was intentionally misleading the jury about the extent and nature of the deal for testimony struck with Gipp is the fact to create this misrepresentation the State insinuated that a Harris County grand jury was looking only into tampering with evidence charges against Gipp.  However, police reports show that Gipp took the Fifth, on March 1, 1995, which was the only time she dealt with a grand jury.  If she had been offered immunity for tampering for the evidence, there would no need for her to take the Fifth or appear at all before a grand jury looking into tampering with the evidence charges.

Gipp's invocation of her Fifth Amendment rights, along with Roberts' police reports describing the immunity deal Gipp got, constitute solid proof, all disclosed pretrial to Fratta's defense, that the State's declaration in front of the jury that Gipp only faced tampering charges and only received immunity against prosecution on this charges was false and misleading.  Reasonable counsel would have surmised that no attorney would allow a client so closely associated with evidence and suspects of capital murder to make a proffer or statement without assurance that the client would not be prosecuted for capital charges.  Indeed, reasonable attorneys would have pried into the undocumented dealing for broad immunity in exchange for incriminating evidence that unquestionably took place behind the scenes between Gipp's attorney and the State.  Had trial counsel done, trial counsel would have been able to impeach Gipp and the State's entire case with

47

proof that the State had promised broad immunity for Gipp to her attorney, and would have been able to show an agreement was struck to keep Gipp in the dark to the extent possible so the State could mislead the jury into believing that Gipp had been promised very little, relative to her criminal exposure, for testimony incriminating Fratta and his codefendants.

However, trial counsel failed to demand disclosure of all dealings between the State and Gipp's attorney including disclosure of oral dealings for immunity in exchange for Gipp's testimony, failed to demand a hearing to which Gipp's attorney, ADA Rizzo, Detective Roberts and others, could be summoned to testify regarding the deal Gipp received for testimony, failed to summon Gipp's attorney to trial so that he could be examined before the jury about his dealings with the State for immunity, and failed to cross examine Gipp, too, about her understanding of the extent and nature of the immunity she believed the State had promised in return for evidence incriminating Fratta and his codefendants.  As a result, trial counsel failed to impeach Gipp's credibility and failed to impeach the integrity of the State's case.  Instead, of casting serious doubt Gipp's credibility and her motive for testifying and instead of showing that the State was manipulating and misleading the jury about the circumstances under which the State procured evidence from Gipp, trial counsel bought the State's version – merely immunity against tampering charges – at face value.  Trial counsel did not have a strategic reason for the omissions and failures catalogued above.  Reasonably confident trial counsel would have taken the measured trial counsel failed to take in order to exclude or impeach the testimony of the State's key witness and the integrity of the state's case.  Trial

counsel's performance was therefore deficient under *Strickland v. Washington*, 466 U.S. 688 (1984).

### D.     Foregoing Errors of Trial Counsel Were Prejudicial under *Strickland v. Washington*, 466 U.S. 688 (1984).

Had trial counsel effectively investigated the actions and tactics identified above that police and prosecutors used to extract information from Gipp, trial counsel would have been able to support and present a meritorious motion to exclude Gipp's testimony entirely on the ground that it was the product of police and prosecutorial misconduct that violated Due Process.   Trial counsel would have also been able to impeach the State's manner and means of assembling its case and discredited its key witness.   Without believable testimony from Gipp the State would not have had a chance of proving its capital murder allegations, either the murder for hire theory or the burglary/murder theory or the law of the parties allegations added to the jury charge.  In light of the State's bare-boned case for every theory in the indictment and charge (*see* Claim Eight below, the evidence and argument for which is incorporated by reference), the consequence of trial counsel's deficient performance were prejudicial under *Strickland*.   Had trial counsel not performed deficiently, and had instead, exposed the police and prosecutorial misconduct described above, and which additional investigation and discovery is calculated to further document, it is reasonably probable that a juror would have refuse to find that the State proved any of its theories of capital murder.   This Court should therefore order relief granted.

## CLAIM FOUR

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT
RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL,
TRIAL COUNSEL FAILED TO IMPEACH GIPP WITH
HER PRIOR INCONSISTENT STATEMENTS.**

Transcripts of Gipp's testimony at the 1996 trials of Fratta, Guidry and Prystash,
and transcripts of her testimony at Guidry's 2007 retrial, are rife with serious
contradictions and omissions.  For example, at Guidry's 2007 retrial, Gipp testified that
when first contacted by Sheriffs, she wanted to testify against Prystash, refused, out of
fear, to provide a statement to officers right away, but promised them she would provide
testimony to a grand jury.

> Q. …. Back in 1994 when you were first contacted by the
> Harris County Sheriff's Department the first time they came
> to your house, were you initially cooperative with them?
>
> Q. Why not?
>
> A. Because I was scared.
>
> Q. Did you want to provide information on Joe Prystash?
>
> A. Yes, but I told them when they came the first time that I
> would talk to them in front of a grand jury.
>
> Q. I'm sorry.
>
> A. That I would talk to them – they told me that I would have
> to go in front of a grand jury.

*State v. Guidry* [2007 retrial] 21 RR 44.

At no other trial (original trials of codefendants in 1996 or Fratta's retrial in 2009) did
Gipp testify she informed Sheriffs straightaway that she was willing to testify before a

grand jury, and HCSO reports drafted by Detective Roberts showed Gipp was lying, one way or the other.

Trial counsel could have impeached Gipp with the following inconsistencies, contradictions and false statements:

> ☐ WHETHER SHE SAW PRYSTASH WITH MR. GUIDRY AFTER THE ALLEGED CRIME: At the second trial, Gipp admitted she previously testified falsely that she saw Mr. Guidry go into his apartment after he allegedly returned from Fratta's house. *State v. Guidry* [Retrial] at 21 RR 75. But Gipp said when interviewed by police in January of 1996, she told police when Prystash came home that night, he was not with Guidry. *See* 01/23/96 Interview of M. Gipp by Lisa Milstein at page 2.

> ☐ REGARDING THE DESCRIPTION OF THE GUN: In her March 4, 1995, statement to the police, Gipp testified the gun "had a cylinder and had a silver finish." See 03/04/95 Gipp Statement, p. 2. She also testified the gun had "wooden grips." Id. During the second trial, however, Gipp testified the grips on the gun were black. *State v. Guidry* [Retrial], 21 RR 58:5-7).

> ☐ REGARDING THE TIME SHE ARRIVED HOME ON THE NIGHT OF THE ALLEGED CRIME: In Gipp's March 4, 1995, statement to the police, she stated she "came home from work about 5:30 p.m." See 03/04/95 Gipp Statement, p. 3. During the second trial, she testified she returned home at 4:30. *State v. Guidry,* [Retrial] 21 RR 47-48.

> ☐ REGARDING THE SHELL CASINGS: In Gipp's March 4, 1995, statement to the police, Gipp testified she either watched Prystash throw the gun casings in the garbage, or Prystash later told her he threw the casings in the garbage. See Ex. 19 (03/04/95 Gipp Statement). During the second trial, however, Gipp stated Prystash took the bullet shells or casings out and dumped them in his hand. See *State v. Guidry* [Retrial] 21 RR 56:21). She said that "after he put the gun between the clothes, he left the room and walked into [her]

kitchen and [she] followed him out and he threw the casings into [her] garbage." Id. at 57:16-19.

□ REGARDING HER CONVERSATION WITH MR. GUIDRY ON THE NIGHT OF THE ALLEGED CRIME: During the second trial, Gipp testified she asked Mr. Guidry when she got home where Joe was; See Ex. 11 (*State v. Guidry* [Retrial]  21  RR 48:20-49:2). During the March 4, 1995, statement to the police, she stated that Guidry asked her where Joe was. See 03/04/95 Gipp Statement, p. 3.  At Fratta's retrials, Gipp said she just walked past Guidry

□ At Guidry's retrial, Gipp testified that when police first came to her apartment she refused to give them a statement, but told them she was willing to go before a Grand Jury and tell the Grand Jury what she knew about the murder of Farah Fratta.  However, Detectives Roberts notes reveal that Gipp did give a statement to police that exonerated Prystash by informing police that Prystash was with Gipp and her brother Keith watching an ice skating show the night the murder took place. According to Robert's report Gipp did not volunteer to testify before a grand jury, and she did not tell Roberts that she would tell the grand jury what she knew about the crime. Gipp told Roberts that she would tell the grand jury, if summoned, exactly what she told Roberts, namely, that Prystash was with Gipp and her brother watching T.V. the night of the murder.

Gipp's March 1995 statement to the police and her January 1996 interview memorandum existed at the time of the second trial and were available to trial counsel. Thus, trial counsel could have used these statements to impeach Gipp's testimony at trial. Roberts' police reports were also available to trial counsel, as was her testimony at Guidry's 2007 retrial.  However, trial counsel either failed to investigate Gipp's previous statements or failed to impeach her with these inconsistencies.  Either way, trial counsel's performance was ineffective.

## B.     Deficient Performance

"It is hornbook law that evidence of prior inconsistent statements of a witness may be admitted to impeach that witness." *United States v. Sisto*, 534 F.2d 616, 622 (5th Cir. 1976).   "Counsel's failure to introduce evidence that contradicts a key witness's trial testimony is patently unreasonable." *Moore v. Sec'y Penn. Dep't of Corr.*, 457 F. App'x 170, 182 (3d. Cir. 2012); *see also Harris v. Artuz*, 100 F. App'x 56, 58–59 (2d Cir. 2004); *Berryman v. Morton*, 100 F.3d 1089, 1098 (3d. Cir. 1996).

In *Moore*, the Court found that one of three key witness's trial testimony could have been impeached via a prior inconsistent statement. *Moore,* 457 F. App'x at 182. Counsel was "unreasonable" in failing to do so. *Id.*   In *Berryman*, the court found there "is no way in which the failure to confront [the key witness] with her prior inconsistent identification testimony can be justified as sound trial strategy or a reasonable strategic choice." 100 F.3d at 1098 (quotation marks omitted).   Indeed, the Court found that such behavior "borders on the inconceivable." *Id.*   In *Harris*, the court found that there was "no tactical justification for counsel's" failure to impeach a key witness with a prior inconsistent statement. 100 F. App'x at 58–59.

Failure to impeach a key witness is, therefore, deficient within the meaning of *Strickland*, which entitles a defendant to reasonably competent attorney.   Gipp was the State's most important witness.   Her testimony at retrial was critical to the jury's decision to convict.   However, trial counsel failed to attack Gipp's credibility by impeaching her with inconsistent statements.   Trial counsel performance, therefore, fell below reasonable professional standards in violation of *Strickland*'s first prong.

### C.   *Strickland* Prejudice

Gipp's inconsistent and contradictory prior statements bear directly on the credibility of Gipp, the State's most important witness.  Gipp's 2007 testimony shows that she was willing to lie and mislead the jury in order to bolster her own credibility and aid the prosecution's case.  With a competent cross, or by calling Robert's as a rebuttal witness, trial counsel could have exposed Gipp's fallacious claim that she wanted to help police from the start but was too scared to inform on Fratta and his codefendants. Competent counsel could have demonstrated that Detectives questioned Gipp time and time again and that she stuck with her story for months – nearly half a year – and insisted that Prystash was with her when Farah was murdered.

In conjunction with cross examination regarding the mental and physical abuse at the hands of police, and gratuitous invasions of her home and destruction of her property, competent counsel could have completely changed the picture of Gipp that the State tried to frame.  Instead, of allowing the State to portray Gipp a witness who refused to testify out of fear of the defendants, and now remorseful over her failure to speak out at the beginning to save Farah, competent counsel would have shown that because of abusive police tactics and threats of capital and criminal prosecution, levelled not just at her but also her brother, Gipp lying about her motives for testifying and was actually in fear of police and prosecutors.

It was vitally important for trial counsel to cross examine Gipp's testimony about the gun she said Prystash returned to her apartment with the night of the murder.  Gipp testified at Fratta's retrial (just as she had at the original trial) that she handled the

weapon, lifted it out its case, and examined it closely to record, so she claimed, the serial number and the make of the revolver. However, she initially said Prystash returned with a silver gun with wooden handles. This describes a completely different weapon than the black Charter Arms Special traced to Fratta. Competent counsel would have crossed Gipp on whether police or prosecutors showed her a gun-lineup like the one they showed Lex Bacquer in order to shape her testimony, described the gun to her, "corrected her testimony," or by any other means skewed and shaped her testimony about the gun she say. A reasonably competent counsel would have pressed Gipp on why she changed her testimony, how she supposedly caught her supposed mistake, and pressed her on who brought the supposed mistake to her attention. Trial counsel failed to even ask if police or prosecutor showed her the gun they claimed was the murder weapon, or a depiction of it, after she initially described a different gun.

Together with evidence that the State and Gipp had made false and misleading jury speeches and given false and misleading testimony about Gipp's immunity deal, with proof that the State had molded Gipp's testimony to avoid exclusion on grounds of unreliability (see Claim 1 above), and with proof that Gipp had lied about her willingness to testify about the crime in front of a grand jury, competent counsel would have completely undermined Gipp's credibility as a witness. Since Gipp was key to convicting Fratta, the failure of trial counsel to use available inconsistent and contradictory statements was prejudicial. Had trial counsel cast serious doubt on Gipp's accuracy and veracity, it is reasonably probable that at least one juror would have harbored severe doubts that Gipp was truthful about the gun she saw, truthful about

writing down the serial number information the state used, and truthful about anything Prystash supposedly told her about the murder. Such jurors would not found that Fratta was guilty beyond a reasonable doubt, particularly in light of the State's thin to non-existent proof of essential facts the jury had to find in order to convict in accordance with the jury charge (*see* Claim Eight below, the argument and evidence for which is incorporated herein by reference). Trial counsel's deficient performance therefore prejudiced Fratta in violation of *Strickland*. This Court should therefore order relief.

## CLAIM FIVE

### IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL TRIAL, COUNSEL FAILED TO SPONSOR EVIDENCE IMPEACHING HEARSAY DECLARANT, JOSEPH PRYSTASH'S, CREDIBILITY.

Because trial counsel had transcripts from the first trial, they knew in advance that the State would attempt to get Prystash's hearsay statements to Gipp into evidence. It was essential that trial counsel take all reasonably competent measures necessary to exclude this incredibly damaging hearsay, and to cast doubt on the credibility of the hearsay declarant, i.e., Prystash, were the trial court to allow the hearsay testimony. However, instead of developing evidence to show that the testimony violated Rule 403 and Due Process, trial counsel erroneously relied on inapplicable law, and failed to develop evidence impeaching Prystash.

**1.    Counsel failed to develop evidence demonstrating that Prystash was too incredible for the court to admit his out of court statements consistent with Due Process or the Texas Rules of Evidence.**

Because retrial took place after the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004), Fratta's right to confront and cross-examine the witnesses against him under the U.S. Constitution's Sixth Amendment's Confrontation Clause was not implicated if a hearsay statement is non-testimonial in nature and bears adequate indicia of reliability. *See Woods v. State,* 2011 WL 1258562 (S. D. Tex. 2011) (citing *Woods v. State*, 152 S.W.3d 105, 113–14 (Tex. Crim. App. 2004)).   It was therefore incumbent upon the defense to attack the reliability of the alleged source of the hearsay, Prystash, as well as the reliability of the witness called to introduce out of court statements.  However, trial counsel failed to bring to the trial courts attention a wealth of information impeaching Prystash's reliability and impeaching Gipp's

The evidence impeaching Prystash falling in the following categories therefore need to be gathered and further substantiated. **First**, there is evidence that Prystash suffered from severe mental illness and mental disabilities.  Leads to this evidence were available. Prystash's federal habeas pleadings raise discuss mitigating evidence including the fact that Prystash may suffer from schizophrenia. *Prystash v. Quarterman*, ** (S.D. Texas), Dkt. Entry 1-1, Petition for Writ of Habeas Corpus at 32-33 ("*Prystash 2005 Fed. Writ*").  The usual course of this disease is includes manifestations and effects beginning in men in their late teens and twenties.  Prystash would therefore have been affected by mental illness at the time he allegedly made incriminating hearsay remarks to Gipp.

**Second,** the same federal habeas pleadings indicate that Prystash may have suffered from fetal alcohol syndrome. *Prystash 2005 Fed. Writ* at 32. The effects of this syndrome, needless to say, would have manifested themselves before trial. Like mental illness, mental disability caused by exposure to high levels of alcohol in utero would cast doubt on the validity and accuracy of Prystash's statements. **Third**, Prystash had a history of criminal conduct that impeached him as a witness. However, trial counsel did not develop or use this evidence to challenge the admissibility of the hearsay Prystash supposedly relayed or to challenge the reliability of those statements once they court allowed them into evidence.

Gipp was Prystash's lover at the time of the murder. 27 RR 12. The two shared an apartment. Gipp testified that she worked at Greenway plaza and provided income, food, transportation and shelter to Prystash. 27 RR 9. Prystash was unemployed and destitute. Prystash was in his 30s (27 RR 8) but did not have a home or apartment of his own. When Prystash was not sleeping with Gipp, he stayed with his father in Cut and Shoot, Texas, in a home without a telephone. 27 RR 11. Gipp had to buy Prystash a pager in order to communicate with him. 27 RR 11. Prystash's only independent source of income appears to have been violent criminal activity, including murder for hire. See 03/04/95 Statement of Mary Gipp. In a statement ultimately given to police to secure immunity, Gipp relates that Prystash had told her that he had killed one or two other men in an office, and been paid for the homicide by a man named Planter. *Id.*

## CLAIM SIX

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHTS, TRIAL COUNSEL FAILED TO EXCLUDE AND IMPEACH THE TESTIMONY OF STATE WITNESSES JIMMY PODHORSKY, JAMES RAY THOMAS, MIKE EDENS AND OTHER STATE'S WITNESSES**

Because of flagrant constitutional violations committed at Fratta's original trial, which compelled this Court to grant habeas relief in 2005, Fratta was not retried until 15 years after Farah's murder.  Many of the deputies and detectives who investigated the case had retired.  Witnesses had aged and memories were not fresh and vivid.  However, trial counsel failed to voir dire State's witness regarding their personal knowledge. Instead, too often, trial counsel allowed the State to lead its witnesses when, because the State's unconstitutional actions at the original trial caused delay, giving the state any leeway would have been an abuse of discretion.   As additional investigation and discovery is calculated to further document, (i) witnesses no longer had personal knowledge regarding matters they testified to at Fratta's retrial, and (ii) had trial counsel taken steps to ensure that witnesses were only testifying from personal knowledge trial counsel would have been able exclude key statements, if not the entirety of the testimony that the aforementioned witnesses and others gave at trial.

Trial counsel also failed to impeach the aforementioned witnesses, and others, with inconsistencies and additions and amplification in their testimony. Trial counsel could have but failed to show that the 2009 testimony of these witnesses diverged in material respects on critical points.  Inter alia trial counsel failed to impeach Podhorsky,

Ray Thomas and Eden with lack of personal knowledge and inconsistent testimony regarding,

- Fratta's statements to each respective witness

- Fratta's demeanor, including, but not limited to, his seriousness when soliciting murder

- The circumstance under which any one of them spoke with Fratta

- The witnesses' respective reactions and feelings on occasions they spoke to Fratta

- The witnesses' recollections about Farah or each other

- Expressions or admissions to the prosecutor about lack of memory

- Preparation or coaching of each witnesses testimony by the prosecutors.

Had trial counsel not failed to test and impeach the aforementioned witnesses, and others, trial counsel would have undermined the State's evidence, inter alia, about Fratta's solicitations.   Trial counsel had good reason to believe that the State was illegitimately amplifying the witnesses' testimony in light of the Fifth Circuit's conclusion that evidence Fratta solicited others was weak circumstantial evidence that he engaged in a murder for hire scheme involving the Prystash and Guidry as specifically alleged in the indictment.

In light of the fact that the State was prevented at retrial from introducing custodial confessions in violation of the Constitution and was unable to introduce false ballistic

evidence that it sponsored at the original trial, trial counsel should have anticipated and prevented the State from introducing and supplementing the testimony of the aforementioned witness or striven to impeach their actual recollection and accuracy.  Had trial counsel done so, it is reasonably probable one or more jurors would have harbored reasonable doubts that Fratta committed any crime alleged in the indictment particularly in light of the State's already bare boned case (*see* Claim Eight the argument and evidence for which is incorporated by reference).  Trial counsel's failures therefore were deficient and prejudicial under *Strickland*.

## CLAIM SEVEN

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHTS, TRIAL COUNSEL FAILED TO EXCLUDE INFLAMMATORY TESTIMONY THAT FRATTA FORCED HIS WIFE TO ENGAGE IN DEVIANT SEX ACTS INCLUDING DEFECATING IN HIS MOUTH, URINATING ON HIM AND CHOKING HIM WHILE HE MASTURBATED.**

In considering whether evidence should be excluded under 404(b), courts should consider whether (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

In Texas, the test for the admission of 404(b) evidence is two pronged. First, the court must determine if the extraneous offense is relevant to a material issue in the case

other then the defendant's character. Second, the evidence must possess probative value that outweighs its inflammatory or prejudicial effect. *Clark v. State*, 726 S.W.2d 120, 122 (Tex.Crim.App.1986); Van Brown v. State, 771 S.W.2d 218, 221 (Tex.App.—Houston [1st Dist.] 1989, review refused).

In March of 1992, the Frattas filed for divorce. 22 RR 40.  December of 1993, Fratta's divorce attorney, Ray Epps, deposed Farah Fratta.  22 RR 117.  During the deposition, Epps asked Farah about the allegation of cruelty in the divorce pleadings. Farah testified that Fratta compelled her to engage in coprophagia and urophilia. According to Farah's deposition testimony the couple would urinate on each other in the bathroom on a regular basis and Fratta required Farah to defecate in his mouth.

Trial counsel invoked Texas Rules of Evidence 401, 403 and Rule 404 to try to prevent the introduction of this testimony.  The State argued secondly that Farah's deposition testimony was admissible through her divorce attorney, Beeler, because it was not offered for the truth of the matter asserted. The State argued secondly that the statements were admissible under 404(b) to show motive.  The theory underlying both arguments was that the allegations, whether true or not, gave Fratta a motive to kill Farah. According to the State, Fratta's motive for killing his wife was to prevent the allegations from going public and to prevent his small children, in particular, from learning of Farah's allegations.

1.     **In violation of Fratta's Sixth Amendment Right to effective assistance of counsel, trail counsel failed to exclude testimony by Farah Fratta's attorney, James Ronald Beeler, that Farah deposed about the  couple' coprophagia and  urophilia and erotic asphyxia.**

Trial counsel failed to object that introduction of Farah's deposition testimony through Beeler would violate Fratta's Due Process right to a fundamentally fair trial, failed to insists that the State demonstrate through *voir dire* that the State could link testimony     through James Ray Thomas to a motive and failed to object under Rule 804 of the Texas Rules of Evidence when it became apparent – because Ray Thomas expressly said so – that Ray Thomas did not and could not remember that Fratta made comments about engaging in anything except "some kind of sexual behavior." 26 RR 124.

James Ronald Beeler represented Farah during divorce proceeding beginning in approximate June of 1993.  Fratta initially was representing himself.  Later he retained an attorney named Ray Epps.  The State called Beeler in order to introduce testimony that Fratta had compelled his wife to engage in deranged sexual acts.   Beeler testified that during the December 1993 deposition,

19 A. The statement that Farah made was that Bob

20 would request her to go into the bathroom and then they

21 would engage in sexual activities that were strange.

22 Q. (By Ms. Bradley) What did Farah say that the

23 defendant wanted her to do specifically?

24 A. To defecate in his mouth, urinate on him, choke

25 him while he was masturbating.

25 RR 118-119.

The theory under which this information was allegedly admissible over TRE 403 and 404(b) objections was that Fratta's motive for killing his wife was to prevent his supposed attraction to these activities, known as coprophagia, urophilia, and erotic asphyxiation, from becoming public or being revealed to his small children.

Beeler himself could not provide any evidence supporting the State's theory that Fratta's alleged motive for the murder was specifically to prevent the disclosure of coprophagic and urophilic activity in public or to the children at the trial scheduled for November 18, 1994.   During the presentation of Beeler's testimony, the trial court indicted that the State needed to demonstrate through some witness that Fratta had expressed or shown concern – not about being accused of engaging in bizarre sexual behavior – but concern that Farah's deposition testimony would be repeated at trial.

2 MS. BRADLEY: …And it's our opinion, and the evidence,

3 I think, bare out the fact that he believed that that

4 information was also going to come out in that trial

5 should that trial take place.

6 THE COURT: And the State has evidence that

7 Mr. Fratta made these comments to some witness that he

8 was concerned about this information --

9 MS. BRADLEY: Yes.

10 THE COURT: -- coming out in the course of

11 the trial, the divorce trial?

12 MS. BRADLEY: Yes.

Beeler could not testify that Fratta was in the least worried about eventual disclosure at trial.  Instead, Beeler's testimony undermined the theory that a motive for murder was to prevent disclosure of sexual strange sexual proclivities.  According to Beeler, Fratta openly proposed arranging an "open marriage" in which Fratta had Farah had multiple partners and double dated with Fratta's father-in-law and was not concerned about losing custody of the children.  Furthermore, Beeler expected the divorce to be resolved amicably without going to trial.  Beeler also testified that by the time of the December 1993 deposition, Fratta's position had hardened, but not because he got wind that Farah was going to expose alleged depraved sexual activities, but because he had retained Ray Epps to represent him.

Because Beeler could only establish what Farah said in deposition and nothing probative about the motive for murder – i.e., to prevent disclosure of Fratta's perversions in a public trial -- the State proffered the testimony of a later witness, James Ray Thomas, to allay the Court's concern that the inflammatory recounting of Farah's description of having to engage in cruel and unusual sexual conduct would be made probative upon being linked up with other evidence.  Thus, the State averred that Ray Thomas would testify that **five months** before the November 1994 divorce trial "Bob got real mad **one time** when he told me that Farah made a statement about his kinky sex habits," and furthermore, would specifically state that Fratta "told me that she said: Bob would want

65

her to get on top of him and shit in his mouth and he would eat it. Bob denied this and he never told me that he would do anything like this."  26 RR 114-115.

However, the promise to provide a link up that rendered Beeler's testimony did not materialize.  Ray Thomas testimony was inadmissible, because he did not and could not testify that he recalled Fratta ever say that Farah had complained in her deposition of having to do specific sex acts.  Ray Thomas could not even testify that Fratta grew angry. All Ray Thomas could remember at retrial was that Fratta appeared **upset**, **one time**, **five months before trial**, when he told Ray that in deposition Farah had mentioned "some kind of sexual behavior."  26 RR 124.

### 2. Trial counsel failed to preclude testimony of James Ray Thomas who admitted that he did not have an independent recollection of hearing Fratta mention specific deviant sexual acts in any context.

Ray Thomas was essential to the State's theory that the motive for the killing was Fratta's desire to prevent Farah's allegation regarding coprophagic and urophilic conduct from becoming public knowledge and revealed to the children.  Without Ray Thomas's testimony, the State could not show that testimony by Beeler or Ray Thomas related to specific sexually deviant acts (As used herein, "specific sexually deviant acts" refers to or is short hand for evidence or references to the alleged facts that Fratta made Farah defecate in his mouth, urinate on him and choke him while masturbating.) was in the least bit relevant.[4]

---

[4] The State's theory that Farah's deposition statements that Fratta made her defecate in his mouth, urinate on him and choke him while masturbating were  admissible to show motive has all the earmarks of a false pretense to get around rules of evidence (TRE 401-403) requiring relevance, especially where testimony is inflammatory.  First, the state did not advance this theory at Fratta's original 1996 trial. Second, there was ample evidence at the 2009 retrial

Trial counsel failed to take Ray Thomas on voir dire, and failed to object under Texas Rules of Evidence 602 and 802 that despite the State's attempt to prepare him with transcripts from the original trial, Ray Thomas had no recollection at all, and therefore no personal knowledge, of any statement by Fratta regarding Farah's allegations in the December 1993 deposition that Fratta made her defecate in his mouth, urinate on Fratta or strangle Fratta while Fratta masturbated.  Trial counsel failed to take these preventative measures although Ray Thomas expressly stated that he could not recall what Fratta said even after reviewing testimony he gave in 1996.

> 6 **Q**. (By Ms. Bradley) Is that what he told you?
>
> 7 **A**. Seems like he did, but, like I said, I have
>
> 8 read it in the statement. I just don't really remember
>
> 9 it. **You know, if I was being honest, I don't remember**
>
> 10 **him saying that, but we did talk about something, some**
>
> 11 **kind of sexual behaviors that he was upset about.**

26 RR 124.

Ray Thomas testified that later in the summer Fratta spoke angrily about the upcoming divorce and that one occasion Fratta said, apparently referring to himself, you need to do something about it while he pulled a gun from under the seat of his car.  Ray

---

showed that Fratta's disposition and behavior during the six month period immediately after Farah's deposition was not attributable in the least to fear or anger that Farah would expose his alleged indulgence in coprophagia, urophilia or erotic aspyxia.  Ray Thomas's testimony and statements by others, including Beeler, show that Fratta was very open about exploring non-standard sexual liaisons and was taking advantage of his separation from Farah by undisguisedly increasing his social activities, dating numerous women, and apparently experimenting with bisexual and transgendered relationships.  Third, the theory hinged on testimony (**that never materialized on retrial**, as shown below) that "on one occasion," approximately four months before the divorce trial, Fratta supposedly became angry as he told Ray Thomas that in a deposition six months earlier Farah had said made her defecate in his mouth, urinate on him and choke him while masturbating.

Thomas advised Fratta "to go see a counselor or doctor or something" because of the anger. 25 RR 46.  The State could introduce general anger as a motive based on Ray Thomas testimony, but could not introduce inflammatory bad acts under the ruse that Fratta killed Farah to prevent allegations of sexual abuse, and coprophagic and urophilic conduct from coming out at trial.

3. **The State mislead the trial court into admitting testimony about inflammatory sexual conduct through predicate witness, Beeler, although the State realized that it had  no means for establishing through link-up witness, Ray Thomas, that these allegations of sexual deviant activities motivated the  murder; however, in violation of Fratta's Sixth Amendment right to effective assistance of counsel, trial counsel failed to take measures to prevent the State from trampling Fratta's right to a fair trial, failed to impeach Ray Thomas and failed to impeach the integrity of the State's case.**

The State intentionally introduced through Beeler evidence that Fratta compelled Farah to engage in three types of sexual activities: coprophagia, urophilia and erotic asphyxiation – the very description of which would be inflammatory to an ordinary juror. However, the State knew that link-up witness, Ray Thomas, did not have personal knowledge that Fratta mentioned any of one of these three activities.  Indeed, when it came time for Ray Thomas to link up, and thereby render relevant, Beeler's inflammatory testimony about these three types of sexually deviant behaviors, the State announced that Ray Thomas would only testify that in the summer of 1994, as the divorce trial got nearer, Fratta told him that at the 1993 deposition Farah had alleged Fratta engaged in only one of these activities, namely, coprophagia.  Moreover, Ray Thomas testimony revealed he did not have personal knowledge that Fratta had engaged in or ever

mentioned coprophagia to him either.  The following conclusions are, therefore, clearly demonstrable:

i.      On the ground that Ray Thomas would provide evidence that with the divorce trial getting nearer Fratta grew angry as he told Ray Thomas that Farah had accused him of engaging in specific kinds of sexual misconduct – coprophagia, urophilia and erotic asphyxiation - the State convinced the trial court to admit Beeler's testimony that Fratta made Farah urinate on him, choke him while he masturbated, and in general engaged in "sexual cruelty."

ii.     However, the State knew, or should have known, that by the time of the 2009 retrial, Ray Thomas did not have personal knowledge that Fratta and Farah engaged in any specific sexually deviant acts did not personally know (or know in any other accepted sense of the term) whether Fratta had ever told him that Farah had accused him of engaging in, or mentioned any, specific sexually deviant acts; and

iii.    The State knew or should have known that Ray Thomas did not have personal knowledge of Fratta becoming angry when he allegedly told Ray Thomas about Farah's deposition testimony about coprophagia, urophilia and erotic asphyxiation, because Ray Thomas did not have personal knowledge of Fratta ever mentioning Farah's deposition testimony that Fratta made her shit in his mouth, pee on him and choke him while he masturbated.

69

iv.     Hence, the State's promise to show through Ray Thomas that Beeler's testimony was relevant and admissible because Ray Thomas would provide testimony showing that the explicit, specific types of sexual misconduct Beeler said Farah described at deposition were connected to a motive for murder was false and misleading.

**4.      Trial counsel's performance was deficient.**

Trial counsel failed to move the trial court for a voir dire of Ray Thomas to ascertain his personal knowledge either before Beeler testified or after Beeler testified but before Ray Thomas took the stand.  Furthermore, trial counsel failed to object pursuant to TRE 401 (relevancy), 403 (substantially more inflammatory), 602 (personal knowledge requirement), 804 (where witness available, past testimony cannot be introduced) or Due Process that Ray Thomas did not have personal knowledge even after Ray Thomas stated on the record that were he to testify honestly, he would have to say he could not recall Fratta talking about any specific deviant sexual acts, about anything Farah said at her December 1993 deposition, but just recalled nebulous, non-contextual comments by Fratta about  "some kind of sexual behavior that upset him."

Nor did trial counsel move to strike Beeler's testimony (*inter alia*, under TRE 401 or 403 and Due Process) after Ray Thomas testified that he honestly did not recall Fratta mention specific deviant sexual acts although Ray Thomas' actual testimony clearly showed that Beeler's testimony could not be rendered relevant through testimony the State had falsely assured the court Ray Thomas supposedly would supply.  Indeed counsel failed to cross-examine Ray Thomas regarding his memory and personal

knowledge although it was clear that Ray Thomas would have to deny that he had any recollection or any personal knowledge of Fratta mentioning Farah's deposition statements about specific deviant sexual acts and Ray Thomas would therefore have to deny he had personal knowledge of Fratta growing angry while (allegedly) he told Ray Thomas that Farah had accused him of engaging in or described specific deviant sexual acts.

### 5. Failure to exclude testimony referring to specific sexually deviant acts and testimony of "sexual cruelty" was prejudicial.

The introduction of such inflammatory statements implicating Fratta in grossly deviant sexual behavior that also involved sexual abuse and sexual assault against his wife violated Due Process. However, trial counsel failed to lodge a Due Process objection. Trial counsel also failed to object under Rule 804 of the Texas Rules of Evidence, which does not allow testimony of available witnesses, such as Ray Thomas, if they have no recollection, and therefore do not have personal knowledge (even after being prepared, as here) with prior statements. Trial counsel failed to request a hearing outside presence of the jury in which the link-up witness, Ray Thomas, could be examined to assess his ability to recollect Fratta's alleged statements about Farah's revelation of their coprophagic conduct, failed to investigate Ray Thomas before the retrial to ascertain whether he recollected the alleged statements and failed to object when the State announced its witness could only testify to coprophagia, and not the other deviant practices introduced through Beeler (urinating on each other, choking Fratta while he masturbated), and failed to object when it became clear that Ray Thomas, who

was the only person who could supply the alleged motive of anger at Farah's disclosure of coprophagia, said he could not remember Fratta saying anything about having his wife shit in his mouth so he could eat it, but only recalled Fratta making a statement about "some kind of sexual behavior."

### 6.    Harm done by Beeler's testimony was amplified by the Court's erroneous instruction to the jury.

The key to why the limiting instruction commanding jurors not to consider Beeler's statements about what Farah said in deposition for the truth of the matter asserted (discussed below) did not defuse harm is the fact that Beeler's testimony could not establish motive and was not meant to establish motive.  Yet the trial court **ordered** the jury to consider Beeler's testimony for precisely this purpose and trial counsel did not object.

As shown above, Beeler was called just to show allegations of sexual abuse (coprophagia, urophilia and erotic asphyxia) were made in Farah's December 1993 deposition.  The state had to show admissibility on grounds the allegations established motive through Ray Thomas, the State failed to do.  However, trial counsel failed to prevent the jury from considering Beeler's inflammatory repetition of Farah's deposition testimony and permitted the trial court to instruct the jury that they could consider the inflammatory deposition testimony that Fratta had Farah "defecate in his mouth, urinate on him, [and] choke him while he was masturbating" as motives for murder.

After the trial court ruled it would allow Beeler to repeat passages of Farah's inflammatory deposition testimony in front of the jury, trial counsel requested that the

court instruct the jury that jurors could not consider the statements that Fratta had Farah "defecate in his mouth, urinate on him, choke him while he was masturbating" for the truth of the matter asserted.  The Court agreed, but (**1**) trial counsel failed to request this instruction before the jury heard this inflammatory testimony, and then (**2**) <u>failed to object when the Court gave a different instruction that greatly magnified the harmful impact of this inflammatory testimony.</u>  Without objection the trial court instructed the jury as follows:

> 17 THE COURT: **Ladies and gentlemen of the**
>
> **18 jury, the testimony of this witness on the last two**
>
> **19 questions was offered for the purposes of aiding you, if**
>
> **20 it does aid you, in determining the motive**, if any.
>
> 21 MR. MCDONALD: And not offered for the
>
> 22 truth of the matter.
>
> 23 THE COURT: And it's not offered for the
>
> 24 truth of the matter asserted.

22 RR 119-120.

> ### a.   Testimony polluted the record with inflammatory evidence that Fratta was a deranged, sick pervert who cruelly and obscenely abused his wife.

The State's concession that the allegations Farah made in her December 1993 deposition were naturally incendiary shows that a prejudicial impact was a certainty.  Due Process and Rule 403 would obviously preclude the allegations that Fratta had Farah "defecate in his mouth, urinate on him, choke him while he was masturbating" unless

they were highly relevant.   Because of this, the lead prosecutor underscored their extremely inflammatory nature as proof that the allegations gave Fratta a motive to murder Farah.  Given this understanding, voiced by the lead prosecutor, the State should be estopped from claiming the introduction of this testimony was not prejudicial.

> **b.     Harm was amplified because the inflammatory related to obscene sexual misconduct, sexual abuse and sexual assault was wrongfully introduced by prosecutors with the knowledge it was inadmissible and unsubstantiated as a motive.**

State had considerable evidence that what agitated Fratta was the prospects of financial hardship, including the prospects of paying child support, but not agitated by the chance that Farah would testify about his specific sexual perversions.  Police interviewed George Batten who told deputies that "Bob was upset about the divorce and he talked about his money situation and he thought Farah would be an unfit mother." [*See* exhibit notebook attached to Fratta's 11.071 Application].

Fratta's coworkers – Mike Melton, Steel Powers, Brian Bennett, Michael Niglieri, Marc Faber, and Jerry Parker – all told police that what upset Fratta were the financial difficulties he thought the divorce would cause him and loss of custody over his children. Mike Melton also advised Deputies that "that Fratta was very upset and resentful about his upcoming divorce. Melton said Fratta was always saying how Farah was better off than him."  Melton said Fratta also complained about "paying for Farah's "Boob Job" on his credit cards and then she didn't pay him back."   *Id.* (HCSO Reports at 221; *See* exhibit notebook attached to Fratta's 11.071 Application).  Powers said he "frequently heard Fratta talking about the problems he was having with child custody. Powers said he

"heard Fratta talking about how Farah was ruining him financially." Powers also heard Fratta express distress his child support was limiting his eligibility with other women and mentioned specifically that "he met a girl at the gym, … [but] he couldn't get involved with the girl because of the child custody case." *Id.* 222. On the other hand, Fratta was not in the least concerned that his sexual deviance would be publicized and, instead, openly revealed he had "forc[ed] his wife to shit on a table." *Id.* Niglieri said Fratta was "bitter about the divorce and visitation." *Id.* 224. Faber said Fratta was "always talking about how his wife would take him to the cleaners." *Id.* 225. Parker told Deputies that "Fratta was tired of Farah squeezing money out of him," *id.* 228, but talked openly about visiting gay bars in Montrose. *Id.* Faber said "Fratta was very competitive and he hated to lose. Custody would be a loss – blow to his pride." *Id.* 225. Finally, Parker was asked if Fratta ever said anything about having Farah killed and Parker reported that one time when Fratta was cooking in the station's kitchen, "he was depressed over his finances" and Fratta said he should go ahead and kill Farah, go to prison, and get the kids upon release. *Id.* at 229.

The State also knew the allegation that Fratta was motivated to kill his wife in order to keep his coprophagia secret was false. Fratta bragged about his erotic eschatological conduct in particular and non-standard sexual proclivities in general. Bennett heard Fratta say something about forcing Farah to shit on a table. *Id.* at 222. Fratta spoke openly about picking up transvestites at Montrose bars, and, without any apparent insight into the inappropriateness, expressed concern to Stanley Marrett (best

man at Fratta's wedding and mutual friend of Farah's) about the small size of Fratta's penis and suggested the two compare their wieners. *Id.* at 239.

### 7.    Failure to cross examine Ray Thomas and impeach the integrity of the State's case through cross and in closing argument prejudiced Fratta.

The importance of Ray Thomas' testimony that he honestly did not remember, even after reviewing his prior testimony, was unquestionably lost upon jurors.  The only salient information that the State's interjection of fact followed by Ray Thomas' testimony that he could honestly recall Fratta mention specific deviant sexual acts was that Ray Thomas had forgotten Fratta's recounting of, and angry response to, specific deviant sexual acts that Farah complained about in her 1994 deposition.  This impression on jurors was solidified, of course, by trial counsel's deficient agreement with the trial court's instructing jurors that they could consider testimony, especially including Beeler's, describing specific deviant sexual acts Farah said Fratta made her engage in as a motive for the murder.

With an effective cross, competent counsel would have been able to significantly reduce the harm caused by the introduction of inadmissible descriptions of specific deviant sexual acts and cast doubt on the integrity of the State's case.  Because Ray Thomas had testified on direct that he honestly could not remember (and, therefore, did not have personal knowledge of) Fratta's ever referencing specific deviant sexual acts,  a cross-examination aimed at demonstrating that Ray Thomas had no recollection, had no personal knowledge would have been straightforward and successful.  Trial counsel could have also demonstrated through cross-examination that the State had tried to prepare Ray

Thomas to testify that he recalled Fratta's referencing specific deviant sexual acts, and could have also compelled Ray Thomas to admit that he told the State that he honestly could not testify to this.

Competent counsel, based on Ray Thomas' testimony on direct, as well as testimony pursuant to a competent cross examination, would have been able to make a meritorious motion to have the Court instruct the jury (i) to disregard Beeler's testimony about specific deviant sexual acts and cruel sexual conduct, (ii) to disregard Ray Thomas' testimony related to such acts, and (iii) to disregard the State's interjections of evidence of specific deviant sexual acts, about none of which Ray Thomas had any recollection or knowledge. Furthermore, based on Ray Thomas' direct testimony, and after a reasonably effective cross, competent counsel would have been able to present a meritorious motion for a mistrial based on intentional prosecutorial misconduct that resulted in the wrongful interjection in a capital trial of lurid, inflammatory and prejudicial testimony that Fratta had engaged in cruel sexual behavior and had compelled Farah to engage in specific deviant sexual acts.

Closing argument would have further changed the entire picture of the case by bringing home to jurors that the State did not have a motive for the murder, knew that it did not, and, to fill this gap, had mislead the trial court and the jury by sponsoring testimony through Beeler and interjecting testimony related to specific sexual deviant acts through leading questions that the State knew in advance were inadmissible because critical link-up witness, Ray Thomas, had no recollection even when prepared with prior transcripts of Fratta ever mentioning such specific deviant sexual acts.

Argument and evidence that State had manipulated the court and the jury in order to interject a lurid, inflammatory motive would itself cast serious doubt on the integrity of the State's entire case, making it reasonably probable that at least one juror would have reasonable doubt that the State had enough legitimate proof of Fratta's guilt to justify a conviction for capital murder.   When coupled with evidence of other serious prosecutorial misconduct, such as that surrounding the testimony of key witness Mary Gipp, the probability that competent counsel could have raised a reasonable doubt in at least one juror that the State could prove its case against Fratta would easily surpass *Strickland*'s "reasonable probability" prejudice threshold. For one thing, trial counsel could have called into question the authenticity and legitimacy of State's Exh. "**', the blue sticky note on which Mary Gipp said she wrote down the serial number of the gun Prystash supposedly brought with him to her apartment on the night of the murder. Competent trial counsel could have demonstrated, and argued in closing, that,

    (i)    the State had tried to deceive jurors with false and misleading statements that Gipp was given transaction immunity only from prosecution for a tampering with witness charge when, in reality, for any oral statements Gipp made, she was given use immunity effective against all charges, including capital charges; and

    (ii)    that the State had covered up the extent and nature of the deals for testimony offered to Gipp by making such deals through  Gipp's lawyer.

The foregoing two sets of facts alone would create substantial doubt about the veracity of Gipp's testimony regarding Prystash's alleged confession to her and, thereby, raised

reasonable doubts that the State had legitimate evidence proving Fratta's guilt beyond a reasonable doubt.

Furthermore, a reasonably competent attorney would have been able to make a well-founded case that Gipp had manufactured State's Exh. ** with information passed to her directly from police or passed to her through her attorney.

### 8. Pursuant to *Trevino v. Thaler*, the foregoing trial IAC allegations are not procedurally defaulted and not subject to dismissal pursuant to Title 28 U.S.C. § 2254(d) or (e).

An ineffectiveness of trial counsel claim can be raised for the first time in the federal pleading, as opposed to earlier in a state proceeding, provided that the following four conditions or elements are met:

> (1) the claim of "ineffective assistance of trial counsel" is a "substantial" claim; (2) the "cause" consiste[s] of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

*Trevino,* 133 S.Ct. at 1913,  *citing Martinez v. Ryan*, 132 S.Ct. 1309, 1318–1319 (2012).

As a matter of law, conditions (3) and (4) are satisfied in Texas cases.  *See Trevino*, 133 S. Ct. at 1915.  Conditions (1) and (2) "cause" are also satisfied in Fratta's case as follows:

### a. State habeas counsel was ineffective for not raising the foregoing IAC claim.

State habeas counsel only raised punishment phase claims, but not a single guilt-innocence claim. The IAC guilt innocence claims raised here would not have detracted in

the least from state habeas counsel's punishment phase efforts.  State habeas therefore failed to investigate or litigate the IAC claim above without having a strategic reason or even a discernable reason not to.

### b.   Fratta's claims are substantial.

For reasons stated in the foregoing briefing on the merits, the IAC claims are substantial for purposes of *Trevino v. Thaler.*

### CLAIM EIGHT

**THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SHOW THAT FRATTA COMMITTED THE CRIME OF CAPITAL MURDER ALLEGED BY STATE, *JACKSON v. VIRGINIA*, 443 U.S. 307 (1979);**

**ALTERNATIVELY, FRATTA RECEIVED INEFFEC-TIVE ASSISTANCE OF APPELLATE COUNSEL UNDER *EVITTS V. LUCEY*, 469 U.S. 387 (1985), BECAUSE APPELLATE COUNSEL FAILED TO APPEAL THE LEGAL SUFFICIENCY OF THE EVIDENCE.**

### A.   STANDARDS

Evidence is sufficient under the *Jackson* standard, if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Under this standard, "[a]ll credibility choices and conflicting inferences are to be resolved in favor of the verdict." *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir.2005) (citation omitted).

However, in *Jackson*, the Supreme Court also held that "[a]fter Winship the critical inquiry on review of the sufficiency of the evidence to support a criminal

conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Id.* at 318–19 (emphases added). That is, the Court made clear that "[t]he Winship doctrine requires more than simply a trial ritual." *Id.* at 316–17.

The Supreme Court cautioned, as well, that "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Id.* However, "[u]nder Winship, which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such a conviction occurs ..., it cannot constitutionally stand." *Id.* at 317–18. Thus, it is the duty of appellate courts to "protect against misapplications of the constitutional standard of reasonable doubt," *id.* at 320, and to enforce the constitutional guarantee that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof," *id.* at 316, 99 S.Ct. 2781 (emphases added).

A reviewing court's function is to "take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative. This function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable doubt." *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995); *see also United States v. Polk*, 56 F.3d 613, 630 (5th Cir. 1995) ("[C]ourts of appeal must not completely abdicate responsibility for reviewing jury verdicts" (internal quotation marks omitted)). *See generally* Jon O. Newman, Beyond "Reasonable Doubt", 68 N.Y.U. L.Rev. 979,

993–97 (1993) (issuing an "urgent plea" to the courts of appeal to "take seriously our obligation" to reverse convictions based on insufficient evidence).

Because the requirement of sufficient proof of guilt beyond a reasonable doubt is fundamental to our notions of liberty and vital to the rule of law, it must be carefully guarded—even if not raised by the defendant. The Supreme Court held over a century ago that even when "th[e] question [of the sufficiency of the evidence] was not properly raised, yet if a plain error was committed in a matter so absolutely vital to defendants, we feel ourselves at liberty to correct it." *Wiborg v. United States*, 163 U.S. 632, 658, 16 S.Ct. 1127, 41 L.Ed. 289 (1896) (emphasis added). The Court later reaffirmed this principle and further explained its importance:

> While no motion or request was made that the jury be
> instructed to find for defendant, ... yet Wiborg v. United
> States, 163 U.S. 632, 658, 16 Sup.Ct. Rep. 1127, 1197, 41 L.
> ed. [L.Ed.] 290 [289], 298, justifies us in examining the
> question in case a plain error has been committed in a matter
> so vital to the defendant.
> .... No matter how severe may be the condemnation which is
> due to the conduct of a party charged with a criminal offense,
> it is the imperative duty of a court to see that all the elements
> of his crime are proved, or at least that testimony is offered
> which justifies a jury in finding those elements. Only in the
> exact administration of the law will justice in the long run be
> done, and the confidence of the public in such administration
> be maintained.

*Clyatt v. United States,* 197 U.S. 207, 221–22 (1905).

## B.    BACKGROUND

Fratta was indicted for capital murder in violation of Texas Penal Code § 19.03(a)(2) ("the person intentionally commits the murder in the course of committing or

attempting to commit … burglary …."   and § 19.03(a)(3) ("the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration").

The indictment that governed retrial was read to the jury at the beginning of trial and stated as follows. However, the trial court struck (29 RR 173) the third paragraph (see stricken through passage below):

> MS. BRADLEY: In the name and by authority
>
> 20 of the State of Texas: The duly organized Grand Jury of
>
> 21 Harris County, Texas, presents in the District Court of
>
> 22 Harris County, Texas, that in Harris County, Texas,
>
> 23 Robert Alan Fratta, hereafter styled the defendant,
>
> 24 heretofore on or about November 9, 1994, did then and
>
> 25 there unlawfully, intentionally and knowingly cause the
>
> 1 death of Farah Fratta, hereafter styled the complainant,
>
> 2 by shooting the complainant with a deadly weapon,
>
> 3 namely, a firearm, and that the defendant did employ
>
> 4 Joseph Prystash to commit the murder for remuneration
>
> 5 and the promise of remuneration, namely, a motor
>
> 6 vehicle.
>
> 7 It is further presented that in Harris
>
> 8 County, Texas, Robert Alan Fratta, hereafter styled the
>
> 9 defendant, heretofore on or about November 9, 1994, did

10 then and there unlawfully, intentionally and knowingly

11 cause the death of Farah Fratta, hereafter styled the

12 complainant, by shooting the complainant with a deadly

13 weapon, namely, a firearm, and the defendant did employ

14 Howard Guidry to commit the murder for remuneration and

15 the promise of remuneration, namely, money.

16 ~~It is further presented that in Harris~~

17 ~~County, Texas, Robert Alan Fratta, hereafter styled the~~

18 ~~defendant, on or about November 9, 1994, did then and~~

19 ~~there unlawfully, intentionally and knowingly cause the~~

20 ~~death of Farah Fratta, hereafter styled the complainant,~~

21 ~~by shooting the complainant with a deadly weapon,~~

22 ~~namely, a firearm, and the defendant did employ Howard~~

23 ~~Guidry to commit the murder for remuneration and the~~

24 ~~promise of remuneration, namely, a firearm.~~

25 It is further presented that in Harris

1 County, Texas, Robert Alan Fratta, hereafter styled the

2 defendant, on or about November 9, 1994, did then and

3 unlawfully, while in the course of committing and

4 attempting to commit the burglary of a building owned by

5 Farah Fratta, intentionally cause the death of Farah

6 Fratta by shooting the complainant with a deadly weapon,

7 namely, a firearm.

8 Against the peace and dignity of the State.

9 Signed, the foreman of the Grand Jury.

22 RR 20-22.

The trial court gave a charge to the jury that added a law of the parties' charge (which, under Texas law, is considered when conducting an analysis of the sufficiency of the evidence), as follows:

> Before you would be warranted in finding the defendant guilty of capital murder, you must find from the evidence beyond a reasonable doubt that on the occasion in question the defendant, Robert Alan Fratta, **intentionally employed** Joseph Prystash and/or Howard Guidry to kill Farah Fratta; **and** the defendant, Robert Alan Fratta, paid or promised to pay Joseph Prystash and/or Howard Guidry to kill Farah Fratta, as alleged in the indictment; **and** Joseph Prystash and/or Howard Guidry **agreed** to kill Farah Fratta **pursuant to such employment** by the defendant, Robert Alan Fratta; **and** that Joseph Prystash and/or Howard Guidry did then and there kill Farah Fratta  by shooting Farah Fratta with a deadly weapon, namely, a firearm, **pursuant to such agreement for remuneration by the defendant, Robert Alan Fratta**, <u>**and**</u> <u>that the defendant, with the intent to promote or assist the commission of the offense of murder of Farah Fratta, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash and/or Howard Guidry in shooting Farah Fratta with the specific intention of thereby killing Farah Fratta;</u>

The charge also allowed conviction on two alternative theories that involved murder and burglary.  The second theory added a "law of parties" charge that, again, was not part of the indictment.

**or** you must find from the evidence beyond a reasonable doubt not only that on the occasion in question the defendant was in the course of committing or attempting to commit the felony offense of burglary of a building owned by Farah Fratta, as alleged in this charge, but also that the defendant specifically intended to cause the death of Farah Fratta, by shooting Farah Fratta, with a deadly weapon, namely, a firearm;

**or** you must find from the evidence beyond a reasonable doubt that the defendant, Robert Alan Fratta, with the intent to promote or assist in the commission of the offense of burglary of a building, if any, solicited, encouraged, directed, aided, or attempted to aid Joseph Andrew Prystash and/or Howard Guidry in shooting Farah Fratta, if he did, with the intention of thereby killing Farah Fratta. If you have a reasonable doubt as to the existence of any of the foregoing elements, then you cannot convict the defendant of capital murder.

30 RR 15-18 (bolding and underscoring added).

The trial court's charge gave the State the bests chance to prove up the State's theory of capital murder by adding "law of the parties" charges (namely, the sections of the charge underlined above) that gave the jury an alternative theory to the convict. Nonetheless, even measured against this more favorable charge, the evidence did not satisfy *Jackson v. Virginia* standards (i.e., the State's proof was "legally insufficient.").

## C. ARGUMENT THAT EVIDENCE WAS LEGALLY INSUFFICIENT

### 1. State Sponsored No Evidence, or, at best, Legally Insufficient Evidence, Supporting the Two Burglary Theories of Capital Murder.

Farah's body was found in the garage of her home.  29 RR 36.  Assistant Medical Examiner, Dwayne Wolf, testified that Farah was shot at very close range. 29 RR 104. The record therefore contains sufficient evidence to show that the shooter entered Farah's

home, for the purpose of Texas law, and killed her in violation of Texas Penal Code §
19.03(a)(2).

However, the State did **not** put on any evidence that Fratta burglarized Farah's
home or that he was the shooter. In fact, the State's theory was that he did not take do
this.   According to the State, Fratta was at church when an alleged murder for hire
scheme came off.  30 RR 128.  Consequently, the only way the State could prove up the
burglary theory of murder against Fratta was through the law of the parties charge.
However, there was legally insufficient evidence – in fact there was no evidence – that
Fratta harbored an intent to promote or assist in the commission of the offense of
burglary of a habitation or building.

Likewise, the State did not sponsor any evidence that Fratta "intended to promote
or assist" Prystash in the commission of a burglary, as required by the law of the parties
charge.  State's evidence showed that Prystash himself did **not** intend or plan to commit a
burglary.   According to the State, Prystash was the driver. 27 RR 38. There was no
evidence that Fratta had an idea that Prystash would play this role (that of driver) and no
evidence that Fratta had any idea that he would not play this role either. The record is
simply devoid regarding this point or the issue of burglary by Prystash.

It is undisputable, that there was no evidence that Fratta communicate with
Guidry, or even was aware of Guidry's identity or existence; it is therefore undisputable
that Fratta knew what Guidry was going to do, where he was going to position himself, or
even whether Guidry was going to shoot Farah.  There is no evidence either that Prystash
informed Fratta that any third party would wait in Farah's home or backyard or shoot her

in any area considered to be the home for the purpose of Texas burglary law.  Nor is there evidence Fratta directed or instructed Prystash on how to carry out the killing. Furthermore, the State did not argue, nor could it, that Prystash's source of information about Farah had to come from Fratta because Prystash knew Farah and so did Gipp, knew how to reach her and where she lived.

Assuming, for the sake of argument, that Fratta intended Guidry to kill Farrah, there was no evidence that Fratta had any advance knowledge that Guidry intended to enter a privileged or protected part of Farah's home (trespass into the curtilage) in order to commit the murder, as opposed to shooting Farah as she pulled up, or exited her car, from a publicly accessible part of the property (from the walkway or driveway or front yard, for example, which would not require, nor be, a home invasion, since there was no fencing around Farah's front yard), or shoot her while she was in transit from the hair dresser to her home or shoot her at some other location.

Finally, the State did not sponsor any evidence that it was "with the intent to promote or assist in the commission of the offense of burglary of a building" that Fratta "solicited, encouraged, directed, aided, or attempted to aid Joseph Andrew Prystash and/or Howard Guidry in shooting Farah Fratta, if he did, with the intention of thereby killing Farah Fratta."  In short, the State put on evidence that Fratta wanted Farah dead. However, it did not show Fratta wanted or intended to have her killed in her home, let alone wanted or intended to have her killed in her home, pursuant to, for the purpose of, or with the intention of committing a burglary or assisting anyone else in burglarizing a home or building.

2. **State Sponsored Legally Insufficient Evidence that Fratta Engaged In a Murder for Hire Scheme.**

   a. **The State failed to put on any evidence that Prystash made an agreement with Fratta to kill Farah.**

Prystash did not agree to shoot Farah or kill her by any other means.  In fact the State's evidence was that Prystash was "the middleman." According to the State, Prystash's job was not to kill Farah, but to find someone who would. *Id.*  Because Prystash did not agree to shoot Farah and did not shoot Fratta, according to the State's own evidence, the State did not sponsor legally sufficient evidence that Fratta, "with the intent to promote or assist the commission of the offense of murder of Farah Fratta, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash" in shooting Farah, as alleged in the parties charge.

   b. **The State failed to put on any evidence that Guidry agreed with Fratta to kill Farah.**

The State did not put on any evidence that Fratta met or spoke with Guidry.  The State did not even contend or sponsor an iota of proof that Fratta knew who Guidry was. As a result, the State did not provide any evidence that Fratta made an agreement with Guidry for Guidry to kill Farah.  For the same reasons, the state failed to sponsor legally sufficient evidence that "with the intent to promote or assist the commission of the offense of murder of Farah Fratta, solicited, encouraged, directed, aided or attempted to aid " Guidry in shooting Farah, as alleged in the parties charge.

**c.     The State failed to put on legally sufficient evidence, or any evidence at all, that Prystash Shot Farah pursuant to an agreement for remuneration by the defendant, Robert Alan Fratta, NOR did the State sponsor legally sufficient evidence, or any evidence at all, that Prystash Shot Farah pursuant to an agreement for remuneration by the defendant, Robert Alan Fratta.**

It is undisputed that Prystash did not shoot Farah; therefore, Prystash did not shoot Farah pursuant to an agreement for remuneration by Fratta.  It is also undisputed that the State did not show, or try to show, at trial that Fratta and Guidry ever communicated, nor show or try to show that by the time of the murder Fratta or Guidry had ever met or heard of each other, nor sponsor evidence that Guidry was aware that any other person, besides Prystash, was involved in any manner in planning or carrying out Farah's murder; therefore, there could not be, and there was not any, proof at trial that Guidry shot Farah pursuant to an agreement for remuneration by the defendant, Robert Alan Fratta.

**d.     The State failed to sponsor legally sufficient proof that Fratta employed Guidry or paid or promised to pay Guidry to kill Farah.**

Because the State failed to put on evidence that Fratta met, spoke with or ever heard of Guidry, the State failed to put on legally sufficient evidence that Fratta employed Guidry.  The State also failed to show that Fratta paid or promised to pay Guidry anything, so the evidence was legally insufficient on this point as well.  Indeed, there was no evidence that Guidry got paid or was promised remuneration from anyone. The trial court's evidentiary ruling, in fact, prohibited that State from eliciting testimony from Gipp that Prystash told her Guidry was going to be remunerated by, or had been promised remuneration from, Fratta since that allegation deflected blame from Prystash.

Moreover, Gipp, who was the only possible source the State had for testimony that Guidry received or was promised remuneration did not testify that Guidry was received or was promised or was meant to receive anything of value from anybody for any act.

> **e.    The State failed to sponsor legally sufficient proof that Fratta employed Prystash or paid or promised to pay Prystash to kill Farah.**

When asked "what did he (Prystash) tell you that he (Prystash) was supposed to get for his part in the murder," Gipp replied that "Joe (Prystash) was supposed to get a jeep." 27 RR 79.  The State put on evidence that Fratta was driving a jeep after he and Farah separated.  25 RR 219. State's witness Podhorsky also testified that Fratta offered to pay him cash and give him a jeep to kill Farah. 27 RR 126.  However, there was no evidence that Fratta discussed payment terms with Prystash at all, let alone payment in the form of a jeep.  As trial counsel argued at closing, the State did not show Fratta still owned or drove a jeep at the time of the murder.  Fratta was driving a Volkswagen instead.  30 RR 71.

The State did not show, either, that Prystash and Fratta made any arrangements for fulfilling the promise of payment Gipp alleged.  Gipp continued on as Prystash's lover after the murder, but did not testify that Prystash ever complained of not getting a jeep or of not getting paid.  In fact, the court ruled that State could not introduce testimony that Fratta promised to pay Prystash anything because such testimony spread blame to Fratta.

## D.     APPELLATE COUNSEL WAS INEFFECTIVE FOR NOT LITIGATING LEGAL INSUFFICIENCY OF THE EVIDENCE.

Appellate counsel did not have a strategic reason for not raising an legal (in)sufficiency of the evidence claim challenging Fratta's conviction, as opposed to punishment. The omission of a *Jackson v. Virginia* claim cannot be excused on the ground that all other claims Appellate counsel raised provided an equal or superior chance for relief.    Appellate counsel raised a boiler plate claim challenging the constitutionality of the Texas special issues that Texas courts summarily reject.   See Appellant's Brief, Claim 32.

Nor would a *Jackson v. Virginia* claim have detracted from Appellate counsel's existing claims.   Indeed, harm analysis that applied to Fratta's direct appeal is conducted against the background of the State's entire case in chief, and is relative to (indirectly proportionate to) the strength of the State's case.   A Jackson v. Virginia claim would have underscored the bare boned proof the State advanced making harm on other Appellate claims easier to show.

Most importantly, as shown above, in Section C and subsections thereto, a challenge to the legal sufficiency of the evidence could be easily and meritoriously framed.   Had Appellate counsel done so Fratta would have been entitled to an acquittal on all charges. Hence, Appellate counsel's performance was deficient and the deficient performance prejudiced Fratta under *Evitts v. Lucey*, 469 U.S. 387 (1985) and *Strickland v. Washington*, 466 U.S. 688 (1984).

### E.   THIS COURT CAN REACH THE MERITS OF THE STAND-ALONE *JACKSON* CLAIM AND THE APPELLATE IAC CLAIM

Fratta challenged legal insufficiency of the evidence claim in pro se pleadings. However, the TCCA refused to consider the merits on the ground that Fratta was not entitled to hybrid representation.  *See Fratta v. State*, 2011 WL 4582498, *1 (Tex. Crim. App. 2011).  However, for the following reasons, the rule against hybrid representation invoked by the TCCA is not an independent and adequate state law ground the application of which results in procedural default of Fratta's *Jackson* claim in the federal system.

In order for a rule to be adequate, the rule must be firmly established and regularly applied. A rule is firmly established and regularly applied when there is no discretion on the part of state court regarding the application of the rule. *NAACP v. Alabama*, 377 U.S. 288, 297 (1964) (holding that because "[a]labama courts have not heretofore applied their rules respecting the preparation of briefs with the pointless severity shown here," the rules did not meet the "firmly established and regularly applied" standard). The requirement is based on the idea of giving the state prisoner a pre-default notice of the rule's existence before invoking it to bar federal review of the prisoner's claim. *NAACP v. Alabama*, 357 U.S. 449, 457 (1958) (rejecting a state rule as firmly established and regularly applied "because petitioner could not fairly be deemed to have been apprised of its existence.")

Texas's so-called rule is neither firmly established or regularly applied.  Indeed, the State does not have a "rule" against hybrid representation in the proper sense of the

term.  Instead, the rule is that courts have discretion to allow hybrid representation at trial

and on appeal. *See Hathorn v. State,* 848 S.W.2d 101, 122 (Tex. Crim. App. 1992) (en

banc).  According to the TCCA's *en banc* decision, which remains the law, in allowing a

defendant hybrid representation,

> The trial court here allowed appellant the best of both worlds.
> While the court appointed counsel to represent appellant on
> appeal, it also granted appellant permission to write and file
> his own appellate brief in appeal of his conviction. And, to
> that end, the court granted appellant's motions "requesting
> notification" and "to inspect and copy record on appeal."
> Those motions requested that appellant be allowed personal
> access to the record to enable him to represent himself in a
> manner that would be satisfactory to him in his pro se brief.
> In short, the trial court allowed hybrid representation on
> appeal.

*Id.*

Alternatively, this court should reach the merits of the appellate IAC claim under

*Trevino* and *Martinez v. Ryan*, 132 S.Ct. 1309 (2012). Although *Reed v. Stephens*, 739

F.3d 753, 778, n.16 (5th Cir. 2012), holds that under *Martinez*, the ineffective assistance

of post-conviction counsel cannot supply cause for procedural default of a claim of

ineffective assistance of appellate counsel, *Martinez* is based on equitable principles that

arguably justifies expansion on a case by case determination, and in *Nguyen v. Curry*,

736 F.3d 1287, 1296 (9th Cir. 2013), the Ninth Circuit extended *Martinez* to excuse

defaulted appellate IAC claims.

Furthermore, evidence that demonstrates *Jackson* error, by itself, and coupled

evidence that State's evidence incriminating Fratta was coerced and manufactured, also

demonstrates that Fratta is innocent of capital murder for purposes of *Schlup v. Delo*, 513

U.S. 298 (1995).  Hence, this Court may reach the merits of Fratta's *Jackson* claim

through the "gateway" exception *Schlup* created to procedural default.

## CLAIM NINE

**CHARGE THE COURT GAVE THE JURY ON GUILT INNOCENCE CONSTRUCTIVELY AMENDED THE INDICTMENT IN VIOLATION OF FRATTA'S FIFTH AMENDMENT RIGHT TO BE INDICTED BY A GRAND JURY AND DUE PROCESS RIGHTS AGAINST ARBITRARY DEPRIVATIONS OF LIFE AND LIBERTY;**

**ALTERNATIVELY, TRIAL COUNSEL'S FAILURE TO OBJECT THAT THE GUILT-INNOCENCE CHARGE CONSTRUCTIVELY AMENDED THE INDICTMENT DEPRIVED FRATTA OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

### A.    STANDARDS

"The Fifth Amendment guarantees that a criminal defendant will be tried only on

charges alleged in a grand jury indictment." *United States v. Threadgill*, 172 F.3d 357,

370 (5th Cir.1999) (internal quotation marks omitted); *see also Stirone v. United States*,

361 U.S. 212, 215-16 (1960) ("[A]fter an indictment has been returned its charges may

not be broadened through amendment except by the grand jury itself."). "A jury charge

constructively amends an indictment, in violation of the Fifth Amendment, if it permits

the jury to convict the defendant upon a factual basis that effectively modifies an

essential element of the crime charged." *United States v. Daniels*, 252 F.3d 411, 413-14

(5th Cir. 2001) (internal quotation marks omitted). "That is, constructive amendment

occurs if the jury is permitted to convict on an alternative basis permitted by the statute

but not charged in the indictment." *Id.* at 414 (internal quotation marks omitted).

Ordinarily, a constructive amendment constitutes reversible error. *United States v. Reasor*, 418 F.3d 466, 475 (5th Cir. 2005).

Typically, though, adding an aiding and abetting instruction does not give rise to claims that the government constructively amended an indictment because a "defendant may be indicted for the commission of a substantive crime and convicted of aiding and abetting its commission although not named in the indictment as an aider and abettor." *United States v. Tropiano*, 418 F.2d 1069, 1083 (2d Cir. 1969), cert. denied, 397 U.S. 1021(1970); *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir. 1971) ("one who has been indicted as a principal may be convicted on evidence showing that he merely aided and abetted").

However, an aiding and abetting jury instruction is appropriate only if the prosecution makes it known that it intends to proceed on a theory of aiding and abetting **and** the evidence so warrants. *United States v. Taylor*, 464 F.2d 240, 242 n.1 (2d Cir. 1972). A principal purpose of the first requirement is to avoid unfair surprise to the defendant. The second requirement assures that the government will continue to carry the burden of proving the crime.

## B.    BACKGROUND

The jury charge allowed jurors to convict Fratta on a theory of aiding and abetting that in Texas law is known as "the law of the parties." *See Hayes v. State*, 265 S.W.3d 673, 696 (Tex. App. -- Houston [1st], 2008) (equating aiding and abetting with "law of the parties"). The amendments to the indictment are reflected in the underlined passages

96

in the right hand column of the following table.  The trial court struck the third paragraph

of the indictment pursuant to trial counsel's motion for acquittal. 29 RR 173.

| INDICTMENT | CHARGE TO JURY |
|---|---|
| Robert Alan Fratta, hereafter styled the defendant, heretofore on or about November 9, 1994, did then and there unlawfully, intentionally and knowingly cause the death of Farah Fratta, hereafter styled the complainant, by shooting the complainant with a deadly weapon, namely, a firearm, and that the defendant did employ Joseph Prystash to commit the murder for remuneration and the promise of remuneration, namely, a motor vehicle.<br><br>It is further presented that in Harris County, Texas, Robert Alan Fratta, hereafter styled the defendant, heretofore on or about November 9, 1994, did then and there unlawfully, intentionally and knowingly cause the death of Farah Fratta, hereafter styled the complainant, by shooting the complainant with a deadly weapon, namely, a firearm, and the defendant did employ Howard Guidry to commit the murder for remuneration and the promise of remuneration, namely, money.<br><br>~~It is further presented that in Harris County, Texas, Robert Alan Fratta, hereafter styled the defendant, on or about November 9, 1994, did then and there unlawfully, intentionally and knowingly cause the death of Farah Fratta, hereafter styled the complainant, by shooting the complainant with a deadly weapon, namely, a firearm, and the defendant did employ Howard Guidry to commit the murder for remuneration and the promise of remuneration, namely, a firearm.~~<br><br> It is further presented that in Harris County, Texas, Robert Alan Fratta, hereafter styled the | Before you would be warranted in finding the defendant guilty of capital murder, you must find from the evidence beyond a reasonable doubt that on the occasion in question the defendant, Robert Alan Fratta, **intentionally employed** Joseph Prystash and/or Howard Guidry to kill Farah Fratta; **and** the defendant, Robert Alan Fratta, paid or promised to pay Joseph Prystash and/or Howard Guidry to kill Farah Fratta, as alleged in the indictment; **and** Joseph Prystash and/or Howard Guidry **agreed** to kill Farah Fratta **pursuant to such employment** by the defendant, Robert Alan Fratta; **and** that Joseph Prystash and/or Howard Guidry did then and there kill Farah Fratta  by shooting Farah Fratta with a deadly weapon, namely, a firearm, **pursuant to such agreement for remuneration by the defendant, Robert Alan Fratta**, <u>and that the defendant, with the intent to promote or assist the commission of the offense of murder of Farah Fratta, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash and/or Howard Guidry in shooting Farah Fratta with the specific intention of thereby killing Farah Fratta;</u><br><br>**or** you must find from the evidence beyond a reasonable doubt not only that on the occasion in question the defendant was in the course of committing or attempting to commit the felony offense of burglary of a building owned by Farah Fratta, as alleged in this charge, but also that the defendant specifically intended to cause the death of Farah Fratta, by shooting Farah Fratta, with a deadly weapon, namely, a firearm; |

| | |
|---|---|
| defendant, on or about November 9, 1994, did then and unlawfully, while in the course of committing and attempting to commit the burglary of a building owned by Farah Fratta, intentionally cause the death of Farah Fratta by shooting the complainant with a deadly weapon, namely, a firearm. | **or** you must find from the evidence beyond a reasonable doubt that the defendant, Robert Alan Fratta, with the intent to promote or assist in the commission of the offense of burglary of a building, if any, solicited, encouraged, directed, aided, or attempted to aid Joseph Andrew Prystash and/or Howard Guidry in shooting Farah Fratta, if he did, with the intention of thereby killing Farah Fratta. If you have a reasonable doubt as to the existence of any of the foregoing elements, then you cannot convict the defendant of capital murder. |

## C.   ARGUMENT THAT LAW OF PARTIES CHARGE CONSTRUCTIVELY AMENDED INDICTMENT

Fratta was on notice that the State intended to proceed against him under the "law of the parties" doctrine.  The likelihood was revealed by voir dire.

6 Q. Okay. And when we talk about the law of

7 parties, that's basically what you'd be instructed at

8 the end of a trial. If you've got more than one person

9 who commits a crime, our law says that all three

10 individuals could be guilty of that crime if they all

11 acted together and they carried out that crime together.

4 RR 282.

### 1.   However, the evidence did not justify supplementing the murder for hire allegation in the Indictment with a law of the parties charge.

As shown in the preceding legal insufficiency claims (See Section C, 2, subsections a-e, the argument and authority for which are incorporated by reference as if

fully set forth herein), according to the State's own evidence, Prystash did not agree to shoot Farah and did not shoot Fratta. Thus, the State did not sponsor legally sufficient evidence, nor any evidence, that Fratta, "with the intent to promote or assist the commission of the offense of murder of Farah Fratta, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash… in shooting Farah Fratta," as alleged in the law of the parties charge.

Furthermore, the State did not put on any evidence that Fratta met or spoke with Guidry.  The State did not even contend or sponsor an iota of proof that Fratta had any communications with Guidry, or that Fratta had the faintest idea who Guidry was or what Guidry's involvement in any crime would be.  For these reasons, the state, therefore, failed to sponsor, and could not possibly sponsor, any evidence, let alone legally sufficient evidence, showing that "with the intent to promote or assist the commission of the offense of murder of Farah Fratta, solicited, encouraged, directed, aided or attempted to aid … Guidry in shooting Farah Fratta," as alleged in the parties charge.

### 2.    Nor did the evidence justify supplementing the Indictment's burglary theories of murder with a law of the parties charge.

As alleged above in Section 'C', subsection 1, the State did not introduce any evidence that Fratta was informed, discussed mentioned or approved the plans that Guidry and Prystash allegedly employed to carry out the murder.  The State did not introduce evidence the Fratta told Prystash or Guidry anything about what Farah would do upon returning home, inform them of where she parked the car, in the garage or on the street, or whether she entered the home through the garage as opposed to taking a path

through publicly accessible and unprotected or privileged space to the front door.  Nor was their evidence that Fratta enabled Prystash or Guidry to enter Farah's home, such as providing either one with a layout or description of the house.

Assuming, for the sake of argument, that Fratta ever intended Guidry or Prystash to kill Farrah, there was no evidence that Fratta picked the specific location for the murder, or had any advance knowledge that Guidry or Prystash intended to enter a privileged part of Farah's home (trespass into the curtilage) in order to commit the murder, as opposed to shooting Farah from a publicly accessible part of the property (from the walkway or driveway or front yard, for example, which would not require, nor be, a home invasion, since there was no fencing around Farah's front yard), or shoot her while she was in transit from the hair dresser to her home.  Since the State did not show that Fratta had concocted, nor did it show he was privy to or aware of, plans Guidry or Prystash may have had to kill Farah in her home or to enter the home in order to kill her, the state therefore failed to put on evidence sufficient for a rational juror to find beyond a reasonable doubt that Fratta intended to promote or assist Guidry or Prystash in committing a burglary.

Finally, the State did not sponsor any evidence that it was "with the intent to promote or assist in the commission of the offense of burglary of a building" that Fratta "solicited, encouraged, directed, aided, or attempted to aid Joseph Andrew Prystash and/or Howard Guidry in shooting Farah Fratta, if he did, with the intention of thereby killing Farah Fratta."  In short, the State put on evidence that Fratta wanted Farah dead.  However, it did not show Fratta wanted or intended to have her killed in her home, let

alone wanted or intended to have her killed in her home, pursuant to, or for the purpose of, committing a burglary.

**D.    IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, TRIAL COUNSEL FAILED TO OBJECT THAT LAW OF PARTIES CHARGE CONSTRUCTIVELY AMENDED INDICTMENT.**

In *Jackson v. Virginia*, the Supreme Court started off its analysis with the following reprise of precedents:

> A meaningful opportunity to defend, if not the right to a trial itself, presumes as well that a total want of evidence to support a charge will conclude the case in favor of the accused. Accordingly, we held in the *Thompson* case that a conviction based upon a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally infirm. *See also Vachon v. New Hampshire*, 414 U.S. 478, 94 S.Ct. 664, 38 L.Ed.2d 666; *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149; *Gregory v. Chicago*, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134; *Douglas v. Buder*, 412 U.S. 430, 93 S.Ct. 2199, 37 L.Ed.2d 52. The "no evidence" doctrine of Thompson v. Louisville thus secures to an accused the most elemental of due process rights: freedom from a wholly arbitrary deprivation of liberty.

*Jackson,* 443 U.S. at 314.

As shown in above in Claim Eight, Section C, subsections 1 and 2, and in Section C, subsections 1 and 2, of this ninth claim, the record on retrial is "totally devoid of relevant evidence" supporting either of the "law of the parties" passages that the trial court added to the jury charge.  As a result, trial counsel should have known, based on long established Supreme Court precedents, such as, *Thompson v. Louisville, supra*, that the charge to the jury threatened Fratta not only "a wholly arbitrary deprivation of liberty" but a wholly arbitrary deprivation of his life.  A reasonably effective attorney

would have therefore objected that the addition of "law of the parties" charges deprived Fratta of Fifth Amendment and Due Process rights.  Trial counsel failed to object and therefore performed deficiently under *Strickland*.  Because trial counsel failed to protect Fratta against structural error, and, if not that, definitely failed to secure "the most elemental of due process rights," namely, a fundamentally fair trial as opposed to arbitrary deprivation of life and liberty, prejudice under *Strickland* is self-evident.  This Court should therefore order relief.

## CLAIM TEN

**TRIAL COUNSEL FAILED TO PREVENT THE STATE FROM ENCOURAGING AT LEAST ONE ACCEPTED JUROR FROM PRESUPPOSING THAT THE STATE HAD A STRONGER CASE THAN THE CASE IT WAS ALLOWED TO PUT ON.**

In *Shipley v. State*, 790 S.W.2d 604 (Tex.Crim.App. 1990), the TCCA held that control of the voir dire examination is within the sound discretion of the trial judge and that the trial judge is given wide discretion in this area.  However, in *Atkins v. State*, 951 S.W.2d 787, 790 (Tex. Crim. App. 1997)(en banc), the TCCA clarified that "a trial judge must determine if the hypothetical is used to explain the law or to commit the venire to specific facts of the case, and must preclude parties from using voir dire examples for any other purpose than to explain the law.  *Id.*  The TCCA then conclude with the following strong statement:  "To find that the question was used for anything other than to explain the law would be an abuse of discretion and would constitute reversible error."  *Id.*

Exchanges with accepted venire members show that during *voir dire*, the State asked questions that were designed to encourage jurors to impress on jurors there was evidence proving Fratta guilty that the State could not put on.

      1 A. No, ma'am.

      2 Q. Okay. All right. In my trial, I got that

      3 Fifth Amendment privilege, but so does Kari and so does

      4 Bill. The State can force Kari to testify against him

      5 and the State can't force Bill to testify against me.

      6 The reason being, if they testify truthfully, they would

      7 naturally incriminate themselves. You see how that

      8 works?

      9 A. Uh-huh (affirmative).

      10 Q. So, the folks who have the best information

      11 about what our plan or agreement was can't be force to

      12 testify. So, the State then has to look for other ways

      13 to prove that agreement. Okay? And what the State --

      14 what kind of evidence would you think the State might

      15 put on?

      16 A. As far as what?

13 RR 198.

      Prosecutor's questions were not needed to explain the law.  If anything they distorted the law, suggesting that while the juror could not draw adverse inferences from

the defendant's silence, the juror could draw inferences supportive of the State's cases because co-defendants exercised their Fifth Amendment rights.  Trial counsel failure to protect Fratta from error harmful enough to require reversal, *see Atkins, supra*, resulted in prejudice under *Strickland.*

## CLAIM ELEVEN

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHTS, TRIAL COUNSEL FAILED TO MAKE A PROPER DUE PROCESS OBJECTION TO POLICE TESTIMONY AND FALSE AND MISLEADING CLOSING ARGUMENT INTIMATING THAT GUIDRY HAD BEEN AT DAVIS FOOD CITY NEAR FARAH'S HOME PROXIMATE TO THE MURDER.**

Officers testified that Guidry was with them when they  went to Food City to check for a pay phone. 29 RR 26.  Phone records police obtained indicated the Food City pay phone number had been dialed November 9, 1994, proximate to the murder. 29 RR 32.  However, Guidry was taken to Food City by police **four months after** the murder.  Guidry's presence with police under these circumstances was irrelevant, but inflammatory.  It also violated Due Process suggesting that Guidry had something to do with the phone calls and that police had discovered this. It also place Guidry near the murder scene. But the State did not have admissible evidence showing that any of this was the case.

In short, the State manufactured evidence against Fratta.  However, trial counsel failed to object that the testimony was misleading and intended to mislead the jurors in violation of Fratta's due process rights.  *See Giglio v. United States,* 405 U.S. 150 (1972). Trial counsel also failed to object on similar Due Process grounds to the State's reliance

104

on this evidence during closing argument, 30 RR 139, although this blatantly violated Fratta's due process rights.

## CLAIM TWELVE

### IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHT TO COUNSEL TRIAL COUNSEL FAILED TO OBJECT ON DUE PROCESS, AND SIXTH AMENDMENT GROUNDS TO THE PROSECUTOR'S REPEATED INTERJECTION OF FACTS OUTSIDE THE RECORD

The prosecutor intentionally interjected extra record facts in her closing argument. 30 RR 5 et seq. Trial counsel objected successfully to many instances and common law grounds that State was straying beyond the record. However, trial counsel failed to bring to request to approach the bench and object that the State's action was intentional, inflammatory and misleading in violation of Fratta's Due Process rights and required drastic intervention.  Further, counsel should have objected that the testimony was uncrossed testimony violating Fratta's Sixth Amendment rights. The prosecutorial misconduct that trial counsel failed to prevent was pervasive and purposeful and, therefore, prejudicial to Fratta.

## CLAIM THIRTEEN

### TRIAL COUNSEL'S CUMULATIVE ERRORS DEPRIVED FRATTA OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

The arguments and evidence that trial counsel's representation was deficient under *Strickland*, which are set forth in the foregoing individual guilt innocence IAC claims, are hereby incorporated by reference, as are the corresponding arguments in each individual

guilt-innocence IAC claim that trial counsel's deficient performance was prejudicial under *Strickland.*   While each claim is sufficient to demonstrate IAC, the proper *Strickland* analysis requires reviewing courts to calculate the cumulative impact of trial counsel's errors.   In this case, the cumulative impact clearly satisfies *Strickland v. Washington*'s deficiency and prejudice prongs.   This Court should therefore order relief granted.

In *Smith* v. *Texas,* 311 U.S. 128 (1940), the Supreme Court said this about a Harris County grand jury ... " ... there had been no negroes on any of the grand juries in 1938, the year petitioner was indicted, that there had been none on any of the grand juries in 1937, that the service of negroes by years had been: 1931,1; 1932, 2; 1933, 1; 1934, 1; 1935, none; 1936,1; 1937, none; 1938, none." This was in a county where blacks made up 20% of the populace and 10% of the poll tax payers [voters]. It IS now more than seventy years later, **little has** changed.

Mr. Fratta is a white male.   [*See* exhibit notebook attached to Fratta's 11.071 Application.]   However, the equal protection clause protects the right of persons to be indicted by a fair representation of their community, i.e., a representative cross section. *See Castaneda v. Partida,* 430 U.S. 482 (1977); *see also Vasquez v. Hillery* 474 U.S. 254 (1986).   Mr. Fratta does not need to be in a protected class to invoke his right to be indicted by a fair representation of his community, nor does he need to be a member of that class to protest an exclusion from grand jury service.

Texas and Harris County have a long history of discrimination against blacks, and Latinos. *See Hernandez v. Texas,* 347 U.S. 475 (1954).   Texas uses the "key man"

system, a system essentially designed to permit partiality.  This system allows those selected by a state court district judge to select those who will serve as potential grand jurors. (*See Castaneda* v. *Partida, id.*)  *See also* Texas Code of Criminal Procedure, Article 19.  Harris County uses "grand jury commissioners" who select candidates from a "broad cross section of the community" per Article 19 from the Code of Criminal Procedure.  From this panel come the actual grand jurors who vote upon indictments. Census data indicate that the Hispanic adult citizen population in Harris County is approximately 21%.  Per a recent University of Houston study [*see* exhibit notebook attached to Fratta's 11.071 Application], the rate of nomination for Hispanics by Grand Jury commissioners was actually 11.5%, and the actual selection rate for service was 8.85%. [*see* exhibit notebook attached to Fratta's 11.071 Application ("THE IMPLICATIONS OF A KEY MAN SYSTEM FOR SELECTING A GRAND JURY: AN EXPLORATORY STUDY" in 3 S.W. JOUR. C.J. 1, 2006.)]

The Supreme Court has recognized the potential discriminatory nature of the key man system. *See Vasquez v. Hillery,* 474 U.S. 254 (1986); *also see Casteneda v. Partida, id.*  Mr. Fratta was indicted by a grand jury using these same suspect methods, and it excluded blacks, Latinos, and women to a degree unacceptable under the doctrine of equal protection.  Per the list of grand jurors attached to Fratta's 11.071 Application, the amount of Hispanic surnames falls below their share of the population based upon census data.  Also, per census data on women, the gender discrimination was equally on a par with that against Hispanics.  In terms of their roughly 19% of the population of Harris

County, blacks were likewise excluded from both the grand jury that indicted Mr. Fratta and the grand jury for the rough year which served in Harris County during that period.

*Casteneda* permits analysis of either grand jury which indicted an individual or historical patterns of discrimination to be used to challenge a grand jury's composition.  A grand jury challenge is thus brought by the Applicant here on these grounds.  Discrimination in any form in our justice system is intolerable. *See Batson* v. *Kentucky,* 476 U.S. 79 (J 986).  Discrimination in the grand jury system affects every other part in our criminal justice system since felony convictions flow from grand jury indictments. *Rideau* v. *Louisiana,* 373 U.S. 723 (1963).  This conviction, since it is based upon an indictment obtained in a discriminatory grand jury process, is thus null and void, and relief should be granted.

## VI.  PUNISHMENT PHASE CLAIMS FOR RELIEF

### CLAIM FOURTEEN

**FRATTA WAS DENIED DUE PROCESS OF LAW DUE TO THE STRUCTURAL CONFLICT OF INTEREST AT THE PUNISHMENT PHASE CAUSED BY STATE MISCONDUCT.**

The Sixth Amendment, through the Fourteenth Amendment to the United States Constitution, provides that in all criminal prosecutions, the accused shall have the right to effective assistance of counsel.  The Texas Constitution, Article I, Section 10, also guarantees a criminal defendant the right to the effective assistance of counsel.  The sentencing stage of trial is a critical stage in which effective representation of counsel is required. *See Gardner* v. *Florida,* 430 U.S. 349 (1977).  Where a conflict of interest

burdens counsel, the defendant is deprived of his Sixth Amendment right to counsel the same as if counsel failed to appear at trial. *Cronic,* 466 U.S. 648 at 653, *see also Bonin* v. *California,* 494 U.S. 1039 (1990).   A constitutional violation may occur if a conflict arises after conviction but before sentencing. *Lopez* v. *Scully,* 58 F.3d 38, 40 (2nd Cir. 1995).

Where no actual assistance of counsel is provided the guarantee made by the Constitution is violated. *Cronic,* 466 U.S. 648 at 653.  To hold otherwise "could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel.  The Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment." *Id.* at 655, *citing Avery* v. *Alabama,* 308 U.S. 444, 446 (1940) (footnotes omitted).  Finally, it has also been noted that if counsel fails to subject the State's case to meaningful adversarial testing, the Sixth Amendment has been violated making the adversarial process itself "presumptively unreliable". *Id.*   "Circumstances of that magnitude may be present on some occasions when, although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659-60.

In the course of deciding this question, the Court identified three situations implicating the right to counsel that involved circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658-659.  First and "[m]ost obvious" was the "complete denial of counsel." *Id.* at 659.  A

trial is presumptively unfair where an accused is denied the presence of counsel at "a critical stage," *id.* Second, it is clear that a similar presumption is warranted if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* Finally, the third situation would be a case where counsel is asked to render effective assistance under circumstances where competent counsel very likely could not. *Id. See Powell v. Alabama,* 287 U.S. 45, 53 (1932). If any of the foregoing situations are presented, a defendant need not show that prejudice or that the proceedings were affected. *Id.* at 659-662; *See also Bell v. Cone,* 535 U.S. 685, 695-96 (2002).

### A.     Structural Conflict Created by State Misconduct

A structural conflict was created between trial counsel and Fratta during the punishment phase of trial when the State made it known they were investigating criminal accusations against trial counsel, King. Since trial counsel was no longer able to effectively represent Fratta and instead was forced to represent her own interests in the face of criminal charges, an inherent conflict of interest affected the fairness of the proceedings. Trial counsel's focus on defending herself required that she place her attention somewhere except upon the punishment phase of Fratta's trial. The media attention garnered by the attack forced King to go on the defensive in the public as well as in the courtroom. Since King was scheduled to prepare the entire punishment case for mitigation, the structural conflict resulted in harm to Fratta.

The punishment phase of Petitioner's trial was scheduled to begin on Tuesday May 26, 2010. Prior to trial, all parties agreed to break the week before punishment over the Memorial Day holiday. After the jury reached a guilty verdict, all parties took the week

off in anticipation of beginning punishment on May 26.  On Saturday night, just two days before trial was to resume, co-counsel McDonald received a call from prosecutor Magness.   McDonald recalled that the prosecution informed him King was being investigated for criminal allegations of supplying Fratta with contraband, at least one partially nude photograph of a woman, while he was in custody at the Harris County Jail. The allegation was that King, assisted by Fratta, smuggled the partially nude photo into the jail, which is a criminal offense and a jail rules violation.  Since trial counsel was no longer able to effectively represent Fratta and instead was forced to represent her own interests in the face of criminal charges, an inherent conflict of interest affected the fairness of the proceedings.  Trial counsel's focus on defending herself required that she place her attention somewhere except upon the punishment phase of Fratta's trial.  The HCDA also released information about the investigation of Fratta's lead counsel to the media, which forced King to defend her reputation in the public.

> **B.    The Fact that King Was Designated to Prepare the Mitigation Evidence at Fratta's Punishment Trial Makes Clear that the Structural Conflict Resulted in Harm to Fratta.**

The trial court was informed, on more than one occasion, that a conflict existed and persisted into the punishment phase of trial.  King requested a mistrial in open court at her first opportunity to do so, on Tuesday, May 26, when court resumed.  At that time, the following exchange occurred on the record:

> MS. KING: ... And one is, my assistant does what I ask her to do. She would have no criminal intent, which has to be proven in any case. She does what I ask her to do. I don't ask her to do anything that's a crime.
>                                     ***

To look at this proceeding from the prosecution's standpoint, that someone might be looking at criminal liability, is extremely intimidating. At this point, I'm going to ask for a mistrial. I think that to intimidate her lawyer -- I mean, Mr. Fratta's lawyer, me, Ms. King -- because r felt very intimidated on Monday when -- I guess, May the 25th, when I was at his office, that now I was being looked at like I had done something wrong in looking at photographs or photographs that had been sent for the purpose of trying to help my client or to try to render him effective assistance of counsel, as the Sixth Amendment guarantees.

***

On Monday, I spent hours trying to understand what was going on and to try to defend myself, while I was supposed to be spending that time trying to defend Mr. Fratta. And answering a lot of the questions that the State asked me yesterday, I spent so much time Monday trying to figure out what happened with these photographs.

***

I've spent so much time on that. And even now, I just think it's extremely unfair, I think it's -- I think it violates Mr. Fratta's constitutional rights and I'd ask for a mistrial and asked that the prosecutors give the next group of lawyers the respect that, hopefully, the lawyers are giving them, because I would not accuse them of anything like that or their assistants, even though I have seen them, you know, talking to witnesses in a way that I didn't think was appropriate.

***

I understand that, in the heat of battle, but to infer that there is -- this is a crime -- because I think Mr. McDonald is just being too nice, he is very congenial, but the way he represented it to me on Monday was that: They might file charges on you. Not that they said it, but that's just the impression that he wanted me to be aware of. I mean, the position that puts me in is just unbelievable, because I would never do anything that I knew or thought was illegal.

33 RR 29-31.

***

112

> THE COURT: '" but I'm also aware that Ms. Magness is
> absolutely correct, that this matter is now being looked at by
> the Sheriff's department and there are other entities that are
> involved in looking at this. And so, not suggesting for one
> second that Ms. Anthony could be prosecuted, but out of an
> abundance of caution, I think it was prudent that Ms. Anthony
> not make any statement at this point.

33 RR 36-37.

In *Cronic,* the Supreme Court determined that ineffective assistance of counsel claims should be examined on the actual performance of counsel at trial, and that reviewing courts should not make a determination of fairness based solely on the surrounding circumstances. *Id.* at 661.  The case now presented is one that lends itself to both the second and third criteria set out in *Cronic,* where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing and also where counsel is asked to render effective assistance under circumstances where competent counsel very likely could not. *Id.* at 659; *see also Powell* v. *Alabama,* 287 U.S. 45, 53 (1932).

Here, the State's misconduct violated Fratta's right to due process when it deliberately made public an investigation of alleged criminal misconduct by his lead trial counsel just before the punishment phase of trial was to begin.   The *Cronic* factors relevant to this Court's inquiry show in no uncertain terms that a structural conflict created by the prosecution resulted in a less than fair trial.  Here, the period of time under which counsel had to act is a significant factor that falls on the Petitioner's side of the ledger.

Trial counsel makes clear that the conflict was initiated just days before trial, and because King was unavailable until just one day before punishment, she was not advised

of the allegations against her until the day before punishment was scheduled to begin. Although King might have had sufficient time to prepare, she was effectively unavailable for the punishment phase.

That she was unavailable for all purposes is evidenced by her asking McDonald to take over punishment, her notice to the trial court that she was unable to participate in punishment, that she asked the trial court for a mistrial, and that she left the courtroom many times during the punishment stage, at one time for a significant period. Further evidence of King's inability to function as Sixth Amendment counsel can be confirmed by the numerous allegations of deficient conduct alleged *infra* and the numerous instances where there was a total lack of preparation, presentation and investigation of the punishment witnesses. There is no evidence in the record that she assisted McDonald in the preparation or presentation of any punishment witness.

From this posture, this Court must turn to the time McDonald had to prepare for the punishment phase, which was essentially *one day* after he learned that King was no longer functioning as conflict-free counsel for Fratta. There were only five (5) witnesses presented during punishment phase; of those, two were custodians of record and one was there under State subpoena. 33 RR 132. Of these witnesses, one was an expert that required significant preparation prior to his testimony, never conducted by McDonald. As discussed, *supra,* Dr. Sorenson, the only witness called to rebut the State's evidence that Fratta was a future danger, sat in the hallway of the courthouse and was *never called to testify at punishment.* Dr. Sorenson was never called even though he had planned to testify, was never told he would not testify and created a power-point presentation to

assist jurors with the factors considered in reaching his conclusion that Fratta was not a future danger. (*See* exhibit notebook attached to Fratta's 11.071 Application.)  King was scheduled to prepare this witness but due to the conflict that was created, had no time to do so prior to his testimony.

For all the foregoing reasons, this case presents in compelling terms a unique situation where a structural conflict existed between trial counsel and the client that resulted in a less than fair trial.  While *Cronic* makes clear this Court should not infer this conclusion from the surrounding circumstances, it is equally clear that no such inference is required here because the record has ample support for the factors identified by the Supreme Court in weighing the fairness of the trial.  Here, both were experienced trial attorneys; however, the State's misconduct disrupted their ability to provide Fratta with effective assistance of counsel.

This case was a high profile, capital murder case that had previously been tried to a death verdict.  Of importance is how closely this case was watched on re-trial by everyone in the community.  The case garnered strong media attention.  Two of the best and most experienced prosecutors were assigned, and it included a defendant that was openly hated by the community.  Finally, it appears from the record that while his attorneys had some access to the witnesses, the short time period under which McDonald had to work would not have permitted him to have any meaningful preparation with them after he was given notice that he would take over the punishment phase.

For all the foregoing reasons, it is clear that a structural conflict was created by the prosecutor's misconduct in making the decision to make criminal allegations against

Fratta's lead counsel, and her young assistant, at a time when King was charged with the duty to her client and her client alone.  As a result of the accusations, and as recounted by King, she was put in the position to take to her own defense, leaving Fratta to fend for himself.  [*See* King's affidavit, originally attached to Fratta's Motion for New Trial.]  In this situation, it cannot be doubted that although counsel was present, **Fratta was left without the Sixth Amendment Counsel as was contemplated by the United States Constitution.**  Where a conflict of interest burdens counsel, the defendant is deprived of his Sixth Amendment right to counsel the same as if counsel failed to appear at trial. *See Bonin* v. *California,* 494 U.S. 1039 (1990).  Where no actual assistance of counsel is provided, the guarantees made by the Constitution are violated. *United States* v. *Cronic,* 466 U.S. 648, 653 (1984).  Since Fratta had no actual assistance of counsel due to a conflict created by State action, he was denied his Sixth Amendment right to effective assistance of counsel.

<u>**CLAIM FIFTEEN**</u>

**FRATTA WAS DENIED SIXTH AMENDMENT RIGHT TO COUNSEL DUE TO AN ACTUAL CONFLICT OF INTEREST AT THE PUNISHMENT PHASE.**

In *Cuyler,* the Supreme Court set out a different standard to analyze actual conflicts of interest that adversely affect the lawyer's performance at trial. *Cuyler* v. *Sullivan,* 446 U.S. 335, 350 (1980).  *Cuyler* is the correct standard to analyze an actual conflict of interest at trial that ultimately affects a defendant's right to Sixth Amendment counsel.  The *Cuyler* Court held that "[i]n order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely

affected his lawyer's performance." *Id.* "In other words, the appellant must show that an actual conflict of interest existed and that trial counsel actually acted on behalf of those other interests during the trial." *Acosta* v. *State,* 233 S.W.3d 349, 355 (Tex. Crim. App. 2007). "An 'actual conflict of interest' exists if counsel is required to make a choice between advancing his client's interests in a fair trial or advancing 'other interests' to the detriment of his client's interests. *Id., citing Monreal v. State,* 947 S.W.2d 559, Tex.Cr.App. 1997). Such 'other interests' can include counsel's personal interests." *Id.*

As set out in the argument and authorities *supra,* King had an actual conflict of interest with Fratta when the State made criminal accusations against her prior to the punishment stage of trial. Since McDonald was put in a position to defend his co-counsel and her assistant, there was no one left to defend the rights of Fratta or prepare for the punishment phase of his capital murder trial. This is exactly the type of scenario contemplated by *Cuyler* and *Acosta.* For this reason, Fratta was denied the effective assistance of counsel by an actual conflict of interest at the punishment phase of trial when his attorney was required to defend herself and not her client.

The State had no need to reveal the investigation or accusations just days before the punishment phase of trial was scheduled to begin. The personal animosity between the lawyers had risen to a level where this act was either an attempt to impugn Fratta in front of the jury or a foolish attempt to attack the reputations of trial counsel with the unexpected destruction of his team's ability to fight for him at punishment. No matter the purpose of the misconduct by the State, the result was the same; an unfair trial that requires reversal. That this is a capital murder case where Fratta ultimately received the

death penalty cannot be underestimated when considering the rights that were affected. As emphasized by the Supreme Court, *supra,* "(l)awyers in criminal cases "are necessities, not luxuries." *Cronic,* 466 U.S. at 653.

In the alternative, should this Court determine that prejudice must be shown under *Strickland,* Fratta incorporates by reference the following argument to grounds one and two. The "prejudice" prong of *Strickland* requires this Court to determine whether trial counsel's deficient conduct was sufficient to undermine its confidence in the jury's punishment verdict, that is, whether there is a reasonable probability that, but for the objectively deficient conduct, the result of the punishment stage would have been different. *Strickland v. Washington,* 466 U.S. at 694; *Kyles v. Whitley,* 514 U.S. at 430. In determining if Fratta has met this burden, this Court cannot require him to show he would have received a lesser sentence but for trial counsel's errors. *Everage v. State,* 893 S.W.2d 219, 222 (Tex. App. - Houston [1st Dist.], 1995). The prejudice Fratta must demonstrate is by less than a preponderance of the evidence.

The *Strickland* prejudice prong can be satisfied on the basis of a single error or numerous errors on trial counsel 's part in the punishment stage, either of which can result in relief. *See Menefee v. State,* 175 S.W.3d 500, 507 (Tex. App. Beaumont, 2005)(failure to object to invalid enhancement allegation); *Oliva v. State,* 942 S.W.2d at 733-34 (failure to object to State's final argument that defendant had not shown any remorse or regret for what he had done). If the prejudicial effect of any or all of counsel's objectively deficient conduct is sufficient to undermine this Court's confidence in the

outcome of the punishment stage, Fratta must be given a new punishment hearing. *See Kyles* v. *Whitley,* 514 U.S. at 441.

Here, trial counsel's conflict of interest with Fratta caused a breakdown in the adversarial system of justice in the punishment phase of his capital murder trial.  First and foremost in evaluating this claim is the prosecution's decision to accuse lead counsel King of criminal charges.  She was the person charged with the responsibility to handle the punishment phase of Fratta's trial.  King did not actually find out about the accusations until the day before punishment began.

King informed the trial court that she spent the rest of that afternoon, the day before punishment, *not preparing* for Fratta's punishment trial but preparing *her* defense to the allegations lodged by the State actors.  Second, the State's further action to release these accusations of criminal misconduct alleged against lead counsel King to the media prior to the start of Fratta's punishment phase resulted in harm to Fratta.  The record is clear that McDonald did not believe in mitigation and did not have time to prepare for the punishment phase.

It is also clear that these allegations had a significant effect on King's ability to defend Fratta in the face of these allegations.  This fact is made clear by her request for a mistrial, her statement to the trial court that she was required to defend herself and could not also protect Fratta's interests, and finally the myriad of deficient conduct alleged when her performance fell below the standard of reasonably effective counsel.  Of note is the fact that the Harris County District Attorney's Office never conducted any investigation into King, even though this fact was conveyed to King just prior to the start

of the punishment phase.  The wealth of evidence in this proceeding underscores the fact that trial counsel's deficient conduct prejudiced Fratta.  The effect of this was it made the State's punishment case significantly more persuasive while it made Fratta's significantly *less* persuasive, the hallmark of prejudice. *See Peters v. State,* 31 S.W.3d 704, 723 (Tex. App. ‑ Houston [1st Dist.], 2000); *Roberts v. State,* 29 S.W.3d 596, 602 (Tex. App. ‑ Houston [1st Dist.], 2000).

In considering whether trial counsel's multitude of deficient conduct prejudiced Fratta, the fact that there was sufficient evidence to support the conviction does not necessarily mean that the nature of that evidence merited a death sentence versus a lengthy prison sentence. *See Salazar v. State,* 118 S.W.3d 880, 885 (Tex. App. ‑ Corpus Christi, 2003)(op. on remand).  Given the effect of the State's misconduct, and the resulting objectively deficient performance of counsel, this Court must have grave doubt that the punishment verdict of death was free from the substantial influence of trial counsel's errors and must act as if it did. *United States v. Lane,* 474 U.S. 438, 449 (1986). This Court has said that in cases of "grave doubt," the defendant, Fratta, must win. *Burnett v. State,* 88 S.W.3d 633, 638 (Tex. Crim. App. 2002).

<u>CLAIM SIXTEEN</u>

**IN VIOLATION OF SIXTH AMENDMENT RIGHTS, FRATTA WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING THE PUNISHMENT STAGE OF TRIAL DUE TO COUNSEL'S FAILURE TO INVESTIGATE, PREPARE AND PRESENT WITNESSES.**

**A.    CHALLENGED CONDUCT**

1.    Trial counsel failed to investigate, prepare or present mitigating evidence of Fratta's family history;

2.    Trial counsel failed to investigate, prepare or present an expert on the issue of future dangerousness;

3.    Trial counsel failed to investigate, prepare or present mitigating evidence of steroid use;

4.    Trial counsel failed to investigate, prepare or present a neuropsychology expert; and

5.    Trial counsel failed to prepare the following trial witnesses:

    a. Dr. Rhan Bailey

    b. Lisa D'Cunha

    c. Steve Rogers

**B.    ARGUMENT AND AUTHORITIES**

The right to the assistance of counsel is guaranteed by the Sixth and Fourteenth Amendment to the United States Constitution and Article 1, Section 10 of the Texas Constitution.  The right to be represented by counsel is by far the most important of a

defendant's constitutional rights because it affects the ability of a defendant to assert all other rights, including the right to a fair trial.  As explained in *Powell v. Alabama,* 287 U.S. 45, 53 (1932):

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with a crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise an admissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect. If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense.

*Id.* at 68-69.

A defendant in a criminal case is entitled to reasonably effective assistance of counsel. *Wilkerson v. State,* 726 S.W.2d 542, 548 (Tex. Crim. App. 1986).  Under the standard set out by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 698 (1984), a defendant seeking relief as a result of trial counsel's deficient performance must first show that counsel's performance was deficient and then demonstrate that this deficient performance prejudiced the defense. *Miniel v. State,* 831 S.W.2d 310, 323 (Tex.

Crim. App. 1992).  The *Strickland* test is applicable to ineffective assistance claims at the guilt-innocence and punishment stage of capital trials. *Craig v. State,* 825 S.W.2d 128, 129 (Tex. Crim. App. 1992).  For an error on counsel's part to reach this level, there must be a reasonable probability, a probability sufficient to undermine confidence in the outcome of the trial, that, but for the counsel's unprofessional errors, the outcome of the proceeding would have been different. *Ex parte Zepeda,* 819 S.W.2d 874, 876 (Tex. Crim. App. 1991).  The defendant must prove ineffective assistance of counsel by a preponderance of the evidence. *Cannon v. State,* 668 S.W.2d 401, 403 (Tex. Crim. App. 1984).

The Supreme Court has held that counsel's performance is measured against an "objective standard of reasonableness ... under prevailing professional norms." *Strickland v. Washington,* 466 U.S. at 688.  In assessing the reasonableness of trial counsel's investigation, or lack thereof, a reviewing court must consider not only the quantum of evidence known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Wiggins v. Smith,* 539 U.S. at 597.  The Supreme Court has long held that a defendant need not show that counsel's deficient performance more likely than not altered the outcome of the case, only that a breakdown in the adversarial system has occurred.

Trial counsel has a professional duty to "present all available evidence and arguments to support the defense of his client." *Jackson v. State,* 857 S.W.2d 678, 683 (Tex. App. - Houston [14th Dist.], 1993); *State v. Thomas,* 768 S.W.2d 335, 336 (Tex. App. - Houston [14th Dist.], 1989).  The Sixth Amendment does "require counsel to put

the prosecution's case to the test through vigorous partisan advocacy." *Haynes v. Cain,* 272 F.3d 757, 764 (5th Cir. 2001).  This professional responsibility encompasses the duty to seek out and interview potential witnesses and the failure to do so constitutes ineffective assistance of counsel. *Ex parte Welborn,* 785 S.W2d 391, 395 (Tex. Crim. App. 1991); *Milburn v. State,* 15 S.W.3d 267, 270 (Tex. App. - Houston [14th Dist.], 2000); *Shanklin v. State,* 190 S.W.3d 154, 165-66 (Tex. App. - Houston [1st Dist.], 2005).  The failure to interview and call witnesses who are available to testify and whose testimony would have been beneficial to the defendant is not strategic because counsel can only make a reasonable decision to forego calling such witnesses after evaluating their testimony and determining that it would not be helpful. *Milburn v. State,* 15 S.W.3d at 270.

While the defendant has the burden to overcome the strong presumption that trial counsel's challenged conduct might be considered "sound trial strategy," this does not mean that counsel may insulate his challenged conduct from appellate review merely by claiming that his conduct was "strategic." *See Bell v. Cone,* 535 U.S. 685, 698 (2000). The Supreme Court has stressed that strategic choices are entitled to deference only to the extent they are based on *informed* decisions by trial counsel. *Strickland v. Washington,* 466 U.S. at 690-91.  A reviewing court's "principal concern" is not whether counsel's conduct was strategic "but rather whether the investigation supporting counsel's decision ... was itself reasonable ... " *Wiggins v. Smith,* 539 U.S. at 522-23.  Counsel's claimed strategic decision "cannot be credited as a calculated tactic or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least

adequate for that purpose." *Lewis* v. *Dretke,* 355 F.3d 364, 368 (5th Cir. 2003); *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir. 1991).  For all these reasons, a strategy that is based on counsel's failure to fully investigate the facts or a misunderstanding of the law is not objectively reasonable. *Moore v. Johnson,* 194 F.3d 586, 610 (5th Cir. 1999).   A reviewing court is "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Id.*

### C.    DEFICIENCY AND PREJUDICE

The State's primary focus in the punishment phase was on Fratta's personality, generally including portraying him as a sexual deviant, a narcissist, a manipulator, and a womanizer, who they showed, ultimately came from an all American home. 33 RR at 183-205.  The State emphasized through Dr. Rhan Bailey, an expert in psychiatry called by Fratta, that Fratta's personality disorders were unchangeable traits that controlled his actions as much today as they did in 1994. 33 RR 98.  Specifically, Dr. Bailey testified on cross that general personality disorders are not viewed as highly changeable because it is how someone is "wired." 3 RR 102-03.  Prosecutors called Dr. Lawrence Abrams, a clinical psychologist who testified about Fratta's relationship with Farah. 32 RR 38-42.  He testified, without objection, that Fratta's relationship with his wife was a "sick relationship." 32 RR 44.   Dr. Abrams detailed the sexually deviant side of their relationship, including Fratta's alleged requests that his wife step on his neck, hit him, and allow him to eat her defecation and urinate his mouth, all as he masturbated, as well as other aspects of his masochistic sexual behavior. 32 RR 44-46.  Dr. Abrams testified he

found the sexual behavior "extreme" and told jurors it was the most he had ever seen, as far as deviant sexual conduct by anyone. 32 RR 45-46.

Fratta's trial attorneys did nothing to rebut the claims made by the State about his personality disorders or attempt to explain his deviant sexual behavior, including attempting to explain his need to be hurt by another person to feel gratification. 32 RR 46-48.   An investigation would have revealed a significant amount of mitigation evidence, including Fratta's family history detailing his upbringing that would have provided mitigating evidence the jury should have considered.  All of this evidence was available but never prepared by trial counsel prior to the punishment phase of his capital murder trial.  As presented in the exhibit volume attached to Fratta's 11.071 Application, Fratta's family has a long history of mental illness, alcoholism, and multiple deaths that had a profound effect on Fratta.  [*See* Affidavit of Vicki Briggs and chart of family members attached to Fratta's 11.071 Application.]  Since Fratta was effectively portrayed by the prosecution as a sexual deviant, narcissist, and a person who manipulates others, this mitigation evidence would have been helpful to the jury to explain his demeanor and behavior.

As set forth in Carmen Laffey's affidavit attached to Fratta's 11.071 applications, she is a licensed mitigation specialist who assisted Fratta's trial attorneys.  She recalled that King and McDonald met monthly with her to discuss the case but they rarely talked about any mitigation investigation or preparation of punishment evidence.  Laffey recalls that the primary focus of their meetings was the guilt-innocence phase of trial.  In fact, McDonald frequently expressed his opinion that he did not believe in mitigation.  For this

reason, King was designated to handle the punishment phase.  According to Laffey, she met with King on two occasions to discuss mitigation prior to punishment.  Specifically, Laffey noted she was never instructed to speak with Fratta's children or extended family that resided out of state except his sister Jill Adams.  Prior to and during the punishment phase, King was distraught over the criminal accusations lodged by the prosecutors that she smuggled contraband into Fratta while he was in the Harris County Jail.  For this reason, McDonald presented witnesses at punishment to assist King.  Laffey never discussed mitigation or punishment witnesses with McDonald, prior to or during the punishment phase of trial.

At the punishment phase, Laffey was called to testify that she was unable to find friends that grew up with Fratta. 33 RR 151.  She testified that although she did make contact with Danny Briscoe, a family friend to Fratta, he was unavailable to testify. 33 RR 152.  Laffey introduced two pages of Fratta's college transcripts and pictures of him as a child. 33 RR 155-56.  Finally, records were introduced that Fratta worked with garments in prison at the Ellis Unit.  This evidence was offered without elaboration as to why or how this could be evidence a jury might find mitigating. 33 RR 158.  Laffey's testimony was so inconsequential to the punishment issues that the State passed on the opportunity to cross-examine her. 33 RR 161.  Laffey's entire presentation as Fratta's mitigation specialist covered just ten pages of the record. 33 RR 149-59.

Review of Fratta's family and background would reveal a large family with numerous cousins, aunts, and uncles.  Investigation into Fratta's family and background would have easily uncovered more family members that were available but neither

contacted nor presented at the punishment stage.  There can be little doubt that Fratta's family history and upbringing would have assisted his jury in understanding the numerous personality defects brought out by the prosecution and ultimately used against him at punishment.  Fratta's background revealed a history of mental health issues, alcoholism and mental illness that included death and institutionalization.  Since Fratta's jury did not hear from these witnesses, they could not have considered the mitigating nature of such stigmatizing personality flaws. 33 RR 83-125.  This mitigation evidence would have revealed to the jury a tragic childhood marked by the death of friends, family and even a sibling.  None of the witnesses called at the punishment phase discussed his troubled childhood and the effect it had on him.  In addition, no one discussed his family's mental history that would have helped his jury to understand that much of the arrogant, narcissistic, sexually deviant personality revealed by the prosecution was out of his control and the product of his heredity as much as his environment.  Not only did Fratta's jury never hear mitigating evidence on these topics, they heard evidence to the contrary from one of Fratta's own witnesses called during the punishment phase.  King called Robin Kazmeroff to testify that he had known Fratta since he was 19 years old. 33 RR 183.

Kazmeroff met Fratta just after his father died when Fratta was 17 years old. Kazmeroff knew Fratta's mother and sister.  He testified that Fratta came from an all American home that had no abuse, no drugs or alcohol problems, and that it seemed like a normal family to him. 33 RR 195-99.  Importantly, King noted on the record that she quickly interviewed Kazmeroff the day he testified. 33 RR 186.  Since no investigation

was conducted, there was little, if any mitigation evidence for his jury to consider in determining whether life or death was an appropriate punishment in this case.  Moreover, the inadequate investigation and preparation of Kazmeroff actually left the jury with a false impression of Fratta's childhood that was in stark contrast with reality.

Had an adequate investigation been done, and as set out in the exhibits volume, Fratta's childhood would have revealed to the jury numerous tragedies, family instability, mental disease and death.  Affidavits revealed the following: the death of Fratta's father at a young age was just one of many deaths he experienced before the age of 18, including but not limited to two cousins, a childhood friend, and a baby brother.  The late-term miscarriage of Fratta's young would be brother.  The death of his father that caused Fratta's mother to have a mental and emotional breakdown that shaped much of Fratta's young adulthood.  His childhood and young adulthood was influenced by his mother's unstable behavior as a caregiver.

> • Fratta was treated very badly by his family members because he was of Italian descent. His uncles treated him like "scum". After the death of his father, Fratta's uncles never visited him because he was Italian.

> • Fratta had no real father figure in his life after the death of his father.

> • There were many other deaths in Fratta's family and Briggs believes this was very hard on him, particularly after his father died.

> • Fratta was devastated when his father died. He was lost and seemed to deal with the loss by keeping himself so busy he did not have to think about it. Fratta started working for the family when he was very young, just like his father. Fratta needed to work to help support the family in his

father's absence.  The family seemed to break apart as a
result of Fratta's father's death.

• All of the men in Fratta's life were very strict
disciplinarians who showed little emotion and were cold to
each other.

• Fratta had at least two family members that were
institutionalized. His aunt was put in the hospital for a
nervous breakdown. Another was placed in a sanitarium.

• Fratta was a physically small child growing up. He was
picked on often and became very insecure about his size as a
result.

• Fratta has a large family. On his mother's side alone there
are 19 cousins. None of them were contacted regarding this
case. Everyone grew up around each other and would have
had information about Fratta's childhood.

The affidavit of Victoria Briggs, also set out in the exhibit volume attached to

Fratta's 11.071 Application, is further evidences that Fratta's trial counsel never

attempted to contact her or his family to discuss how Fratta upbringing or family history.

Had she been contacted she would have made herself available to testify.  The mitigation

evidence Fratta's jury never heard was information that would have been particularly

helpful to the jury's decision about whether he would be a future danger to society and in

its ultimate decision to put him to death.  Much of the punishment case presented by the

State consisted of details pertaining to Fratta's personality, sexual preferences, his cold

demeanor after the death of his wife, and his paranoia towards family and friends.  This

evidence could have been effectively rebutted by the defense to help the jury understand

or at the very least minimize the impact of the extraneous, stigmatizing acts alleged by

the State.  Fratta's defense attorneys could not make a tactical decision not to call the

family members that were available to testify because they were never interviewed or called.   While trial counsel may argue that Fratta did not provide the names of these witnesses in preparation for the punishment phase, this argument has been repeatedly held to be unavailing. *See Rompilla v. Beard,* 545 U.S. 374, 360 (2005)(even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, counsel is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial); *See also Ex parte Martinez,* 195 S.W.3d 713, 729 (Tex. Crim. App. 2006)(same).

Trial counsel's failure to investigate anyone of the numerous witnesses or attempt to investigate Fratta's family history, given the monumental materiality of this testimony to the issue of future dangerousness and to explain the myriad of extraneous bad acts alleged at punishment, was objectively deficient conduct.   The failure to interview and call anyone of these witnesses was objectively deficient conduct, as they were available and willing to testify at the punishment phase of trial. *Ex parte Welborn,* 785 S.W.2d at 395, *Milburn v. State,* 15 S.W.3d at 270, *Shanklin v. State,* 190 S.W.3d at 165-66.

If trial counsel were to claim that the failure to investigate or present these witnesses was tactical, this assertion is devoid of merit because "a decision to interview a potential witness is not a decision related trial strategy; rather, it is a decision related to adequate preparation for trial." *Chambers v. Armentrout,* 907 F.2d at 828.   Since neither trial attorney interviewed any of the 28 witnesses, any tactical decision that might be asserted could not, as a matter of law, be objectively reasonable. *Milburn v. State,* 15

S.W.3d at 270, *Smith v. State,* 894 S.W.2d 876, 880 (Tex. App. - Amarillo, 1995)("Trial counsel's abdication of his basic threshold responsibility to ascertain facts and seek out and interview potential witnesses is the antithesis of sound trial strategy."). Trial counsel's failure to interview and contact these witnesses, even though they were available and willing to testify, and the failure to investigate any of Fratta's family history in order to prepare a punishment case that provided jurors with any mitigating evidence to help explain Fratta's personality disorders or unusual behavior, both before and after the death of his wife, was objectively deficient. *See Ex parte Gonzales,* 204 S.W.3d 391, 396-97 (Tex. Crim. App. 2006)(trial attorneys failure to investigate and present mitigating evidence in capital murder case), *see also Ex parte Briggs,* 187 S.W.3d 458, 469 (Tex. Crim. App. 2005).

Trial counsel's decision not to call any of the 28 witnesses presented was objectively deficient conduct because it was not informed by a reasonable investigation. The Supreme Court has stressed that strategic choices are entitled to deference only to the extent they are based on *informed* decisions. *Strickland* v. *Washington,* 466 U.S. at 690-91. A reviewing court's "principal concern" is not whether an attorney's conduct was strategic, "but rather whether the investigation supporting counsel's decision .. , *was itself reasonable." Wiggins v. Smith, 539* U.S. at 522-23 (emphasis in original). For all the foregoing reasons, trial counsel's decision not to call or investigate Fratta's family history and upbringing was objectively deficient conduct.

Future dangerousness is a special issue that focuses on a defendant's character for violence, not merely the quantity or quality of the institutional restraints put on that

person. *Coble v. Slate,* 330 S.W.3d 253, 268-69 (Tex. Crim. App. 2010), *reh'g denied* (Jan. 12, 2011). "This Court's case law has construed the future-dangerousness special issue to ask whether a defendant would constitute a continuing threat ' whether in or out of prison' without regard to how long the defendant would actually spend in prison if sentenced to life." *Id., citing Estrada* v. *State,* 313 S.W.3d 274 (Tex. Crim. App. 2010). The United States Supreme Court recently held that "a state capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Id.,* citing *Kansas v. Marsh,* 548 U.S. 163, 173-74 (2006). Therefore, a jury is asked to focus on the defendant's individual character and the probability that he would commit acts of violence in the society in which he found himself. *Id.* The most important criterion the jury must decide when focusing on the future dangerousness issue is whether the defendant would pose a risk of violence in the future, in a structured prison community. *Id.* Importantly, as this Court has observed, "the 'future dangerousness' special issue ensures that no defendant, regardless of how heinous his capital crime, will be sentenced to death unless the jury finds that he poses a real threat of future violence. *Coble v. State,* 330 S.W.3d 253, 268.

As set forth in the report and *curriculum vitae* made part of the exhibit Volume attached to Fratta's 11.0171 Application, Dr. Jon Sorenson, has a doctoral degree in criminal justice and is employed as a professor in criminal justice at Prairie View University. He has received grants from the Texas Department of Family and Protective

Services, The Texas Department of State Health Services and the Clark Foundation for the National Associates Program on State Sentencing and Corrections. He has published over fifty articles in peer-reviewed publications, three of which were cited by the United States Supreme Court in *Ring v. Arizona,* 536 U.S. 584 (2002). In this capacity, he has conducted psychological evaluations and risk assessments of numerous offenders charged in capital cases. He is familiar with the significant body of research regarding future dangerousness, specifically regarding institutionalization.

Dr. Sorenson was contacted by Carmen Laffey pretrial to conduct an evaluation and risk assessment on Fratta, to determine if there were any factors present that would have constituted mitigating evidence in the punishment stage. As set out in his affidavit, Dr. Sorenson's reviewed medical, jail and prison records in anticipation of testifying to Fratta's likelihood of being a future danger in prison. Ultimately, Dr. Sorenson formed an opinion, based on statistical data, that he was overwhelmingly in favor of "Mr. Fratta being little or no risk at all to committing future acts of violence." Based on his findings, Dr. Sorenson prepared a presentation for jurors to better understand the statistical analysis he used to determine that Fratta would not be a future danger to society or prison officials.

Dr. Sorenson concluded that a number of factors were present that were mitigating in nature:

> • Fratta is "middle-aged male with minimal history of disciplinary infractions while incarcerated ... who demonstrated positive adjustment to his incarceration."

134

• Fratta is a college educated, 52-year-old man who has already served 14 years in prison without any assault or serious rule violation.

• "Numerous studies indicate that the incidents of prison rule violations and disciplinary infractions greatly decreases with age as does the rate of inmate homicide and staff assault. Further, studies also show that the probability of future acts of violence decreases as the amount of time served by an inmate increases."

• There was a less than 2% chance that Fratta would ever actually commit another act of violence in prison.

Even though Dr. Sorenson waited outside the courtroom to testify at Fratta's punishment stage, the jury never heard from him because he was never called. Although he waited in the hallway, had previously prepared and organized a presentation to educate jurors on the factors to consider in future dangerousness determinations and to give them his opinion that Fratta had a high probability of never being a future danger, *he was not called.* No experts were called by the defense at the punishment phase of Fratta's trial on the issue of future dangerousness.

Trial counsel's decision not to call Dr. Sorenson to testify was objectively deficient because the issue of future dangerousness was tantamount to the life or death of Fratta and no other evidence was presented on this issue to the jury. As discussed *supra,* a decision to call a witness must be informed by a reasonable investigation. Neither trial attorney ever met with Dr. Sorenson to prepare for the punishment phase of trial. In fact, Laffey only met with Dr. Sorenson on one occasion. Since neither attorney met with Dr. Sorenson, and because the mitigation specialist in this case only met with him on one

occasion, there can be no sound tactical decision not to call him as a witness where no reasonable investigation was conducted. *See Wiggins v. Smith,* 539 U.S. at 522.  Because trial counsel's failure to call Dr. Sorenson or any expert on future dangerousness, where it is one of the essential issues for jurors to determine in the punishment of a capital murder trial, it was objectively deficient conduct.  This failure cannot be redressed by trial counsel who may say that Dr. Bailey satisfied this because first, Dr. Bailey was never prepared properly.  Second, Dr. Bailey does not conduct research on penal institution actuarial factors that tend to work in favor of or against an inmate being a future danger. Fratta was prejudiced by trial counsel's objectively deficient conduct in that the jurors never heard any evidence from the defense on the issue of future dangerous.  Laffey, as a mitigation specialist, opined that Dr. Sorenson's testimony would have been beneficial to the jury in assessing Fratta's risk of future dangerousness.

Carmen Laffey, the mitigation specialist in this case, identified a significant history of anabolic steroid use by Fratta.  Having identified this issue, it was never investigated or presented at the punishment phase of his trial.  As recounted by Laffey, Fratta's defense attorneys either did not believe in mitigation evidence or met only rarely on the issue of mitigation.  Laffey recalled that she met with trial attorneys only twice to discuss mitigation and punishment evidence for Fratta in his capital murder case.

Fratta started competing in professional body building in the late 1970's.  Fratta's history of steroid use first began with injectable anabolic steroids in the 1980's.  He continued to take oral steroids, including Anadrol, Winstral and Dianabols for several years.  In 1991 a physician began injections of Cypionate and Propionate steroids.  On at

least one occasion, the combination of steroids caused his blood pressure to skyrocket and his nose to bleed.  Fratta provided all this information to Laffey, to use at the punishment phase.  He also provided releases for medical records to be collected in order to substantiate his recollections.  Fratta's trial attorneys did not investigate, prepare or present evidence of steroid abuse and never discussed with him why this information was not used at the punishment stage.

Attached to the exhibit volume filed with Fratta's 11.071 Application are numerous articles from reliable, scientific sources that long-term steroid abuse, like that presented here, can cause any number of the relevant personality traits possessed by Fratta.  Specifically, this information would have been essential to rebut the State's claim that Fratta's paranoia, delusional personality, and bizarre sexual desires, were unchangeable traits that made him as much of a future danger in 1994 as he would be in the present.  The State emphasized through Dr. Bailey that these were unchangeable personality traits that Fratta possessed which controlled his actions as much today as they did in 1994.  33 RR 98.

Trial counsel's responsibility to present all available evidence and arguments on his client's behalf is especially true when it involves the investigation and presentation of mitigation evidence in the punishment stage of trial. *See Williams* v. *Taylor,* 529 U.S. 362, 395·39 (1999).  "The sentencing stage of any case, regardless of the potential punishment, is the time at which for many defendants the most important services of the entire proceeding can be performed.   Where the potential punishment is life imprisonment [or death] ... the sentencing proceeding takes on an added importance."

*Vela v. Estelle,* 708 F.2d 954, 964 (5th Cir. 1983). "Counsel must make a significant effort, based on a *reasonable investigation and logical argument,* to mitigate his client's punishment." *Patrasso v. Nelson,* 121 F.3d 297, 303·04 (7th Cir. 1997).

Consistent with these obligations the numerous articles presented on anabolic steroid abuse and its effects on the human brain and particularly on personality traits of those who abuse them underscores how this information would have assisted the jury to put in proper perspective those traits. The steroid abuse and its effects on Fratta could have made the State's case for future dangerousness significantly *less* persuasive while making a case for life significantly *more* persuasive. For all these reasons, trial counsel's failure to investigate or present this material at the punishment stage of Fratta's capital murder trial was objectively deficient conduct. *See Wright v. State,* 223 S.W.3d at 43-44, *Ex parte Briggs,* 187 S.W.3d at 467.

Trial counsel failed to investigate, prepare or present a neuropsychology expert to discuss the effects of steroid abuse on the brain and other mental disorders; both presented in this case. A neuropsych screening of Fratta could have revealed information about the long-term effects of steroid abuse has on the mind and the body. The damages of steroid abuse are documented in the articles attached to the exhibit volume, that show that abuse of steroids does affect the brain and personality. Trial counsel was objectively deficient in failing to investigate, prepare or present an expert on this relevant mitigation evidence at the punishment phase of Fratta's trial. Viewed through the prism of controlling legal authority *supra,* trial counsel's failure to consult with and call an expert

witness in the area of neuropsychology was objectively deficient conduct that could not have been the result of a reasoned trial strategy.

Trial Counsel's Failure to Prepare The Following Trial Witnesses:

### a. Dr. Rhan Bailey

Dr. Rhan Bailey was a defense witness called during the punishment phase of trial. Dr. Bailey testified that he is currently under contract with the State of Texas to evaluate sex offenders and determine the risk of future dangerousness if they were released from prison. 33 RR 52.  Dr. Bailey conducted psychological testing on Fratta and concluded he had "paranoid disorder thought" and some delusional thinking. 33 RR 67.  Fratta had "mild brain impairment" according to Dr. Bailey and some paranoia and mood disorder. 33 RR 68-75.  On cross examination, the prosecution made clear that none of what Dr. Bailey presented to the jury "reduces the moral blameworthiness" of Fratta, to which he agreed.  33 RR 89.  The State focused on the fact that narcissism was a prominent trait in Fratta and discussed the possibility of exposing Fratta to other unknown victims. 33 R 89-97.  The prosecution even eluded, without objection to "fights" by Fratta while he was in prison, that it was a risk to take him off death row and again reiterated that Dr. Bailey's testimony did not diminish Fratta's moral blameworthiness. 33 RR 103.  Finally the prosecution discussed unusual sexual behavior of Fratta and got Dr. Bailey to confirm that the personality disorders that were exhibited by Fratta were not viewed as changeable because it is how a person is "wired". 33 RR 102.

Based on the Laffey's affidavit (attached to Fratta's 11.071 Application) this witness was never prepared by trial counsel.  Since the testimony elicited by Dr. Bailey

tended to hurt the defense rather than help it, it revealed a total lack of preparation on the part of trial counsel in presenting him the jury. In addition, Dr. Bailey gave the jury information about personality disorders that he later testified would be a *"future danger"* thereby buttressing the State's case and not the defense.

### b. Lisa D'Cunha

Lisa D'Cunha was called as a defense witness to introduce medical records from the Texas Department of Criminal Justice ("TDCJ"). 33 RR 137-38. It is clear that she was called to testify that Fratta had never harmed himself or others while in TDCJ however the State was able to present the witness for the purpose of showing that Fratta was manipulative. 33 RR 145. The State used D'Cunha to tell the jury about an incident contained in the records where Fratta claimed he would sleep all the time and was depressed. 33 RR 145. The notes in the file indicated he was requesting a cell with a window. The notes conclude "the patient did not appear depressed. This appears to be manipulation for secondary gain." 33 RR 145. In light of the personality traits that were consistently shown by the State to be a possible future danger, this harmed Fratta. Trial counsel's preparation for this witness or a review of the medical records would have revealed this information and permitted the redaction from the records.

### c. *Steve Rogers*

Steve Rogers was a prosecution witness the State had determined they were not going to call as a witness. 33 RR 162. King made a last minute decision to call Rogers even though she did not prepare him to testify. King called him to provide information on Fratta's work in the garment area of prison after the judge would not allow Laffey to

elaborate on this topic.  Although some general information was presented that Fratta was a trusted inmate permitted to work in garments, the State elicited from Rogers that Fratta had been caught with a weapon in his cell back in 1998 that resulted in him being removed from the trusted position in garments. 33 RR 167.  King was left to argue that the weapon had never been used, which Rogers agreed to this fact. 33 RR 170.  The State offered on cross that a weapon can also be obtained in the restricted death row area. 33 RR 170.  Finally, King referred to the object as a "shank" in front of the jury. 33 RR 181. It was later revealed that the alleged weapon was actually a piece of the bed that had come loose before Fratta was assigned to that particular cell.

Mark Robertson, a TDCJ inmate who was housed in the cell when the piece of metal broke off of the bed attests to the fact that Fratta never removed the item or maintained it as a weapon.  Fratta's trial attorneys never investigated or presented Robertson to the jury.  For this reason, Fratta's jury was left with the impression that Fratta was caught with a "shank" in his cell, lost his privileges, and that weapons can be obtained even on death row.

### D.    CONCLUSION

In a recent Texas capital murder case that originally resulted in death but was reversed, remanded and ultimately pled to a life sentence, there was significant mitigation evidence never properly presented to jurors who sought death, and the Fifth Circuit observed the following in reversing the conviction: When, as with *Walbey*, a "petitioner's claim stems from counsel's decision to limit the scope of their investigation into potential mitigating evidence ... [and] counsel attempt[ s] to justify [the 1 limited investigation as

reflecting a tactical judgment," the deference owed to such a strategic judgment turns on "the adequacy of the investigations supporting those judgments." "[Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *See* Affidavit of Mark Robertson (Attached to Fratta's 11.071 Application).

The question "is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence ... was *itself reasonable."* "[C]ounsel should consider presenting ... [the defendant's] medical history, educational history, employment and training history, *'family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences." That is, "generally accepted standards of competence require that counsel conduct an investigation regarding the accused's background and character." *Walbey* v. *Quarterman,* 309 Fed. Appx. 795, 800 (5th Cir. 2009) (internal quotations omitted).

The prejudice prong of *Strickland* requires this Court to determine whether trial counsel's deficient conduct was sufficient to undermine its confidence in the jury 's punishment verdict, that is, whether there is a reasonable probability that, but for this objectively deficient conduct, the result of the punishment stage would have been different. *Strickland v. Washington,* 466 U.S. at 694; *Kyles v. Whitley,* 514 U.S. at 430. In determining if Fratta has met this burden, this Court cannot require him to show he would have received a lesser sentence but for trial counsel's errors. *See Everage v. State,* 893 S.W.2d 219, 222 (Tex. App. – Houston [1st Dist.], 1995).  The prejudice Fratta must

demonstrate is by less than a preponderance of evidence, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of trial." *Strickland v. Washington,* 466 U.S. at 693.  The prejudice prong of *Strickland* can be satisfied on the basis of a single error on trial counsel's part in the punishment stage of trial. *See Ware v. State, 875* S.W.2d 432, 488 (Tex. App. - Austin 1998)(failure to elicit testimony to support argument that defendant be given probated sentence); *Oliva v. State,* 942 S.W.2d 727, 733-34 (Tex. App. - Houston Dist.), 1997)(failure to object to State's final argument that defendant had not shown any remorse or regret for what he had done).  If the prejudicial effect of anyone or all of counsel's objectively deficient conduct is sufficient to undermine this Court's confidence in the outcome of the punishment stage, Fratta must be given a new punishment hearing. *See Kyles v. Whitley,* 514 U.S. at 441.

Viewed through this prism, trial counsel's numerous errors caused a breakdown in the adversarial system of justice in the punishment stage of Fratta's capital murder trial. Had the defense called Dr. Sorenson there would have been at least some evidence put before this jury that Fratta was not a future danger.  There is a reasonable probability that if jurors would have heard some evidence on the issue of future dangerousness, which significantly impacts one of two special issues that have to be answered, they might have struck a different balance in this case.  There was also significant mitigation evidence of Fratta's family and upbringing that was never presented to the jury.  Not only did the jury never hear about his troubled childhood, the jury heard that he came from a normal, all American home.  The jury never heard evidence of Fratta's significant steroid abuse and how it affected his personality, brain functioning and sexual drives.  The wealth and

magnitude of the errors alleged in this proceeding show in compelling terms that a total lack of investigation, preparation and presentation had a substantial influence on trial counsel's errors.  Given the synergistic effect of trial counsel's deficient conduct in failing to call Dr. Sorenson, in calling but failing to prepare Dr. Bailey and Lisa D'Cunha, in failing to investigate, prepare and present evidence of significant steroid abuse over many years and finally the failure to present an expert to help explain the evidence presented harmed Fratta.  Fratta was prejudiced by trial counsel's failure to interview and call the witnesses who were ready, willing and available to testify at the punishment stage.  The total failure to call Dr. Sorenson was also prejudicial that Fratta received death, even though he has no criminal history, and no violent or major rule infractions in the 14 years he served on death row.  For all the foregoing reasons, Fratta was prejudiced by trial counsel's objective deficient conduct at punishment.

## **PRAYER**

WHEREFORE, Robert Alan Fratta, requests that this Court:

1.     Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

2.     Grant him an evidentiary hearing at which he may present evidence in support of the foregoing claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to conduct reasonable discovery and brief the issues of fact and of law raised by this petition or such hearing.

3.      Grant a hearing on procedural issues, including exhaustion of remedies, procedural default, should Respondent seek dismissal of the petition or any claims on procedural grounds.

4.      Grant such other relief as law and justice require.

                          Respectfully submitted,

                          HILDER & ASSOCIATES, P.C.

By:    */s/ James G. Rytting*
        Philip H. Hilder
        State Bar No. 19620050
        James Rytting
        State Bar No. 24002883
        819 Lovett Boulevard
        Houston, Texas 77006
        Telephone (713) 655-9111
        Facsimile (713) 655-9112
        ATTORNEYS FOR PETITIONER

## **VERIFICATION**

I, James Rytting, state that to the best of my knowledge, the facts alleged in support of the claims in this case are true and correct, under penalty of perjury, as proscribed by Title 18 U.S.C. § 1746; and I hereby sign on behalf of Petitioner, Robert Alan Fratta.

                    /s/ *James G. Rytting*
                    James G. Rytting

## <u>CERTIFICATE OF SERVICE</u>

On February 12, 2015, a copy of Mr. Fratta's petition for writ of habeas corpus was served upon Respondent by ECF filing or U.S. Mail, return receipt requested, addressed to Ellen Stewart-Klein, Assistant Attorney General, Capital Litigation, P.O. Box 12548, Capitol Station, Austin, Texas 78711.

/s/ *James G. Rytting*_____
James G. Rytting