## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **ROBERT ALAN FRATTA,** | § | |
| | § | |
| **PETITIONER,** | § | |
| **V.** | § | |
| | § | |
| **WILLIAM STEPHENS, DIRECTOR** | § | **4:13-cv-03438** |
| **TEXAS DEPARTMENT OF** | § | |
| **CRIMINAL JUSTICE,** | § | |
| **INSTITUTIONAL DIVISION,** | § | |
| | § | |
| **RESPONDENT.** | § | |

_____

## FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS OF A PERSON IN STATE CUSTODY

_____

TO THE HONORABLE MELINDA HARMON, U.S. DISTRICT JUDGE:

Petitioner, Robert Allen Fratta, files this first amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 as follows:

## JURISDICTION

This Court has personal jurisdiction pursuant to Title 28 U.S.C. § 2241(d) because Fratta was convicted of capital murder, on retrial, in 2009, in a Harris County, Texas, district court.  Subject matter jurisdiction is conferred by Title 28 U.S.C. § 2254.

## INTRODUCTION

Fratta was first convicted of capital murder and sentenced to death in April 1996. The Texas Court of Criminal Appeals affirmed the conviction and sentence on direct appeal. *Fratta v. State*, No. AP-72,437 (Tex. Crim. App. June 30, 1999) (not designated

1

for publication) and later denied relief on his Article 11.071 application for a writ of habeas corpus. *Ex parte Fratta*, No. WR-31,536-02 (Tex. Crim. App. Sept. 22, 2004) (not designated for publication).

Fratta filed an application for a writ of habeas corpus in federal district court, where relief was granted based on violations of the Confrontation Clause of the Sixth Amendment to the Constitution of the United States. *Fratta v. Quarterman*, No. H-05- 3392, 2007 U.S. Dist. LEXIS 72705 (S.D. Tex. Sept. 28, 2007) (not designated for publication). The United States Court of Appeals for the Fifth Circuit affirmed the district court's judgment. *Fratta v. Quarterman*, 536 F.3d 485, 488 (5th Cir. Tex. 2008).

On retrial, the State proceeded on the capital murder theory advanced at the original trial that Fratta had violated Texas Penal Code 19.03(a)(3)("the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration"). The State also alleged a new theory of capital murder, namely, that Fratta had also violated 19.03(a)(2)("the person intentionally commits the murder in the course of committing or attempting to commit … burglary…."). In May 2009, Fratta was again convicted of capital murder. The Jury once more answered special issues, such that on June 1, 2009, the trial court was constrained to sentence Fratta to death.

Fratta filed thirty-two points of error on direct appeal, but the TCCA found them meritless. *Fratta v. State*, No. AP-76,188 (Tex. Crim. App. 2011) (unpublished). Fratta also filed an Article 11.071 Application for a writ of habeas corpus. The Article 11.071 writ did not contain a single claim for relief challenging the guilt-innocence phase. On

February 12, 2014, the Texas Court denied relief in an unpublished opinion. *Ex parte Fratta,* 2014 WL 631218 (Tex. Crim. App. 2014) (not designated for publication).

In present federal proceedings, Mr. Fratta challenges the constitutional soundness of his trial foremost on grounds that he received ineffective assistance of counsel at the guilt innocence phase of his 2009 retrial.  As shown below, trial counsel also failed to challenge the sufficiency of the evidence by briefing and arguing a motion for a directed verdict and failed to object that the addition of law of the party charges to the jury instructions given at guilt innocence violated Mr. Fratta's Fifth Amendment and Due Process rights.  Mr. Fratta's conviction also depends on the testimony of key witnesses who were subject to intense and abusive police methods that trenched on Mr. Fratta's due process rights to a fair trial.  However, trial counsel did not take reasonably necessary steps to investigate police or prosecutorial misconduct.  Had trial counsel done so he would have been able to discredit the State's key witness as well as the integrity of the State's case.

AEDPA standards that ordinarily apply cannot be presumed at this point to pose an obstacle to Fratta's guilt innocence IAC claims.  Under *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), ineffectiveness of state habeas counsel permits a federal petitioner to raise trial IAC claims in Texas capital cases upon a showing that the claim is meritorious and that state habeas counsel should have, but did not, raise these IAC claims.

## STATEMENT OF THE FACTS

### *Crime Scene*

On November 9, 1994, Farah Fratta was shot twice in the head.  *See* exhibit notebook attached to Fratta's 11.071 Application (Autopsy Report).  One shot grazed her skull, the other was a shot to the back of the head that penetrated her brain. *Id.*  Neighbors heard the shots and looked out their window from across the street.  They saw Farah on the ground in the garage and saw a man, described as a black man, flee the Fratta property and enter a sedan, which, they remembered, had only one working headlight.  The sedan sped away.  Neighbors then called 911 and crossed the street to see if they could help Farah.

Farah did not die immediately, and Fratta, who had been at church with the couple's three children that Wednesday evening, arrived before EMS transported her to hospital. Farah's parents, the Baquers, also arrived.  Lex Baquer, Farah's father, testified he saw his child convulsing on the garage floor.  Fratta and the Baquers followed the ambulance to hospital.  Emergency intervention was to no avail and Farah died.

### *State's Evidence*

State's evidence showed that Mr. Fratta grew increasingly bitter toward his wife over the course of several months. 25 RR 92.  He asked fellow body builders at President & First Lady Gym in Northeast Houston if they knew anyone who could assassinate Farah Fratta. 25 RR 114, et seq.; 25 RR 168, et seq.  Jimmy Podhorsky testified that Mr. Fratta discussed a price of $1000.00 dollars upfront. *Id.*  Podhorsky said Mr. Fratta mentioned more money after the murder, which would come from a damage award he received in an auto injury case, from Farah Fratta's insurance, and from an overseas trust fund. *Id.* at 939.

4

Although Podhorsky said he thought Mr. Fratta was serious, he evidently did not think the danger warranted a phone call to police or a warning to Farah, and neither did anyone else who said Mr. Fratta propositioned them.

Mary Gipp's testimony connected Mr. Fratta and Mr. Prystash by placing them together at the President and First Lady Gym in Humble, Texas, several days prior to the murder. 27 RR 14.  She testified that Mr. Fratta's and Prystash's friendship dated back six months prior to the murder. 27 RR 6.  Gipp also testified that she lived with Prystash, 27 RR 7, and said Prystash knew Guidry, who resided in an apartment next door. 27 RR 16. On the night of the murder, Gipp said she saw Guidry sitting on the front step dressed in a black shirt and black pants. 27 RR 46.  Prystash came home shortly thereafter dressed in a black shirt and jeans. 27 RR 47.  Prystash left shortly and telephoned her a couple minutes after leaving. *Id.*

Around 8:30 or 9:00 p.m. – Gipp was not sure – Prystash returned to the complex. 27 RR 59.  Gipp said Prystash walked through the apartment to the bedroom and unloaded a gun, taking two shells out.  27 RR 60.  Gipp identified State's Exhibit 60 as the gun she saw Prystash handling. 27 RR 60.  She testified, further, that Prystash threw the shells in the kitchen garbage.  After Prystash left, Gipp said she took the shells out of the trash and put them in a zip-lock bag. 27 RR 142.  Gipp said that after Prystash left, she got out the gun she had seen Prystash with and took the information off of the gun, *id.*, writing the serial number and make on a blue slip of paper. 27 RR 87.  Gipp, through her attorney, gave this information to police. *Id.*

On March 1, 1995, four months after the murder of Farah Fratta, police arrested Guidry for robbery and recovered several guns.  Law enforcement traced one of the weapons to Mr. Fratta.  The serial number on this weapon matched the number Gipp said she wrote down off the gun she saw Prystash bring home the night of the murder.  The State's ballistic expert could not match the bullet that killed Farah Fratta to the weapon, but did match it to a slug retrieved from a life-preserver jacket hanging on the wall of the garage in which she was shot. 22 RR 625-26.  Gipp testified that Prystash received the weapon in June of 1994, five months before Farah Fratta's death and nine months prior to the time police found the gun on Guidry.  The State also introduced records demonstrating that Prystash and Fratta contacted each other by pager and phone near the time of the murder, and that Guidry placed calls around this time using a cell phone Prystash borrowed off Gipp.  Apart from the confessions, the content of the calls was unknown.  Evidence showed that Prystash and Fratta had become acquaintances years before the murder and spoke by phone in person on many other occasions.  They shared ordinary interests, e.g., in working out at the gym, about which to converse.  On the other hand, the State did not have evidence demonstrating that Mr. Fratta and Guidry ever contacted each other by telephone or any means.  There was no evidence the two had ever met.

After the murder, Mr. Fratta again talked with Podhorsky.  Podhorsky advised him to keep his mouth shut.  25 RR 137.  Although police investigated Podhorsky, he was not involved.  Finally, police recovered $1050 in cash from a plain white envelope found in Mr. Fratta's car.  However, unlike at the first trial, where there was no witness to corroborate the defense's theory that the cash was partial payment for carpeting Fratta had

recently bought, trial counsel sponsored substantial evidence, including receipts from Sears, confirming that Fratta had taken money out precisely for this reason. 25 RR 150 et seq.

## PART I

## LEGAL INSUFFICIENCY AND CONSTRUCTIVE AMENDMENT OF INDICTMENT CLAIMS

## CLAIM ONE

**THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SHOW THAT FRATTA COMMITTED THE CRIME OF CAPITAL MURDER ALLEGED BY THE STATE, *JACKSON v. VIRGINIA*, 443 U.S. 307 (1979).**

**A.     PROCEDURAL ISSUES**

> **1.     The TCCA rejection of Fratta's insufficiency of the evidence claim was not based on independent, adequate or regularly applied state law grounds.**

>> **a.     Whether to afford the right of hybrid representation is completely discretionary, and therefore is not an adequate or regularly applied state law ground.**

Fratta challenged legal insufficiency of the evidence claim in pro se pleadings. However, the TCCA refused to consider the merits on the ground that Fratta was not entitled to hybrid representation.  *See Fratta v. State*, 2011 WL 4582498, *1 (Tex. Crim. App. 2011).  However, for the following reasons, the rule against hybrid representation invoked by the TCCA is not an independent and adequate state law ground on which to base a procedural default of Fratta's *Jackson* claim in the federal system.

In order for a rule to be adequate, the rule must be firmly established and regularly applied. A rule is firmly established and regularly applied if the state court does not have discretion whether to apply the rule. *NAACP v. Alabama*, 377 U.S. 288, 297 (1964) (holding that because "[a]labama courts have not heretofore applied their rules respecting the preparation of briefs with the pointless severity shown here," the rules did not meet the "firmly established and regularly applied" standard). The requirement is based on the idea of giving the state prisoner a pre-default notice of the rule's existence before invoking it to bar federal review of the prisoner's claim. *NAACP v. Alabama*, 357 U.S. 449, 457 (1958) (rejecting a state rule as firmly established and regularly applied "because petitioner could not fairly be deemed to have been apprised of its existence").

Texas's so-called rule is neither firmly established or regularly applied.  Indeed, the State does not have a "rule" against hybrid representation in the proper sense of the term. Instead, the rule is that courts have discretion to allow hybrid representation at trial and on appeal. *See Hathorn v. State,* 848 S.W.2d 101, 122 (Tex. Crim. App. 1992) (en banc). According to the TCCA's *en banc* decision, which remains the law, in allowing a defendant hybrid representation,

> The trial court here allowed appellant the best of both worlds. While the court appointed counsel to represent appellant on appeal, it also granted appellant permission to write and file his own appellate brief in appeal of his conviction. And, to that end, the court granted appellant's motions "requesting notification" and "to inspect and copy record on appeal." Those motions requested that appellant be allowed personal access to the record to enable him to represent himself in a manner that would be satisfactory to him in his pro se brief. In short, the trial court allowed hybrid representation on appeal.

*Id.*

**b.      TCCA's decision to deny Fratta the right to present his insufficiency claims pro se was neither an adequate nor regularly applied rule; it violated Texas law.**

In *Webb v. State*, 533 S.W.2d 780 (Tex. Crim. App. 1976), the Texas Court extended the right of self representation at trial, which the Supreme Court recognized in *Faretta v. California*, 422 U.S 806 (1975), to appellants, as follows:

> Faretta asserted his right to conduct his own defense at trial; however, since the Sixth Amendment right to counsel is applicable to both trial and appeal, it would follow that the correlative right to reject the assistance of counsel would be equally applicable to both the trial and the appeal of a criminal case. We discern no meaningful distinction between conducting a defense at trial and prosecuting an appeal which would prevent the application of the Faretta rationale to the case of an appellant who wished to reject representation by counsel and instead represent himself on appeal.

*Id.* at 783.

By virtue of Texas Code of Crimnal Procedure,  Article 1.051(f) (Vernon 2005), several Texas courts have recognized that a criminal appellant has a statutory right of self-representation on appeal. *Sickles v. State*, 170 S.W.3d 298, 299 (Tex. App. – Waco, 2005) (*Sickles II*) (citing *Fewins v. State,* 170 S.W.3d 293, 296, 2005 WL 2155228 (Tex.App.-Waco Sept. 7, 2005, order) (per curiam, upublished).  Although there is a split, Texas appellate courts that have not recognized a statutory right have recognized that an appellate court may, in its discretion, authorize a party's self-representation on appeal. *See Bibbs v. State*, 2011 WL 6015773 (Tex.App.-Amarillo, 2011) (per curiam, unpublished).

Fratta filed several motions to proceed pro se on direct appeal.  The motions were filed well ahead of the State's deadline for filing its Appellee's brief.  The State filed a

motion to strike Fratta's pleadings.  The TCCA did not rule on Fratta's motion until it issued its decision denying Fratta the right to hybrid representation.  The motions also made clear that there was a conflict between Fratta and appellate counsel, who refused to file Fratta's clearly meritorious insufficiency of the evidence claim and his claims challenging the indictment and jury charge.

The TCCA did not find that Fratta's requests to proceed pro se were untimely or disruptive, and they were not.  Fratta filed his pro se appeal in conjunction with his motions to represent himself.    The decision not to allow Fratta to present his insufficiency of the evidence claim and claims challenging the indictment and jury charge were at best arbitrary and capricious, and at worst, in clear violation of the TCCA's own precedents.  As such, the TCCA's decision to reject Fratta's *Jackson* insufficiency and challenges to the indictment and charge does not rest on independent, adequate or regularly applied state law grounds.   Therefore, this Court may reach the merits of these claims.

> **2.      Merits review is also justified under miscarriage of justice exceptions to default.**

Alternatively, this Court may reach the merits of Fratta's *Jackson* claim through the "gateway" exception *Schlup* created to procedural default. *See* S*chlup v. Delo*, 513 U.S. 298 (1995).  Fratta's *Schlup* claim is argued below in Part II of the Amended Brief.

**B.      STANDARDS**

> **1.      Review is de novo under federal standards.**

To determine sufficiency of a state conviction as a matter of constitutional law, federal courts looks to the "substantive elements of the criminal offense as defined by state

law." *Brown v. Collins*, 937 F.2d 175, 181 (5ᵗʰ Cir. 1991) (quoting *Jackson*, 443 U.S. at 324 n. 16, not to a State's procedural requirements).

### 2. *Jackson v. Virginia*, 443 U.S. 307 (1979), provides the legal framework.

Evidence is sufficient under the *Jackson* if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Under this standard, "[a]ll credibility choices and conflicting inferences are to be resolved in favor of the verdict." *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir.2005) (citation omitted).

However, in *Jackson*, the Supreme Court also held that "[a]fter Winship the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Id.* at 318–19.  That is, the Court made clear that "[t]he Winship doctrine requires more than simply a trial ritual." *Id.* at 316–17.

The Supreme Court cautioned as well that "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Id.* However, "[u]nder Winship, which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such a conviction occurs ..., it cannot constitutionally stand." *Id.* at 317–18. Thus, it is the duty of appellate courts to "protect against misapplications of the constitutional standard of reasonable doubt," *id.* at 320, and to enforce the constitutional guarantee that

"no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof," *id*. at 316.

A reviewing court's function is to "take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative. This function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable doubt." *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995); *see also United States v. Polk*, 56 F.3d 613, 630 (5th Cir. 1995) ("[C]ourts of appeal must not completely abdicate responsibility for reviewing jury verdicts."). *See generally* Jon O. Newman, Beyond "Reasonable Doubt", 68 N.Y.U. L.Rev. 979, 993–97 (1993) (issuing an "urgent plea" to the courts of appeal to "take seriously our obligation" to reverse convictions based on insufficient evidence).

Because the requirement of sufficient proof of guilt beyond a reasonable doubt is fundamental to our notions of liberty and vital to the rule of law, it must be carefully guarded—even if not raised by the defendant. The Supreme Court held over a century ago that even when "th[e] question [of the sufficiency of the evidence] was not properly raised, yet if a plain error was committed in a matter so absolutely vital  to defendants, we feel ourselves at liberty to correct it." *Wiborg v. United States*, 163 U.S. 632, 658 (1896). The Court later reaffirmed this principle and further explained its importance:

> While no motion or request was made that the jury be instructed to find for defendant, ... yet Wiborg v. United States, 163 U.S. 632, 658, 16 Sup.Ct. Rep. 1127, 1197, 41 L. ed. [L.Ed.] 290 [289], 298, justifies us in examining the question in case a plain error has been committed in a matter so vital to the defendant.

.... No matter how severe may be the condemnation which is due to the conduct of a party charged with a criminal offense, it is the imperative duty of a court to see that all the elements of his crime are proved, or at least that testimony is offered which justifies a jury in finding those elements. Only in the exact administration of the law will justice in the long run be done, and the confidence of the public in such administration be maintained.

*Clyatt v. United States,* 197 U.S. 207, 221–22 (1905).

### B.     BACKGROUND

Fratta was indicted for capital murder in violation of Texas Penal Code § 19.03(a)(2) ("the person intentionally commits the murder in the course of committing or attempting to commit … burglary ….")  and § 19.03(a)(3) ("the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration").

The indictment that governed retrial accused Fratta of Capital Murder in Four Counts.  However, the trial court struck portions as indicated below. 29 RR 173. The Indictment read to the jury was as follows:

| | |
|---|---|
| COUNT ONE | MS. BRADLEY: In the name and by authority 20 of the State of Texas: The duly organized Grand Jury of 21 Harris County, Texas, presents in the District Court of 22 Harris County, Texas, that in Harris County, Texas, 23 Robert Alan Fratta, hereafter styled the defendant, 24 heretofore on or about November 9, 1994, did then and 25 there unlawfully, intentionally and knowingly cause the 1 death of Farah Fratta, hereafter styled the complainant, 2 by shooting the complainant with a deadly weapon, 3 namely, a firearm, and that the defendant did employ 4 Joseph Prystash to commit the murder for remuneration 5 and the promise of remuneration, namely, a motor 6 vehicle. |

| | |
|---|---|
| COUNT TWO | 7 It is further presented that in Harris<br>8 County, Texas, Robert Alan Fratta, hereafter styled the<br>9 defendant, heretofore on or about November 9, 1994, did<br>10 then and there unlawfully, intentionally and knowingly<br>11 cause the death of Farah Fratta, hereafter styled the<br>12 complainant, by shooting the complainant with a deadly<br>13 weapon, namely, a firearm, and the defendant did employ<br>14 Howard Guidry to commit the murder for remuneration and<br>15 the promise of remuneration, namely, money. |
| COUNT THREE | 16 It is further presented that in Harris<br>17 County, Texas, Robert Alan Fratta, hereafter styled the<br>18 defendant, on or about November 9, 1994, did then and<br>19 there unlawfully, intentionally and knowingly cause the<br>20 death of Farah Fratta, hereafter styled the complainant,<br>21 by shooting the complainant with a deadly weapon,<br>22 namely, a firearm, and the defendant did employ Howard<br>23 Guidry to commit the murder for remuneration and the<br>24 promise of remuneration, namely, a firearm. |
| COUNT FOUR | 25 It is further presented that in Harris<br>1 County, Texas, Robert Alan Fratta, hereafter styled the<br>2 defendant, on or about November 9, 1994, did then and<br>3 unlawfully, while in the course of committing and<br>4 attempting to commit the burglary of a building owned by<br>5 Farah Fratta, intentionally cause the death of Farah<br>6 Fratta by shooting the complainant with a deadly weapon,<br>7 namely, a firearm.<br>8 Against the peace and dignity of the State.<br>9 Signed, the foreman of the Grand Jury.<br><br>22 RR 20-22. |

22 RR 20-22.

At the charge conference, the trial court granted Fratta's request for a lesser included charge of murder

The Application Paragraph of the charge repeated the counts in the Indictment, with the exception of the third count stricken above.  Pursuant to Rule 7.01 and 7.02(a) of the Texas Penal Code, the trial court also added the trial also added language authorizing conviction for aiding and abetting.  As a result, the jury was charged with considering FOUR distinct capital murder counts: (1) Fratta solicited Prystash to kill Farah, or aided and abetted Prystash in the aforedescribed solicitation offense; (2) Fratta solicited Guidry to kill Farah, or aided Guidry in the afore described solicitation offense; (3) in the course of burglary, Fratta killed Farah, or aided and abetted Prystash in committing this offense; and (4) in the course of burglary, Fratta intentinally killed Farah, or aided Guidry in this offense.  However, the jury charge combined the third and fourth counts into one paragraph.  The charge against Fratta given to the jury read as follows:

| COUNT ONE | Now, if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 9th day of November, 1994, the defendant, Robert Alan Fratta, did then and there unlawfully, intentionally, or knowingly cause the death of Farah Fratta, by shooting Farah Fratta with a deadly weapon, namely, a firearm, and the defendant did employ Joseph Prystash to commit the murder for remuneration or the promise of remuneration, namely, a motor vehicle; or if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 9th day of November, 1994, **Joseph Andrew Prystash** did then  and there unlawfully, intentionally, or knowingly cause the death of Farah Fratta, by shooting Farah Fratta with a deadly weapon, namely a firearm, and the defendant did employ Joseph Prystash to commit the murder for remuneration or the promise of remuneration, namely, a motor vehicle, and that the defendant, Robert Alan Fratta, with the intent to promote or assist the commission of the offense, if any, solicited, |

| | |
|---|---|
| | encouraged, directed, aided or attempted to aid **Joseph Andrew Prystash** to commit the offense, if he did;<br><br>or if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 9th day of November, 1994, the defendant, Robert Alan Fratta, did then and there unlawfully, intentionally or knowingly cause the death of Farah Fratta, by shooting Farah Fratta with a deadly weapon, namely, a firearm, and that the defendant did employ **Howard Guidry** to commit the murder for remuneration or the promise of remuneration, namely, money; or if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 9th day of November, 1994, **Howard Guidry** did then and there unlawfully, intentionally or knowingly cause the death of Farah Fratta, by shooting Farah Fratta with a deadly weapon, namely, a firearm, and the defendant did employ Howard Guidry to commit the murder for remuneration or the promise of remuneration, namely, money, and that the defendant, Robert Alan Fratta, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Howard Guidry to commit the offense, if he did; |
| COUNT TWO | |
| COUNT THREE AND FOUR | or if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 9th day of November, 1994, the defendant, Robert Alan Fratta, did then and there unlawfully, while in the course of committing or attempting to commit the burglary of a building owned by Farah Fratta, intentionally cause the death of Farah Fratta by shooting Farah Fratta with a deadly weapon, namely, a firearm; or if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 9th day of November, 1994, Joseph Andrew Prystash **and/or** Howard Guidry did then and there unlawfully, while in the course of committing or attempting to commit the burglary of a building owned by Farah Fratta, intentionally cause the death of Farah Fratta by shooting Farah Fratta with a deadly weapon, namely, a firearm, and that the defendant, Robert Alan Fratta, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash **and/or** Howard Guidry to commit the offense, if he did, then you will find the defendant guilty of capital murder, as charged in the indictment<br><br>30 RR 14-21 |

### C.    ARGUMENT FOR ACQUITTAL ON CAPITAL CHARGES

**1.    The State failed to put on any evidence that Fratta shot Farah or the Prystash shot Farah for money with Fratta's assistance as alleged in Count One of the Indictment**

There was no evidence Fratta did not shoot Farah. The State's theory was that Fratta was at Church when Farah was shot and killed.  The State sponsored evidence the proved Fratta did not shoot Farah.

There was no evidence that Prystash shot Farah.  The State's argued that Prystash drove Guidry to the murder scene and attempted to prove this theory. The State did not sponsor any evidence that Prystash pulled the trigger.  If follows from the fact that Prystach did not shoot Farah, that the State failed to sponsor any evidence that Prystash shot Farah for remuneration, as alleged in the indictment and charge.  Hence, the State did not introduce any evidence that Fratta aided or abetted Prystash in committing the crime of intentionally killing Farah with a firearm in return for remuneration.

No evidence at all supported any of the theories contained in Count One.  Hence, no rational jury could find Fratta guilty of crime alleged in Count One under any standard, let alone find him guilty beyond a reasonable doubt. Therefore, acquittal on Count One is necessary.

**2.    The State failed to put on any evidence supporting Count Two in the jury charge.**

As alleged in subsection '1' above, the State did not sponsor any evidence Fratta shot Farah. Nor is there any evidence that he offered or paid anything of value to kill Farah for a firearm.  The State did not put on any evidence that Fratta met or spoke with Guidry.

The State did not sponsor an iota of proof that Fratta knew who Guidry was, where Guidry lived or who Guidry associated with.  In particular, there is no evidence Fratta knew of any connection, communications or dealing between Guidry and Prystash.

As a result, the State did not provide any evidence that Guidry killed Farah for remuneration from Fratta. It follows that there is no evidence that Fratta, "with the intent to promote or assist the commission of the offense of murder of Farah Fratta, solicited, encouraged, directed, aided or attempted to aid " Guidry in shooting Farah, as alleged in Count Two of the charge.

Because there was no evidence supporting any theory alleged in Count Two of the charge, no rational jury could find beyond a reasonable doubt that Fratta was guilt of the conduct allegd in Count Two. Hence, acquittal on this Count is necessary.

> **3.**    **The state failed to sponsor an evidence supporting the allegation that Fratta killed Farah in the course of a burglary, or that he aided or abetted Prystash commission of this crime, or aided or abetted Guidry's commission of this crime.**

> **a.**    **Prystash**

The State sponsored no evidence Fratta burgled Farah's home or shot Farah. Instead, the State convincingly proved that Fratta was at church when Farah was killed.  Hence, no rational jury could find that Fratta, "in the course of committing or attempting to commit the burglary of a building owned by Farah Fratta, intentionally cause the death of Farah Fratta by shooting Farah Fratta."

The State also sponsored no evidence that Prystash burgled Farah's home or shot Farah. Instead, the State insisted Prystash drove Guidry to the scene, left and then picked

Guidry up after the murder.  Hence, no rational jury could find beyond a reasonable doubt that Prystash shot Farah in the course of burglary,  or find beyond a reasonable doubt that Fratta, "with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash's" commission of murder in course a burglary.  Hence, Fratta must be acquitted of this subcount of Count Three.

### b.    Guidry

There was no evidence Fratta communicated with Guidry.  Indeed, there was no evidence that Fratta met Guidry or knew anything at all about Guidry, not who Guidry was, nor where he lived nor whom he associated with.  Specifically, there was no evidence Fratta had any idea Prystah knew Guidry or communicated with him.  Conversely, there was no evidence Guidry knew anything about Fratta.  Thus, no rational jury could find that the evidence showed beyond a reasonable doubt that Fratta "solicited, encouraged, directed, aided or attempted to aid Howard Guidry to commit the offense of shooting Farah in the course of a burglary."

Nor was there sufficient evidence for a jury to find that Guidry shot Farah or was ever at the scene.  Gipp testified that she saw Guidry and Prystash speak a couple times in the days before the murder outside on the stairs or landing of Gipp's apartment.  However, Gipp did not know what they talked about, and the meeting was far from unusual, since Guidry was Gipp's neighbor and Prystach stayed on and off at Gipp's apartment.

Gipp also testified that she saw Guidry on the steps leading to her second story apartment the hours before the murder, and that she saw Prystash return to her apartment

that night.  Prystash was not with anyone when he returned, and he returned with a gun. Gipp also testified that some days after the murder Prystash gave Guidry this gun to throw away.  Instead of discarding the gun, Guidry kept the gun and was caught with it five months after Farah died when Guidry was arrested for armed robbery.  The gun proved to a .38 Charter Arms revolver that police traced to Fratta.

The State tried to link the .38 Charter Arm, and therefore Guidry, to the scene and the murder through ballistic evidence, but failed.   The State's expert testified he could not match bullets test fired from the .38 Charter Arms to the bullet found at the murder scene. The expert also testified that a bullet casing (shell) found at the scene was not fired in the .38 Charter Arms that police recovered from Guidry.  If the anything, the ballistic evidence excluded the gun found on Guidry as the murder weapon.

No rational jury could find beyond a reasonable doubt that Guidry was guilty of murder in the course of burglary on evidence such as this.  Nobody placed Guidry at the scene.  The ballistic evidence that was the only way the State had of tying Guidry to the murder absolutely could not.  The fact that the bullet had "class characteristics" of bullets test fired in the .38 Charter Arms was not probative evidence.  That testimony established that the bullet could have fired the weapon.  Eye witness testimony that black man around 5'9" ran from the scene and got in a car with a headlight missing did help to narrow the universe of potential suspects down.  Without sufficient evidence that Guidry was even at the scene, no rational jury could "find that the evidence showed beyond a reasonable doubt that Fratta solicited, encouraged, directed, aided or attempted to aid Howard Guidry to

commit the offense of shooting Farah in the course of a burglary." Hence, this Court must order Fratta acquitted of all capital charges.

### D. ACQUITTAL ON LESSER INCLUDED MURDER CHARGES IS NECESSARY.

The charge also instructed jurors on the lesser included offense of murder as follows:

> Therefore, if you find from the evidence beyond a reasonable doubt that on or about the 9th day of November, 1994, in Harris County, Texas, the defendant, Robert Alan Fratta, did then and there unlawfully, intentionally or knowingly cause the death of Farah Fratta, by shooting Farah Fratta with a deadly weapon, namely, a firearm; or if you find from the evidence beyond a reasonable doubt that on or about the 9th day of November, 1994, in Harris County, Texas, Joseph Andrew Prystash and/or Howard Guidry, did then and there unlawfully, intentionally or knowingly cause the death of Farah Fratta, by shooting Farah Fratta with a deadly weapon, namely, a firearm, and that the defendant, Robert Alan Fratta, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash and/or Howard Guidry to commit the offense, if he did, then you will find the defendant guilty of murder.

There was no evidence supporting the theories in this lesser included charge either, which also proves that the capital charges were void of constitutionally necessary factual support.

As stated, there was no evidence Fratta shot Farah. Similarly, there was no evidence Prystash shot Farah; hence, no evidence that Fratta, "with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash." Finally, for reasons stated in subsection 3(a) above, there was no evidence Fratta, with the intent to promote or assist the commission of the offense,

if any, solicited, encouraged, directed, aided or attempted to aid Howard Guidry.  Hence, no rational jury could find beyond a reasonable doubt that Fratta was guilty of the lesser included offense of murder as set forth in the indictment and jury charge.  Fratta therefore must be acquitted on all Counts.

## CLAIM TWO

**CHARGE THE COURT GAVE THE JURY ON GUILT INNOCENCE CONSTRUCTIVELY AMENDED THE INDICTMENT IN VIOLATION OF FRATTA'S FIFTH AMENDMENT RIGHT TO BE INDICTED BY A GRAND JURY AND DUE PROCESS RIGHTS AGAINST ARBITRARY DEPRIVATIONS OF LIFE AND LIBERTY.**

**A.     FRATTA RAISED AND EXHAUSTED CHARGING ERROR CLAIMS IN PRO SE PLEADINGS**

**1.     Fratta fairly presented his charging error claims.**

"The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir.1998).  For a claim to have been fairly presented, the state court must "be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) (per curiam); *Deters v. Collins*, 985 F.2d 789, 795 (5th Cir.1993). The state court must have the opportunity to pass on the substance of the petitioner's claims. *Carter v. Estelle*, 677 F.2d 427, 443 (5th Cir. 1982), cert. denied, 460 U.S. 1056 (1983).   As shown in the subsections that follow, Fratta raised an exhausted the claims herein challenging the constitutionality of the trial court's charge to the jury.

## 2. TCCA denied relief on inadequate and irregularly applied procedural grounds.

The TCCA denied on the ground that Fratta was invoking a right to hybrid representation, which the TCCA exercised discretion to deny.   For reasons stated above, in Claim One, because the alleged rule against hybrid representation on which the TCCA relied is discretionary, the "rule" does not qualify as an adequate, or regularly applied state law basis for denying relief.  Fratta also sought to file the following claims pro se, and was denied fundamental rights to self-representation extended by the TCCA's own precedents. *See Webb,* 533 S.W.2d at 780.   Hence, this Court can reach the merits of the following charging error claims.

### B. STANDARDS

"The Fifth Amendment guarantees that a criminal defendant will be tried only on charges alleged in a grand jury indictment." *United States vThreadgill*, 172 F.3d 357, 370 (5th Cir.1999) (internal quotation marks omitted); *see also Stirone v. United States*, 361 U.S. 212, 215-16 (1960) ("[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself."). "A jury charge constructively amends an indictment, in violation of the Fifth Amendment, if it permits the jury to convict the defendant upon a factual basis that effectively modifies an essential element of the crime charged." *United States v. Daniels*, 252 F.3d 411, 413-14 (5th Cir. 2001) (internal quotation marks omitted). "That is, constructive amendment occurs if the jury is permitted to convict on an alternative basis permitted by the statute but not charged

in the indictment." *Id.* at 414.  Ordinarily, a constructive amendment constitutes reversible error. *United States v. Reasor*, 418 F.3d 466, 475 (5th Cir. 2005).

Typically, though, adding an aiding and abetting instruction does not give rise to claims that the government constructively amended an indictment because a "defendant may be indicted for the commission of a substantive crime and convicted of aiding and abetting its commission although not named in the indictment as an aider and abettor." *United States v. Tropiano*, 418 F.2d 1069, 1083 (2d Cir. 1969), cert. denied, 397 U.S. 1021(1970); *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir. 1971) ("one who has been indicted as a principal may be convicted on evidence showing that he merely aided and abetted").

However, an aiding and abetting jury instruction is appropriate only if the prosecution makes it known that it intends to proceed on a theory of aiding and abetting **and** the evidence so warrants. *United States v. Taylor*, 464 F.2d 240, 242 n.1 (2d Cir. 1972). A principal purpose of the first requirement is to avoid unfair surprise to the defendant. The second requirement assures that the government will continue to carry the burden of proving the crime.

## C.     BACKGROUND

The jury charge allowed jurors to convict Fratta on a theory of aiding and abetting that in Texas law is known as "the law of the parties." *See Hayes v. State*, 265 S.W.3d 673, 696 (Tex. App. -- Houston [1st], 2008) (equating aiding and abetting with "law of the parties").  The amendments to the indictment are reflected in the underlined passages in

the right hand column of the following table.  The trial court struck the third paragraph of the indictment pursuant to trial counsel's motion for acquittal. 29 RR 173.

### D.   WITH RESPECT TO EACH COUNT, THE JURY CHARGE CONSTRUCTIVELY AMENDED THE INDICTMENT

#### 1.   Fratta fairly raised the issues below.

In pro se pleadings filed July 29, 2010 and December 13, 2010, Fratta repeatedly objected that the law of the parties charge that the trial court's instructions added to each surviving count violated his Due Process and Fifth Amendment rights.  *See* Ex. '1' (Points of Error 37-39, pages numbered 127-134); Ex. '2' (Points of Error 5-8 at ii-iii, and  pp. 1-9).

#### 2.   Amendments to jury charge violated Fratta's Due Process and Fifth Amendment Rights

##### a.   Evidence did not justify supplementing the murder for hire allegation in the Indictment with a law of the parties charge.

As shown in the preceding legal insufficiency claims (the argument and authority for which are incorporated by reference as if fully set forth herein), according to the State's own evidence, Prystash did not agree to shoot Farah and did not shoot Fratta. Thus, the State did not sponsor legally sufficient evidencethat Fratta, "with the intent to promote or assist the commission of the offense of murder of Farah Fratta, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash… in shooting Farah Fratta," as alleged in the law of the parties charge.

Furthermore, the State did not put on any evidence that Fratta met or spoke with Guidry.  The State did not even contend or sponsor an iota of proof that Fratta had any

communications with Guidry, or that Fratta had the faintest idea who Guidry was or what Guidry's involvement in any crime would be.  For these reasons, the state, therefore, failed to sponsor, and could not possibly sponsor, any evidence, let alone legally sufficient evidence, showing that "with the intent to promote or assist the commission of the offense of murder of Farah Fratta, solicited, encouraged, directed, aided or attempted to aid … Guidry in shooting Farah Fratta," as alleged in the parties charge.

**b.**     **The evidence did not justify supplementing the Indictment's burglary theories of murder with a law of the parties charge.**

For reasons set forth in Claim One, the State did not sponsor any evidence "with the intent to promote or assist in the commission of the offense of burglary of a building" that Fratta "solicited, encouraged, directed, aided, or attempted to aid Joseph Andrew Prystash and/or Howard Guidry in shooting Farah Fratta."

Nor did the State introduce any evidence that Fratta was informed, discussed mentioned or approved the plans that Guidry and Prystash allegedly employed to carry out the murder.  The State did not introduce evidence the Fratta told Prystash or Guidry anything about what Farah would do upon returning home, inform them of where she parked the car (whether in the garage or on the street) or whether she entered the home through the garage as opposed to going round to the front door.  Nor was their evidence that Fratta enabled Prystash or Guidry to enter Farah's home, such as providing either one with a layout or description of the house.

There was no evidence that Fratta picked the specific location for the murder, or had any advance knowledge that Guidry or Prystash intended to enter a privileged part of

Farah's home (trespass into the curtilage) in order to commit the murder, as opposed to shooting Farah from a publicly accessible part of the property (from the walkway or driveway or front yard, for example, which would not require, nor be, a home invasion, since there was no fencing around Farah's front yard), or shoot her while she was in transit to her home. Adding the parties charge, therefore, constructively amended the indictment.

> ### 3.   The Jury Charge constructively amended the indictment to allow conviction upon finding that Fratta or his codefendants merely acted  unlawfully, as opposed to knowingly and intentionally.

> #### a.   Fratta pled this claim, pro se, on direct appeal

In supplemental briefing filed July 29, 2010, Fratta complained that the jury charge does not even quote my indictment verbatim, and the wording lessens the requirements" for proving offenses on which the Grand Jury returned the Indictment. Ex. '1' (page numbered 128).  Fratta stressed specifically that "my indictment states: "unlawfully, intentionally AND knowingly," whereas the JC (i.e., jury charge) substitutes the word "or" for "and." *Id.*   Fratta correctly concluded in points of error numbered 37-39, that the modification of the *mens rea* violated his Fourteenth Amendment Due Process and Fifth Amendment Rights, and resulted in a fatal variance.  *Id.*

> #### b.   Federal standards apply

The TCCA refused to consider Fratta's claim and denied relief on the ground that Fratta was not entitled to hybrid representation.  For reasons stated above, this was neither an adequate or regularly applied state law ground.  This Court therefore reviews the claim presented herein de novo, unencumbered by state common law conventions for interpreting indictment and jury charge.

**c.**   **The jury charge instructed jurors to convict on the basis of elemental findings that diverge fatally from the essential element set forth by statute that define the offenses for which Fratta was indicted.**

Pleading the mens rea disjunctively, "unlawfully, intentionally **or** knowingly," completely changed the requirements that the jury had to find satisfied in order to convict Fratta.   While the Indictment required the jury to find both that Fratta acted intentionally and knowingly, the jury charge permitted conviction upon finding Fratta only acted **unlawfully**.

The amendment to the indictment affected all four counts.   The jury not only was permitted to convict Fratta as a principal on all counts upon finding that he acted "unlawfully, intentionally or knowingly," the jury was allowed to convict Fratta under the law of the parties charge added to each Count by the trial court's instructions upon finding Fratta aided and abetted Guidry or Prystach to commit the crimes alleged in any of the four counts "unlawfully, intentionally **or** knowingly."   In violation of Due Process, this alleviated the jury's responsibility to find that Fratta intentionally and knowingly, and in violation of the Fifth Amendment permitted the jury to find Fratta guilty for illegal conduct (act plus mens rea) on which the Grand Jury did not return the Indictment.

**d.**   **Other parts of the jury charge could not possibly not cure error.**

Because acting "unlawfully" was not defined in the definitional section of the trial court's instruction even generally as "acting criminally," Fratta could be found guilty under the trial court's instructions without a finding that he or his codefendants acted with criminal intent.   The application paragraphs can not salvage the jury instructions since, as

argued above, this section of the charge mistakenly instructed jurors to convict upon merely finding Fratta intended to commit burglary.  The charging error therefore is reversible error *per se* or structural error.  *See Sullivan v. Lousiana*, 508 U.S. 275 (1993); *Arizona v. Fulminante*, 499 U.S. 279 (1991).

Requiring the jury to convict Fratta on capital charges and murder charges for acting "**unlawfully**, intentionally **or** knowingly" is as serious and incurable as error as would be an instruction that required jurors to convict upon finding Fratta acted "**negligently**, intentionally or knowingly."  This Court should therefore order that Fratta be released or that he be retried on all counts.

4.      **Because the Indictment for burglary murder does not allege that anyone  but Fratta burgled and shot Farah, the constructive amendment resulted in conviction on proof that varied materially from the conduct on which the Grand Jury indicted Fratta.**

a.      **Fratta raised this claim below.**

In his July 29, 2010, pro se pleadings,  Fratta correctly pointed out to the Texas Court of Criminal Appeals that Count Four (burglary-murder) of the Indictment alleged Fratta committed burglary and killed Farah "ACTING ALONE."  Prystash and Guidry are not mentioned in this Count.  Nor did the Indictment plead generally that Fratta and others known or unknown committed murder in the course of a robbery.  However, the jury charge added a law of the parties instruction that permitted jurors to find Fratta guilty of aiding and abetting either Guidry or Prystash to shoot Farah in the course of a burglary.  Fratta therefor alleged in his thirty-ninth claim for relief on direct appeal that the law of the parties charge resulted in a fatal or material variance. Ex. '1'.

29

###### b.      Relief is necessary.

"A material variance occurs when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense." *United States v. Rodriguez*, 553 F.3d 380, 390-91 (5th Cir. 2008) (citing *United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir.), cert. denied, 128 S.Ct. 297 (2007)).   Prohibitions against material variances exist to protect defendants from convictions based on evidence that shows the defendant's "participation in a crime of the same type alleged in the indictment, but on significantly different facts" than can be reasonably anticipated from the indicted offense.   This is because material variances place defendants at risk of being unable to prepare their defenses or of double jeopardy. *Id.* (citing *United States v. Thomas*, 12 F.3d 1350, 1357 (5th Cir.1994).

###### c.      Law of the parties charge does not create a new offense.

Texas's law of the parties, Tex. Penal Code 702(a), like the federal aiding and abetting statute, 18 U.S.C. § 2, does not create a separate offense, but merely makes those who aid and abet in a crime punishable as principals.  *See United States v. McKnight,* 799 F.2d 443, 445 (8th Cir. 1986).   Hence, a proper law of the party charge does not alter essential elements.

###### d.      The variance prejudiced Fratta

The face of the indictment conveyed the unmistakable impression that the State would attempt to convict Fratta on a burglary murder allegation by proving he burgled Farah's home and he shot her himself.   The other counts in the indictment for soliciting murder strengthened this impression because these counts name Guidry and Prystash.   The

Indictment therefore gave Fratta no reason to suspect the State would seek to prove guilt

through proof of burgling conduct on the part of Prystash or Guidry.   Because the State

procured a conviction through evidence introduced to prove conduct that the indictment

indicated the state would **not** prosecute, relief from a prohibited material variance is

warranted.  This Court should therefore order Fratta released or retried.

### E.    ABSTRACT PARAGRAPH OF INDICTMENT CONSTRUCTIVELY AMENDED THE INDICTMENT IN VIOLATION OF DUE PROCESS AND THE FIFTH AMENDMENT.

#### 1.    Fratta fairly raised this claim.

Referring to page four of the jury charge, which contains the Abstract on how the

law must be applied in assessing each count, Fratta stressed that the jury charge "gives the

instruction that 'the offense'" Fratta committed "is 'burglary of a building,' NOT the

murder charge."  Ex. '2' p. 5.   In Points of Error 2, 5, and 7, Fratta complained that the

the jury charge violated Texas law and his Due Process and Fifth Amendment rights.  *Id.*

at ii-iii.

#### 2.    Instructions gave jurors leave to convict Fratta based upon finding evidence of unindicted intentional conduct that does not constitute a crime.

Set fourth in full the relevant part of the jury charge's instructios on how jurors had

to apply the law to the  burglary-murder allegations contained in combined Counts Three

and  Four of he Jury Charge are as follows:

> **or you must find from the evidence beyond a reasonable**
> **doubt that the defendant, Robert Alan Fratta, with the**
> **intent to promote or assist in the commission of the offense**
> **of burglary of a building,** if any, solicited, encouraged,
> directed, aided, or attempted to aid Joseph Andrew Prystash

<u>and/or Howard Guidry in shooting Farah Fratta, if he did, with the intention of thereby killing Farah Fratta.</u> If you have a reasonable doubt as to the existence of any of the **foregoing elements**, then you cannot convict the defendant of capital murder.

Ex. '3' (jury charge) (underscoring and bolding added).

Under Tex. Penal Code §7.02,

(a)    A person is criminally responsible for an offense committed by the conduct of another if:

*** 

(2)  acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense

Section 7(a)(2) permits a jury to find a defendant guilty of a given offense, **X**, if the jury finds beyond a reasonable doubt that the defendant "acting with intent to promote or assist the commission of **that offense**," namely offense **X,** the defendant "solicits, encourages, directs, aids, or attempts to aid the other person to commit offense **X**.   That is to say, the law of the parties only applies if the offense that the defendant solicits, encourages, directs, aids or attempts to aid another person to commit is **the same offense as** the offense that the indictment alleges the defendant "acted with intent to promote or assist the commission of."

On the other hand, it not an offense under the law of the parties, or under any other Texas statutes, for someone acting with intent to promote or assist the commission of the offense '**X**',  to solicit, encourage, direct, aid, or attempt to aid another person to commit the offense '**Y**'.   Convictions obtained under a hybrid charge of this form would grotesquely violate due process, because jurors need not find anything but a coincidental

connection between the defendant's intentions and the offense that actually takes place. Texas law does permit this hybridization, and any criminal law taking this form be unconstitutional.

The burglary-murder charge on which jurors were instructed unquestionably is such a hybrid.  The trial instructed jurors that they could find Fratta guilty of capital murder upon finding Fratta intended to promote or assist the commission of **burglary,** while soliciting, aiding or attempting to aid another person **"to shoot Farah."**  As such, the indictment allowed jurors to convict Fratta upon finding elements different from those defining burglary-murder and different from those in the indictment.  Because this hybrid combination of criminal intent to burgle and conduct that aided someone else to commit a different crime allowed conviction upon finding evidence in support completely different than those defining the capital crime for which Fratta was indicted, this portion of the jury charge clearly violated Fratta's Due Process and Fifth Amendment rights.

### 3. The law of the parties charge in the application paragraphs did not cure error.

The law of parties charge appended to the burglary-murder count did not correct the impression left by the abstract that jurors need only conside whether Fratta had the intent to burglarize a building.  The application did not clarify that the jurors had to find both that Fratta intended for someone to kill Farah and intended for this same person to burglarize the home. The law of the parties appendage stated as follows,

> or if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 9th day of November, 1994, Joseph Andrew Prystash **and/or** Howard Guidry did then and there unlawfully, while in the course of committing or attempting to

> commit the burglary of a building owned by Farah Fratta,
> intentionally cause the death of Farah Fratta by shooting Farah
> Fratta with a deadly weapon, namely, a firearm, <u>and that the</u>
> defendant, Robert Alan Fratta, with the intent to promote or assist
> the commission of the offense, if any, solicited, encouraged,
> directed, aided or attempted to aid Joseph Andrew Prystash **and/or**
> Howard Guidry to commit the offense, if he did, then you will find
> the defendant guilty of capital murder, as charged in the indictment

The **mandatory language** of the application paragraph (i.e. the phrase "you must")

created a presumption that jurors had to follow this paragraph.  Meanwhile mandatory language

is absent from the law of the parties charge appended to the burglary-murder Count in the

application paragraph.  The best that can be said is that the jurors were left with an instruction so

hopelessly confused that it is impossible to tell what the jurors relied upon.  At worst, the

mandatory language in the jury charge ensured they convicted Fratta for a non-statutory offense,

a fortiorari, one that changed the elements of the charge for which he indicted.


## PART II

## GATEWAY INNOCENCE AND BRADY CLAIMS

## <u>CLAIM THREE</u>

**FRATTA'S NEW FORENSIC EVIDENCE PROVES A MISCARRIAGE OF JUSTICE UNDER *SCHLUP V. DELO,* 513 U.S. 1995 (1995), THAT PERMITS REVIEW OF ANY DEFAULTED CLAIMS**

**A.      STANDARDS**

    **1.      The holding in *McQuiggins v. Perkins*, 133 S.Ct. 1924 (2013), means actual innocence is also a "gateway" past AEDPA's statute of limitations.**

In *Perkins*, 133 S.Ct. at 1928, the Supreme Court held "that actual innocence, if

proved, serves as a gateway through which a petitioner may pass whether the impediment

is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, expiration of the statute of limitations." *Perkins* "clarifie[d] that a federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown." The illustration given where unjustified delay would be a factor involved abuse of the actual innocence gateway. The State envisioned a case in which a petitioner laid in wait in wait in order to "use stale evidence to collaterally attack his conviction ... when an elderly witness has died and cannot appear at a hearing to rebut new evidence." The Court instructed that under these circumstances "the timing of such a petition,…, should seriously undermine the credibility of the actual-innocence claim."

The timing and circumstances under which Fratta raises actual innocence do not detract in the least from the merits of his argument. Whether raised now or at an earlier opportunity, the substance of the actual argument would be exactly the same. The State's opportunity to counter Fratta's actual innocence claim is unaffected as well. Fratta's gateway innocence argument does not depend on documents or witnesses any more or less accessible today than on February 12, 2015, when his original Petition was filed.

## 2. *Schlup*'s "Gateway innocence" standards.

In *Schlup v. Delo,* 513 U.S. 298 (1995), the Supreme Court recognized that otherwise procedurally-defaulted claims may be cognizable upon showing that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." This formulation "ensures that petitioner's case is truly 'extraordinary,' while still providing petitioner a meaningful avenue by which

to avoid a manifest injustice." *See also, House v. Bell*, 547 U.S. 518 (2006) (citing 513 U.S., at 327).   A petition supported by a convincing *Schlup* gateway showing "raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error"; hence, "a review of the merits of the constitutional claims" is justified. *Id.* (*quoting Schlup*, 513 U.S., at 317).

In determining whether a petitioner has passed through *Schlup's* gateway, the court may consider "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."[1]   However, the habeas court's analysis is not limited to such evidence.   *Schlup* makes plain that the habeas court must consider "all the evidence," old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial." *See id.*, at 327-328, 115 S.Ct. 851 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal).   Based on this total record, the court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." 513 U.S., at 329.

While "the court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors," *id.*, the gateway actual-innocence standard is not equivalent to the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), which governs claims of insufficient

---

evidence. *House,* 547 U.S. at 519.   When confronted with a challenge based on trial evidence, courts presume that the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict.   Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly-supplemented record. *See id.*   If new evidence so requires, this may include consideration of "the credibility of the witnesses presented at trial." *Id.*

In *Sawyer v. Whitley*, the Supreme Court recognized that imposing death even on a defendant guilty of murder would violate the constitution if the defendant produced clear and convincing evidence that no reasonable juror would have found him eligible for the death sentence.   In *Schlup*, the Court fashioned a less onerous standard for raising defaulted guilt-innocence claims.   To demonstrate actual innocence as a gateway to review of procedurally barred claims arising from the guilt-innocence phase of trial, a petitioner must show that in light of all the evidence, including specific, reliable evidence not presented at trial, "it is more likely than not that no reasonable juror would have convicted him" of the underlying crime. *See Bousley v. United States*, 523 U.S. 614, 623 (1998).

In *Finley v. Johnson*, the Fifth Circuit concluded that a showing of facts establishing an affirmative defense that would result in the defendant's acquittal constituted a sufficient showing of actual innocence to allow a petitioner to proceed with a procedurally defaulted constitutional claim. 243 F.3d at 221. Petitioner Finley claimed that new undisputed evidence showed he was actually innocent of the Texas crime of aggravated kidnapping because he believed his acts were "immediately necessary to avoid imminent harm" to the

victim's wife and daughter. Id. at 220. Necessity is a complete defense to criminal conduct in Texas. Tex. Penal Code Ann. § 9.22; see Finley, 243 F.3d at 220 n. 6. The Fifth Circuit observed that "Finley has pointed to new evidence which is both undisputed and highly probative of his affirmative defense of necessity." *Id*. at 221. Noting that an actual innocence claim is "a factual matter," id. at 220, the Fifth Circuit concluded that "a showing of facts which are highly probative of an affirmative defense which if accepted by a jury would result in the defendant's acquittal constitutes a sufficient showing of 'actual innocence....' " Id. at 221 (emphasis added).

In *Jones v. Delo*, 56 F.3d 878, 883 (8th Cir. 1995), the Eighth Circuit held that a defaulted petitioner's claim of innocence is "actual" and not "legal" when the claim negates an essential element of a capital conviction. Jones was convicted of capital murder, but in habeas proceedings submitted new evidence of mental disabilities caused by organic brain to show that at the time he killed his girlfriend, he was incapable of "deliberation," an element of capital murder. *Id.* at 882. Based on new evidence of Jones's mental aptitude and organic brain disease, medical experts testified that Jones was "incapable of deliberation at the time of the killing." Id. The Eighth Circuit rejected Missouri's argument that an inability to deliberate is a claim of legal innocence and explained that "one is ... actually innocent if the State has the 'right' person but he is not guilty of the crime with which he is charged." *Id*. at 883. Accordingly, if Jones could negate his ability to deliberate, "an essential element of the crime for which he was convicted," then his claim would not be "one of mere legal innocence." *Id.*

**B.      ARGUMENT**

**1.      New evidence showing that Fratta's gun was not the murder weapon and Guidry was not the shooter constitutes solid, reliable proof that Fratta is actually innocent of the capital crime with which he was charged.**

**a.      Trial court prevented trial counsel from introducing forensic evidence disproving the State's critical theory that Guidry shot Farah with a gun that belonged to Fratta.**

Key to the State's case was alleged proof that Guidry shot Farah with a gun purchased by Fratta that Prystash kept and then gave Guidry so he could carry out the murder.   Gipp testified that Prystash returned the night of the murder with a weapon, emptied two bullets from the chamber and placed the gun in a lined gun case.  When Prystash left the house, Gipp said she wrote down the gun's serial number on a blue sticky-note.  Six months after the murder the State arrested Guidry for robbery and found he was in possession of .38 Charter Arms.  In connection with efforts to get Gipp immunity, Gipp's attorney turned over the blue-sticky with the serial number to prosecutors.   Law enforcement then matched the number Gipp said she scribbled on the blue-sticky to the serial number on the .38 Charter Arm recovered from Guidry.

At Fratta's original trial in 1996, the State sponsored false testimony from CE Anderson that the according to which bullets recovered at the murder scene matched bullets test fired in this .38 Charter Arms, and suppressed ballistic reports contradicting Anderson's testimony.  The second trial in 2009 trial was different in two respects.  First, at the 2009 trial, the State had to call another firearms examiner, not because the State was

loath to sponsor false testimony the second time around,[2] but because Anderson was too ill to testify.   Firearms examiner James Baldwin, instead of Anderson, took the stand. Baldwin said he could not match the bullets recovered at the crime scene to the .38 Charter Arms found on Guidry.   Second, trial counsel forced the State finally to disclose the contradictory reports by pursuing disclosure all ballistic reports through pretrial motions and hearings.

Nonetheless, the State still managed to create the false impression that ballistics supported the theory that Guidry shot Farah with a gun traced to Fratta through Prystash, and the State (prosecutors and trial court, as well, this time) still managed to prevent trial counsel from disabusing the jury of this false impression with forensic evidence showing that Fratta's gun (the .38 Charter Arms found on Guidry) was **not** the murder weapon.  First off, Baldwin testified that a bullet collected at the crime scene and bullets test fired in the .38 Charter Arms found on Guidry displayed common "class characteristics."   Baldwin also gave excuses for why he could not achieve a match at this late date, nearly 15 years after the murder.   Among the reasons Baldwin said a match was not possible now was that over time the .38 Charter Arms had languished uncared for in the evidence room and displayed signs of rust.   The jury was thereby led to entertain the possibility that testing earlier would have generated a match.   Secondly, the State objected on hearsay ground to the defense's request to introduce ballistic reports based on testing conducted near the time

---

[2] Indeed, at co-defendant Guidry's second trial, the State called Anderson to falsely testify again and suppressed ballistic reports contradicting him again.

of the crime that excluded the .38 Charter Arms as the murder weapon, and the trial court erroneously sustained the State's hearsay objections.

       **b.**    **Finger prints, blood evidence, and eye-witness accounts together pointed to Vernon Barlow, not to Guidry, thereby exonerating Fratta of all charges.**

Although the State disclosed ballistic tests (only to prevent their use at Fratta's second trial) the State did **not** disclose dramatically important forensic evidence, physical evidence, and police reports proving that another man, not Guidry, shot Farah.  Before Fratta's original trial, law enforcement had developed evidence that showed that another man, named Vernon Christoper Barlow, shot Farah and the Guidry had not.   Barlow was a 5'10 black male. See Ex. 8 (CAD Murder Report, Rossi Supplement (11/15/94)); see also Ex. 13 (Office of Harris County District Clerk Case Details Printing (02/04/13, 1988 Misdemeanor)). In 1994, at the time of Farrah Fratta's death, Barlow was 25 years old. *Id.* Vernon Barlow thus matched the eyewitness description of the young, black, shorter male that neighbors at the scene when Farah was shot.  However, the State did not turn this evidence over to Fratta's original defense team or turn it over to the attorneys defendant Fratta at his second trial.[3]

Police found Barlow through their investigation of James Podhorsky.  In the months that followed Farah's death, police focused on Podhorsky.   Police discovered that Podhorsky had a grey/black Corvette with silver front fenders that matched the general description of the getaway car. *Id.* The hatchback Corvette had one inoperable front

---

[3] The State also hid the evidence from Guidry's first and second set of attorneys.

headlight, and there was blood on the seat. *Id.*    Police followed up this matching lead, ordering testing on the blood, and tracking down previous owners.   Police discovered the hatchback Corvette was registered to Barlow.   Police then ran an A.F.I.S. search on latent fingerprints obtained from the driver's door and left front fender of the car Farah Fratta drove into her garage on the night of the murder.   These fingerprints matched Barlow's. See Ex. 8 (CAD Murder Report, Rossi Supplement (11/15/94)). Given that Farah's car was backed into the garage and that she was shot on the driver's side, latent prints from the driver's door and front fender match the location of where the shooter would have been standing during the murder. However, the State did not disclose any of this information to the defense.

> **i.    Forensic evidence is precisely the type that Schlup demands.**

The emphasis in *Schlup* on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Schlup, 513 U.S. at 327–28.   A petitioner, however, must still show that the evidence is credible and reliable. See id. at 324.   Schlup gave, as examples, "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence."

In most cases, absent novel challenges, fingerprint evidence is sufficiently reliable to satisfy Rule 702 of the Federal Rules of Evidence and *Daubert v. Merill Dow Pharmaceutical, Inc.,* 509 U.S. 579 (1993).   Fingerprint identification has been admissible as reliable evidence in criminal trials in this country since at least 1911.  *See United States v. John*, 597 F.3d 273 (5th Cir 2010) (citing *United States v. Crisp*, 324 F.3d 261, 266 (4th

Cir.2003)). In terms of specific *Daubert* factors, the reliability of the technique has been

tested in the adversarial system for over a century and has been routinely subject to peer

review. *Id.* (citing U*nited States v. Havvard*, 260 F.3d 597, 601 (7th Cir.2001)). Moreover,

as a number of courts have noted, the error rate is low. *Id.*  (citing  *United States v. Mitchell*,

365 F.3d 215, 246 (3d Cir.2004)).

**ii.    Evidence excluded at trial is new evidence, for
purposes of  *Schlup,* that this Court can consider.**

The *Schlup* inquiry "liberates a petitioner's argument from traditional rules of

evidence." *McGowen v. Thaler*, 717 F.Supp. 626, 663 (S.D. Tex. 2010).  "In assessing the

adequacy of petitioner's showing" of actual innocence, therefore, "the district court is not

bound by the rules of admissibility that would govern at trial." *Id.*   The   trial   court's

evidentiary   rulings   prohibiting   defense   counsel   from   introducing   ballistic   reports

contradicting the State's allegation the Guidry was later arrested with the murder weapon

pose no obstacle to this Court's consideration of ballistic evidence proving Fratta innocent

of crimes charged.

**2.    Convicting Fratta required the State to prove beyond a
reasonable doubt that Guidry shot Farah; hence, evidence
showing Farah was shot by someone else with whom neither
Fratta, Prystash or Guidry had any connection exonerates Fratta.**

**a.    Fratta's new evidence shows he is actually innocent of the
criminal conduct charged in COUNTS ONE THROUGH
FOUR**

A critical element that the jury had to find beyond a reasonable doubt in order to

convict Fratta under all four counts was that  "Joseph Prystash or Howard Guidry did then

and there kill Farah Fratta  by shooting Farah Fratta with a deadly weapon."  Under the law

43

of the parties charge appended to theory one the jury still had to find that Fratta aided or attempted to aid Joseph Andrew Prystash or Howard Guidry **in shooting Farah Fratta**. In either event, in order to convict Fratta of capital murder, the jury had therefore to find beyond a reasonable doubt that (i) Prystash shot Farah **or** (2) that Guidry shot Farah.

The State made no attempt to show Fratta shot Farah. The State did not attempt to show Prystash shot Farah either. According to the State's theory, which should not be confused with its evidence, Prystash supplied Guidry the weapon, drove Guidry to the scene where Guidry supposedly lay in wait for Farah, and then drove the getaway car after Guidry shot Farah. However, the State did not sponsor any significant evidence that Guidry shot Farah. Indeed, the State failed to sponsor significant evidence that Guidry was at the scene at all, apart from evidence connecting Guidry to the murder weapon.

The evidence connecting Guidry to the murder weapon, and therefore circumstantially placing him at the scene that the State tried to muster consisted in (i) proof that five months after the murder, Guidry was found in possession of a .38 Charter Arms that once belonged to Fratta, (ii) ballistic evidence that a firearm examiners testified showed the bullets that killed Farah were fired in a weapon having the same "class characteristics" as the .38 Charter Arms later found on Guidry, and (iii) testimony from Gipp that she had seen Prystash talking with Guidry in the weeks before the murder, that she saw Guidry on the steps of her apartment the hours before the murder, and that she saw Prystash returned to her apartment with a gun that proved be the .38 Charter Arm that belonged to Fratta. This highly circumstantial evidence (i-iii) barely connected Fratta,

Guidry and Prystash and was used by the State to argue that Guidry was at the murder scene.  There was nothing else.

The evidence of guilt **at trial**  to which this Court must compare Fratta's new evidence of innocence is meager to the point of being insufficient as the case stood. The new evidence disproves the meagerly incriminating implications that State tried to intimate showed Fratta and Guidry were involved together in Farah's murder.  However, this threadbare case is disproved by new evidence that the State suppressed.  No evidence placed Guidry at the murder scene, and Gipp testified Prystash gave Guidry the .38 Charter Arms to dispose of **after** the murder, not before.  The State's firearms examiner, Baldwin, testified that he could "neither identify nor exclude" the Charter Arms .38 Special found on Guidry as he murder weapon, which meant Baldwin could not say that the bullet came from the .38 Charter Arms recovered from Guidry.[4]  On cross-examination, Baldwin agreed that the bullets could be fired from several types of guns.

However, Baldwin affirmed that that the projectiles recovered at the murder scene "are showing similar class characteristics to a Charter Arms .38 Special."  Farah's across the street neighbor testified that she looked out her window when she heard shots ring out and saw a black man about 5'9" run to a grey or silver hatchback type getaway vehicle that

---

[4] Pursuant to a March 12, 2009 examination, the firearms examiners could not identify the lead bullet fragments found at the crime scene and in Farah's body as having been fired from the Charter Arms gun. See Ex. 24 (R. Baldwin Report of Forensic Laboratory Examination, 03/12/09), and the Regional Firearms Identification Laboratory sent a personal email to the District Attorney's office stating that he "could neither identify nor eliminate [the relevant specimens] as having been fired from the submitted 38 Spl. Chrter Arms revolver (State's Exhibit 60 Lab Item 1)."  The examiner confirmed he had "compared both the morgue specimen (State's Exhibit 51, Lab Item 9) and the bullet fragment (State's Exhibit 49, Lab Item 8) to my test fired specimens and those [] from Montgomery County." Id

she noticed had a headlight out.   This general description, needless to say, could fit thousands upon thousands of persons.  Moreover, Guidry was six foot tall.[5]

Fratta's new evidence – ballistic reports that the Court kept out of evidence and fingerprint evidence implicating Barlow – shreds the meager proof the State had to show Guidry was ever at the crime scene.   The earliest tests on the .38 Charter Arms handgun that the State maintained Guidry used to shoot Farah <u>excluded</u> this gun as the murder weapon. Firearms examiners determined that two fired lead bullets from the crime scene and related bullet fragments could not be identified as having been fired from the Charter Arms gun. Ex. '4' (03/15/95 Firearms Examination Letter).  This did not mean simply that the bullets may or may not have been fired from the gun; instead, the report stated as follows: "Test fired bullets fired in the above described weapon were found [to] bear **inconsist[e]nt** characteristics from the barrel." *Id.* (emphasis added).   This meant, instead, that the identifying characteristics of the .38 Charter Arms proved that this gun was **not** the murder weapon.   In 2007, Robert Baldwin also concluded that a cartridge found at the scene was **not** fired in the .38 Charter Arms that law enforcement recovered from Guidry.

No jury would have found beyond a reasonable doubt that Guidry shot Farah based on the State's case at trial if the jury had been confronted with (i) evidence **excluding** the

---

[5] The weakness of this testimony placing Guidry at the scene is reflected in the desperate measure the State took to firm up its case against Guidry.   The State offered a videotape showing Guidry at a store, near the murder scene, to which law enforcement had traced calls Fratta had made from the church the night of the murder.  (In an unfathomable ruling, Fratta's trial court allowed the video portion of the tape into evidence.).  However, Guidry was not a case of a perpetrator getting caught "returning to the scene of the crime."  Law enforcement took Guidry to the food store four months after Farah was shot and videotaped him on site as part of their investigation.  The evidence placing Guiidry near the scene of the crime was manufactured by the State after the fact, and manufactured illegally.

murder weapon the State insisted Guidry used to commit the crime and (i) forensic evidence pointing to another suspect, Vernon Barlow, who fit eye-witness descriptions (as vague and general as they were) better than Guidry, and who owned a car contaminated with human blood that fit descriptions for the getaway vehicle.

Without proof beyond a reasonable doubt that Guidry shot Farah, no reasonable jury could find Fratta was guilty of capital murder as charged in the indictment or as charged in the trial court's jury instructions.  Nor could any reasonable jury find that Fratta was guilty of the lesser offense of murder that was added to the jury charge,[6] since the lesser included offense also required the jury to find that Fratta shot Farah, which is absolutely false, **or** find that Prystash shot her, which the State made no attempt to prove, maintaining instead that Prystash was the driver, **or** that Guidry shot Farah, which the new evidence would preclude any reasonable juror from finding beyond a reasonable doubt.

The new evidence disproving Guidry's involvement in Farah's murder and implicating Barlow readily satisfies *Schlup*'s actual innocence threshold.  This Court can therefore reach all claims that Respondent may contend are defaulted or time barred under the AEDPA.  These claims include all guilt innocence claims alleged herein.

---

[6] The trial court's instruction on murder was as follows: "if you find from the evidence beyond a reasonable doubt that on or about the 9th day of November, 1994, in Harris County, Texas, the defendant, Robert Alan Fratta, did then and there unlawfully, intentionally or knowingly cause the death of Farah Fratta, by shooting Farah Fratta with a deadly weapon, namely, a firearm; or if you find from the evidence beyond a reasonable doubt that on or about the 9th day of November, 1994, in Harris County, Texas, Joseph Andrew Prystash and/or Howard Guidry, did then and there unlawfully, intentionally or knowingly cause the death of Farah Fratta, by shooting Farah Fratta with a deadly weapon, namely, a firearm, and that the defendant, Robert Alan Fratta, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash and/or Howard Guidry to commit the offense, if he did, then you will find the defendant guilty of murder."

## CLAIM FOUR

### NEW EVIDENCE PERMITS MR. FRATTA TO PASS THROUGH THE *SCHLUP* GATEWAY, AND ESTABLISHES A CONSTITUTIONAL VIOLATION UNDER *BRADY*

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87 (1963).  The Court has since disavowed any difference between exculpatory and impeachment evidence, *United States v. Bagley,* 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.), and abandoned the distinction between a situation where the defense requested *Brady* information and where no request was made.  *United States v. Agurs,* 427 U.S. 97, 107 (1976).  Whether or not the state was aware of the existence or value of evidence to the defense, federal law holds that due process is violated when favorable, material evidence is suppressed by the government.  *Kyles,* 514 U.S. at at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police."); *see Bagley,* 473 U.S. at 682.

The Supreme Court recognized that a prosecutor's interest is "not that [he] should win a case, but that justice shall be done."  *Berger v. United States,* 295 U.S. 78, 88 (1935). He is a servant of that law, aiming not just to prevent a guilty defendant from escaping, but to prevent an innocent defendant from suffering.  *Id.*  "He may prosecute with earnestness

and vigor . . . but while he may strike hard blows, he is not at liberty to strike foul ones." *Id.* The Texas Disciplinary Rules of Professional Conduct hold a prosecutor similarly responsible. Tex. Disciplinary Rules of Prof'l Conduct 3.09, cmt. 1 ("[A] prosecutor is obliged to see that the defendant is accorded procedural justice, that the defendant's guilt is decided upon the basis of sufficient evidence, and that any sentence imposed is based on all unprivileged information known to the prosecutor."); *id.* (requiring prosecutor to afford procedural justice to defendants).

To prove a *Brady* violation, Mr. Fratta must demonstrate the state failed to disclose favorable, material evidence. *Brady,* 373 U.S. at 87. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Strickler,* 527 U.S. at 280 (citing *Bagley,* 473 U.S. at 682); *see also Kyles v. Whitley,* 514 U.S. at 433-34. It bears emphasis that a showing of materiality does not require a petitioner to demonstrate by a preponderance that disclosure of the suppressed evidence would have resulted in his acquittal (based upon the presence of reasonable doubt or a theory of the crime that does not inculpate the defendant). *Kyles,* 514 U.S. at 434 (citing *Bagley,* 473 U.S. at 680 (adopting *Strickland* formulation)); *cf. Strickland,* 466 U.S. at 693 ("We believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."). The Supreme Court explained:

> *Bagley's* touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable

probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

*Kyles,* 514 U.S. at 434 (quoting *Bagley,* 473 U.S. at 678).

Moreover, a *Brady* analysis is not a sufficiency of the evidence test. *Kyles,* 514 U.S. at 435. Mr. Fratta does not need to demonstrate that, after discounting the inculpatory evidence, there was not enough evidence to convict. *Id.* As the Supreme Court noted, the possibility of an acquittal on a criminal charge does not mean that a jury does not also have sufficient basis to convict. *Id.* Once this Court finds that a *Brady* violation occurred, no further harmless error analysis needs to be undertaken. *Id.* By definition, *Brady* error could not be treated as harmless, because demonstrating a reasonable probability that the result of the proceeding would have been different necessarily entails the conclusion that the suppression had a substantial and injurious effect on the jury's verdict. *Id.* (citations omitted).

Finally, the Supreme Court stressed that materiality must be assessed collectively, not item-by-item. *Kyles,* 514 U.S. at 436. A prosecutor may not have a duty to disclose every piece of evidence in its possession, however, once the collective impact of nondisclosure of numerous pieces of evidence establishes a "reasonable probability," constitutional violation ensues. *Id.* at 437-38. Accordingly, a court conducting a *Brady* analysis must assess the cumulative effect of each piece of evidence suppressed. *Id.* at 440. "Repeated references dismissing particular items of evidence as immaterial and so suggesting that cumulative materiality" does not exist is not a proper analysis. *Id.* A series

of independent materiality evaluations strung together in an opinion is not the cumulative evaluation required by *Bagley.  Id.*

### 1. The Evidence Mr. Fratta Brings Before this Court is Favorable and Material

Pursuant to the indictment and the state's theory of the case, the state had to prove that Robert Fratta hired Guidry to shoot Farah.  Given that the state presented no evidence whatsoever indicating that Mr. Fratta knew or ever communicated with Howard Guidry, this was the weakest part of the state's case.  If the jurors had known that the gun Guidry possessed did not shoot Farah they would have no reliable evidence before them implicating Guidry in Farah's death.  Evidence indicating someone other than Guidry – whose fingerprints were at the scene, who carried the same type of gun used to kill Farah, and who drove a car matching the getaway description that had human blood on the seat– would have caused the jury to find the state brought the wrong shooter into Fratta's trial.  Once the state's theory of the triggerman was discredited, the jury would have been more skeptical to accept other evidence and theories form the state regarding Farah's death.  As such, Mr. Fratta's conviction and death sentence are not worthy of confidence and cannot stand.

If the state had not suppressed evidence, counsel could have attacked the "thoroughness and even the good faith of the [police] investigation."  *Kyles,* 514 U.S. at 445; *see Lindsey v. King,* 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding new trial because withheld *Brady* evidence "carried within it the potential . . . for the . . . discrediting  . . . of police methods employed in assembling the case").  The fact that the state's own experts

concluded that the gun found on Guidry did not shoot the bullets found at the scene reflects upon the good faith of the investigation. *See Bowen v. Maynard,* 799 F.2d 593, 613-14 (10th Cir. 1986) (in affirming habeas grant, noting that "withheld evidence raises serious questions about the manner, quality, and thoroughness of the investigation" and can be considered in assessing a *Brady* violation). Moreover, suppressed fingerprint evidence can render a capital murder conviction unconstitutional. *See, eg., Missouri ex rel. Koster v. Green,* 388 S.W.3d 603, 631, 633 (Mo. Ct. App. 2012) ("[T]he fingerprints excluding Allen would have provided the defense with further support that someone else was the perpetrator . . . and [t]he State's nondisclosure of the prints deprived Allen of the ability to wage a full defense and demonstrate to the jury that police had in fact found numerous foreign identifiable prints . . . that excluded Allen."); *Bailey v. Lafler,* No. 1:09-cv-460, 2010 WL 4286352, *4 (W.D. Mich. Sept. 29, 2010) (allowing petitioner to amend his petition to add a *Brady* claim based on exculpatory suppressed evidence that petitioner's fingerprints did not match those left at homicide scene).

### 2. Counsel Filed Numerous Pretrial Motions Requesting Exculpatory and Impeachment Material, and were Misled when the State Divulged Nothing in Response

Prior to trial, counsel filed at least eight motions requesting *Brady* evidence. Specifically, counsel requested:

- The "results of any scientific tests . . . including, but not limited to ballistic tests or fingerprints," Mtn 4.3 (Def Motion for Disc and Inspection); Mtn 4.11 (Mtn for Disc, Prod. & Inspect of Evid,); Mtn 4.15 (Mtn for Disc & Inspect of all Tests Performed);

- "Any written report of any test that is biological, microscopic, or scientific analysis," of any item tested by any state agency, law enforcement, or private

citizen, during the course of investigation, including the name and address of any forensic analyst used, Mtn 4.3 (Def Motion for Disc and Inspection);

- "Any and all fingerprint impressions" collected during the investigation, Mtn 4.3 (Def Motion for Disc and Inspection);

- Any investigation into the weapon the state alleges was used in the offense, Mtn 4.15 (Mtn for Prod & Insp of all Tests Performed);

- Evidence concerning every scientific test conducted pursuant to the investigation, including the party performing the test and a copy of the examination report, bench notes, and results, Mtn 4.15 (Mtn for Disc & Prod of All Tests Performed);

- The identity of any material or sample tested, including the date, location methods used, results, reports, and name of technician or examiner, Mtn 4.23 (Mtn for Prod of Impeachment Evid);

- The names of every expert consulted on the case or during the course of investigation, Mtn 4.15 (Mtn for Disc & Insp of all Tests Performed);

- All notes from any person participating in the investigation of the case, Mtn 4.11 (Mtn for Disc, Prod, & Inspect of Evid);

- All notes concerning witness interviews conducted by the prosecutor, law enforcement, or any state agency, Mtn 4.9 (Mtn for the Production of Wit Interview Notes);

- Any impeachment evidence pertaining to any state's witness, Mtn 4.15 (Mtn for Disc & Insp of all Tests Performed);

- Information concerning the credibility of any witness, including implied and/or expressed immunity agreements or promises of reward, Mtn 4.17 (Mot for Prod of Exculpatory, Impeachment & Mitigating Evid); Mtn 4.15 (Mtn for Disc & Insp of all Tests Performed);

- Any mitigating evidence pertaining to guilt or punishment, Mtn. 4.17 (Mtn for Prod of Exculpatory, Impeachment & Mitigating Evid); and

- An *in camera* review of the entire state's file by the court to ensure that all exculpatory and impeachment evidence has been provided to Mr. Fratta, Mtn 4.13 (Mtn for *In Camera* Insp. of State's Entire File).

Every piece of *Brady* evidence complained of herein was specifically requested, on more than one occasion, by the defense prior to trial. The state failed to disclose any of it. As the *Bagley* Court noted, a *Brady* violation becomes even more prejudicial when the state suppresses evidence after a specific request from the defense:

> The Government suggests that a materiality standard more favorable to the defendant reasonably might be adopted in specific request cases. The Government notes that an incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.

> We agree that the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.

*Bagley,* 473 U.S. at 682-83. Thus, this Court's *Brady* prejudice analysis must include consideration of the adverse effect that the prosecutor's failure to respond had on the preparation of the defense. *Id.*

In *Bagley,* the Court held that the prosecutor's response, or lack of production, to the defendant's discovery motion "misleadingly induced" counsel to believe no impeaching or exculpatory evidence existed. *Bagley,* 473 U.S. at 683. Mr. Fratta's counsel was likewise misled by the state's response to his request, depriving counsel of a cogent theory of innocence to guilt and reduction of moral culpability during sentencing. Prejudice in this case is not speculative. It is actual. Mr. Fratta's jury would certainly have

chosen to believe the person who shot Farah was the person whose fingerprints were found at the scene, matched the eyewitness description of the shooter, carried the type of gun used in the murder, and drove the type of car eyewitnesses saw, which had human blood on the seat, before they would believe the shooter was a person who never met Robert Fratta and carried a gun that ballistics confirmed did not shoot Farah.  Learning that the state was wrong about the identity of the triggerman would cause the jury view all other aspects of the state's case with skepticism, lessening their assessment of Mr. Fratta's moral culpability and the likelihood they would have voted to sentence him to death.  Because "all of these possible findings were precluded by the prosecution's failure to disclose the evidence that would have supported them, 'fairness' cannot be stretched to the point of calling this a fair trial."  *Kyles,* 514 U.S. at 454.

### 3.     This Court Must Consider the Effect of the Withheld Evidence Cumulatively

The forensic evidence should not only be viewed in isolation; this Court must give Mr. Fratta the full exculpatory value of this evidence viewed cumulatively.  *See Kyles,* 514 U.S. at 434, 436; *see also Goudy v. Basinger,* 604 F.3d 394, 400 (7th Cir. 2010) (error for district court to dismiss "each piece of suppressed evidence in seriatim, rather than assessing its cumulative effect as required by *Kyles*").  As a matter of law and fact, each piece of the suppressed evidence listed herein is exculpatory.  Furthermore, even if no single piece of suppressed evidence was material, when taken together, withholding of numerous files from the defense containing evidence relating to fingerprints, blood evidence, and police reports identifying another possible suspect and getaway vehicle – all

of which implicated someone other than Guidry as the shooter – was prejudicial.  If trial counsel was provided with evidence the state withheld, they could have derailed the state's theory of the case.  Any verdict returned by a jury prevented from considering such significant and impactful evidence is not worthy of confidence, and Mr. Fratta did not receive a fair trial because of the suppression.

### 4.   Mr. Fratta has met *Brady's* Standard for Determining Materiality

*Brady v. Maryland* concerned the issue of who actually killed the victim.  373 U.S. 83, 84 (1963).  Brady and his co-defendant Boblit were both found guilty and sentenced to death in separate trials.  *Id.*  In his trial, Brady took the stand and admitted his participation in the crime, but claimed Boblit did the actual killing.  *Id.*  During closing argument, counsel conceded Brady was guilty of first-degree murder, but asked the jury to return a non-death sentence.  *Id.*  Prior to trial, counsel had requested all statements by Brady's co-defendant.  *Id.*  The prosecution provided counsel with several of Boblit's statements, but failed to divulge one in which he admitted the actual homicide.  *Id.*

In state court proceedings, the Maryland Court of Appeals granted Brady a new punishment trial, stating "[w]e cannot put ourselves in the place of the jury and assume what their views would have been as to whether it did or did not matter whether it was Brady's hands or Boblit's hands that twisted the shirt about the victim's neck."  *Id.* at 88. Relief was restricted only to punishment because state law prohibited the confession from being admitted in the guilt phase of trial.  *Id.* at 89-90.  In dictum, the Supreme Court noted that Boblit's confession could have impacted both Brady's guilt and punishment verdicts,

but deferred to the state court holding concerning a matter of state law and granted of penalty trial relief. *Id.* at 90.

Similarly, evidence that Vernon Barlow, and not Howard Guidry, shot Farah would have impacted the verdict in Mr. Fratta's case. If the jury watched the state put on an entire case-in-chief of experts insinuating that the gun Guidry possessed shot Farah, only to learn during the defense rebuttal that the state's own tests conclusively proved it did not, the state's credibility on all other matters would be compromised. *See Banks,* 540 U.S. at 694 (quoting *Mooney v. Holohan,* 294 U.S. 103, 112 (1935) (per curiam) ("prosecutions 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice'"). If the jury sat through the state's entire case-in-chief and didn't learn until the defense rebuttal that another man's fingerprints were found at the scene, that this man had human blood on his car seat, and he owned the type of gun used to shoot Farah, that jury would question every aspect of the police investigation into the case. *See Kyles,* 514 U.S. at 445 (suppressed evidence denied petitioner the right to "attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even good faith of the investigation as well"). Taken together, this Court must hold that the *Brady* violations have rendered Mr. Fratta's conviction and death sentence constitutionally infirm.

**5.    *Brady* Satisfies Cause to Excuse Procedural Default**

In *Strickler v. Greene,* 527 U.S. 263 (1999), the Court held that a *Brady* violation establishes cause to excuse procedural default. Strickler and his co-defendant car-jacked a woman from a mall parking lot. *Strickler,* 527 U.S. at 266, 269. Her body was found

frozen, nude, and battered, evident that she had been beaten over the head with a 69-pound rock.  *Id.* at 269. The case against Strickler was extremely strong. The state presented witnesses who testified that Strickler confessed to the murder, was driving the victim's car, attempted to use the victim's bank card, gifted friends with jewelry belonging to the victim, had blood and semen on his clothes, and his hair was found at the scene near the body.  *Id.* at 266- 269.

Anne Stoltzfus was a key state's witness who claimed she saw Strickler abduct the victim in the mall parking lot, positively identifying him in a photo lineup.  *Id.* at 271. Strickler's *Brady* claim was based upon notes police took during their interviews with Stoltzfus and her ensuing correspondence with them, indicating that her memory of the offense and ability to identify any suspects was much foggier than the certainty with which she professed to on the stand.  *Id.* at 273-74.  The prosecutor acknowledged that he never saw these memoranda until long after trial.  *Id.* at 275.

Trial counsel never filed a motion requesting *Brady* material because the prosecutor had an open file policy.  *Strickler,* 527 U.S. at 276.  During closing argument, counsel conceded that the evidence was sufficient to find Strickler guilty only of first-degree murder -- not capital murder.  *Id.*  During state post-conviction proceedings, Strickler raised an unsuccessful claim that counsel was ineffective for failing to file a *Brady* motion pre-trial.  *Id.* at 278.  Strickler did not raise a stand-alone claim that the prosecution violated *Brady.*

During federal habeas proceedings, Strickler was able, for the first time, to view the prosecution's file and he raised, for the first time, a direct claim that his conviction was

unconstitutional because the state failed to comply with *Brady*.  *Strickler,* 527 U.S. at 278.

Finding cause to excuse the procedural fault of his *Brady* claim, the district court granted

the writ.  *Id.* at 279.  Cause was established because counsel had no prior access to this

evidence, and the state repeatedly withheld it throughout proceedings.  *Id.*  The Court of

Appeals for the Fourth Circuit vacated in part and remanded, holding the *Brady* claim

procedurally defaulted because the factual basis was available to Strickler at the time he

filed his state petition.  *Id.* (Circuit precedent held a party cannot establish cause for a

default if he "should have known of such claims through the exercise of due diligence").

The Supreme Court announced that, in order to excuse procedural default, cause and

prejudice parallel two of the three components of the alleged *Brady* violation itself.

*Strickler,* 527 U.S. at 282.  The state's suppression of evidence constitutes cause for the

procedural default, and if the evidence is "material," prejudice is established and

procedural default is overcome.  *Id.*  Suppressing evidence is "conduct attributable to the

state that impeded trial counsel's access to the factual basis for making a *Brady* claim" in

state court.  *Id.*  Because it was reasonable for trial counsel to rely on the presumption that

the prosecutor would fulfill his duty to disclose all exculpatory evidence, state habeas

counsel was also reasonable to rely upon this presumption.  *Id.* at 284 ("the standard for

cause should not vary depending on the timing of a procedural default") (quoting *Murray

v. Carrier,* 477 U.S. 478,491 (1986)).

The government argued cause was not established because a newspaper article

should have alerted counsel to the Stoltzfus correspondence, and if a federal habeas lawyer

could procure an order granting access to all state files, state habeas counsel could have

done the same.  *Strickler,* 527 U.S. at 284-85.  These arguments failed because counsel is under no obligation to presume the state is suppressing evidence.  *Id.* (counsel is reasonable presume that if *Brady* evidence is not present within an "open file," it does not exist). Furthermore, the fact that a federal district court granted broad discovery does not demonstrate that a state court would have also done so.  *Id.* (mere speculation that evidence may exist is unlikely to establish good cause for a discovery request).  "In the context of a *Brady* claim, a defendant cannot conduct the 'reasonable and diligent investigation' mandated by *McClesky* to preclude a finding of procedural default when the evidence is in the hands of the state."  *Id.* at 287-88 (citing *McClesky v. Zant,* 499 U.S. 467 (1991)).

Although the Court found the *Brady* evidence was not material, it did note that the standard used by Fourth Circuit was incorrect.  *Strickler,* 527 U.S. at 290.  The Court of Appeals held that prejudice did not ensue because, after discounting Stoltzfus's testimony entirely, the still record contained ample, independent evidence to support a guilty verdict and death sentence.  *Id.*  This standard is erroneous, the Court clarified:

> As we made clear in *Kyles,* the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions.  Rather, the question is whether "the favorable evidence could be reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.
>
> *Id.* at 290 (quoting *Kyles* 514 U.S. at 434-35).

Mr. Fratta has likewise demonstrated cause for the procedural default of his *Brady* claim.  Counsel filed numerous pretrial motions requesting exculpatory and impeachment evidence, evidence concerning scientific tests, and notes and memorandum created by the

state concerning their investigation.  Counsel had a right to presume that the state would honor their ethical duties and Mr. Fratta's constitutional rights and divulge this evidence. Likewise, state post-conviction counsel was reasonable to rely upon the state's response to trial counsel's specific requests and to presume no *Brady* evidence existed.  Moreover, counsel was reasonable in presuming that the state would not permit any expert or other witness to testify in a misleading fashion, and would "raise a red flag" in the presence of untruthful assertions.  *Banks v. Dretke,* 50 U.S. 668, 674 (2004).

In *Banks v. Dretke,* the Court once again corrected an erroneous standard concerning cause and prejudice,.  540 U.S. at 694.  The Fifth Circuit held that Bank's failure during state post-conviction proceedings to attempt to locate and interview witnesses and police officers undermined a finding of cause.  *Id.* at 695.  Noting that a similar argument was rejected in *Strickler,* the *Banks* Court lent "no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecutor represents that all such material has been disclosed."  *Id.* (state post-conviction counsel has no obligation to assert claims based only on suspicion)  A defendant cannot be penalized when the state suppresses evidence and misleads counsel:

> The state here nevertheless urges, in effect, that the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence, so long as the potential existence of a prosecutorial misconduct claim might have been detected.  A rule thus declaring the prosecutor may hide, defendant must seek, is not tenable in a system constitutionally bound to accord defendants due process.

*Id.* at 696 (quotations omitted).

Responsibility for the procedural default of Mr. Fratta's claims lies with the state. *See Murray v. Carrier,* 477 U.S. 478, 488 (1986) (cause inquiry turns on events or circumstances "external to the defense"). During his trial and state post-conviction proceedings, the state suppressed evidence and misleadingly represented that it fully complied with its *Brady* disclosure obligations. *See id.* at 693. "It was appropriate for [Mr. Fratta] to assume that his prosecutors would not stoop to improper litigation conduct to advance prospects for gaining a conviction." *Id.* at 694 (citing *Berger v. United States,* 295 U.S. 788,88 (1935); *Strickler,* 527 U.S. at 284).

## PART III

## INEFFECTIVENESS OF TRIAL COUNSEL CLAIMS

### A.   CAUSE AND PREJUDICE. *TREVINO V. THALER*, 133 S.CT. 1911 (2013).

Below Fratta raises claims that, in violation of Sixth Amendment, Fratta received ineffective assistance of trial counsel at the guilt-innocence phase of his trial. State habeas counsel did not raise any guilt-innocence IAC claims. *See Strickland v. Washington*, 466 U.S. 688 (1984), State habeas counsel inexcusably failed to challenge the constitutionality of Fratta's conviction at all, and raised punishment phase claims only. Nonetheless, despite state habeas counsel's failure to raise guilt innocence claims in state proceedings, none of Fratta's federal guilt-innocence IAC claims are defaulted or barred by the AEDPA.

In *Trevino v. Thaler*, 133 S.Ct. 1911 (2013), the Supreme Court created a narrow exception, whereby a federal habeas court may find "cause" thereby excusing a defendant's procedural default, if the underlying constitutional claim that state habeas failed to raise is

an ineffectiveness of trial counsel claim.  To qualify for the exception, the IAC claim must

meet the following four conditions or elements:

> (1) the claim of "ineffective assistance of trial counsel" is a "substantial"
> claim; (2) the "cause" consist[s] of there being "no counsel" or only
> "ineffective" counsel during the state collateral review proceeding; (3) the
> state collateral review proceeding was the "initial" review proceeding in
> respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state
> law requires that an "ineffective assistance of trial counsel [claim] ... be
> raised in an initial-review collateral proceeding."

*Id.* citing *Martinez v. Ryan*, 132 S.Ct. 1309, 1318–1319 (2012).

As a matter of law, conditions (3) and (4) are satisfied in Texas cases.  *See Trevino*,

133 S. Ct. at 1915.

*Trevino's* second condition, (2), "cause" due to ineffectiveness of state habeas

counsel, is also satisfied, for the following reasons:  state habeas counsel did not have a

strategic reason for not contesting guilt innocence; none of Fratta's present guilt-innocence

IAC claims would have detracted in the least from the punishment phase claims that state

habeas counsel actually did raise; state habeas counsel had virtually all the transcripts and

extra record evidence relied upon to develop Fratta's present guilt-innocence IAC claims.

In particular, state habeas counsel had at his disposal police reports, and transcripts and

records from Fratta's original trial and the trials of Fratta's codefendants that Fratta relies

upon in these federal proceedings to identify constitutional claims. This evidene shows that

that trial counsel (i) failed to impeach key witnesses, (ii) failed to exclude harmful

testimony and evidence, (iii) failed to impeach the integrity of the State's case at trial in

closing argument, and (iv) failed to challenge the sufficiency of the evidence or object to constructive amendments of, and variances from, the indictment.

State habeas counsel clearly should have investigated all the leads and developed all the other evidence that Fratta has discovered in federal habeas proceedings.  First, state habeas counsel, like trial counsel, failed to seek search warrants, inventories, or police reports related to the search of Gipp's apartment, or to identify witnesses, including police witnesses, to a search that turned up nothing.  However, the search warrant and inventory and/or police reports and witnesses are calculated to demonstrate that Gipp falsely testified about key evidence she claimed to have preserved in her apartment.  Second, state habeas counsel, like trial counsel, failed to investigate leads to witnesses that were calculated to confirm that Gipp's testimony was coerced by mental and physical abuse at the hands of Harris County Sheriff Office deputies and detectives.  For example, state habeas counsel failed to contact current federal habeas counsel, or his investigator, both of whom had litigated or investigated issues underlying Fratta's previous federal petition challenging his 1996 conviction, and failed to move the convicting court to allow state habeas counsel to depose Gipp and police witnesses regarding coerced testimony.  Third, state habeas counsel failed to investigate the accuracy and veracity of other key guilt-innocence witnesses, such as James Ray Thomas.  Fourth, state habeas counsel failed to challenge the sufficiency of the evidence and amendments to the indictment through trial IAC claims despite having all the means necessary to raise these claims and despite Fratta's exhortations to raise these claims.  In general, the litigation and investigation failures of state habeas counsel repeat the failures of trial counsel, which are detailed in Fratta's guilt-innocence IAC claims in

order to demonstrate deficient performance of trial counsel under *Strickland*, and, for similar reasons, establish "cause" under *Trevino*.

*Trevino's* first condition, (1), is also satisfied.  This condition – that the claim of "ineffective assistance of trial counsel" must be "substantial" claim – is related to the merits of the *Strickland* deficiency and prejudice arguments that Fratta makes below in each of his IAC claims.  Proof in Section V below of the merits of each IAC claim is therefore sufficient to satisfy the *Trevino's* "substantial claim" requirement.

## CLAIM FIVE

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, TRIAL COUNSEL FAILED TO OBJECT THAT LAW OF PARTIES CHARGE CONSTRUCTIVELY AMENDED INDICTMENT.**

> **1.  Failure to object allowed Fratta to be convicted for conduct for which the state did not introduce any evidence.**

In *Jackson v. Virginia*, the Supreme Court started off its analysis with the following reprise of precedents:

> A meaningful opportunity to defend, if not the right to a trial itself, presumes as well that a total want of evidence to support a charge will conclude the case in favor of the accused. Accordingly, we held in the *Thompson* case that a conviction based upon a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally infirm. *See also Vachon v. New Hampshire*, 414 U.S. 478, 94 S.Ct. 664, 38 L.Ed.2d 666; *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149; *Gregory v. Chicago*, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134; *Douglas v. Buder*, 412 U.S. 430, 93 S.Ct. 2199, 37 L.Ed.2d 52. The "no evidence" doctrine of Thompson v. Louisville thus secures to an accused the most elemental of due process rights: freedom from a wholly arbitrary deprivation of liberty.

*Jackson,* 443 U.S. at 314.

As shown in above in Claim One and in Section C, subsections 1 and 2, of this ninth claim, the record on retrial is "totally devoid of relevant evidence" supporting either of the "law of the parties" passages that the trial court added to the jury charge.  As a result, trial counsel should have known, based on long established Supreme Court precedents, such as, *Thompson v. Louisville, supra*, that the charge to the jury threatened Fratta not only "a wholly arbitrary deprivation of liberty" but a wholly arbitrary deprivation of his life.

A reasonably effective attorney would have therefore objected that the addition of "law of the parties" charges deprived Fratta of Fifth Amendment and Due Process rights. Trial counsel failed to object and therefore performed deficiently under *Strickland.* Because trial counsel failed to protect Fratta against structural error, and, if not that, definitely failed to secure "the most elemental of due process rights," namely, a fundamentally fair trial as opposed to arbitrary deprivation of life and liberty.

> **2.     Failure to object to the amendment of the indictment with a law of parties charge allowed the jury to convict Fratta for conduct that is not recognized or defined by Texas law.**

Review of the two "law of the parties" instruction given in this case (the murder for hire law of the parties charge and the burglary/murder law of the parties charge) shows that the law of the parties charge constructively amended the indictment by allowing the jury to convict Fratta for conduct that does not constitute capital murder as charged in the indictment.  First, Jurors were instructed by the parties charge related to murder for hire (Texas Penal Code §19.03(a)(3)) to convict Fratta for murder for hire upon finding that,

> the defendant, with the intent to promote or assist the commission of the offense of murder of Farah Fratta, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash and/or Howard Guidry in shooting Farah Fratta with the specific intention of thereby killing Farah Fratta.

However, this conduct does not constitute murder for hire or burglary murder. Soliciting, encouraging, directing and aiding are not the same activity as remunerating. Once can solicit, direct or aid without paying anything of value. Soliciting, encouraging, directing and aiding another to commit murder, without anything more, is not a capital offense under §19.03(a)(3). However, trial counsel failed to object on Due Process or Fifth Amendment grounds to this constructive amendment of the indictment. As a result, the jury was allowed to returning a guilty verdict in a capital case for conduct that does not constitute capital murder.

Second, the law of the parties charge related to murder in course of burglary (Texas Penal Code §19.03(a)(2)) constructively amended the indictment by allowing jurors to convict Fratta upon finding that:

> Robert Alan Fratta, with the intent to promote or assist in the commission of the offense of burglary of a building, if any, solicited, encouraged, directed, aided, or attempted to aid Joseph Andrew Prystash and/or Howard Guidry in shooting Farah Fratta, if he did, with the intention of thereby killing Farah Fratta

However, §19.03 of the Penal Code does not define a capital offense in which (i) the intention of the defendant is merely to promote or assist in the commission of the offense

of burglary of a building and (ii) the conduct is soliciting, directing aiding or attempting to be aid another in shooting he victim.

Consideration of the law of the parties language codified in §7.02 of the Texas Penal Code shows that the parties charge constructively amended the indictment in such a way that jurors could convict for uncharged action that did not constitute capital murder.  The relevant provision of §7.02, namely, §7.02(a)(2) states that

> "a defendant is criminally responsible for an offense committed by the conduct of another,… if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."

In other words, under §7.02(a)(2) the defendant has to act with the intention of promoting or assisting the commission of a charged offense.   The charged offense in the Fratta indictment was burglary/murder.   However, the charge constructively amended the indictment to allow the jury to convict Fratta upon finding that he acted with intention of promoting or assisting the commission of burglary.  But Fratta was not charged with burglary in the indictment.  However, trial counsel failed to raise a Due Process or Fifth Amendment objection to the constructive amendment of the indictment.  This failure allowed the jury to convict Fratta for conduct that did not constitute a capital offense, and therefore for conduct that did not constitute a capital offense charged in the indictment.

Counsel's failures to make Due Process and Fifth Amendment objections to the constructive amendment of the indictment described above prejudiced Fratta because the Due Process and Fifth Amendment violations were structural errors. The law of the parties charge related Texas Penal Code §19.03(a)(3) instructed the jury to find Fratta guilty of

capital murder under a murder for hire theory without having to find the essential element of remuneration.   The law of the parties charge related to Texas Penal Code §19.03(a)(2) allowed the jury to convict Fratta without having to find guilty of capital murder under a burglary/murder theory without having to find the requisite element of intent, namely, intention to assist or promote murder in the course of a burglary.   *See, e.g.*, *Sullivan v. Louisiana*, 508 U.S. 275 (1983).

The law of the parties charges also rendered Fratta's trial fundamentally unfair and his conviction arbitrary and capricious.   It is reasonably probable that the jury returned a guilty capital murder verdict upon finding action and intentions that do not constitute a capital offense.   The law of the parties charges related to murder for hire and murder/burglary are prominent in the charge.   The charge does not contain other language that would cause jurors to disregard the parties charge related to murder for hire under §19.03(a)(3) or burglar/murder under §19.03(a)(2).   Nor does the evidence support the contention that jurors convicted Fratta on straight murder for hire or burglary/murder theories.   As shown, in Claim One, the evidence was insufficient to convict on these "non-aiding and abetting" theories.

## CLAIM SIX

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, TRIAL COUNSEL ALLOWED THE STATE TO INTRODUCE FALSE, INCRIMINATING TESTIMONY THAT THE STATE CRAFTED TO CIRCUMVENT THE TRIAL COURT'S RULINGS AND RULES OF EVIDENCE.**

At Fratta's retrial in 2009, the State argued and the trial court (and later the TCCA found) that Prystash's statements were not testimonial.  As a result, the State at retrial sought to introduce Gipp's damaging hearsay testimony.  The trial court ruled that Prystash's statements, to the extent that they implicated other codefendants, was not admissible.  However, the State solicited testimony from Gipp that was designed to illegitimately circumvent the trial court's ruling as follows:

> 5 Q. And in that conversation with Joseph Prystash,
>
> 6 did he ever tell you anything about participating in the
>
> 7 murder of Farah Fratta?
>
> 8 MS. KING: Objection, Your Honor. That
>
> 9 violates the confrontation clause and it's hearsay.
>
> 10 THE COURT: Overruled. That's a yes or no,
>
> 11 ma'am.
>
> 12 THE WITNESS: Yes.
>
> 13 Q.  (By Ms. Bradley) In this conversation when he
>
> 14 was talking about when the murder was going to occur,
>
> 15 that it was going to occur on Wednesday, did he tell you

16  what his involvement was going to be in terms of what

17  his role was?

18      A.  Yes, he did.

19      Q.  And what was his role?

20      MS. KING:  Objection, confrontation clause

21  and hearsay.

22      THE COURT:  Overruled.

23      THE WITNESS:  He was the middle man to find

24  somebody that would kill Farah.

27 RR 41.

23   Q.  (By Ms. Bradley) When you had this conversation

24  with Prystash and he told you that Farah Fratta was

25  going to be murdered on Wednesday night, what was your

1  reaction to that?

2          MS. KING:  Objection, Your Honor, assumes

3  facts not in evidence.

4          THE COURT:  Overruled.

5          THE WITNESS:  What was my feeling on it?

6  Kind of disbelief, but he did it.

27 RR 43.

1      A.  I went into the bedroom, took the gun out of

2  the case and wrote down the information that was on the

3  gun.

4      Q.  And why did you do that?

5      A.  Because I knew he killed her.

6      Q.  So, even though he had talked about planning to

7  kill her and even though you saw him walk out of your

8  apartment that night, going to kill her, when did the

9  reality actually sink in with you that he done it?

10      A.  I saw it on the news, and then when he walked

11  into the apartment and he unloaded the gun I knew they

12  killed her and I asked him and he said yes.

13    MS. KING:  Objection, Your Honor, to

14  confrontation and hearsay.

27 RR 72.

**A.    Comparison of Gipp's 2009 Testimony (Fratta retrial) to Her Testimony Against Fratta and, especially, Prystash at their Separate 1996 Trials, Shows Gipp was Testifying Falsely at Fratta's retrial.**

At Prystash's trial, the State did not have any confrontation clause problems regarding anything Prystash said to Gipp.   Because Prystash was the defendant, his statements to Gipp came into evidence as an admission of a party opponent.  The State, therefore, had an unimpeded opportunity to introduce every detail of Prystash's conversations with Gipp, including every incriminating statement, regardless of whether the statement incriminated Prystash, Fratta or Guidry.

Gipp testified that Prystash told her the murder would take place on Wednesday while Fratta was at church. *State v. Prystash* [1996 trial], __ RR 179.  Gipp also testified that Prystash told her that Guidry was going to get $1000 dollars and that he (Prystash) was going to get a jeep as follows:

> Q.   Did he [Prystash)] say what he and Guidry were going to get for doing that?
>
> A.   Guidry was going to get a thousand dollars, and Joe [Prystash] was going to get a jeep.

*Id.*

This was the entirety of Gipp's account at Prystash's 1996 trial of Prystash's pre-murder confession.  *Id.*

Gipp did not testify at Prystash's trial that Prystash told her he was "the middleman," nor did Gipp testify hat Prystash said that is his job was to find someone to kill Farah, nor did she testify that she knew he killed her, nor that he had talked about planning to kill her. Gipp's testimony at Fratta's retrial that Prystash made these alleged statements, as well as her claims to knowledge and assenting to the prosecutor's interjections of "facts" was false and misleading testimony contrived in collusion with the State.

**B.    Trial Counsel Failed to Demand a Hearing or Voir Dire of Gipp, Failed to Call Rebuttal Witnesses and Failed to Impeach Gipp and the Integrity of the State's Case With Proof Gipp Testified Falsely at the State's Direction, all in Violation of *Strickland's* Deficiency Prong.**

At Prystash's 1996 trial, Gipp did not testify that Prystash told her he was "the middle man" or that his job was "to find someone to kill Farah."  However, trial counsel failed to challenge Gipp's 2009 testimony with these contradictions.  Counsel failed to

show that Prystash never used the term "middleman" and that Gipp, who was prying Prystash for information, never asked a questions such as, "What was your job or role in the murder?"

Trial counsel's failure to expose the State's manipulation of Gipp's testimony to circumvent evidentiary rulings at Fratta's 2009 retrial was not excusable.  Trial counsel had access to, and was obligated to review, Gipp's testimony in previous cases against Fratta, Prystash and Guidry.  Trial counsel therefore should have known that Gipp did not testify that Prystash said he was a "middle man" or that his job was "to find someone to kill Farah" at any of the earlier trials.

Trial counsel also knew, or should have realized, that the State had a motive to massage and manipulate Gipp's testimony and should have been prepared expose the manipulation.  Questions the State asked venire persons revealed the State's intentions:

> 4 Q. Okay. Okay. And, of course, the Judge talked
>
> 5 to you about the law of parties and said that more than
>
> 6 one person could be criminally responsible for the
>
> 7 crime. In other words, in the murder-for-hire scenario,
>
> 8 if you've got a person who hired somebody, you have a
>
> 9 person who's the middleman, and you have a person who's
>
> 10 the gunman, do you see how all three of those people
>
> 11 could be held responsible for that capital murder?

4 RR 90 (jury voir dire).

The trial court convened hearings and conferences with counsel on Confrontation

Clause and hearsay (Rule 802) issues.  At these proceedings, that State expressly advanced

the theory that a middleman was more blameworthy, so that testimony that reflected this

role was admissible:

> MS. BRADLEY: With regards to Proffer
>
> 16 No. 1, Ms. Gipp testified that during conversations that
>
> 17 she had with Joe Prystash he told her that he was going
>
> 18 to sub-contract the murder and get someone to kill Farah
>
> 19 for Bob Fratta. He also told her that Bob was supposed
>
> 20 to pay $1,000 to the shooter as part of that agreement.
>
> 21 And, you know, again, it's our position
>
> 22 that each person in a capital murder in a
>
> 23 murder-for-hire scenario is equally culpable regardless
>
> 24 of their role, unlike an aggravated robbery that turns
>
> 25 into a capital murder, the middleman is equally guilty
>
> 1 in a murder-for-hire scenario as the person who hires
>
> 2 him or -- and the person who shoots. He is the one who
>
> 3 puts the whole deal together. And it would be our
>
> 4 position that that statement also is a statement against
>
> 5 Joseph Prystash's penal interest because that says what
>
> 6 he is going to do to make the deal happen.

26 RR 46 (conference with trial court).

Given the enormous weight and importance that Prystash's pre-murder hearsay confession had for the State's case, it was incumbent upon trial counsel to demonstrate to the trial court using Gipp's prior testimony, particularly the unimpeded testimony at Prystash's trial, that the State was seeking to introduce misleading testimony in order to fit within the trial court's ruling on admissibility.   To do this, trial counsel, in pretrial proceedings or at trial, should have  brought Gipp's prior testimony to the trial court's attention and moved to take Gipp on voir dire for the purpose of showing that (a) Prystash never used the term "middleman" and never told Gipp his "job was to find someone to kill Farah," (b) that Gipp was providing opinion based on hearsay statements that were inadmissible under the trial court's evidentiary rulings, and (c) that testimony had been prepared by the State to make false and misleading alterations to her testimony in order to render it admissible at Fratta's retrial.   However, trial counsel failed to take these necessary steps.

Trial counsel's deficiency is underscored by failure to impeach Gipp and the State's case through obviously necessary cross-examination questions.   Trial counsel failed to ask Gipp whose idea it was to use the term "middle man" and whose idea was it to describe Prystash's job as "finding someone to kill Farah."   Trial counsel also failed to impeach Gipp with the fact that she had not testified in other proceedings that Prystash used this language and these terms.   Had trial counsel taken these steps, trial counsel would have been able to preclude Gipp's testimony about middlemen and Prystash's job, or would have been able to secure an instruction to disregard this testimony, and would have been entitled to effectively attack the integrity of the State's case in closing argument on the ground that

the State sought to introduce false and misleading testimony through Gipp, and had done so to circumvent the trial court's rulings.

**C.    Trial Counsel Failed to Exclude or Impeach Gipp's Testimony, or the Integrity of the State's Case, Regarding Her Allegation that She  Knew that "They" Had Killed Farah.**

Gipp did not witness the killing.  Gipp did not see Prystash leave with a weapon. Gipp's testimony was not based on personal knowledge that Prystash, Guidry and Fratta had killed Farah at all; it was based entirely on inferences and opinion drawn from alleged hearsay comments of Prystash.  However, trial counsel failed to properly object under TRE 602 and Due Process to the State's elicitation of misleading testimony with questions that presupposed, and created the false impression, that Gipp had knowledge and became aware (*sic*, "reality sink[ing] in") that Prystash, Guidry and Fratta had killed Farah.  *See* 27 RR 43, 72 (reproduced in Section A above).  Trial counsel also failed to make the proper relevancy and Due Process objections to the State's elicitation of testimony regarding Gipp's feelings.  Trial counsel, therefore, let Gipp falsely intimate she knew immediately and certainly that Prystash, Guidry and Fratta had killed Farah.

Trial counsel should have anticipated the State's attempts to circumvent Rule 602 with questions framed in terms of feelings.  Review of transcripts available to trial counsel, demonstrates that the State used the same improper devices to circumvent evidentiary rules and violate Due Process when the State sponsored Gipp's testimony at Fratta's original trial and at Guidry's retrial.

**D.    Trial Counsel Failed to Exclude or Impeach Gipp's Testimony Regarding a Getaway Vehicle and Failed to Impeach the Integrity of the State's Case.**

The State sponsored testimony designed to mislead the jury into believing that Gipp knew that the vehicle Farah's neighbors saw leaving the murder scene, and described to news broadcasters, was the same vehicle that Prystash owned as follows:

> 13    Q.  After the murder, you said that on the night of
>
> 14  the murder there was a broadcast about the description
>
> 15  of **that vehicle that was used in the murder**; is that
>
> 16  right?
>
> 17    A.  Correct.
>
> 18    Q.  Did Joseph Prystash do anything with regard to
>
> 19  **that vehicle** after the murder?
>
> 20    A.  Yes, he did.

27 RR 79

> 15    Q.  (By Ms. Bradley) After the murder, Ms. McNeill,
>
> 16  did you ever see Joseph Prystash, I guess -- well, let
>
> 17  me put it in a timeframe?
>
> 18    You said that the news broadcast
>
> 19  information about the vehicle on TV and then the next
>
> 20  day Prystash was changing the head lamp on the car.
>
> 21  Shortly -

27 RR 82

Gipp did not see Prystash drive away, nor testify that Prystash told her he was leaving in the car he owned.  Gipp also was unsure of what type of car Prystash owned in 1994; Gipp thought Prystash owned a little Nissan but could not say if it was a hatchback or not.

> 16 Q. And what kind of car did he own back then?
>
> 17 A. (By Gipp) It was a little-- I think it was a four-door
>
> 18 little Nissan, a silver Nissan.
>
> 19 Q. Was it kind of like a hatchback Nissan or how
>
> 20 would you describe it?
>
> 21 A. I don't know if it was a hatchback. It was
>
> 22 just a small economy Nissan car, little silver car.

27 RR 10.

Gipp recalled, though, that the car had some body damage and a broken headlight.  27 RR 10-11.

Neighbors interviewed for TV the night of the murder were less definite in their descriptions.  Mrs. Laura Hoelscher said she saw a small silver car, and that was it.

> Q. Okay. You weren't able to give any description
>
> 1 of the car other than, I believe, on the tape that you
>
> 2 described it as a small silver car?
>
> A.      That is correct.

23 RR 130-131.

Mr. Hoelscher testified he saw a small silver or silver-gray car with a headlight out. 23 RR 145.  The Hoelschers did not notice damage to the body of the vehicle, or identify the make or model.  No one else saw a vehicle pull up to Farah's house at the time of the murder. Hence, a broadcast of the Hoelschers' description of the car would not allow Gipp, or anyone else listening, to truthfully testify that he or she heard a broadcast singularly describing Prystash's car, as opposed to a thousand other small silver or gray cars with a headlight out.

However, trial counsel failed to voir dire Gipp and exclude her testimony pursuant to Rule 602 of the Texas Rules of Evidence on the ground that she lacked personal knowledge and was, instead, relating an opinion based on hearsay in order to fit the State's theory of the case.  Trial counsel failed to move the trial court to strike Gipp's misleading hearsay testimony that she knew, from a TV announcers verbal broadcast, that the car used in the murder was Prystash's, and trial counsel failed to move for an instruction to disregard this testimony, on the ground that the State had solicited false and misleading testimony in violation of Fratta's due process rights.  Trial counsel also failed to demonstrate to the jury during trial on the merits, or in closing argument, that the State had attempted, once more, to skew and distort the evidence for the purpose of securing a conviction based on false, misleading, and inadmissible testimony.

**E.      Trial Counsel failed to Object to Introduction of the Note on Which Gipp Allegedly Wrote the Charter Arms Revolver's Serial Number and Brand, or Impeach Gipp's Claim that She Recorded the Information the Night of the Murder.**

The information on the blue sticky note was pure hearsay for which there was no exception.  The note was not a business record, for example, nor did it fall under any other provisions of TRE 803, which permit the introduction of written statements.  Even if the State had successfully argued that the blue sticky note was a recorded recollection under Rule 803(5), the State would not have been able to introduce the note, but could only have had Gipp read the information at trial.  *Id.*  Trial counsel, however, failed to keep the note out of evidence by making the proper Rule 802 and 803 arguments and objections.

Trial counsel failed to impeach Gipp's testimony about the circumstances under which she created the sticky-note record, by failing, inter alia, to establish that Gipp initially gave a different description of the gun, the information from which she claimed to record.  (*See* Claim Five, below, Sections A-C, which are incorporated by reference, detailing trial counsel's failures to impeach Gipp's testimony about the gun).  Had trial counsel done so, the State would not have been able to establish the authenticity of the note as a recorded recollection and Gipp would not have been able to even read from the blue sticky note.  Had the trial court nonetheless admitted the note, the foregoing impeachment, along with other evidence, impeaching Gipp's credibility and demonstrating her collusion with the prosecution to incriminate Fratta (*see* Sections A-E, above, of this first claim and Claim Five below, the argument and evidence of which are incorporated by reference), would have raised serious doubts about the veracity of Gipp's tale regarding when, why

and whether she actually wrote down information from the gun she said she saw Prystash return with.

Trial counsel should have been prepared to challenge the admission of the note and any information it contained pursuant to Rule 802 and 803. Furthermore, trial counsel should have realized that the State was manufacturing stories about the Charter Arms. At Fratta's original trial, the State had a firearms examiner willing to falsely testify that a bullet found in Farah's garage was a ballistic match with bullets fired from the Charter Arms revolver recovered from Guidry when he was arrested March 1, 1995 (five months after the murder) for robbery. (Testimony of C.E. Anderson). Gipp's testimony that she wrote a serial number of the a gun that the State then matched to the Charter Arms provided the State with a neat and seemingly unassailable chain of proof demonstrating Guidry was involved in Farah's murder. The State also argued at the original trial that Guidry received the Charter Arms as remuneration for Farah's murder.

At retrial, the *State's* new firearms examiner denied that the ballistic match alleged at trial could be made. (Testimony of Robert Baldwin.) The State abandoned its theory that Guidry got the gun for remuneration. Competent trial counsel would, therefore, have realize that the State had long been engaged in twisting gun evidence to show Guidry's involvement in capital murder scenarios for which it otherwise had no proof. However, trial counsel did not impeach the State's case with the fact that the State was fishing for ways to incriminate Guidry, which it had to do in order to convict Fratta for capital murder.

With the gun as payment theory discarded (and ordered struck from the indictment), Gipp's testimony about Prystash returning with a Charter Arms falls apart. While there is

some sense to the story that Prystash might have paid Guidry by giving him a gun, there is no reason why Prystash would take the alleged murder weapon from Guidry, return to the apartment with the alleged murder weapon, store it, and then give the gun back to Guidry for the purpose of getting rid of it.  (According to Gipp's testimony at other trials, but **not** at Fratta's retrial, Prystash told her he gave the gun to Guidry to throw in a lake.)  The fact that Gipp initially said that Prystash returned the night of the murder with a gun of a completely different discription underscores the implausible, concocted qualities of Gipp's testimony.  However, in violation of *Strickland*, trial counsel never impeached Gipp's testimony or the State's shifting theories about the Charter Arms.

### F.     Trial Counsel's Deficient Performance Resulted in Prejudice as Defined by *Strickland v. Washington*, 466 U.S. 688 (1984).

Competent counsel could have excluded the testimony excerpted in Section A above.  Without this testimony, the State would not have been able to demonstrate anything precise about Prystash's involvement in Farah's murder.  Trial counsel could have even cast doubt on the State's theory that Prystash was the driver by excluding or impeaching Gipp's identification of the alleged getaway vehicle from TV newscasts.  Guidry's involvement in any crime whatsoever would have been indiscernible.

The trial court's evidentiary rulings prevented Gipp from relaying alleged statements from Prystash that implicated Guidry through hearsay as the shooter or the recipient of remuneration.[7]  The State's new ballistic expert reversed the false testimony

---

[7] The State blatantly violated the trial court's evidentiary ruling by quickly soliciting testimony (through curt leading question) as follows:

sponsored at Fratta's original trial that purportedly showed the gun Guidry was found with months after Farah died was the murder weapon.  The State hopes to raise bare inferences that Guidry was the shooter depended, therefore, on: (i) the hearsay regarding Prystash's so called "middleman" role and his supposed job to find a killer, and (ii) on Gipp spreading blame through the false pretense of knowledge, i.e., inadmissible comments about "reality sinking in" and "feelings" of certainty that "they," Prystash, Guidry and Fratta, had killed Farah.  The State's evidence that Guidry was involved at all, let alone what his role was, would have vanished from indiscernible to nothing, if trial counsel had excluded or impeached Gipp's testimony.

The State's evidence that Fratta was involved in a murder for higher scheme or a burglary/murder scheme is bare boned as it is.  (See Claim One on *Jackson* insufficiency, the evidence and argument for which is incorporate by reference herein.)  Without Gipp's tendentious testimony about Prystash's so called "middleman" role, and without testimony contrived to create a false impression of personal knowledge about the identity of the getaway vehicle and the commission of the crime by all three codefendants (or with this testimony effectively impeached), the record supporting the State's theories of capital

---

2 A. On Wednesday evening.
3 Q. All right. And did he tell you that he was
4 going to be involved in that murder?
5 A. Yes.
6 Q. And did he also tell you that Howard Guidry was
7 going to be involved in that murder?
8 A. Yes, he did.

27 RR 37.

But the trial court sustained defense counsel's objections and instructed the jury to disregard the testimony that Guidry was involved.  *Id.*

murder would be even more devoid.  Without the blue sticky note's information, or with

Gipp's testimony about her production of the note undermined, the state would not have a

case against Guidry for murder, let alone a capital murder involving remuneration or

burglary (for which, as shown below in Claim One, there was zero evidence at Fratta's

retrial implicating Guidry, as required by the indictment).  Thus, failure to exclude or

impeach the testimony discussed above in Sections A-E prejudiced Fratta under *Strickland*.

## CLAIM SEVEN

### IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, TRIAL COUNSEL FAILED TO PREVENT THE INTRODUCTION OF PRYSTASH'S HEARSAY TESTIMONY THAT THE STATE INTRODUCED THROUGH MARY GIPP.

For the purpose of this claim "Prystash's Hearsay" refers to all out of court

statements by Prystash that Gipp related to the jury, including, but not limited to, the

testimony excerpted and discussed in Claim I above.  It also includes Gipp's testimony

regarding Prystash's alleged statement that he gave Guidry a gun to throw in a body of

water, 27 RR 78, statements that Prystash said he knew Farah was dead, that he saw Farah

in the garage, statements that Prystash said he was going to "subcontract Howard Guidry,

27 RR 207, statements about going to the gym after the murder to meet Fratta, 27 RR 216-

217, and statements in which Gipp claimed that she "knew" or "felt" would happen, *see* 27

RR 72, since these statements are all based solely on hearsay allegedly coming from

Prystash.

## A.     BACKGROUND

By the time the State retried Fratta in 2009, the Supreme Court had delivered opinions in *Crawford v. Washington*, 541 U.S. 36 (2004) and *Whorton v. Bockting*, 549 U.S. 406 (2007).   *Crawford* drew a bright line rule prohibiting the introduction of testimonial statements.   *Crawford* also provided some general parameters or suggestions for determining whether a statement was testimonial.   *Bockting* clarified that if an out of court statement was not testimonial admitting the statement would not infringe upon a defendant's Sixth Amendment rights.

## B.     ARGUMENT

### 1.     Trial Counsel Failed to Present Readily Available Evidence that Gipp's Aim was to Obtain Testimony to Aid a Possible Prosecution.

*Crawford* narrowed the range of out of court statements subject to the Confrontation Clause to testimonial statements.   However, before Fratta's retrial, the Supreme Court issued opinions in *Michigan v. Bryant,* 131 S.Ct. 1143 (2011) and *Davis v. Washington,* 547 U.S. 813 (2006), that showed that a statement could be testimonial even though the statement was not made in custody by a declarant who intended to provide testimony to aid a prosecution.

Whether a statement is testimonial under *Bryant* and *Davis* depends significantly on the purpose of the questioner.   The same statements can be testimonial if the questioner's purpose is to elicit statements to aid in the prosecution of a crime – regardless of the declarant's intentions, official status of the questioner or the situs of the statements – and non-testimonial if questioner has a different purpose.

In Fratta's case, Prystash's motives for describing the murder to Gipp were indiscernible as was his credibility.  Discussing the reasons Prystash might have had for confessing to Gipp, the TCCA explained in an opinion disposing of Guidry's direct appeal that,

> "Prystash's statements to Gipp did nothing to advance the cause of or facilitate the conspiracy. The statements were not made in an effort to enlist Gipp's assistance or cooperation, elicit information that could be used in the conspiracy, or do anything other than report the status of the conspiracy to Gipp. Prystash was merely describing to Gipp what was occurring or what had occurred."

*See Guidry v. State,* 9 S.W.3d 133, 148 (Tex. Crim. App. 1999); *and see Guidry v. Dretke*, 397 F.3d 306 (5th Cir. 2005).

Gipp, on the other hand, had one reason only for asking Prystash to comment on details surrounding Farah's murder and that was to gather information for use against Prystash and Fratta in a prosecution.  Gipp's testimony at Guidry's 2007 retrial confirm that Gipp's motive for obtaining and preserving information about the murder was to provide evidence for use by the prosecution.  From the beginning, Gipp said she wanted to serve as a State's witness.  When she was first contacted by deputies, Gipp was ready to testify about evidence she got from Prystash and told deputies that she would testify before a grand jury.  *State v. Guidry* [2007 Retrial], Testimony of Mary Gipp, 21 RR 44.  When asked why she wrote down on a blue sticky note the serial number and make of the gun that Gipp said she saw Prystash carrying when he returned to her apartment the evening of November 9, 1994, Gipp answered:

A.  (by Ms. Gipp) Because I knew that this was
    evidence and that they needed this information.

Q.  (By Ms. Siegler) By "they," you mean?

A.  The police.

*Id.* at 61-62.

However, trial counsel failed to request a hearing in which to examine Gipp's motives for soliciting information from Gipp, failed to take Gipp on *voir dire* at trial in order to demonstrate her motives, and failed to present proof that Gipp's was probing Prystash for information that police and prosecutors could use against Prystash and Fratta. As a result, trial counsel failed to show that the information Gipp procured from Prystash qualified as testimonial and therefore should have been excluded under *Crawford* as a violation of the Confrontation Clause.

> **2.    Trial Counsel Also Failed to Raise a Proper Due Process Objection in the Alternative and, Instead, Objected on Constitutional Grounds the Supreme Court Had Already Abrogated in *Bockting*.**

Trial counsel sought to prevent the State from sponsoring Prystash's out of court statement through Gipp by citing the trial court to *Ohio v. Roberts*, 448 U.S. 56 (1980) and *Lily v. Virginia*, 527 U.S. 116 (1999). 19 RR 38. However, in *Bockting* the Court rejected the principles used in these cases – namely, (i) presence or absence of indicia of reliability or (ii) falling under a historical exception, such as statement against penal interest – to determine whether or not admission of hearsay violated the confrontational clause. Consequently, by the time of trial the Sixth Amendment arguments trial counsels urged, in their briefing and in open court, namely (1) that the circumstances under which Prystash

made his hearsay statements did not satisfy *Lilly,* and (2) that the Prystash's statements spread blame and were not against his penal interest, no longer rested on valid authority.

Instead of relying upon overturned or abrogated Sixth Amendment cases, trial counsel should have raised due process objections to the introduction of Prystash's incriminating hearsay. This Court had already found that the circumstances under which Prystash's hearsay statements incriminating Fratta were made did not bear minimal indicia of reliability (or particularized guarantees of trustworthiness). Summarizing this Court's analysis, the Fifth Circuit stated,

> In finding that the admission of Prystash's statements to Gipp was error, the district court reasoned that "[t]he record gives **no basis upon which to evaluate Prystash's credibility** when he allegedly made the statements." [The district court] also found persuasive this court's determination, in affirming a grant of habeas relief in Guidry's case, that similar testimony by Gipp in Guidry's trial constituted a violation of the Confrontation Clause. *See Guidry v. Dretke*, 397 F.3d 306, 328-30 (5th Cir. 2005) (affirming grant of habeas relief based on Confrontation Clause violation in admitting Prystash's statements to Gipp at Guidry's trial).

*Fratta v. Quarterman*, 536 F.3d 485, 498 (5th Cir. 2008).

Before this Court concluded that it was impossible to evaluate Prystash's credibility, the Texas Court of Criminal Appeals had come to a similar conclusion. After Guidry's first trial, the CCA found it "'doubtful [Prystash's statements] possessed particularized guarantees of trustworthiness .... '" *State v. Guidry*, 9 S.W.3d 133, 151 (Tex. Crim. App. 1999).

a. **The Basis for a Due Process Objection that Trial Counsel Should have Made  was Obvious:**  <u>No Defendant's Conviction Should Depend, as Here, on a Non-testifying Codefendant's Confession the Truth or Falsity of   Which Neither Court Nor Jury Can Ascertain.</u>

The record on **re**trial in Fratta's case, as it pertains to Prystash's hearsay confession introduced through Gipp, also provides "no basis on which to evaluate Prystash's credibility."  This means that whether Prystash told Gipp the truth or not about Farah's murder simply cannot be ascertained, neither by a reviewing court nor by a jury (since the jury did not have an opportunity to listen and observe Prystash either).  The State did not introduce new evidence pertaining to the circumstance of Prystash's alleged confession to Gipp.  Prior rulings by federal and state courts declaring the impossibility of assessing Prystash's credibility and doubting the reliability of  his confession to Gipp (which trial counsel was duty bound to know) therefore set the stage for a meritorious Due Process objection.  By admitting Prystash's hearsay declarations, the trial court was ensuring that conviction at trial would rest squarely on out of court statements the truth of which was impossible for the jury to rationally ascertain.

Since a devastatingly incriminating confession of a non-testifying codefendant, the truth of which is indeterminable, will obviously render a trial fundamentally unfair, it follows straightforwardly that admission of Prystash's confession through Gipp violated basic Due Process principles and called for an objection on Due Process grounds from trial counsel.  Trial counsel certainly did not need to engage in novel or obscure analysis in order to frame an objection.  The fundamental unfairness of trial that centers on a co-defendant's confession the truth of which is unascertainable is obvious.

Furthermore, legal authority published by the time of retrial expressly notified any reasonable counsel that in the wake of *Crawford*, a Due Process objection to a codefendant's confession, such as Prystash's to Gipp, was essential.  *See* Epstein, J., *Avoiding Trial by Rumor: Identifying the Due Process Threshold for Hearsay Evidence After The Demise of the  "Ohio v. Robert" "Reliability" Standard*, 77 UMKC L Rev. 119 (2008); Taslitz, A.E., *What Remains of Reliability: Hearsay and Freestanding Due Process After Crawford v. Washington*, Crim. J. Mag., vol. 20, Issue 2 (2005).

### 3.    Failure to Exclude Prystash's Alleged Confession to Gipp Prejudiced Fratta.

The facts recited in section (2) above that demonstrate Due Process was violated because of the fundamental unfairness of introducing Prystash's confession, also demonstrates prejudice.

#### a.    Supreme Court law addressing the harmful impact of non-testifying codefendant confessions illustrates the prejudice caused by Prystash's hearsay tale to Gipp.

The same results – proof of prejudice – follows from Supreme Court pronouncements about the harm caused by non-testifying codefendant's confessions in the *Bruton* line of cases.  Although the constitutional error is different, the prejudice analysis is relevant.  In *Bruton v. United States*, 391 U.S. 123 (1968), the Court ruled that the "devastating" nature of a non-testifying codefendant confession cannot dependably be kept from mind by the jury once it is introduced even by a limiting instruction that commands the jury not to use the co-defendant's confession against the defendant.  Where, as here, the trial court did **not** give a limiting instruction, and the obvious and only purpose of

introducing the nontestifying co-defendant's confession Prystash allegedly made to Gipp was to incriminate Fratta, the harmful impact on the jury hits with full force.

**b.      Prejudice is *res judicata*.**

This Court's and the Fifth Circuit's previous analyses of the **harmfulness** of Prystash's hearsay confession to Gipp are dispositive.  This Court expressly found that "the trial court improperly allowed Ms. Gipp's testimony to come before the jury **and that it harmed the defense.**" *See Fratta v. Quarterman*, 2007 WL 2872698, *20-*23 and n. 25 (S.D. Tex. 2005).  Harm follows from the District Court's (Gilmore, J.), and the Fifth Circuit's analysis of identical testimony introduced at Guidry's first trial.  As this Court remarked,

> The fatal error identified by [the Fifth Circuit in] the Guidry case was that, absent the constitutionally defective confession and testimony, no evidence proved that Guidry committed a murder for remuneration.[26]  Under Texas law, "the State has the heavy burden of demonstrating that the murder was performed for the reason of pecuniary gain." *Rice v. State*, 805 S.W.2d 432, 435 (Tex.Crim.App.1991) (emphasis added). "Texas Penal Code § 19.03(a)(3) defines the elements of capital murder for remuneration as: (1) a person (2) intentionally or knowingly (3) causes (4) the death of an individual (5) for remuneration or the promise of remuneration." *Ex parte Granger*, 850 S.W.2d 513, 516-17 (Tex.Crim.App.1993).[27] Here, the guilt/innocence instructions required the jury to find Fratta guilty if he "intentionally employed Joseph Prystash and/or Howard Guidry to kill Farah Fratta; and the defendant, Robert Alan Fratta, paid or promised Joseph Prystash and/or Howard Guidry to kill Farah Fratta as alleged in the indictment[.]"  The instructions expressly required the jury to find that Fratta employed Prystash "to commit the murder for remuneration or the promise of remuneration, namely, a motor vehicle" and that Guidry did so for "money." Trans. at 280-81 (emphasis added).

*Id.* at *22.

The Fifth Circuit, therefore, found that Guidry's federal district court's "conclusions were correct," because "without the confession and challenged hearsay, there is insufficient evidence to convict Guidry of murder for remuneration or promise of remuneration." *Id.* at *22, n. 26 (*citing* Guidry, 397 F.3d at 331).

In Fratta's second trial, the State actually was "without the confession" Guidry and Prystash made.  The case tying Guidry to a murder for remuneration scheme depended entirely on Gipp's hearsay testimony.  Moreover, the evidence tying Guidry to a homicide of any sort was infinitely weaker at Fratta's retrial because the State was unable to use the false ballistic testimony introduced at Fratta's (and Guidry's) first trials.   This magnified the importance of the hearsay testimony linking Guidry to the murder.  As insufficient as it was, it was the only evidence raising a speculation that Fratta paid Guidry to shoot Farah, The State absolutely had to prove this beyond a reasonable doubt in order to convict under the murder for remuneration scheme for which the Grand Jury indicted Fratta, because the State did not even attempt to prove the only other alteralternative theory, namely, that Fratta paid Prysash to shoot Farah,   State did not argue, or introduce evidence, that anyone, including Prystash, shot .

The fact that harm must be determined on retrial under *Strickland's* prejudiced standard and not pursuant to the *Brecht* test is of no moment.  Rarely will the outcomes of *Brecht*'s harm analysis and analysis for *Strickland* prejudice be any different.  *See United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2342 (2004) (Scalia, J., concurring) (describing the *Chapman, Brecht, Agurs*, and *Strickland* standards as "ineffable gradations

of probability... beyond the ability of the judicial mind (or any mind) to grasp"); *Smith v. Dixon*, 14 F.3d 956, 974, 976 (4th Cir.1994) (en banc) (concluding that the prejudice inquiry under Strickland is essentially the same as the harmless-error inquiry under Brecht.) This is not one of those rare cases. Moreover, there are distinct differences between the original trial and retrial (and in the post-conviction posture with respect to trial and retrial) that **amplify** the harmfulness caused by the re-introduction of Prystash's out of court confession to Gipp, making the prejudicial effect at retrial deeper and more obvious.

**First**, in 1996, C.E. Anderson testified that a bullet pried from the lifesaving float hanging in Farah's garage was fired from the gun found on Guidry, traced to Fratta through its serial number, and allegedly seen and documented by Gipp (Gipp testified she saw Prystash carrying the night of the murder and wrote the serial number down on the blue sticky note that the State later introduced as an Exhibit). At the 2009 retrial, the State was unable to prove a ballistic link at all. Instead of C.E. Anderson, the State summoned firearms expert Robert Baldwin. Baldwin testified he could not match any recovered slugs to the revolver found on Guidry. Unlike C.E. Anderson, Baldwin testified, too, that the shell casing found in the garage near Farah's body could not have been fired in a revolver.

This change in the background of the two trials against which Prystash's confession must be assessed is enormous. At the 1996 trial, the State had highly incriminating expert testimony, independent of Prystash's confession, scientifically tying Guidry, Prystash and Fratta to the murder weapon. At retrial, however, the State introduced an expert's testimony that (i) informed the jury that the slugs found in the garage could not be matched to the revolver Fratta once owned and (ii) supported an inference (because Baldwin

testified the shell casing Sheriffs found near Farah's body could not have been fired in Fratta's revolver) that a different weapon, not linked to Guidry, Prystash or Fratta, was used to kill Farah.  This made Prystash's confession to Gipp more crucial to the State's case and more prejudicial to the defense.

**Second**, at the original trial, the defense simply alleged that the $1050 law enforcement seized from Fratta's car was for carpet, but did not, in 1996, present any evidence contradicting the State's theory that the $1,050 that law enforcement seized from the glove-compartment of Fratta's vehicle (24 RR 57) was to pay for Farah's murder.  At the 2009 retrial, the defense sponsored testimony through Ray Thomas showing Fratta had contracted to purchase and install carpet in the house in which he was living during the pendency of his divorce. 25 RR 150-155.  The defense also called the manager of the Sears store that sold Fratta the carpet. 29 RR 176, 180.

At the 2009 retrial, the State proceeded against Fratta under the same murder for hire theory without introducing any additional evidence of a payment scheme.  Once more, Prystash's confession to Gipp was absolutely essential.  The State did not have admissible proof that Fratta arranged to pay Guidry.  There was no evidence the two – Fratta and Guidry – had ever met or communicated.  The State introduced testimony that Fratta had offered other people money to kill Farah; however, these offers were treated as ridiculous and rejected.  The State therefore had to show that Fratta had arranged to pay Guidry through Prystash.  Gipp's testimony that (i) Prystash told her that he was the middle man in the scheme and that (ii) Prystash's job was to find someone to kill Farah was therefore crucial to proving the murder for hire offense alleged in the indictment.

Prystash's statements were also vital to any hope the State had of conviction on a burglary/murder theory. The State failed to prove anything about Fratta's relationship to Guidry or knowledge of his activities. Failure to provide significant evidence delineating Prystash's role as middleman or recruitment of Guidry to kill Farah would make a legitimate conviction on a parties charge for burglary/murder inconceivable.

In light of the State's bare-boned case in support of either of its theories of capital murder, the harm caused by counsel's failure to exclude Prystash's hearsay testimony is correspondingly greater. After the *de novo* review of this claim, which *Tevino v. Thaler*, 133 S. Ct. 1911 (2013), permits, this Court should grant relief on Fratta's ineffectiveness of counsel claim.

## CLAIM EIGHT

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, TRIAL COUNSEL FAILED TO INVESTIGATE THE CONDITIONS UNDER WHICH GIPP WAS INTERROGATED AND FAILED TO CROSS EXAMINE GIPP ABOUT THE DURESS UNDER WHICH SHE AGREED TO PROVIDE STATE'S EVIDENCE.**

According to the lead prosecutor[8] at the original trial in 1996, Gipp was the State's most important witness. Gipp's importance magnified several fold at the 2009 retrial. After the original trial this Court granted habeas relief on confrontation clause claims, the Fifth Circuit upheld this Court's decision, and, thereafter, the State on retrial could not from introduce the highly incriminating custodial confessions of co-conspirators Prystash

---

[8] Kelly Siegler

and Guidry. *Fratta v. Quarterman*, No. H-05- 3392, 2007 U.S. Dist. LEXIS 72705 (S.D. Tex. Sept. 28, 2007) (not designated for publication).  The relative importance to the State of Gipp's testimony was therefore greatly enhanced.

**A.   Trial Counsel Failed to Impeach Gipp, and Failed to Impeach the State's Assembly of its Case, with Evidence of Police Misconduct that Included Harsh Interrogations, Physical Violence Against Witnesses, Deception of Witnesses and Deprivation of Sleep and Food.**

Law enforcement's investigation of Fratta's case is rife with misconduct.  Because of misconduct, Fratta's co-defendant's, Howard Guidry's, capital conviction was overturned.   Guidry was granted habeas relief and retried because the State used unconstitutional methods to extract a confession.   The other co-defendant's, Joseph Prystash's, federal proceedings were abated so he could exhaust claims related to illegal police interrogations.  The treatment of Mary Gipp by detectives and deputies displays a similar pattern of deceptive and even violent action aimed at procuring evidence supporting the State's case.

<em><u>Gipp</u></em>

The prosecutor who originally prosecuted Fratta stated publicly on a 48 Hour CBS News program devoted to the Fratta case that aired February 5, 2011, that Mary Gipp was the State's most important witness.  *48 Hours: Thou Shalt Not Kill.*  Gipp's importance stemmed from her relationship with codefendant Prystash with whom she was living when the murder took place.  The most damaging aspect of Gipp's testimony was her recounting of out-of-court statements (see record excerpts reproduced above) allegedly made by

Prystash that connected Fratta to a murder for hire scheme that involved Prystash, who supposedly paid a man named Guidry to shoot Farah Fratta.

Because this Court determined that the prosecution use of non-testifying codefendant confession at the original trial violated Fratta's confrontation clause rights, the Gipp's importance as a key witness at retrial was magnified several fold. Trial counsel was therefore obligated to attack the validity of Gipp's testimony, including investigating evidence that Gipp was harassed and physical abused by Deputies and Detectives until she gave a statement and produced physical evidence critical to the State's case.

The lead prosecutor revealed the State's outright hostility towards Gipp in the 48 Hour News cast. The lead prosecutor publicly stated that Gipp "was a witch; she was a smart aleck; she was a bitch." The prosecutor's caustic appraisal of the witness on whom the State's case hinged was reflected in the treatment that deputies and detectives meted out to Gipp.

Detectives tried to interrogate Gipp at home on several occasions before she sought representation, showing up unannounced during inconvenient hours. Gipp initially denied that Prystash had left her apartment on the night of the murder. She insisted that he had remained at 2226 Millstone with her and her brother, Keith Gipp, watching a program on ice-skating.

In order to break Gipp's resistance, law enforcement determined to show Gipp they could gratuitously disrupt her life as it pleased. For example, there no evidence that Gipp ever refused to talk to police at all or refused access to her residence. Police had no reason to think that evidence they could have seized earlier through a consensual search near the

November 9, 1995, date of the crime was still present more than a month later.  However, as Christmas neared police either sought and obtained a search warrant, or obtained consent to search from Keith Gipp,[9] that evidently permitted them to conduct an unlimited search of Gipp's apartment, because officers proceeded not only to search the premises but also ripped open all the presents Gipp had place under her Christmas tree.  The idea that Gipp had hidden evidence in Christmas packages was of course preposterous.  The police maneuver was simply to harass Gipp into making statements supporting the State's case.

Nonetheless, Gipp maintained her position – which was that she did not have knowledge about the murders – for five months, from November 10, 1995, until March of 1996.  The evidence indicates, and further investigation and discovery is calculated to show that eventually police broke her down with threats of violence and prosecution and continued harassment, that, specifically (not only) that law enforcement took Gipp to the Lockwood station for interview, used force to extract information from Gipp, including physically assaulting Gipp.  Police witness(es) who have come forth (but cannot be now identified) have provided information that indicate one or more detectives or deputies slapped Gipp in the face and that alcohol was present and consumed at one or more interrogation.

Trial counsel was on notice that Gipp, like other potential witnesses, had given testimony under conditions of physical and mental duress.  However, trial counsel did not investigate any physical violence that lead to Gipp's turning state witness, including leads

---

[9] Mary Gipp testified that she was away but Keith Gipp was present when HCSO searched her apartment in November or December of 1994.

99

to evidence that Gipp assaulted at her residence or at the Lockwood station.  The record reflects that Gipp was interviewed by multiple officers on multiple occasions; however, trial counsel did not discover the occasions, the identities of the officers or the circumstances of the serial interrogations.  Trial counsel also failed to impeach Gipp with evidence that she agreed to testify, and was testifying, against Fratta because of physical abuse and/or mental duress.  Trial counsel failed to inquire into the conditions under which Gipp talked to police, failed via research or cross to discover the number or identity of law enforcement personnel present during Gipp's interview, and failed to inquire into any threats made against Gipp's brother, whether Gipp feared for his safety or that he – that is Keith Gipp – would be criminally prosecuted.  Trial counsel had good reason, because Keith Gipp was summoned to appear before a grand jury.  The summons was to compel testimony and Keith Gipp, like his sister, was threatened with criminal prosecution.  Police report show Keith Gipp asserted his Fifth Amendment rights and refused to testify. However, trial counsel did not impeach Gipp on grounds that she was testifying not only to save her neck but out of fear her brother would be prosecuted.

In sum, trial counsel also had reason to investigate and cross examine Gipp about mental duress caused by abuse of police and prosecutorial power, which additional investigation and discovery in these proceedings is calculated to further establish, including, but not only including,

     i.        threats to prosecute Gipp for capital murder if she did not turn State's witness,

     ii.       invasions and gratuitous destruction of Gipp's property,

iii.     unannounced and unmemorialized interrogations of Gipp at her home and
at police stations, and

iv.     threats to prosecute Gipp's brother, Keith,

the occurrence of which is documented in the pretrial and trial record available to trial counsel, and which can be further demonstrated through investigation and discovery in this present federal cause of action.

Trial counsel also had reason to investigate and cross examine Gipp about physical abuse and mental duress caused by State agents.  Before trial, trial counsel was notified by letter that former federal habeas counsel's investigator had discovered that one or more Sheriff's deputy had disclosed that Gipp had been struck or otherwise assaulted or threatened by one or more of the detectives or deputies who interviewed Gipp.

### *Guidry*

A pattern of witness abuse was evident before trial and post-conviction records of codefendants prosecuted for Farah's murder.  Trial counsel had access to, and should have been familiar with this record, but did not conduct a reasonable investigation of abuse of witnesses in Fratta's case despite this pattern of illegal police and prosecutorial conduct. The very same HCSO personnel who investigated and interviewed Gipp – namely, Billingsley, Valerio, Roberts and others – also investigated and interviewed Guidry. Officers violated basic constitutional law by refusing to honor Guidry's request for an attorney.  Instead, HCSO detectives interviewed Guidry in waves and isolated him for hours in between even after Guidry requested to see the attorney, Michael Druery, assigned to represent him on robbery charges.

The Fifth Circuit opinion upholding habeas relief granted by Judge Nancy Atlas retails how the HCSO Detectives interviewed Guidry late at night, leaving him isolated for hours, only to return to try to extract a confession.  Faced with Guidry's persistent invocation of his Sixth Amendment right to speak with an attorney before answering police questions, detectives resorted to deceit.  Detectives told Guidry that they had contacted Druery and that Druery had asked them to pass on the message that Guidry should speak with the detectives.  Guidry then proceeded to confess involvement and agreed to a videotaped reenactment of the murder.

HCSO would have gotten away with the grotesque violation of constitutional rights.  However, during state post-conviction proceedings held in chambers, Roberts was asked by assistant district attorneys why they questioned Guidry when they knew he had counsel.  Roberts replied that he had contacted Druery and received Druery's permission to speak with Guidry.  Prosecutors immediately contacted Druery who said no such events had transpired:  Roberts had not called him, Druery said, and he did not give HCSO personnel permission to speak with Guidry.  When Roberts backtracked and flatly denied stating that he had contacted Druery or telling Guidry that he had permission from his attorney for Guidry to speak with him, the assistant district attorneys in charge of post-conviction litigation realized they would be a witness against Roberts and withdrew.

Despite the obvious violations of constitutional right and obvious proof that Roberts was lying, the State took advantage of a longstanding ritual whereby trial courts sign off on any findings that the Harris County District Attorney's Office puts before them.  Prosecutors drafted findings of fact and conclusions of law excusing Roberts' in chambers

remarks and minimizing the materiality of Guidry's confession and recommended that relief be denied.  The trial court, followed by the Texas Court of Criminal Appeals, duly adopted the State's proposed findings and upheld Guidry's capital conviction.  However, an evidentiary hearing in federal court confirmed that both the prosecution and defense attorneys had heard Roberts state unequivocally, when asked why he insisted on speaking with a represented party, that he had contacted Druery and received permission to speak with Guidry.  Druery also testified that he had done no such thing.  Relief was granted by the federal district court and the Fifth Circuit upheld the judgment.

However, trial counsel failed to impeach the State's case with evidence that the State had violated constitutional law in order to procure evidence against Fratta.

### *Prystash*

Prystash also complained of harsh treatment by HCSO, including being struck, deprived of sleep and food and testifying under duress.  According to Prystash's 2005 federal petition, he was deprived of sleep and beaten during interrogation.

**B.    In Violation of the Sixth Amendment and Fratta's Due Process Rights Trial Counsel Failed to Impeach Gipp and the State's Case with Evidence that Law Enforcement Continued to Threaten Gipp with Charges of Capital Murder in Order to Extract Testimony.**

Over a period of five months, Gipp declined to provide the State with the type of incriminating evidence that State needed to convict Fratta.  To obtain incriminating evidence, the State threatened to prosecute Gipp.  However, the State realized that using the hammer of capital charges to extract incriminating evidence would undermine Gipp's credibility.  As a result, when the State brought Gipp before a Grand Jury, the State did not

leave a record indicating that the Grand Jury was convened to consider capital charges. The State then misleadingly announced in court in front of the jury that the Grand Jury Gipp allegedly appeared before was merely considering whether to indict Gipp for the third degree felony offense of tampering with evidence in order to defuse what should have been, in any event, a thorough, and devastating impeachment of Gipp. Trial counsel, however, failed to pierce this obvious ruse and discharge the Sixth Amendment obligation to defend Fratta. Instead, trial counsel allowed the State to minimize the threats Gipp was under despite un-controvertible evidence that the threats actually being made to extract incriminating information literally put Gipp's life at risk.

Trial counsel knew that the State considered Gipp a suspect in a capital murder scheme. Trial counsel also knew and should have known that the State pressured Gipp with prospects of prosecution for capital murder to turn Gipp into a State's witness. Gipp, in fact, testified that she turned State's witness out of fear she would be indicted for capital murder. This fear of capital charges appeared to be the exclusive motivation for her testimony against Fratta:

> 6 Q. (By Ms. Bradley) And I understand that, but
>
> 7 were you questioned by the grand jury in any way or did
>
> 8 you give a formal statement in response to that grand
>
> 9 jury subpoena?
>
> 10 A. I may have answered a question or two, I don't
>
> 11 know. They were basically going to, you know, charge me
>
> 12 with capital murder.

27 RR 85

However, on cross examination, trial counsel failed to press Gipp on why she felt she faced the possibility of capital murder charges, failed to ask who had threatened her with possible prosecution for capital murder and failed to impeach her for testifying in order to save her own skin.  Instead, trial counsel took that State's minimization of the threats levied against Gipp at face value, thereby inexcusably foregoing the opportunity to impeach Gipp and impeach the integrity of the State's case with proof of prosecutorial misconduct.

### C.    Trial Counsel Allowed the State to Mislead the Jury about Offers of Immunity and to Minimize Threats of Prosecution Against Key Witnesses depriving Fratta, thereby, of his Sixth Amendment Right to Effective Assistance of Counsel.

In violation of Due Process, the State misled the jury and the court into believing that the State had only threatened Gipp with indictment for a third degree felony charge of tampering with the evidence.  The State also may have misled the jury into believing that the State had only offered Gipp immunity against this third degree felon charge of tampering.  However, documents available to counsel show that Gipp and her brother invoke the Fifth Amendment on the belief that that they might be implicate in Farah's capital murder.  Assistant DA Rizzo filed a motion to compel; Judge Mary Bacon ruled that Gipp and her brother had immunity only with respect to the tampering with evidence charges.  She did not afford immunity against the possibility of a capital prosecution.  Gipp could therefore be forced to testify only about what she knew about tampering with the evidence.  The state filed a motion and Court granted immunity against tampering.

However, after the motion was granted, the State and Gipp came to an agreement that any oral statements she made would not be used against her, thereby, effectively immunizing her from prosecution for any offense arising from Farah's murder.

Gipp's own testimony at retrial (discussed above in Section B) and Gipp's statements to CBS news reporters after retrial confirm that she testified to avoid capital murder charges.  *48 Hours: Thou Shalt Not Kill*.  Trial counsel, however, allowed the State to "correct" Gipp's testimony even though documents available to trial counsel before retrial (namely, HCSO incident reports) show that the State did not have evidence of tampering until after Gipp and her brother were summoned on March 1, 1995, to give testimony before the Grand Jury.

HCSO reports provided to defense counsel prove that the State had no reason to charge Gipp with tampering with the evidence before March 1, 1995.  Before this date, the State did not have not have evidence that she had erased phone messages or had hidden or destroyed physical evidence.  HCSO reports show, instead, that Gipp was the sole source of information supporting a tampering charge  (namely, for allegedly disposing of casings she said she saw Prystash empty from a revolver on the night of the murder), and that she provided this information after the March 1, 1995, Grand Jury session.

A report by Detective Roberts, confirms that on March 3, 1995, Gipp appeared at the office of Assistant District Attorney Dan Rizzo with her attorney, George Parnham. Also present was Detective G.R. Roberts.  According to Roberts, Gipp "gave an oral statement as to what she would say before the Grand Jury" if she were ever summoned again.  What Gipp said is unknown, because Roberts did not take any notes about what

Gipp told prosecutor she would say.  (The departure from usual HCSO practice strongly indicates that Rizzo instructed Roberts not to take notes.)   However, Roberts **did** memorialize the fact that the Rizzo offered Gipp not only transaction immunity, but use immunity for all statements that she made and effective against all charges.  According to Roberts, "[t]here was an oral agreement between the parties that everything she said orally to us would not be used against her." *Id.*

The meeting at Rizzo's office with Rizzo ended with Gipp agreeing to meet with Roberts and Rizzo the next day, March 4, 1996, at the Sheriff's Department.  Gipp and the State agreed that if the State was satisfied with the written statement, Gipp would not have to testify in front of the Grand Jury.  On March 4, 1996, Gipp, Parnham, Roberts and Rizzo gathered at the Sheriff's Department and Gipp provided a written statement, which her trial testimony later paralleled, that included the hearsay from Prystash implicating Fratta.  The statement also contained Gipp's tales about seeing Prystash with a gun when he returned the night of the murder, about Gipp hiding and eventually discarding the casings Prystash removed from the gun, and about Gipp writing down the gun's serial number on a blue sticky note.  At the March 4, 1995, meeting Gipp also produced the blue sticky note in the zip lock bag she later testified she had stored from the night of the murder until turning the blue sticky note over to her attorney shortly before her March 4, 1995, proffer.

There is no record indicating that Gipp was summoned after March 1, 1996, to appear before a Harris County grand jury.  In fact, part of the deal she struck with prosecutors was that she would not have to testify before a grand jury if she signed a written statement memorializing her oral proffer of information about Farah's murder.  Robert's

HCSO report clearly documents this term of the deal.  The timing of the March 1, 1996, grand jury appearance and Detective Roberts' and Wedgewerth's memorialization of the fact that Gipp *first* told her tale of disposing of evidence (namely, the shell casings) on March 3-4, 1996 (after the appearing before the grand jury), at ADA Rizzo's office and the Lockwood police station further solidifies the conclusion that Gipp was offered broad immunity and that the State's assertions to the jury in open court that Gipp only got immunity against prosecution for tampering with the evidence were false and misleading.

Absolutely clinching the conclusion that the State was intentionally misleading the jury about the extent and nature of the deal for testimony struck with Gipp is the fact to create this misrepresentation the State insinuated that a Harris County grand jury was looking only into tampering with evidence charges against Gipp.  However, police reports show that Gipp took the Fifth, on March 1, 1995, which was the only time she dealt with a grand jury.  If she had been offered immunity for tampering for the evidence, there would no need for her to take the Fifth or appear at all before a grand jury looking into tampering with the evidence charges.

Gipp's invocation of her Fifth Amendment rights, along with Roberts' police reports describing the immunity deal Gipp got, constitute solid proof, all disclosed pretrial to Fratta's defense, that the State's declaration in front of the jury that Gipp only faced tampering charges and only received immunity against prosecution on this charges was false and misleading.  Reasonable counsel would have surmised that no attorney would allow a client so closely associated with evidence and suspects of capital murder to make a proffer or statement without assurance that the client would not be prosecuted for capital

charges.  Indeed, reasonable attorneys would have pried into the undocumented dealing for broad immunity in exchange for incriminating evidence that unquestionably took place behind the scenes between Gipp's attorney and the State.  Had trial counsel done, trial counsel would have been able to impeach Gipp and the State's entire case with proof that the State had promised broad immunity for Gipp to her attorney, and would have been able to show an agreement was struck to keep Gipp in the dark to the extent possible so the State could mislead the jury into believing that Gipp had been promised very little, relative to her criminal exposure, for testimony incriminating Fratta and his codefendants.

However, trial counsel failed to demand disclosure of all dealings between the State and Gipp's attorney including disclosure of oral dealings for immunity in exchange for Gipp's testimony, failed to demand a hearing to which Gipp's attorney, ADA Rizzo, Detective Roberts and others, could be summoned to testify regarding the deal Gipp received for testimony, failed to summon Gipp's attorney to trial so that he could be examined before the jury about his dealings with the State for immunity, and failed to cross examine Gipp, too, about her understanding of the extent and nature of the immunity she believed the State had promised in return for evidence incriminating Fratta and his codefendants.  As a result, trial counsel failed to impeach Gipp's credibility and failed to impeach the integrity of the State's case.  Instead, of casting serious doubt Gipp's credibility and her motive for testifying and instead of showing that the State was manipulating and misleading the jury about the circumstances under which the State procured evidence from Gipp, trial counsel bought the State's version – merely immunity against tampering charges – at face value.  Trial counsel did not have a strategic reason for

the omissions and failures catalogued above.  Reasonably confident trial counsel would have taken the measured trial counsel failed to take in order to exclude or impeach the testimony of the State's key witness and the integrity of the state's case.  Trial counsel's performance was therefore deficient under *Strickland v. Washington*, 466 U.S. 688 (1984).

### D. Foregoing Errors of Trial Counsel Were Prejudicial under *Strickland v. Washington*, 466 U.S. 688 (1984).

Had trial counsel effectively investigated the actions and tactics identified above that police and prosecutors used to extract information from Gipp, trial counsel would have been able to support and present a meritorious motion to exclude Gipp's testimony entirely on the ground that it was the product of police and prosecutorial misconduct that violated Due Process.  Trial counsel would have also been able to impeach the State's manner and means of assembling its case,[10] and discredited its key witness.

Without believable testimony from Gipp the State would not have had a chance of proving its capital murder allegations, either the murder for hire theory or the burglary/murder theory or the law of the parties allegations added to the jury charge.  In light of the State's bare-boned case for every theory in the indictment and charge (*see* Claim One above, the evidence and argument for which is incorporated by reference), the consequence of trial counsel's deficient performance were prejudicial under *Strickland*. Had trial counsel not performed deficiently, and had instead, exposed the police and prosecutorial misconduct described above, and which additional investigation and

---

[10] The impact of a threat of death is reflected in the policies of the United States Attorney.  The US Attorneys Manual states that "[t]he death penalty may not be sought, and no attorney for the Government may threaten to seek it, solely for the purpose of obtaining a more desirable negotiating position." See Rule 9-10.120.

discovery is calculated to further document, it is reasonably probable that a juror would have refuse to find that the State proved any of its theories of capital murder.  This Court should therefore order relief granted.

## CLAIM NINE

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, TRIAL COUNSEL FAILED TO IMPEACH GIPP WITH HER PRIOR INCONSISTENT STATEMENTS.**

Transcripts of Gipp's testimony at the 1996 trials of Fratta, Guidry and Prystash, and transcripts of her testimony at Guidry's 2007 retrial, are rife with serious contradictions and omissions.  For example, at Guidry's 2007 retrial, Gipp testified that when first contacted by Sheriffs, she wanted to testify against Prystash, refused, out of fear, to provide a statement to officers right away, but promised them she would provide testimony to a grand jury.

> Q. …. Back in 1994 when you were first contacted by the Harris County Sheriff's Department the first time they came to your house, were you initially cooperative with them?
>
> Q. Why not?
>
> A. Because I was scared.
>
> Q. Did you want to provide information on Joe Prystash?
>
> A. Yes, but I told them when they came the first time that I would talk to them in front of a grand jury.
>
> Q. I'm sorry.
>
> A. That I would talk to them – they told me that I would have to go in front of a grand jury.

*State v. Guidry* [2007 retrial] 21 RR 44.

At no other trial (original trials of codefendants in 1996 or Fratta's retrial in 2009) did Gipp testify she informed Sheriffs straightaway that she was willing to testify before a grand jury, and HCSO reports drafted by Detective Roberts showed Gipp was lying, one way or the other.

Trial counsel could have impeached Gipp with the following inconsistencies, contradictions and false statements:

> ☐ WHETHER SHE SAW PRYSTASH WITH MR. GUIDRY AFTER THE ALLEGED CRIME: At the second trial, Gipp admitted she previously testified falsely that she saw Mr. Guidry go into his apartment after he allegedly returned from Fratta's house. *State v. Guidry* [Retrial] at 21 RR 75. But Gipp said when interviewed by police in January of 1996, she told police when Prystash came home that night, he was not with Guidry. *See* 01/23/96 Interview of M. Gipp by Lisa Milstein at page 2.

> ☐ REGARDING THE DESCRIPTION OF THE GUN: In her March 4, 1995, statement to the police, Gipp testified the gun "had a cylinder and had a silver finish." See 03/04/95 Gipp Statement, p. 2. She also testified the gun had "wooden grips." Id. During the second trial, however, Gipp testified the grips on the gun were black. *State v. Guidry* [Retrial], 21 RR 58:5-7).

> ☐ REGARDING THE TIME SHE ARRIVED HOME ON THE NIGHT OF THE ALLEGED CRIME: In Gipp's March 4, 1995, statement to the police, she stated she "came home from work about 5:30 p.m." See 03/04/95 Gipp Statement, p. 3. During the second trial, she testified she returned home at 4:30. *State v. Guidry,* [Retrial] 21 RR 47-48.

> ☐ REGARDING THE SHELL CASINGS: In Gipp's March 4, 1995, statement to the police, Gipp testified she either watched Prystash throw the gun casings in the garbage, or Prystash later told her he threw the casings in the garbage.

See Ex. 19 (03/04/95 Gipp Statement). During the second trial, however, Gipp stated Prystash took the bullet shells or casings out and dumped them in his hand. See *State v. Guidry* [Retrial] 21 RR 56:21). She said that "after he put the gun between the clothes, he left the room and walked into [her] kitchen and [she] followed him out and he threw the casings into [her] garbage." Id. at 57:16-19.

☐ REGARDING HER CONVERSATION WITH MR. GUIDRY ON THE NIGHT OF THE ALLEGED CRIME: During the second trial, Gipp testified she asked Mr. Guidry when she got home where Joe was; See Ex. 11 (*State v. Guidry* [Retrial]  21  RR 48:20-49:2). During the March 4, 1995, statement to the police, she stated that Guidry asked her where Joe was. See 03/04/95 Gipp Statement, p. 3.  At Fratta's retrials, Gipp said she just walked past Guidry

☐  At Guidry's retrial, Gipp testified that when police first came to her apartment she refused to give them a statement, but told them she was willing to go before a Grand Jury and tell the Grand Jury what she knew about the murder of Farah Fratta.  However, Detectives Roberts notes reveal that Gipp did give a statement to police that exonerated Prystash by informing police that Prystash was with Gipp and her brother Keith watching an ice skating show the night the murder took place. According to Robert's report Gipp did not volunteer to testify before a grand jury, and she did not tell Roberts that she would tell the grand jury what she knew about the crime. Gipp told Roberts that she would tell the grand jury, if summoned, exactly what she told Roberts, namely, that Prystash was with Gipp and her brother watching T.V. the night of the murder.

Gipp's  March  1995  statement  to  the  police  and  her  January 1996  interview memorandum existed at the time of the second trial and were available to trial counsel. Thus, trial counsel could have used these statements to impeach Gipp's testimony at trial. Roberts'  police  reports  were  also  available  to  trial  counsel,  as  was  her  testimony  at Guidry's 2007 retrial.  However, trial counsel either failed to investigate Gipp's previous

statements or failed to impeach her with these inconsistencies.  Either way, trial counsel's performance was ineffective.

### B.    Deficient Performance

"It is hornbook law that evidence of prior inconsistent statements of a witness may be admitted to impeach that witness." *United States v. Sisto*, 534 F.2d 616, 622 (5th Cir. 1976).  "Counsel's failure to introduce evidence that contradicts a key witness's trial testimony is patently unreasonable." *Moore v. Sec'y Penn. Dep't of Corr.*, 457 F. App'x 170, 182 (3d. Cir. 2012); *see also Harris v. Artuz*, 100 F. App'x 56, 58–59 (2d Cir. 2004); *Berryman v. Morton*, 100 F.3d 1089, 1098 (3d. Cir. 1996).

In *Moore*, the Court found that one of three key witness's trial testimony could have been impeached via a prior inconsistent statement. *Moore,* 457 F. App'x at 182.  Counsel was "unreasonable" in failing to do so. *Id.*  In *Berryman*, the court found there "is no way in which the failure to confront [the key witness] with her prior inconsistent identification testimony can be justified as sound trial strategy or a reasonable strategic choice." 100 F.3d at 1098 (quotation marks omitted).  Indeed, the Court found that such behavior "borders on the inconceivable." *Id.*  In *Harris*, the court found that there was "no tactical justification for counsel's" failure to impeach a key witness with a prior inconsistent statement. 100 F. App'x at 58–59.

Failure to impeach a key witness is, therefore, deficient within the meaning of Strickland, which entitles a defendant to reasonably competent attorney.  Gipp was the State's most important witness.  Her testimony at retrial was critical to the jury's decision to convict.  However, trial counsel failed to attack Gipp's credibility by impeaching her

with inconsistent statements.  Trial counsel performance, therefore, fell below reasonable professional standards in violation of *Strickland*'s first prong.

### C. *Strickland* Prejudice

Gipp's inconsistent and contradictory prior statements bear directly on the credibility of Gipp, the State's most important witness.  Gipp's 2007 testimony shows that she was willing to lie and mislead the jury in order to bolster her own credibility and aid the prosecution's case.  With a competent cross, or by calling Robert's as a rebuttal witness, trial counsel could have exposed Gipp's fallacious claim that she wanted to help police from the start but was too scared to inform on Fratta and his codefendants.  Competent counsel could have demonstrated that Detectives questioned Gipp time and time again and that she stuck with her story for months – nearly half a year – and insisted that Prystash was with her when Farah was murdered.

In conjunction with cross examination regarding the mental and physical abuse at the hands of police, and gratuitous invasions of her home and destruction of her property, competent counsel could have completely changed the picture of Gipp that the State tried to frame.  Instead, of allowing the State to portray Gipp a witness who refused to testify out of fear of the defendants, and now remorseful over her failure to speak out at the beginning to save Farah, competent counsel would have shown that because of abusive police tactics and threats of capital and criminal prosecution, levelled not just at her but also her brother, Gipp lying about her motives for testifying and was actually in fear of police and prosecutors.

It was vitally important for trial counsel to cross examine Gipp's testimony about the gun she said Prystash returned to her apartment with the night of the murder.  Gipp testified at Fratta's retrial (just as she had at the original trial) that she handled the weapon, lifted it out its case, and examined it closely to record, so she claimed, the serial number and the make of the revolver.  However, she initially said Prystash returned with a silver gun with wooden handles.  This describes a completely different weapon than the black Charter Arms Special traced to Fratta.  Competent counsel would have crossed Gipp on whether police or prosecutors showed her a gun-lineup like the one they showed Lex Baquer in order to shape her testimony, described the gun to her, "corrected her testimony," or by any other means skewed and shaped her testimony about the gun she say.  A reasonably competent counsel would have pressed Gipp on why she changed her testimony, how she supposedly caught her supposed mistake, and pressed her on who brought the supposed mistake to her attention.  Trial counsel failed to even ask if police or prosecutor showed her the gun they claimed was the murder weapon, or a depiction of it, after she initially described a different gun.

Together with evidence that the State and Gipp had made false and misleading jury speeches and given false and misleading testimony about Gipp's immunity deal, with proof that the State had molded Gipp's testimony to avoid exclusion on grounds of unreliability (see Claim 1 above), and with proof that Gipp had lied about her willingness to testify about the crime in front of a grand jury, competent counsel would have completely undermined Gipp's credibility as a witness.  Since Gipp was key to convicting Fratta, the failure of trial counsel to use available inconsistent and contradictory statements was

prejudicial.  Had trial counsel cast serious doubt on Gipp's accuracy and veracity, it is reasonably probable that at least one juror would have harbored severe doubts that Gipp was truthful about the gun she saw, truthful about writing down the serial number information the state used, and truthful about anything Prystash supposedly told her about the murder.  Such jurors would not found that Fratta was guilty beyond a reasonable doubt, particularly in light of the State's thin to non-existent proof of essential facts the jury had to find in order to convict in accordance with the jury charge (s*ee* Claim One above, the argument and evidence for which is incorporated herein by reference).  Trial counsel's deficient performance therefore prejudiced Fratta in violation of *Strickland*.  This Court should therefore order relief.

### CLAIM TEN

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL TRIAL, COUNSEL FAILED TO SPONSOR EVIDENCE IMPEACHING HEARSAY DECLARANT, JOSEPH PRYSTASH'S, CREDIBILITY.**

Because trial counsel had transcripts from the first trial, they knew in advance that the State would attempt to get Prystash's hearsay statements to Gipp into evidence.  It was essential that trial counsel take all reasonably competent measures necessary to exclude this incredibly damaging hearsay, and to cast doubt on the credibility of the hearsay declarant, i.e., Prystash, were the trial court to allow the hearsay testimony.  However, instead of developing evidence to show that the testimony violated Rule 403 and Due Process, trial counsel erroneously relied on inapplicable law, and failed to develop evidence impeaching Prystash.

117

1.      **Counsel failed to develop evidence demonstrating that Prystash was too incredible for the court to admit his out of court statements consistent with Due Process or the Texas Rules of Evidence.**

Because retrial took place after the Supreme Court's decision in *Crawford v. Washington,* 541 U.S. 36 (2004), Fratta's right to confront and cross-examine the witnesses against him under the U.S. Constitution's  Sixth Amendment's Confrontation Clause was not implicated if a hearsay statement is non-testimonial in nature and bears adequate indicia of reliability. *See Woods v. State,* 2011 WL 1258562 (S. D. Tex. 2011) (citing *Woods v. State*, 152 S.W.3d 105, 113–14 (Tex. Crim. App. 2004)).  It was therefore incumbent upon the defense to attack the reliability of the alleged source of the hearsay, Prystash, as well as the reliability of the witness called to introduce out of court statements.  However, trial counsel failed to bring to the trial courts attention a wealth of information impeaching Prystash's reliability and impeaching Gipp's

The evidence impeaching Prystash falling in the following categories therefore need to be gathered and further substantiated. **First**, there is evidence that Prystash suffered from severe mental illness and mental disabilities.  Leads to this evidence were available.  Prystash's federal habeas pleadings discuss mitigating evidence including the fact that Prystash may suffer from schizophrenia. *Prystash v. Quarterman*, 4:05-cv-01546 (S.D. Tex., filed 4/28/2005), Dkt. Entry 1-1, Petition for Writ of Habeas Corpus at 32-33 ("*Prystash 2005 Fed. Writ*").  The usual course of this disease is includes manifestations and effects beginning in men in their late teens and twenties.  Prystash would therefore have been affected by mental illness at the time he allegedly made incriminating hearsay

remarks to Gipp.  **Second,** the same federal habeas pleadings indicate that Prystash may have suffered from fetal alcohol syndrome. *Prystash 2005 Fed. Writ* at 32. The effects of this syndrome, needless to say, would have manifested themselves before trial.  Like mental illness, mental disability caused by exposure to high levels of alcohol in utero would cast doubt on the validity and accuracy of Prystash's statements.  **Third**, Prystash had a history of criminal conduct that impeached him as a witness.  However, trial counsel did not develop or use this evidence to challenge the admissibility of the hearsay Prystash supposedly relayed or to challenge the reliability of those statements once they court allowed them into evidence.

Gipp was Prystash's lover at the time of the murder. 27 RR 12.  The two shared an apartment.  Gipp testified that she worked at Greenway plaza and provided income, food, transportation and shelter to Prystash.  27 RR 9.  Prystash was unemployed and destitute. Prystash was in his 30s (27 RR 8) but did not have a home or apartment of his own.  When Prystash was not sleeping with Gipp, he stayed with his father in Cut and Shoot, Texas, in a home without a telephone.  27 RR 11. Gipp had to buy Prystash a pager in order to communicate with him.  27 RR 11.  Prystash's only independent source of income appears to have been violent criminal activity, including murder for hire. See 03/04/95 Statement of Mary Gipp.  In a statement ultimately given to police to secure immunity, Gipp relates that Prystash had told her that he had killed one or two other men in an office, and been paid for the homicide by a man named Planter. *Id.*

## CLAIM ELEVEN

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHTS, TRIAL COUNSEL FAILED TO EXCLUDE AND IMPEACH THE TESTIMONY OF STATE WITNESSES JIMMY PODHORSKY, JAMES RAY THOMAS, MIKE EDEN AND OTHER STATE'S WITNESSES**

Because of flagrant constitutional violations committed at Fratta's original trial, which compelled this Court to grant habeas relief in 2005, Fratta was not retried until 15 years after Farah's murder.  Many of the deputies and detectives who investigated the case had retired.  Witnesses had aged and memories were not fresh and vivid.  However, trial counsel failed to voir dire State's witness regarding their personal knowledge.  Instead, too often, trial counsel allowed the State to lead its witnesses when, because the State's unconstitutional actions at the original trial caused delay, giving the state any leeway would have been an abuse of discretion.  As additional investigation and discovery is calculated to further document, (i) witnesses no longer had personal knowledge regarding matters they testified to at Fratta's retrial, and (ii) had trial counsel taken steps to ensure that witnesses were only testifying from personal knowledge trial counsel would have been able exclude key statements, if not the entirety of the testimony that the aforementioned witnesses and others gave at trial.

Trial counsel also failed to impeach the aforementioned witnesses, and others, with inconsistencies and additions and amplification in their testimony. Trial counsel could have but failed to show that the 2009 testimony of these witnesses diverged in material respects

on critical points.  Inter alia trial counsel failed to impeach Podhorsky, Ray Thomas and Eden with lack of personal knowledge and inconsistent testimony regarding,

- Fratta's statements to each respective witness

- Fratta's demeanor, including, but not limited to, his seriousness when soliciting murder

- The circumstance under which any one of them spoke with Fratta

- The witnesses' respective reactions and feelings on occasions they spoke to Fratta

- The witnesses' recollections about Farah or each other

- Expressions or admissions to the prosecutor about lack of memory

- Preparation or coaching of each witnesses testimony by the prosecutors.

Had trial counsel not failed to test and impeach the aforementioned witnesses, and others, trial counsel would have undermined the State's evidence, inter alia, about Fratta's solicitations.  Trial counsel had good reason to believe that the State was illegitimately amplifying the witnesses' testimony in light of the Fifth Circuit's conclusion that evidence Fratta solicited others murder his wife was weak circumstantial evidence that he engaged in a murder for hire scheme involving the Prystash and Guidry as specifically alleged in the indictment.

In light of the fact that the State was prevented at retrial from introducing custodial confessions in violation of the Constitution and was unable to introduce false ballistic

121

evidence that it sponsored at the original trial, trial counsel should have anticipated and prevented the State from introducing and supplementing the testimony of the aforementioned witness or striven to impeach their actual recollection and accuracy.

Had trial counsel done so, it is reasonably probable one or more jurors would have harbored reasonable doubts that Fratta committed any crime alleged in the indictment particularly in light of the State's already bare boned case (*see* Claim One the argument and evidence for which is incorporated by reference).  Trial counsel's failures therefore were deficient and prejudicial under *Strickland.*

<u>Lex Baquer</u>

Trial counsel failed to impeach Baquer personal recollection of the gun, and failed to challenge the use of the gun lineup to shape Baquer's testimony.  Trial counsel file a motion to suppress the lineup and Baquer's related testimony. However, trial counsel failed to challenge testimony under Texas Rule of Evidence 602.  The record shows that Baquer was not qualified as an expert and could not give expert opinion testimony.  While layperson opinion are permissible under limited circumstances, gun-identification from a lineum is not one of them.  Hence the only theory would be that Baquer's personal recollection and knowledge of Fratta's gun enabled him to identify the Charter Arms gun shown in the photographs as the revolver he allegedly returned to Fratta.

Trial counsel failed to show that Baquer had no such knowledge or recollection.  In order to identify the Charter Arms gun depicted in the "gun lineup" Baquer would have had to be aware of a distinguishing characteristic blemish of defect on the gun or be able to recognize a unique manufacture feature such as the serial number.

122

Trial counsel should have requested voir dire to demonstrate that Baquer did not have personal knowledge of  distinguishing features of  the gun he says he received from Fratta that would enable him to make the singular, identification of the gun in a photograph. Voir dire would have shown that Baquer could not pick out the gun from thousands of identical Charter Arms revolvers,  Voir dire would have demonstrated, in fact, that Baquer could not pick out the gun from a lineup consisting of similar looking but different brands of revolvers.

However, trial counsel failed to object that use of the suggestive lineup amounted to manufacturing evidence against Fratta in violation of his due process rights rather than sponsorship of legitimate testimony from personal knowledge in accordance with TRE 602.  Instead, Baquer was giving opinion testimony that was not even based on Baquers' experience and familiarity with guns, of which he apparently had none.  Trial counsel failed to pursue his objection that the gun-lineup was overly suggestive.  Had trial counsel made the proper objections and sought voir dire he would have excluded the gun-lineup testimony.

<u>Hoelscher Testimony</u>

Trial counsel failed to object to Lauren and Daren Hoelscher's testimony on the ground that both eyewitness had been hypnotized, resulting in testimony that fit the State's theory of the case. Trial counsel could have excluded the Holschers' testimony altogether from Fratta's second trial, removing from the jury's purview the only eyewitness accounts of Farah's death and drastically changing the landscape of trial.  *See Zani v. State,* 758 S.W.2d 233, 243-44 (Tex. Crim. App. 1988) (en banc), *superseded on other grounds,* 928

S.W.2d 550 (posthypnotic testimony is only admissible if the state meets its "heavy burden" to demonstrate by clear and convincing evidence, pursuant to a ten-factor test, that hypnosis did not render the witness's memory untrustworthy or substantially impair the ability of counsel to cross).[11]   Trial counsel could have eliminated evidence the State needed to raise an inference that Guidry was the person at the seen whom the Hoelshers saw. Trial counsel would also have eliminated the Hoelscher's testimony about the getaway vehicle, which the State used to raise an inference that Prystash arrive at the scene to pick up the shooter right after Farah was shot.

Trial counsel's decision not to object or impeach the Hoelscher's on the ground that they had been hypnotized cannot be explained as strategic or excused for any other reasons. Trial counsel had access to pleadings filed subsequent to Fratta's original trial.  Fratta's 11.071 Application raised a due process claim for relief base on the fact that the State had failed to disclosed that the Hoelscher's had been hypnotized by state agents before trial. This same claim was also raised as Claim #7 in Fratta's original federal application, as follows:

> The State prosecutor and other law enforcement officials
> arranged for Ms. Hoelscher and her husband to be hypnotized and

---

[11] The *Zani* factors are:  [1] the level of training in the clinical uses and forensic applications of hypnosis by the person performing the hypnosis; [2] the hypnotist's independence from law enforcement investigators, prosecution, and defense; [3] the existence of a record of any information given or known by the hypnotist concerning the case prior to the hypnosis session; [4] the existence of a written or recorded account of the facts as the hypnosis subject remembers them prior to undergoing hypnosis; [5] the creation of recordings of all contacts between the hypnotist and the subject; [6] the presence of persons other than the hypnotist and the subject during any phase of the hypnosis session, as well as [7] the location of the session; [8] the appropriateness of the induction and memory retrieval techniques used; [9] the appropriateness of using hypnosis for the kind of memory loss involved; and [10] the existence of any evidence to corroborate the hypnotically- enhanced testimony.

*Zani*, 758 S.W.2d at 243–44 (quoting *People v. Romero*, 745 P.2d 1003, 1017 (Colo. 1987) (en banc)).

questioned under hypnosis with respect to the shooting of Farah Fratta. The hypnosis occurred after the prosecutors has obtained Mary Gipp's statement identifying Howard Guidry as the sole person who was at Ms. Fratta's residence and as the person who shot Ms. Fratta. On information and belief, Mr. Fratta alleges that the process of hypnosis interfered with Ms. Hoelscher's memory of the night of the shooting. Before being hypnotized, Ms. Hoelscher was confident that she saw three different people the night Farah Fratta was shot. One person who was near Ms. Fratta's body was wearing red or maroon colored pants and fled through the door of the garage immediately after the shooting. A second person dressed in black, whom Ms. Hoelscher believed to be a black man, was on the other side of the car from Ms. Fratta in front of the garage near a tree or bush. The second person was picked up in front of the house by a third person driving a light colored car.

At trial, Ms. Hoelscher testified that she saw pants "[r]ight next to [Ms. Fratta's] body." She said she could barely remember that part. She "just thought [she] saw pants." 20 R 202. She also testified that she saw a person standing outside and on the opposite side of the garage near a bush or tree. The man near the tree was dressed in black and was either a black man or had black makeup on. The man appeared to be nervous or cold. Ms. Hoelscher could not see anything in his hands. The prosecutor's questions of Ms. Hoelscher were designed to give the impression that she probably saw only one person near Ms. Fratta, despite the clear implication of Ms. Hoelscher's initial statement to police that she saw two people - one dressed in red or maroon pants who was seen in the garage near Farah Fratta's body immediately after the shooting, who fled the garage through the door to the right of the car, and another man dressed in black on the other side of the car in front of the garage. Although on cross, Ms. Hoelscher acknowledged what she said in her initial statements, she hedged: "I just saw that. I don't know what that was. I didn't know whether it was my mind freaking out on me or what." 20 R 221.

Failure to exclude the Hoelscher's testimony or impeach it for being the product of hypnotism harmed Fratta. Although the Hoelschers did not provide a description from which a reasonable juror could conclude that the Hoelscher's saw Guidry, the testimony did cooroborate evidence that Prystash drove the getaway car. Without this testimony,

there was no evidence that Prystash went near the scene or picked up the shooter.  Against the background of the State's insufficient case, the Hoelscher's  testimony was prejudicial.

## CLAIM TWELVE

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHTS, TRIAL COUNSEL FAILED TO EXCLUDE INFLAMMATORY TESTIMONY THAT FRATTA FORCED HIS WIFE TO ENGAGE IN DEVIANT SEX ACTS INCLUDING DEFECATING IN HIS MOUTH, URINATING ON HIM AND CHOKING HIM WHILE HE MASTURBATED.**

In considering whether evidence should be excluded under 404(b), courts should consider whether (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

In Texas, the test for the admission of 404(b) evidence is two pronged. First, the court must determine if the extraneous offense is relevant to a material issue in the case other then the defendant's character. Second, the evidence must possess probative value that outweighs its inflammatory or prejudicial effect. *Clark v. State*, 726 S.W.2d 120, 122 (Tex.Crim.App.1986); Van Brown v. State, 771 S.W.2d 218, 221 (Tex.App.—Houston [1st Dist.] 1989, review refused).

In March of 1992, the Frattas filed for divorce. 22 RR 40.  December of 1993, Fratta's divorce attorney, Ray Epps, deposed Farah Fratta.  22 RR 117.  During the

126

deposition, Epps asked Farah about the allegation of cruelty in the divorce pleadings.  Farah deposed that Fratta compelled her to engage in coprophagia and urophilia.  According to Farah's deposition testimony the couple would urinate on each other in the bathroom on a regular basis and Fratta required Farah to defecate in his mouth.

Trial counsel invoked Texas Rules of Evidence 401, 403 and Rule 404 to try to prevent the introduction of this testimony at Fratta's 1997 retrial.  The State argued that Farah's deposition testimony was admissible through her divorce attorney, Beeler, because it was not offered for the truth of the matter asserted. The State argued secondly that the statements were admissible under 404(b) to show motive.  The theory underlying both arguments was that the allegations, whether true or not, gave Fratta a motive to kill Farah. According to the State, Fratta's motive for killing his wife was to prevent the allegations from going public and to prevent his small children, in particular, from learning of Farah's allegations.

     **1.**     **In violation of Fratta's Sixth Amendment Right to effective assistance of counsel, trail counsel failed to exclude testimony by Farah Fratta's attorney, James Ronald Beeler, that Farah deposed about the  couple' coprophagia and  urophilia and erotic asphyxia.**

Trial counsel failed to object that introduction of Farah's deposition testimony through Beeler would violate Fratta's Due Process right to a fundamentally fair trial, failed to insists that the State demonstrate prior to Beeler's testimony,  through *voir dire* of Thomas, that the State could link testimony through James Ray Thomas to a motive, as the State promised, and failed to object under Rule 804 of the Texas Rules of Evidence, and due process, when it became apparent – because Ray Thomas expressly said so – that Ray

Thomas did not and could not remember that Fratta made comments about engaging in anything except "some kind of sexual behavior." 26 RR 124.

James Ronald Beeler represented Farah during divorce proceeding beginning in approximate June of 1993. Fratta initially was representing himself. Later he retained an attorney named Ray Epps. The State called Beeler in order to introduce testimony that Fratta had compelled his wife to engage in deranged sexual acts. Beeler testified that during the December 1993 deposition,

> 19 A. The statement that Farah made was that Bob
>
> 20 would request her to go into the bathroom and then they
>
> 21 would engage in sexual activities that were strange.
>
> 22 Q. (By Ms. Bradley) What did Farah say that the
>
> 23 defendant wanted her to do specifically?
>
> 24 A. To defecate in his mouth, urinate on him, choke
>
> 25 him while he was masturbating.

25 RR 118-119.

The theory under which this information was allegedly admissible over TRE 403 and 404(b) objections was that Fratta's motive for killing his wife was to prevent his supposed attraction to these activities, known as coprophagia, urophilia, and erotic asphyxiation, from becoming public or being revealed to his small children.

Beeler himself could not provide any evidence supporting the State's theory that Fratta's alleged motive for the murder was specifically to prevent the disclosure of coprophagic and urophilic activity in public or to the children at the trial scheduled for

November 18, 1994.   During the presentation of Beeler's testimony, the trial court indicated that the State needed to demonstrate through some witness that Fratta had expressed or shown concern – not about being accused of engaging in bizarre sexual behavior – but concern that Farah's deposition testimony would be repeated at trial.

> 2 MS. BRADLEY: …And it's our opinion, and the evidence,
>
> 3 I think, bare out the fact that he believed that that
>
> 4 information was also going to come out in that trial
>
> 5 should that trial take place.
>
> 6 THE COURT: And the State has evidence that
>
> 7 Mr. Fratta made these comments to some witness that he
>
> 8 was concerned about this information --
>
> 9 MS. BRADLEY: Yes.
>
> 10 THE COURT: -- coming out in the course of
>
> 11 the trial, the divorce trial?
>
> 12 MS. BRADLEY: Yes.

Beeler could not testify that Fratta was in the least worried about eventual disclosure at trial.   Instead, Beeler's testimony undermined the theory that a motive for murder was to prevent disclosure of sexual strange sexual proclivities.   According to Beeler, Fratta openly proposed arranging an "open marriage" in which Fratta had Farah had multiple partners and double dated with Fratta's father-in-law and was not concerned about losing custody of the children.   Furthermore, Beeler expected the divorce to be resolved amicably without going to trial.   Beeler also testified that by the time of the December 1993

deposition, Fratta's position had hardened, but not because he got wind that Farah was going to expose alleged depraved sexual activities, but because Fratta had retained Ray Epps and Epps, evidently, was taking a harder line against settling.

Because Beeler could only establish what Farah said in deposition and nothing probative about the motive for murder – i.e., to prevent disclosure of Fratta's alleged perversions in a public trial -- the State proffered the testimony of a later witness, James Ray Thomas, to allay the Court's concern about Beeler's inflammatory retelling of Farah's description, during deposition, of having to engage in cruel and unusual sexual conduct. Thus, the State promised that Ray Thomas would testify that **five months** before the November 1994 divorce trial "Bob got real mad **one time** when he told me that Farah made a statement about his kinky sex habits," and furthermore, would specifically state that on the occasion that Fratta got real mad he "told me that she said: Bob would want her to get on top of him and shit in his mouth and he would eat it."  The State also promised that Ray Thomas would say during the same angry episode that "Bob denied this and he never told me that he would not do anything like this."  26 RR 114-115.

However, the promise to provide a link up that rendered Beeler's testimony admissible did not materialize.  Ray Thomas did not and could not testify that he recalled Fratta ever say that Farah had complained in her deposition of having to do specific sex acts.  Ray Thomas could not even testify that Fratta grew angry.  All Ray Thomas could remember at retrial was that Fratta appeared **upset**, **one time**, **five months before trial**, when he told Ray that in deposition Farah had mentioned "some kind of sexual behavior."  26 RR 124.  Ray Thomas did not say how upset, how long Fratta remained upset or the

degree of Fratta's alleged displeasure.  Ray Thomas did not have any recollection of whether the sexual conduct was normal, innocuous or abnormal and revolting.

> **2.     Trial counsel failed to preclude testimony of James Ray Thomas who admitted that he did not have an independent recollection of hearing Fratta mention specific deviant sexual acts in any context.**

Ray Thomas was essential to the State's theory that the motive for the killing was Fratta's desire to prevent Farah's allegation regarding coprophagic and urophilic conduct from becoming public knowledge and revealed to the children.  Without Ray Thomas's testimony, the State could not show that testimony by Beeler or Ray Thomas related to specific sexually deviant acts (As used herein, "specific sexually deviant acts" refers to or is short hand for evidence or references to the alleged facts that Fratta made Farah defecate in his mouth, urinate on him and choke him while masturbating.) was in the least bit relevant.[12]

Trial counsel failed to take Ray Thomas on voir dire, and failed to object under Texas Rules of Evidence 602 and 802 that despite the State's attempt to prepare him with

---

[12] The State's theory that Farah's deposition statements that Fratta made her defecate in his mouth, urinate on him and choke him while masturbating were  admissible to show motive has all the earmarks of a false pretense to get around rules of evidence (TRE 401-403) requiring relevance, especially where testimony is inflammatory.  First, the state did not advance this theory at Fratta's original 1996 trial. Second, there was ample evidence at the 2009 retrial showed that Fratta's disposition and behavior during the six month period immediately after Farah's deposition was not attributable in the least to fear or anger that Farah would expose his alleged indulgence in coprophagia, urophilia or erotic aspyxia.  Ray Thomas's testimony and statements by others, including Beeler, show that Fratta was very open about exploring non-standard sexual liaisons and was taking advantage of his separation from Farah by undisguisedly increasing his social activities, dating numerous women, and apparently experimenting with bisexual and transgendered relationships.  Third, the theory hinged on testimony (**that never materialized on retrial**, as shown below) that "on one occasion," approximately four months before the divorce trial, Fratta supposedly became angry as he told Ray Thomas that in a deposition six months earlier Farah had said made her defecate in his mouth, urinate on him and choke him while masturbating.

transcripts from the original trial, Ray Thomas had no recollection at all, and therefore no personal knowledge, of any statement by Fratta regarding Farah's allegations in the December 1993 deposition that Fratta made her defecate in his mouth, urinate on Fratta or strangle Fratta while Fratta masturbated.  Trial counsel failed to take these preventative measures although Ray Thomas expressly stated that he could not recall what Fratta said even after reviewing testimony he gave in 1996.

> 6 **Q**. (By Ms. Bradley) Is that what he told you?
>
> 7 **A**. Seems like he did, but, like I said, I have
>
> 8 read it in the statement. I just don't really remember
>
> 9 it. **You know, if I was being honest, I don't remember**
>
> **10 him saying that, but we did talk about something, some**
>
> **11 kind of sexual behaviors that he was upset about.**

26 RR 124.

Ray Thomas testified that later in the summer Fratta spoke angrily about the upcoming divorce and that one occasion Fratta said, apparently referring to himself, you need to do something about it while he pulled a gun from under the seat of his car.  Ray Thomas advised Fratta "to go see a counselor or doctor or something" because of the anger.  25 RR 46.  The State could introduce general anger as a motive based on Ray Thomas testimony, but could not introduce inflammatory bad acts under the ruse that Fratta killed Farah to prevent allegations of sexual abuse, and coprophagic and urophilic conduct from coming out at trial.

**3.     The State mislead the trial court into admitting testimony about inflammatory sexual conduct through predicate witness, Beeler, although the State realized that it had  no means for establishing through link-up witness, Ray Thomas, that these allegations of sexual deviant activities motivated the  murder; however, in violation of Fratta's Sixth Amendment right to effective assistance of counsel, trial counsel failed to take measures to prevent the State from trampling Fratta's right to a fair trial, failed to impeach Ray Thomas and failed to impeach the integrity of the State's case.**

The State intentionally introduced through Beeler evidence that Fratta compelled Farah to engage in three types of sexual activities: coprophagia, urophilia and erotic asphyxiation – the very description of which would be inflammatory to an ordinary juror. However, the State knew that link-up witness, Ray Thomas, did not have personal knowledge that Fratta mentioned any of one of these three activities.  Indeed, when it came time for Ray Thomas to link up, and thereby render relevant, Beeler's inflammatory testimony about these three types of sexually deviant behaviors, the State announced that Ray Thomas would only testify that in the summer of 1994, as the divorce trial got nearer, Fratta told him that at the 1993 deposition Farah had alleged Fratta engaged in only one of these activities, namely, coprophagia.  Moreover, Ray Thomas testimony revealed he did not have personal knowledge that Fratta had engaged in or ever mentioned coprophagia to him either.  The following conclusions (i-iv, below) are, therefore, clearly demonstrable:

i.     On the ground that Ray Thomas would provide evidence that with the divorce trial getting nearer Fratta grew angry as he told Ray Thomas that Farah had accused him of engaging in specific kinds of sexual misconduct – coprophagia, urophilia and erotic asphyxiation - the State convinced the

trial court to admit Beeler's testimony that Fratta made Farah urinate on him, choke him while he masturbated, and in general engaged in "sexual cruelty."

ii.  However, the State knew, or should have known, that by the time of the 2009 retrial, Ray Thomas did not have personal knowledge that Fratta and Farah engaged in any specific sexually deviant acts did not personally know (or know in any other accepted sense of the term) whether Fratta had ever told him that Farah had accused him of engaging in, or mentioned any, specific sexually deviant acts; and

iii.  The State knew or should have known that Ray Thomas did not have personal knowledge of Fratta becoming angry when he allegedly told Ray Thomas about Farah's deposition testimony about coprophagia, urophilia and erotic asphyxiation, because Ray Thomas did not have personal knowledge of Fratta ever mentioning Farah's deposition testimony that Fratta  made her shit in his mouth, pee on him and choke him while he masturbated.

iv.  Hence, the State's promise to show through Ray Thomas that Beeler's testimony was relevant and admissible because Ray Thomas would provide testimony showing that the explicit, specific types of sexual misconduct Beeler said Farah described at deposition were connected to a motive for murder was false and misleading.

**4.      Trial counsel's performance was deficient.**

Trial counsel failed to move the trial court for a voir dire of Ray Thomas to ascertain his personal knowledge either before Beeler testified or after Beeler testified but before Ray Thomas took the stand.  Furthermore, trial counsel failed to object pursuant to TRE 401 (relevancy), 403 (substantially more inflammatory), 602 (personal knowledge requirement), 804 (where witness available, past testimony cannot be introduced) or Due Process that Ray Thomas did not have personal knowledge even after Ray Thomas stated on the record that were he to testify honestly, he would have to say he could not recall Fratta talking about any specific deviant sexual acts, about anything Farah said at her December 1993 deposition, but just recalled nebulous, non-contextual comments by Fratta about  "some kind of sexual behavior that upset him."

Nor did trial counsel move to strike Beeler's testimony (*inter alia*, under TRE 401 or 403 and Due Process) after Ray Thomas testified that he honestly did not recall Fratta mention specific deviant sexual acts although Ray Thomas' actual testimony clearly showed that Beeler's testimony could not be rendered relevant through testimony the State had falsely assured the court Ray Thomas supposedly would supply.  Indeed counsel failed to cross-examine Ray Thomas regarding his memory and personal knowledge although it was clear that Ray Thomas would have to deny that he had any recollection or any personal knowledge of Fratta mentioning Farah's deposition statements about specific deviant sexual acts and Ray Thomas would therefore have to deny he had personal knowledge of Fratta growing angry while (allegedly) he told Ray Thomas that Farah had accused him of engaging in or described specific deviant sexual acts.

**5.     Failure to exclude testimony referring to specific sexually deviant acts and testimony of "sexual cruelty" was prejudicial.**

The introduction of such inflammatory statements implicating Fratta in grossly deviant sexual behavior that also involved sexual abuse and sexual assault against his wife violated Due Process.  However, trial counsel failed to lodge a Due Process objection.  Trial counsel also failed to object under Rule 804 of the Texas Rules of Evidence, which does not allow testimony of available witnesses, such as Ray Thomas, if they have no recollection, and therefore do not have personal knowledge (even after being prepared, as here) with prior statements.  Trial counsel failed to request a hearing outside presence of the jury in which the link-up witness, Ray Thomas, could be examined to assess his ability to recollect Fratta's alleged statements about Farah's revelation of their coprophagic conduct, failed to  investigate Ray Thomas before the retrial to ascertain whether he recollected  the alleged statements and failed to object when the State announced its witness could only testify to coprophagia, and not the other deviant practices introduced through Beeler (urinating on each other, choking Fratta while he masturbated), and failed to object when  it became clear that Ray Thomas, who was the only person who could supply the alleged motive of anger at Farah's disclosure of coprophagia, said he could not remember Fratta saying anything about having his wife shit in his mouth so he could eat it, but only recalled Fratta making a statement about "some kind of sexual behavior."

**6.     Harm done by Beeler's testimony was amplified by the Court's erroneous instruction to the jury.**

The key to why the limiting instruction commanding jurors not to consider Beeler's statements about what Farah said in deposition for the truth of the matter asserted

(discussed below) did not defuse harm is the fact that Beeler's testimony could not establish motive and was not meant to establish motive.  Yet the trial court **ordered** the jury to consider Beeler's testimony for precisely this purpose and trial counsel did not object.

As shown above, Beeler was called just to show allegations of sexual abuse (coprophagia, urophilia and erotic asphyxia) were made in Farah's December 1993 deposition.  The state had to show admissibility on grounds the allegations established motive through Ray Thomas, the State failed to do.  However, trial counsel failed to prevent the jury from considering Beeler's inflammatory repetition of Farah's deposition testimony and permitted the trial court to instruct the jury that they could consider the inflammatory deposition testimony that Fratta had Farah "defecate in his mouth, urinate on him, [and] choke him while he was masturbating" as motives for murder.

After the trial court ruled it would allow Beeler to repeat passages of Farah's inflammatory deposition testimony in front of the jury, trial counsel requested that the court instruct the jury that jurors could not consider the statements that Fratta had Farah "defecate in his mouth, urinate on him, choke him while he was masturbating" for the truth of the matter asserted.  The Court agreed, but **(1)** trial counsel failed to request this instruction before the jury heard this inflammatory testimony, and then **(2)** <u>failed to object when the Court gave a different instruction that greatly magnified the harmful impact of this inflammatory testimony.</u>  Without objection the trial court instructed the jury as follows:

> 17 THE COURT: **Ladies and gentlemen of the**
>
> **18 jury, the testimony of this witness on the last two**
>
> **19 questions was offered for the purposes of aiding you, if**

**20 it does aid you, in determining the motive**, if any.

21 MR. MCDONALD: And not offered for the

22 truth of the matter.

23 THE COURT: And it's not offered for the

24 truth of the matter asserted.

22 RR 119-120.

> **a.** **Testimony polluted the record with inflammatory evidence that Fratta was a deranged, sick pervert who cruelly and obscenely abused his wife.**

The State's concession that the allegations Farah made in her December 1993 deposition were naturally incendiary shows that a prejudicial impact was a certainty. Due Process and Rule 403 would obviously preclude the allegations that Fratta had Farah "defecate in his mouth, urinate on him, choke him while he was masturbating" unless they were highly relevant. Because of this, the lead prosecutor underscored their extremely inflammatory nature as proof that the allegations gave Fratta a motive to murder Farah. Given this understanding, voiced by the lead prosecutor, the State should be estopped from claiming the introduction of this testimony was not prejudicial.

> **b.** **Harm was amplified because the inflammatory testimony related to obscene sexual misconduct, sexual abuse and sexual assault was wrongfully introduced by prosecutors with the knowledge it was inadmissible and unsubstantiated as a motive.**

State had considerable evidence that what agitated Fratta was the prospects of financial hardship, including the prospects of paying child support, but not agitated by the chance that Farah would testify about his specific sexual perversions. Police interviewed

George Batten who told deputies that "Bob was upset about the divorce and he talked about his money situation and he thought Farah would be an unfit mother." [*See* exhibit notebook attached to Fratta's 11.071 Application].

Fratta's coworkers – Mike Melton, Steel Powers, Brian Bennett, Michael Niglieri, Marc Faber, and Jerry Parker – all told police that what upset Fratta were the financial difficulties he thought the divorce would cause him and loss of custody over his children. Mike Melton also advised Deputies that "that Fratta was very upset and resentful about his upcoming divorce. Melton said Fratta was always saying how Farah was better off than him." Melton said Fratta also complained about "paying for Farah's "Boob Job" on his credit cards and then she didn't pay him back." *Id.* (HCSO Reports at 221; *See* exhibit notebook attached to Fratta's 11.071 Application). Powers said he "frequently heard Fratta talking about the problems he was having with child custody. Powers said he "heard Fratta talking about how Farah was ruining him financially." Powers also heard Fratta express distress his child support was limiting his eligibility with other women and mentioned specifically that "he met a girl at the gym, … [but] he couldn't get involved with the girl because of the child custody case." *Id.* 222.

### 7. Failure to cross examine Ray Thomas and impeach the integrity of the State's case through cross and in closing argument prejudiced Fratta.

The importance of Ray Thomas' testimony that he honestly did not remember, even after reviewing his prior testimony, was unquestionably lost upon jurors. The only salient information that the State's interjection of fact followed by Ray Thomas' testimony that he could honestly recall Fratta mention specific deviant sexual acts was that Ray Thomas had

forgotten Fratta's recounting of, and angry response to, specific deviant sexual acts that Farah complained about in her 1994 deposition.  This impression on jurors was solidified, of course, by trial counsel's deficient agreement with the trial court's instructing jurors that they could consider testimony, especially including Beeler's, describing specific deviant sexual acts Farah said Fratta made her engage in as a motive for the murder.

With an effective cross, competent counsel would have been able to significantly reduce the harm caused by the introduction of inadmissible descriptions of specific deviant sexual acts and cast doubt on the integrity of the State's case.  Because Ray Thomas had testified on direct that he honestly could not remember (and, therefore, did not have personal knowledge of) Fratta's ever referencing specific deviant sexual acts,  a cross-examination aimed at demonstrating that Ray Thomas had no recollection, had no personal knowledge would have been straightforward and successful.  Trial counsel could have also demonstrated through cross-examination that the State had tried to prepare Ray Thomas to testify that he recalled Fratta's referencing specific deviant sexual acts, and could have also compelled Ray Thomas to admit that he told the State that he honestly could not testify to this.

Competent counsel, based on Ray Thomas' testimony on direct, as well as testimony pursuant to a competent cross examination, would have been able to make a meritorious motion to have the Court instruct the jury (i) to disregard Beeler's testimony about specific deviant sexual acts and cruel sexual conduct, (ii) to disregard Ray Thomas' testimony related to such acts, and (iii) to disregard the State's interjections of evidence of specific deviant sexual acts, about none of which Ray Thomas had any recollection or knowledge.

Furthermore, based on Ray Thomas' direct testimony, and after a reasonably effective cross, competent counsel would have been able to present a meritorious motion for a mistrial based on intentional prosecutorial misconduct that resulted in the wrongful interjection in a capital trial of lurid, inflammatory and prejudicial testimony that Fratta had engaged in cruel sexual behavior and had compelled Farah to engage in specific deviant sexual acts.

Closing argument would have further changed the entire picture of the case by bringing home to jurors that the State did not have a motive for the murder, knew that it did not, and, to fill this gap, had mislead the trial court and the jury by sponsoring testimony through Beeler and interjecting testimony related to specific sexual deviant acts through leading questions that the State knew in advance were inadmissible because critical link-up witness, Ray Thomas, had no recollection even when prepared with prior transcripts of Fratta ever mentioning such specific deviant sexual acts.

Argument and evidence that State had manipulated the court and the jury in order to interject a lurid, inflammatory motive would itself cast serious doubt on the integrity of the State's entire case, making it reasonably probable that at least one juror would have reasonable doubt that the State had enough legitimate proof of Fratta's guilt to justify a conviction for capital murder.  When coupled with evidence of other serious prosecutorial misconduct, such as that surrounding the testimony of key witness Mary Gipp, the probability that competent counsel could have raised a reasonable doubt in at least one juror that the State could prove its case against Fratta would easily surpass *Strickland*'s "reasonable probability" prejudice threshold. For one thing, trial counsel could have called

into question the authenticity and legitimacy of the blue sticky note on which Mary Gipp said she wrote down the serial number of the gun Prystash supposedly brought with him to her apartment on the night of the murder.    Competent trial counsel could have demonstrated, and argued in closing, that,

> (i)    the State had tried to deceive jurors with false and misleading statements that Gipp was given transaction immunity only from prosecution for a tampering with witness charge when, in reality, for any oral statements Gipp made, she was given use immunity effective against all charges, including capital charges; and

> (ii)    that the State had covered up the extent and nature of the deals for testimony offered to Gipp by making such deals through  Gipp's lawyer.

The foregoing two sets of facts alone would create substantial doubt about the veracity of Gipp's testimony regarding Prystash's alleged confession to her and, thereby, raised reasonable doubts that the State had legitimate evidence proving Fratta's guilt beyond a reasonable doubt. Furthermore, a reasonably competent attorney would have been able to make a well-founded case that Gipp had manufactured the blue sticky note with information passed to her directly from police or passed to her through her attorney.

### 8.    Pursuant to *Trevino v. Thaler*, the foregoing trial IAC allegations are not procedurally defaulted and not subject to dismissal pursuant to Title 28 U.S.C. § 2254(d) or (e).

An ineffectiveness of trial counsel claim can be raised for the first time in the federal pleading, as opposed to earlier in a state proceeding, provided that the following four conditions or elements are met:

142

(1) the claim of "ineffective assistance of trial counsel" is a "substantial" claim; (2) the "cause" consiste[s] of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

*Trevino,* 133 S.Ct. at 1913,  *citing Martinez v. Ryan*, 132 S.Ct. 1309, 1318–1319 (2012).

As a matter of law, conditions (3) and (4) are satisfied in Texas cases.  *See Trevino*, 133 S. Ct. at 1915.  Conditions (1) and (2) "cause" are also satisfied in Fratta's case as follows:

### a.    State habeas counsel was ineffective for not raising the foregoing IAC claim.

State habeas counsel only raised punishment phase claims, but not a single guilt-innocence claim. The IAC guilt innocence claims raised here would not have detracted in the least from state habeas counsel's punishment phase efforts.  State habeas therefore failed to investigate or litigate the IAC claim above without having a strategic reason or even a discernable reason not to.

### b.    Fratta's claims are substantial.

For reasons stated in the foregoing briefing on the merits, the IAC claims are substantial for purposes of *Trevino v. Thaler.*

## CLAIM THIRTEEN

**TRIAL COUNSEL FAILED TO PREVENT THE STATE FROM ENCOURAGING AT LEAST ONE ACCEPTED JUROR FROM PRESUPPOSING THAT THE STATE HAD A STRONGER CASE THAN THE CASE IT WAS ALLOWED TO PUT ON.**

In *Shipley v. State*, 790 S.W.2d 604 (Tex.Crim.App. 1990), the TCCA held that control of the voir dire examination is within the sound discretion of the trial judge and that the trial judge is given wide discretion in this area.  However, in *Atkins v. State*, 951 S.W.2d 787, 790 (Tex. Crim. App. 1997)(en banc), the TCCA clarified that "a trial judge must determine if the hypothetical is used to explain the law or to commit the venire to specific facts of the case, and must preclude parties from using voir dire examples for any other purpose than to explain the law. *Id.*  The TCCA then conclude with the following strong statement:  "To find that the question was used for anything other than to explain the law would be an abuse of discretion and would constitute reversible error." *Id.*

Exchanges with accepted venire members show that during *voir dire*, the State asked questions that were designed to encourage jurors to impress on jurors there was evidence proving Fratta guilty that the State could not put on.

1 A. No, ma'am.

2 Q. Okay. All right. In my trial, I got that

3 Fifth Amendment privilege, but so does Kari and so does

4 Bill. The State can force Kari to testify against him

5 and the State can't force Bill to testify against me.

6 The reason being, if they testify truthfully, they would

144

7 naturally incriminate themselves. You see how that

8 works?

9 A. Uh-huh (affirmative).

10 Q. So, the folks who have the best information

11 about what our plan or agreement was can't be force to

12 testify. So, the State then has to look for other ways

13 to prove that agreement. Okay? And what the State --

14 what kind of evidence would you think the State might

15 put on?

16 A. As far as what?

13 RR 198.

Prosecutor's questions were not needed to explain the law.  If anything they distorted the law, suggesting that while the juror could not draw adverse inferences from the defendant's silence, the juror could draw inferences supportive of the State's cases because co-defendants exercised their Fifth Amendment rights.  Trial counsel failure to protect Fratta from error harmful enough to require reversal, *see Atkins, supra*, resulted in prejudice under *Strickland*.

## CLAIM FOURTEEN

**IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHTS, TRIAL COUNSEL FAILED TO MAKE A PROPER DUE PROCESS OBJECTIONS TO POLICE TESTIMONY AND FALSE AND MISLEADING CLOSING ARGUMENT INTIMATING THAT GUIDRY HAD BEEN AT DAVIS FOOD CITY NEAR FARAH'S HOME PROXIMATE TO THE MURDER.**

Officers testified that Guidry was with them when they went to Food City to check for a pay phone. 29 RR 26. Phone records police obtained indicated the Food City pay phone number had been dialed November 9, 1994, proximate to the murder. 29 RR 32. However, Guidry was taken to Food City by police **four months after** the murder. Guidry's presence with police under these circumstances was irrelevant, but inflammatory. It also violated Due Process suggesting that Guidry had something to do with the phone calls and that police had discovered this. It also place Guidry near the murder scene. But the State did not have admissible evidence showing that any of this was the case.

In short, the State manufactured evidence against Fratta. However, trial counsel failed to object that the testimony was misleading and intended to mislead the jurors in violation of Fratta's due process rights. *See Giglio v. United States,* 405 U.S. 150 (1972). Trial counsel also failed to object on similar Due Process grounds to the State's reliance on this evidence during closing argument, 30 RR 139, although this violated Fratta's due process rights.

The lengths to which the prosecutor went to interject manufactured evidence placing Guidry near the crime scene was extraordinary. The prosecutor ignored sustained state law objections until trial counsel gave up,

LEAD PROSECUTOR: …..You know that Howard Guidry went out with the police in March of 1995. Howard Guidry showed them the --

MS. KING: Objection, Your Honor. That's improper argument. That is outside the evidence.

THE COURT: Sustained as to the form of the statement, Ms. Bradley.

MS. KING: Your Honor, I'd ask that jury be instructed to disregard.

THE COURT: The jury will disregard the last statement of the prosecutor.

MS. KING: I'd ask for a mistrial.

THE COURT: Denied.

MS. BRADLEY: In March of 1995, Howard Guidry went to the Food City and showed the pay phone to the officers there --

MS. KING: Objection, Your Honor, that's outside the evidence.

THE COURT: Sustained.

MS. BRADLEY: The officers --

MS. KING: I'd ask the jury to disregard.

THE COURT: The jury will disregard the

last statement of the prosecutor.

MS. KING: And I'd ask for a mistrial.

THE COURT: Denied.

30 RR 139.

Undaunted by the unmistakable message that interjecting allegations placing Guidry at Food City seconds away from the scene was impermissible, the prosecutor forged ahead in conscious disregard of the trial court's rulings and Guidry's rights.

MS. BRADLEY: In March of 1995, Howard Guidry went to the Food City along with the officers. While the officers were there, they looked at the phone number on the pay phone outside the Food City. They documented that phone number in their reports. Then they went back to the house where Farah Fratta was murdered and they went inside the garage where Farah Fratta was murdered. The evidence shows, obviously, that the person who killed Farah Fratta didn't have access to a phone and, clearly, didn't have a car. The person who killed Farah Fratta waited for Farah Fratta to come home that night, just as the defendant had planned it.

30 RR 139-140.

This time trial counsel failed to make a contemporaneous objection, as required by Texas law, on Due Process, Sixth Amendment, or any grounds, to the prosecutor's use of post-convicting events to create the misleading impression that the evidence showed Guidry was near the crime scene placing calls to the Food City pay phone in order to effect a getaway.  However, the State did not introduce evidence developed at the time of the crime, as opposed to manufactured afterwards, demonstrating any of these allegations and implications in the passage at 30 RR 139-140 set forth above.

Trial counsel's failure to complain that the State was violating Due Process by intentionally and repeatedly misleading the jury with fact created post-crime harmed Fratta.  Without this misuse of post-crime facts to place Guidry near the crime scene, connect him to phone call made proximate to the crime and, and involve him in the assailants' flight from the scene, the State could not prove essential elements of its case at all, let alone beyond a reasonable doubt.  The State had to show that Guidry shot Farah in order to prove any theory of murder, capital or lesser included, set forth in the jury charge.  However, the State simply did not have sufficient evidence to show Guidry was at or near the crime scene around the time Farah was shot.  No one saw Guidry leave or return with Prystash the night of the murder.  Gipp was not allowed to testify that Prystash told her anything implicating Guidry in the offense.  The only evidence was the recovery from Guidry of a gun once owned by Fratta (which could not be matched to the bullets that killed the victim) five months after the murder.

Moreover, Gipp's testimony undercut completely the incriminating effect of this attenuated evidence regarding he gun's recovery.  Gipp testified she saw Prystash return to

her apartment the night of the murder alone with the gun the State claims was used to kill Farah.  Gipp did not testify that Prystash said Guidry was with him or used the gun to kill Farah. Instead, she testified that two days **after** the murder Prystash gave Guidry the gun to throw in a "body of water."   This is the first and only time that Guidry was linked to the gun until March of 2000 when, upon being arrested for an unrelated crime, he was found in possession of the gun.

A reasonable jury could not have convicted Fratta of capital murder absent the State's intentionally misleading use of facts generated by police after the crime. Had counsel prevented the State from interjecting these post-crime facts involving Guidry at Food City by objecting on proper due process grounds, it is reasonably probable that the jury would not have convicted Fratta of capital murder.

## CLAIM FIFTEEN

### IN VIOLATION OF FRATTA'S SIXTH AMENDMENT RIGHT TO COUNSEL TRIAL COUNSEL FAILED TO OBJECT ON DUE PROCESS AND SIXTH AMENDMENT GROUNDS TO THE PROSECUTOR'S REPEATED INTERJECTION OF FACTS OUTSIDE THE RECORD

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairnes*s. Id.* Improper references to facts outside the record also implicate specific constitutional rights. Implicit in the guarantees of the Sixth Amendment is the right to have the evidence presented in a

timely manner so that the criminal defendant has an opportunity to refuse it. The prosecutor's comments on matters not in evidence also implicate basic concepts of fundamental fairness. *See Miller v. State of North Carolina*, 583 F.2d 701, 706 (4th Cir. 1978).   However, in order to preserve constitutional error trial counsel cannot simply complain of improper arguments or interjections of facts outside the record. The Texas Court of Appeals' holdings put the defense bar on notice that an objection "of this type is non-constitutional in nature." *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000).

The prosecutor intentionally interjected extra record facts in her closing argument. 30 RR 5 et seq.  On several occasions, trial counsel objected successfully, on common law grounds, that the State, in closing argument, was straying beyond the record.  However, trial counsel failed to request to approach the bench and object that the State's action was intentional, inflammatory and misleading in violation of Fratta's Due Process rights. Further, counsel should have objected that the testimony was uncrossed testimony violating Fratta's Sixth Amendment rights. The unconstitutional prosecutorial conduct that trial counsel failed to prevent was pervasive and purposeful and, therefore, prejudicial to Fratta.

### A.   Trial counsel failed to object on proper constitutional grounds to the following interjections or extra-record allegations.

After recounting Podhorsky's testimony that Fratta queried him about having Farah killed, the State argued that,

- And shortly before [Farah's] murder, [Fratta] is seen at the racquet ball courts, out in the parking lot at the Woodlands gym talking to Joe Prystash. Probably having

the same conversation with Joe Prystash that he had with
Jimmy Podhorsky.

30 RR 127.

But no one testified to the content of this conversation with Prystash.

The State argued further that

- That "November the 9th of 1994, as Bob Fratta
  is picking up his children and taking them to Wyatt's
  Cafeteria, he is finalizing the plans for his wife's
  murder. And he gets a phone call from Joe Prystash on
  that cell phone in the Wyatt's Cafeteria.

30 RR 128

The Court sustained the defense's objection that this argument was outside the record,

since the State failed to identify who placed the call to Fratta.  However, the State just

ignored the Court's admonitions and argued,

> On November 9, 1994, while Fratta's "sitting there with his son, Bradley Fratta,
> now Bradley Baquer, and Daniel and Amber eating dinner, there is a phone call,
> there is a conversation, and the plans for Farah Fratta's murder are being
> finalized."

30 RR 127

However, there was no testimony about the content of the phone call either, and the Court

again had to instruct the jury to disregard.

Undeterred, the State pieced together an incriminating sequence of events

culminating in the murder from jury arguments that Court had ruled moments before was

impermissible,

> there is a call from the cell phone to Bob Fratta's house and then there's the call to Wyatt's Cafeteria. And then after that call to Wyatt's Cafeteria, it's time to call Farah Fratta's house to find out whether or not she's home. And after that, what do we know happened based on the evidence? We know that Howard Guidry and Joe Prystash went to Farah Fratta's house.

*Id*.

To circumvent the Court's exclusion of hearsay, State attributed, without any foundation for doing so, **foreknowledge** to Gipp of a plan to kill Farah rather than claiming that Gipp heard or learned of plans to kill Farah,

> When she's walking up, Mary Gipp already knows the murder is happening tonight. The murder is happening tonight, because Bob Fratta is going to have the kids. And that was important to Bob Fratta, to make sure that he had the kids --

*Id*.

This, too, drew an objection, that he Court sustained, but State blew right through the Court's ruling to interject the improper argument that,

> And Mary Gipp told you that on November 9th of 1994 Howard Guidry and Joseph Prystash were going to kill Farah Fratta

20 RR 132

Again, the Court's ruling that this was outside the record had absolutely no effect.  The State immediately repeated the exact improper argument, and the Court, perhaps out of fatigue, overruled the defense's objections. *Id*.

### B.    Counsel failed to object at all to false and misleading testimony.

Interjecting false and misleading factual assertions violates *Giglio v. United States*, 405 U.S. 150, 154-55 (1972), and requires reversal unless the Government shows beyond

a reasonable doubt that there was no appreciable effect on the jury's verdict. *Darden v. Wainwright*, 477 U.S. 168 (1986), also protects defendants against pervasive government misconduct during closing argument that jeopardizes fundamentally fair trial.  Prejudicial statements made during closing argument "militate in favor of reversal" because they are "the last words spoken to the jury by the trial attorneys." *See United States v. Manning*, 23 F.3d 570, 575 (1st Cir. 1994).

The State interjected the false allegation that Ray Thomas testified that Fratta told him "how mad he was about" Farah's allegations of sexual misconduct, and then directed the jury that "[y]ou can consider that as part of the motive," for the killing. 30 RR 45 (closing argument).  Thomas testified that he could not remember Fratta's deportment or verbal expressions.  He absolutely did <u>not</u> testify that Fratta told him what the State argued, that is why the State vainly attempted to get Thomas to say that he remembered Fratta acting angrily.  However, trial counsel failed to object to, so the State drummed on this misleading beat.

> And you know the fact that she was saying those things, not only did it make him mad, it was going to embarrass him, and it came to the point where they were actually going to go through a custody trial, she was going to sit up on the witness stand, she was going to raise her right hand to take an oath, and she was going to sit through a courtroom full of people just like we have here now, and she was going to tell all of those disgusting things. And that's what got him so upset. **And that's where the motive starts**.

*Id.*

Trial counsel did not have a strategic reason for permitting the State's misleading inventions of a motive.  Permitting the State to focus the jury on inflammatory evidence as the motive for the crime was highly prejudicial.  In conjunction with the State's other, pervasive misconduct in closing this error justified habeas relief.

### B. Counsel failed to object to the State's insinuation that the State had incriminating evidence that the jury was not allowed to hear.

The State's evidence that Fratta, Prystash or Guidry agreed to kill Farah for remuneration was sorely lacking.  Realizing the vulnerability of its case, the State improperly anticipated that "somebody over here on this side of the table is going to get up and start arguing and telling you [that] [t]he State didn't prove the agreement," and then improperly argued that,

> I mean, don't we all agree that the best evidence [of an agreement] would come from the mouth of Joseph Prystash or Howard Guidry? But we don't have that luxury. And neither do you.

*Id.* 47-48.

Trial counsel again failed to object, despite authority resoundingly condemning the State's endeavor to convict through incriminating innuendo.

### C. Counsel failed to object to the State's improper attribution of incriminating thoughts and beliefs to Fratta

The State testified as to Fratta's unexpressed thoughts for which it had no evidence,

> And don't you know as he's
> sitting there in the pew of St. Mary's Catholic Church,
> he is just waiting: Is she dead yet? Is she dead yet?

Have they done it?

30 RR 28.

And the defendant has to be thinking as he's sitting in St. Mary's Catholic Church he has finally, finally won.   He's finally gotten the upper hand.

30 RR 136.

No objection was made to these highly incriminating statements.  The idea that the prosecution is making reasonable inferences from the evidence cannot be entertained.  The attribution of occurrent thoughts was just as foundationless as the jury argument that Fratta sat in Church muttering similar homicidal statements would have been.  A strategic reason for not objecting cannot be fathomed.  The State attribution of homicidal thoughts to Fratta around the time the killing took place was obviously prejudicial. The cumulative effect of improper jury argument requires relief from this court.

## CLAIM SIXTEEN

**TRIAL COUNSEL'S CUMULATIVE ERRORS DEPRIVED FRATTA OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL**

The arguments and evidence that trial counsel's representation was deficient under *Strickland*, which are set forth in the foregoing individual guilt innocence IAC claims, are hereby incorporated by reference, as are the corresponding arguments in each individual guilt-innocence IAC claim that trial counsel's deficient performance was prejudicial under *Strickland*.   While each claim is sufficient to demonstrate IAC, the proper *Strickland* analysis requires reviewing courts to calculate the cumulative impact of trial counsel's

errors.   In this case, the cumulative impact clearly satisfies *Strickland v. Washington*'s deficiency and prejudice prongs.  This Court should therefore order relief granted.

In *Smith* v. *Texas,* 311 U.S. 128 (1940), the Supreme Court said this about a Harris County grand jury ... " ... there had been no negroes on any of the grand juries in 1938, the year petitioner was indicted, that there had been none on any of the grand juries in 1937, that the service of negroes by years had been: 1931,1; 1932, 2; 1933, 1; 1934, 1; 1935, none; 1936,1; 1937, none; 1938, none." This was in a county where blacks made up 20% of the populace and 10% of the poll tax payers [voters].  It IS now more than seventy years later, **little has** changed.

Mr. Fratta is a white male.  [*See* exhibit notebook attached to Fratta's 11.071 Application.]   However, the equal protection clause protects the right of persons to be indicted by a fair representation of their community, i.e., a representative cross section. *See Castaneda v. Partida,* 430 U.S. 482 (1977); *see also Vasquez v. Hillery* 474 U.S. 254 (1986).  Mr. Fratta does not need to be in a protected class to invoke his right to be indicted by a fair representation of his community, nor does he need to be a member of that class to protest an exclusion from grand jury service.

Texas and Harris County have a long history of discrimination against blacks, and Latinos. *See Hernandez v. Texas,* 347 U.S. 475 (1954).  Texas uses the "key man" system, a system essentially designed to permit partiality.  This system allows those selected by a state court district judge to select those who will serve as potential grand jurors. (*See Castaneda* v. *Partida, id.*).  *See also* Texas Code of Criminal Procedure, Article 19.  Harris County uses "grand jury commissioners" who select candidates from a "broad cross section

of the community" per Article 19 from the Code of Criminal Procedure.  From this panel come the actual grand jurors who vote upon indictments.  Census data indicate that the Hispanic adult citizen population in Harris County is approximately 21%.  Per a recent University of Houston study [*see* exhibit notebook attached to Fratta's 11.071 Application], the rate of nomination for Hispanics by Grand Jury commissioners was actually 11.5%, and the actual selection rate for service was 8.85%. [*see* exhibit notebook attached to Fratta's 11.071 Application ("THE IMPLICATIONS OF A KEY MAN SYSTEM FOR SELECTING A GRAND JURY: AN EXPLORATORY STUDY" in 3 S.W. JOUR. C.J. 1, 2006.)]

The Supreme Court has recognized the potential discriminatory nature of the key man system. *See Vasquez v. Hillery,* 474 U.S. 254 (1986); *also see Casteneda v. Partida, id.*  Mr. Fratta was indicted by a grand jury using these same suspect methods, and it excluded blacks, Latinos, and women to a degree unacceptable under the doctrine of equal protection.  Per the list of grand jurors attached to Fratta's 11.071 Application, the amount of Hispanic surnames falls below their share of the population based upon census data.  Also, per census data on women, the gender discrimination was equally on a par with that against Hispanics.  In terms of their roughly 19% of the population of Harris County, blacks were likewise excluded from both the grand jury that indicted Mr. Fratta and the grand jury for the rough year which served in Harris County during that period.

*Casteneda* permits analysis of either grand jury which indicted an individual or historical patterns of discrimination to be used to challenge a grand jury's composition.  A grand jury challenge is thus brought by the Applicant here on these grounds.

158

Discrimination in any form in our justice system is intolerable. *See Batson* v. *Kentucky,* 476 U.S. 79 (J 986).  Discrimination in the grand jury system affects every other part in our criminal justice system since felony convictions flow from grand jury indictments. *Rideau* v. *Louisiana,* 373 U.S. 723 (1963).  This conviction, since it is based upon an indictment obtained in a discriminatory grand jury process, is thus null and void, and relief should be granted.

## PART IV

## PUNISHMENT PHASE CLAIMS FOR RELIEF

### CLAIM SEVENTEEN

### FRATTA WAS DENIED DUE PROCESS OF LAW DUE TO THE STRUCTURAL CONFLICT OF INTEREST AT THE PUNISHMENT PHASE CAUSED BY STATE MISCONDUCT.

The Sixth Amendment, through the Fourteenth Amendment to the United States Constitution, provides that in all criminal prosecutions, the accused shall have the right to effective assistance of counsel.  The Texas Constitution, Article I, Section 10, also guarantees a criminal defendant the right to the effective assistance of counsel.  The sentencing stage of trial is a critical stage in which effective representation of counsel is required. *See Gardner* v. *Florida,* 430 U.S. 349 (1977).  Where a conflict of interest burdens counsel, the defendant is deprived of his Sixth Amendment right to counsel the same as if counsel failed to appear at trial. *Cronic,* 466 U.S. 648 at 653, *see also Bonin* v. *California,* 494 U.S. 1039 (1990).  A constitutional violation may occur if a conflict arises after conviction but before sentencing. *Lopez* v. *Scully,* 58 F.3d 38, 40 (2nd Cir. 1995).

Where no actual assistance of counsel is provided the guarantee made by the Constitution is violated. *Cronic,* 466 U.S. 648 at 653. To hold otherwise "could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel. The Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment." *Id.* at 655, *citing Avery* v. *Alabama,* 308 U.S. 444, 446 (1940) (footnotes omitted). Finally, it has also been noted that if counsel fails to subject the State's case to meaningful adversarial testing, the Sixth Amendment has been violated making the adversarial process itself "presumptively unreliable". *Id.* "Circumstances of that magnitude may be present on some occasions when, although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659-60.

In the course of deciding this question, the Court identified three situations implicating the right to counsel that involved circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658-659. First and "[m]ost obvious" was the "complete denial of counsel." *Id.* at 659. A trial is presumptively unfair where an accused is denied the presence of counsel at "a critical stage," *id.* Second, it is clear that a similar presumption is warranted if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* Finally, the third situation would be a case where counsel is asked to render effective assistance under circumstances where competent counsel very likely could not. *Id. See Powell v. Alabama,*

287 U.S. 45, 53 (1932).  If any of the foregoing situations are presented, a defendant need

not show that prejudice or that the proceedings were affected.  *Id.* at 659-662; *See also Bell*

*v. Cone,* 535 U.S. 685, 695-96 (2002).

A.      **Structural Conflict Created by State Misconduct**

A structural conflict was created between trial counsel and Fratta during the

punishment phase of trial when the State made it known they were investigating criminal

accusations against trial counsel, King.  Since trial counsel was no longer able to effectively

represent Fratta and instead was forced to represent her own interests in the face of criminal

charges, an inherent conflict of interest affected the fairness of the proceedings.  Trial

counsel's focus on defending herself required that she place her attention somewhere except

upon the punishment phase of Fratta's trial.  The media attention garnered by the attack

forced King to go on the defensive in the public as well as in the courtroom.  Since King

was scheduled to prepare the entire punishment case for mitigation, the structural conflict

resulted in harm to Fratta.

The punishment phase of Petitioner's trial was scheduled to begin on Tuesday May

26, 2010.  Prior to trial, all parties agreed to break the week before punishment over the

Memorial Day holiday.  After the jury reached a guilty verdict, all parties took the week

off in anticipation of beginning punishment on May 26.  On Saturday night, just two days

before trial was to resume, co-counsel McDonald received a call from prosecutor Magness.

McDonald recalled that the prosecution informed him King was being investigated for

criminal allegations of supplying Fratta with contraband, at least one partially nude

photograph of a woman, while he was in custody at the Harris County Jail.  The allegation

was that King, assisted by Fratta, smuggled the partially nude photo into the jail, which is a criminal offense and a jail rules violation.  Since trial counsel was no longer able to effectively represent Fratta and instead was forced to represent her own interests in the face of criminal charges, an inherent conflict of interest affected the fairness of the proceedings. Trial counsel's focus on defending herself required that she place her attention somewhere except upon the punishment phase of Fratta's trial.  The HCDA also released information about the investigation of Fratta's lead counsel to the media, which forced King to defend her reputation in the public.

    **B.**    **The Fact that King Was Designated to Prepare the Mitigation Evidence at Fratta's Punishment Trial Makes Clear that the Structural Conflict Resulted in Harm to Fratta.**

The trial court was informed, on more than one occasion, that a conflict existed and persisted into the punishment phase of trial.  King requested a mistrial in open court at her first opportunity to do so, on Tuesday, May 26, when court resumed.  At that time, the following exchange occurred on the record:

> MS. KING: ... And one is, my assistant does what I ask her to do. She would have no criminal intent, which has to be proven in any case. She does what I ask her to do. I don't ask her to do anything that's a crime.
>
>                     ***
>
> To look at this proceeding from the prosecution's standpoint, that someone might be looking at criminal liability, is extremely intimidating. At this point, I'm going to ask for a mistrial. I think that to intimidate her lawyer -- I mean, Mr. Fratta's lawyer, me, Ms. King -- because r felt very intimidated on Monday when -- I guess, May the 25th, when I was at his office, that now I was being looked at like I had done something wrong in looking at photographs or photographs that had been sent for the purpose of trying to

help my client or to try to render him effective assistance of
counsel, as the Sixth Amendment guarantees.

***

On Monday, I spent hours trying to understand what was
going on and to try to defend myself, while I was supposed to
be spending that time trying to defend Mr. Fratta. And
answering a lot of the questions that the State asked me
yesterday, I spent so much time Monday trying to figure out
what happened with these photographs.

***

I've spent so much time on that. And even now, I just think
it's extremely unfair, I think it's -- I think it violates Mr.
Fratta's constitutional rights and I'd ask for a mistrial and
asked that the prosecutors give the next group of lawyers the
respect that, hopefully, the lawyers are giving them, because I
would not accuse them of anything like that or their
assistants, even though I have seen them, you know, talking
to witnesses in a way that I didn't think was appropriate.

***

I understand that, in the heat of battle, but to infer that there is
-- this is a crime -- because I think Mr. McDonald is just
being too nice, he is very congenial, but the way he
represented it to me on Monday was that: They might file
charges on you. Not that they said it, but that's just the
impression that he wanted me to be aware of. I mean, the
position that puts me in is just unbelievable, because I would
never do anything that I knew or thought was illegal.

33 RR 29-31.

***

THE COURT: '" but I'm also aware that Ms. Magness is
absolutely correct, that this matter is now being looked at by
the Sheriff's department and there are other entities that are
involved in looking at this. And so, not suggesting for one
second that Ms. Anthony could be prosecuted, but out of an
abundance of caution, I think it was prudent that Ms. Anthony
not make any statement at this point.

33 RR 36-37.

163

In *Cronic,* the Supreme Court determined that ineffective assistance of counsel claims should be examined on the actual performance of counsel at trial, and that reviewing courts should not make a determination of fairness based solely on the surrounding circumstances. *Id.* at 661. The case now presented is one that lends itself to both the second and third criteria set out in *Cronic,* where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing and also where counsel is asked to render effective assistance under circumstances where competent counsel very likely could not. *Id.* at 659; *see also Powell* v. *Alabama,* 287 U.S. 45, 53 (1932).

Here, the State's misconduct violated Fratta's right to due process when it deliberately made public an investigation of alleged criminal misconduct by his lead trial counsel just before the punishment phase of trial was to begin. The *Cronic* factors relevant to this Court's inquiry show in no uncertain terms that a structural conflict created by the prosecution resulted in a less than fair trial. Here, the period of time under which counsel had to act is a significant factor that falls on the Petitioner's side of the ledger.

Trial counsel makes clear that the conflict was initiated just days before trial, and because King was unavailable until just one day before punishment, she was not advised of the allegations against her until the day before punishment was scheduled to begin. Although King might have had sufficient time to prepare, she was effectively unavailable for the punishment phase.

That she was unavailable for all purposes is evidenced by her asking McDonald to take over punishment, her notice to the trial court that she was unable to participate in punishment, that she asked the trial court for a mistrial, and that she left the courtroom

many times during the punishment stage, at one time for a significant period.  Further evidence of King's inability to function as Sixth Amendment counsel can be confirmed by the numerous allegations of deficient conduct alleged *infra* and the numerous instances where there was a total lack of preparation, presentation and investigation of the punishment witnesses.  There is no evidence in the record that she assisted McDonald in the preparation or presentation of any punishment witness.

From this posture, this Court must turn to the time McDonald had to prepare for the punishment phase, which was essentially *one day* after he learned that King was no longer functioning as conflict-free counsel for Fratta.  There were only five (5) witnesses presented during punishment phase; of those, two were custodians of record and one was there under State subpoena. 33 RR 132.  Of these witnesses, one was an expert that required significant preparation prior to his testimony, never conducted by McDonald.  As discussed, *supra,* Dr. Sorenson, the only witness called to rebut the State's evidence that Fratta was a future danger, sat in the hallway of the courthouse and was *never called to testify at punishment.*  Dr. Sorenson was never called even though he had planned to testify, was never told he would not testify and created a power-point presentation to assist jurors with the factors considered in reaching his conclusion that Fratta was not a future danger. (*See* exhibit notebook attached to Fratta's 11.071 Application.)  King was scheduled to prepare this witness but due to the conflict that was created, had no time to do so prior to his testimony.

For all the foregoing reasons, this case presents in compelling terms a unique situation where a structural conflict existed between trial counsel and the client that resulted

in a less than fair trial.  While *Cronic* makes clear this Court should not infer this conclusion from the surrounding circumstances, it is equally clear that no such inference is required here because the record has ample support for the factors identified by the Supreme Court in weighing the fairness of the trial.  Here, both were experienced trial attorneys; however, the State's misconduct disrupted their ability to provide Fratta with effective assistance of counsel.

This case was a high profile, capital murder case that had previously been tried to a death verdict.  Of importance is how closely this case was watched on re-trial by everyone in the community.  The case garnered strong media attention.  Two of the best and most experienced prosecutors were assigned, and it included a defendant that was openly hated by the community.  Finally, it appears from the record that while his attorneys had some access to the witnesses, the short time period under which McDonald had to work would not have permitted him to have any meaningful preparation with them after he was given notice that he would take over the punishment phase.

For all the foregoing reasons, it is clear that a structural conflict was created by the prosecutor's misconduct in making the decision to make criminal allegations against Fratta's lead counsel, and her young assistant, at a time when King was charged with the duty to her client and her client alone.  As a result of the accusations, and as recounted by King, she was put in the position to take to her own defense, leaving Fratta to fend for himself.  [*See* King's affidavit, originally attached to Fratta's Motion for New Trial.]  In this situation, it cannot be doubted that although counsel was present, Fratta was left without the Sixth Amendment Counsel as was contemplated by the United States

Constitution.  Where a conflict of interest burdens counsel, the defendant is deprived of his Sixth Amendment right to counsel the same as if counsel failed to appear at trial. *See Bonin* v. *California,* 494 U.S. 1039 (1990).  Where no actual assistance of counsel is provided, the guarantees made by the Constitution are violated. *United States* v. *Cronic,* 466 U.S. 648, 653 (1984).  Since Fratta had no actual assistance of counsel due to a conflict created by State action, he was denied his Sixth Amendment right to effective assistance of counsel.

<u>**CLAIM EIGHTEEN**</u>

**FRATTA WAS DENIED SIXTH AMENDMENT RIGHT TO COUNSEL DUE TO AN ACTUAL CONFLICT OF INTEREST AT THE PUNISHMENT PHASE.**

In *Cuyler,* the Supreme Court set out a different standard to analyze actual conflicts of interest that adversely affect the lawyer's performance at trial. *Cuyler* v. *Sullivan,* 446 U.S. 335, 350 (1980).  *Cuyler* is the correct standard to analyze an actual conflict of interest at trial that ultimately affects a defendant's right to Sixth Amendment counsel.  The *Cuyler* Court held that "[i]n order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Id.*  "In other words, the appellant must show that an actual conflict of interest existed and that trial counsel actually acted on behalf of those other interests during the trial." *Acosta* v. *State,* 233 S.W.3d 349, 355 (Tex. Crim. App. 2007).  "An 'actual conflict of interest' exists if counsel is required to make a choice between advancing his client's interests in a fair trial or advancing 'other interests' to the detriment of his client's

interests. *Id., citing Monreal v. State,* 947 S.W.2d 559, Tex.Cr.App. 1997).  Such 'other interests' can include counsel's personal interests." *Id.*

As set out in the argument and authorities *supra,* King had an actual conflict of interest with Fratta when the State made criminal accusations against her prior to the punishment stage of trial.  Since McDonald was put in a position to defend his co-counsel and her assistant, there was no one left to defend the rights of Fratta or prepare for the punishment phase of his capital murder trial.  This is exactly the type of scenario contemplated by *Cuyler* and *Acosta.*  For this reason, Fratta was denied the effective assistance of counsel by an actual conflict of interest at the punishment phase of trial when his attorney was required to defend herself and not her client.

The State had no need to reveal the investigation or accusations just days before the punishment phase of trial was scheduled to begin. The personal animosity between the lawyers had risen to a level where this act was either an attempt to impugn Fratta in front of the jury or a foolish attempt to attack the reputations of trial counsel with the unexpected destruction of his team's ability to fight for him at punishment. No matter the purpose of the misconduct by the State, the result was the same; an unfair trial that requires reversal. That this is a capital murder case where Fratta ultimately received the death penalty cannot be underestimated when considering the rights that were affected. As emphasized by the Supreme Court, *supra,* "(l)awyers in criminal cases "are necessities, not luxuries." *Cronic,* 466 U.S. at 653.

In the alternative, should this Court determine that prejudice must be shown under *Strickland,* Fratta incorporates by reference the following argument to grounds one and

two.  The "prejudice" prong of *Strickland* requires this Court to determine whether trial counsel's deficient conduct was sufficient to undermine its confidence in the jury's punishment verdict, that is, whether there is a reasonable probability that, but for the objectively deficient conduct, the result of the punishment stage would have been different. *Strickland v. Washington,* 466 U.S. at 694; *Kyles v. Whitley,* 514 U.S. at 430.   In determining if Fratta has met this burden, this Court cannot require him to show he would have received a lesser sentence but for trial counsel's errors. *Everage v. State,* 893 S.W.2d 219, 222 (Tex. App. - Houston [1st Dist.], 1995).  The prejudice Fratta must demonstrate is by less than a preponderance of the evidence.

The *Strickland* prejudice prong can be satisfied on the basis of a single error or numerous errors on trial counsel 's part in the punishment stage, either of which can result in relief. *See Menefee v. State,* 175 S.W.3d 500, 507 (Tex. App. Beaumont, 2005)(failure to object to invalid enhancement allegation); *Oliva v. State,* 942 S.W.2d at 733-34 (failure to object to State's final argument that defendant had not shown any remorse or regret for what he had done).  If the prejudicial effect of any or all of counsel's objectively deficient conduct is sufficient to undermine this Court's confidence in the outcome of the punishment stage, Fratta must be given a new punishment hearing. *See Kyles* v. *Whitley,* 514 U.S. at 441.

Here, trial counsel's conflict of interest with Fratta caused a breakdown in the adversarial system of justice in the punishment phase of his capital murder trial.  First and foremost in evaluating this claim is the prosecution's decision to accuse lead counsel King of criminal charges.  She was the person charged with the responsibility to handle the

punishment phase of Fratta's trial.  King did not actually find out about the accusations until the day before punishment began.

King informed the trial court that she spent the rest of that afternoon, the day before punishment, *not preparing* for Fratta's punishment trial but preparing *her* defense to the allegations lodged by the State actors.  Second, the State's further action to release these accusations of criminal misconduct alleged against lead counsel King to the media prior to the start of Fratta's punishment phase resulted in harm to Fratta.  The record is clear that McDonald did not believe in mitigation and did not have time to prepare for the punishment phase.

It is also clear that these allegations had a significant effect on King's ability to defend Fratta in the face of these allegations.  This fact is made clear by her request for a mistrial, her statement to the trial court that she was required to defend herself and could not also protect Fratta's interests, and finally the myriad of deficient conduct alleged when her performance fell below the standard of reasonably effective counsel.  Of note is the fact that the Harris County District Attorney's Office never conducted any investigation into King, even though this fact was conveyed to King just prior to the start of the punishment phase.  The wealth of evidence in this proceeding underscores the fact that trial counsel's deficient conduct prejudiced Fratta.  The effect of this was it made the State's punishment case significantly more persuasive while it made Fratta's significantly *less* persuasive, the hallmark of prejudice. *See Peters v. State,* 31 S.W.3d 704, 723 (Tex. App. - Houston [1st Dist.], 2000); *Roberts v. State,* 29 S.W.3d 596, 602 (Tex. App. - Houston [1st Dist.], 2000).

In considering whether trial counsel's multitude of deficient conduct prejudiced Fratta, the fact that there was sufficient evidence to support the conviction does not necessarily mean that the nature of that evidence merited a death sentence versus a lengthy prison sentence. *See Salazar v. State,* 118 S.W.3d 880, 885 (Tex. App. - Corpus Christi, 2003)(op. on remand).   Given the effect of the State's misconduct, and the resulting objectively deficient performance of counsel, this Court must have grave doubt that the punishment verdict of death was free from the substantial influence of trial counsel's errors and must act as if it did. *United States v. Lane,* 474 U.S. 438, 449 (1986).  This Court has said that in cases of "grave doubt," the defendant, Fratta, must win. *Burnett v. State,* 88 S.W.3d 633, 638 (Tex. Crim. App. 2002).

## CLAIM NINETEEN

**IN VIOLATION OF SIXTH AMENDMENT RIGHTS, FRATTA WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING THE PUNISHMENT STAGE OF TRIAL DUE TO COUNSEL'S FAILURE TO INVESTIGATE, PREPARE AND PRESENT WIT-NESSES.**

**A.   CHALLENGED CONDUCT**

1.   Trial counsel failed to investigate, prepare or present mitigating evidence of Fratta's family history;

2.   Trial counsel failed to investigate, prepare or present an expert on the issue of future dangerousness;

3.   Trial counsel failed to investigate, prepare or present mitigating evidence of steroid use;

4.      Trial counsel failed to investigate, prepare or present a neuropsychology

expert; and

5.      Trial counsel failed to prepare the following trial witnesses:

a. Dr. Rhan Bailey

b. Lisa D'Cunha

c. Steve Rogers

**B.      ARGUMENT AND AUTHORITIES**

The right to the assistance of counsel is guaranteed by the Sixth and Fourteenth

Amendment to the United States Constitution and Article 1, Section 10 of the Texas

Constitution.   The right to be represented by counsel is by far the most important of a

defendant's constitutional rights because it affects the ability of a defendant to assert all

other rights, including the right to a fair trial.  As explained in *Powell v. Alabama,* 287 U.S.

45, 53 (1932):

> The right to be heard would be, in many cases, of little avail if
> it did not comprehend the right to be heard by counsel. Even
> the intelligent and educated layman has small and sometimes
> no skill in the science of law. If charged with a crime, he is
> incapable, generally, of determining for himself whether the
> indictment is good or bad. He is unfamiliar with the rules of
> evidence. Left without the aid of counsel he may be put on trial
> without a proper charge, and convicted upon incompetent
> evidence, or evidence irrelevant to the issue or otherwise an
> admissible. He lacks both the skill and knowledge adequately
> to prepare his defense, even though he have a perfect one. He
> requires the guiding hand of counsel at every step in the
> proceedings against him. Without it, though he be not guilty,
> he faces the danger of conviction because he does not know

> how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect. If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense.

*Id.* at 68-69.

A defendant in a criminal case is entitled to reasonably effective assistance of counsel. *Wilkerson v. State,* 726 S.W.2d 542, 548 (Tex. Crim. App. 1986).  Under the standard set out by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 698 (1984), a defendant seeking relief as a result of trial counsel's deficient performance must first show that counsel's performance was deficient and then demonstrate that this deficient performance prejudiced the defense. *Miniel v. State,* 831 S.W.2d 310, 323 (Tex. Crim. App. 1992).  The *Strickland* test is applicable to ineffective assistance claims at the guilt-innocence and punishment stage of capital trials. *Craig v. State,* 825 S.W.2d 128, 129 (Tex. Crim. App. 1992).  For an error on counsel's part to reach this level, there must be a reasonable probability, a probability sufficient to undermine confidence in the outcome of the trial, that, but for the counsel's unprofessional errors, the outcome of the proceeding would have been different. *Ex parte Zepeda,* 819 S.W.2d 874, 876 (Tex. Crim. App. 1991). The defendant must prove ineffective assistance of counsel by a preponderance of the evidence. *Cannon v. State,* 668 S.W.2d 401, 403 (Tex. Crim. App. 1984).

The Supreme Court has held that counsel's performance is measured against an "objective standard of reasonableness ... under prevailing professional norms." *Strickland*

*v. Washington,* 466 U.S. at 688.   In assessing ·the reasonableness of trial counsel's investigation, or lack thereof, a reviewing court must consider not only the quantum of evidence known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Wiggins v. Smith,* 539 U.S. at 597.  The Supreme Court has long held that a defendant need not show that counsel's deficient performance more likely than not altered the outcome of the case, only that a breakdown in the adversarial system has occurred.

Trial counsel has a professional duty to "present all available evidence and arguments to support the defense of his client." *Jackson v. State,* 857 S.W.2d 678, 683 (Tex. App. - Houston [14th Dist.], 1993); *State v. Thomas,* 768 S.W.2d 335, 336 (Tex. App. - Houston [14th Dist.], 1989).   The Sixth Amendment does "require counsel to put the prosecution's case to the test through vigorous partisan advocacy." *Haynes v. Cain,* 272 F.3d 757, 764 (5th Cir. 2001).  This professional responsibility encompasses the duty to seek out and interview potential witnesses and the failure to do so constitutes ineffective assistance of counsel. *Ex parte Welborn,* 785 S.W2d 391, 395 (Tex. Crim. App. 1991); *Milburn v. State,* 15 S.W.3d 267, 270 (Tex. App. - Houston [14th Dist.], 2000); *Shanklin v. State,* 190 S.W.3d 154, 165-66 (Tex. App. - Houston [1st Dist.], 2005).  The failure to interview and call witnesses who are available to testify and whose testimony would have been beneficial to the defendant is not strategic because counsel can only make a reasonable decision to forego calling such witnesses after evaluating their testimony and determining that it would not be helpful. *Milburn v. State,* 15 S.W.3d at 270.

While the defendant has the burden to overcome the strong presumption that trial counsel's challenged conduct might be considered "sound trial strategy," this does not mean that counsel may insulate his challenged conduct from appellate review merely by claiming that his conduct was "strategic." *See Bell v. Cone,* 535 U.S. 685, 698 (2000). The Supreme Court has stressed that strategic choices are entitled to deference only to the extent they are based on *informed* decisions by trial counsel. *Strickland v. Washington,* 466 U.S. at 690-91. A reviewing court's "principal concern" is not whether counsel's conduct was strategic "but rather whether the investigation supporting counsel's decision ... was itself reasonable ... " *Wiggins v. Smith,* 539 U.S. at 522-23. Counsel's claimed strategic decision "cannot be credited as a calculated tactic or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose." *Lewis* v. *Dretke,* 355 F.3d 364, 368 (5th Cir. 2003); *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir. 1991). For all these reasons, a strategy that is based on counsel's failure to fully investigate the facts or a misunderstanding of the law is not objectively reasonable. *Moore v. Johnson,* 194 F.3d 586, 610 (5th Cir. 1999). A reviewing court is "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Id.*

## C.    DEFICIENCY AND PREJUDICE

The State's primary focus in the punishment phase was on Fratta's personality, generally including portraying him as a sexual deviant, a narcissist, a manipulator, and a womanizer, who they showed, ultimately came from an all American home. 33 RR at 183-

175

205.  The State emphasized through Dr. Rhan Bailey, an expert in psychiatry called by Fratta, that Fratta's personality disorders were unchangeable traits that controlled his actions as much today as they did in 1994. 33 RR 98.  Specifically, Dr. Bailey testified on cross that general personality disorders are not viewed as highly changeable because it is how someone is "wired." 3 RR 102-03.  Prosecutors called Dr. Lawrence Abrams, a clinical psychologist who testified about Fratta's relationship with Farah. 32 RR 38-42.  He testified, without objection, that Fratta's relationship with his wife was a "sick relationship." 32 RR 44.  Dr. Abrams detailed the sexually deviant side of their relationship, including Fratta's alleged requests that his wife step on his neck, hit him, and allow him to eat her defecation and urinate his mouth, all as he masturbated, as well as other aspects of his masochistic sexual behavior. 32 RR 44-46.  Dr. Abrams testified he found the sexual behavior "extreme" and told jurors it was the most he had ever seen, as far as deviant sexual conduct by anyone. 32 RR 45-46.

Fratta's trial attorneys did nothing to rebut the claims made by the State about his personality disorders or attempt to explain his deviant sexual behavior, including attempting to explain his need to be hurt by another person to feel gratification. 32 RR 46-48.  An investigation would have revealed a significant amount of mitigation evidence, including Fratta's family history detailing his upbringing that would have provided mitigating evidence the jury should have considered.  All of this evidence was available but never prepared by trial counsel prior to the punishment phase of his capital murder trial. As presented in the exhibit volume attached to Fratta's 11.071 Application, Fratta's family has a long history of mental illness, alcoholism, and multiple deaths that had a profound

effect on Fratta.  [*See* Affidavit of Vicki Briggs and chart of family members attached to Fratta's 11.071 Application.]  Since Fratta was effectively portrayed by the prosecution as a sexual deviant, narcissist, and a person who manipulates others, this mitigation evidence would have been helpful to the jury to explain his demeanor and behavior.

As set forth in Carmen Laffey's affidavit attached to Fratta's 11.071 applications, she is a licensed mitigation specialist who assisted Fratta's trial attorneys.  She recalled that King and McDonald met monthly with her to discuss the case but they rarely talked about any mitigation investigation or preparation of punishment evidence.  Laffey recalls that the primary focus of their meetings was the guilt-innocence phase of trial.  In fact, McDonald frequently expressed his opinion that he did not believe in mitigation.  For this reason, King was designated to handle the punishment phase.  According to Laffey, she met with King on two occasions to discuss mitigation prior to punishment.  Specifically, Laffey noted she was never instructed to speak with Fratta's children or extended family that resided out of state except his sister Jill Adams.  Prior to and during the punishment phase, King was distraught over the criminal accusations lodged by the prosecutors that she smuggled contraband into Fratta while he was in the Harris County Jail.  For this reason, McDonald presented witnesses at punishment to assist King.  Laffey never discussed mitigation or punishment witnesses with McDonald, prior to or during the punishment phase of trial.

At the punishment phase, Laffey was called to testify that she was unable to find friends that grew up with Fratta. 33 RR 151.  She testified that although she did make contact with Danny Briscoe, a family friend to Fratta, he was unavailable to testify. 33 RR 152.  Laffey introduced two pages of Fratta's college transcripts and pictures of him as a

child. 33 RR 155-56.  Finally, records were introduced that Fratta worked with garments in prison at the Ellis Unit.  This evidence was offered without elaboration as to why or how this could be evidence a jury might find mitigating. 33 RR 158.  Laffey's testimony was so inconsequential to the punishment issues that the State passed on the opportunity to cross-examine her. 33 RR 161.  Laffey's entire presentation as Fratta's mitigation specialist covered just ten pages of the record. 33 RR 149-59.

Review of Fratta's family and background would reveal a large family with numerous cousins, aunts, and uncles.  Investigation into Fratta's family and background would have easily uncovered more family members that were available but neither contacted nor presented at the punishment stage.  There can be little doubt that Fratta's family history and upbringing would have assisted his jury in understanding the numerous personality defects brought out by the prosecution and ultimately used against him at punishment.  Fratta's background revealed a history of mental health issues, alcoholism and mental illness that included death and institutionalization.  Since Fratta's jury did not hear from these witnesses, they could not have considered the mitigating nature of such stigmatizing personality flaws. 33 RR 83-125.  This mitigation evidence would have revealed to the jury a tragic childhood marked by the death of friends, family and even a sibling.  None of the witnesses called at the punishment phase discussed his troubled childhood and the effect it had on him.  In addition, no one discussed his family's mental history that would have helped his jury to understand that much of the arrogant, narcissistic, sexually deviant personality revealed by the prosecution was out of his control and the product of his heredity as much as his environment.  Not only did Fratta's jury never hear

mitigating evidence on these topics, they heard evidence to the contrary from one of Fratta's own witnesses called during the punishment phase.  King called Robin Kazmeroff to testify that he had known Fratta since he was 19 years old. 33 RR 183.

Kazmeroff met Fratta just after his father died when Fratta was 17 years old. Kazmeroff knew Fratta's mother and sister.  He testified that Fratta came from an all American home that had no abuse, no drugs or alcohol problems, and that it seemed like a normal family to him. 33 RR 195-99.  Importantly, King noted on the record that she quickly interviewed Kazmeroff the day he testified. 33 RR 186.  Since no investigation was conducted, there was little, if any mitigation evidence for his jury to consider in determining whether life or death was an appropriate punishment in this case.  Moreover, the inadequate investigation and preparation of Kazmeroff actually left the jury with a false impression of Fratta's childhood that was in stark contrast with reality.

Had an adequate investigation been done, and as set out in the exhibits volume, Fratta's childhood would have revealed to the jury numerous tragedies, family instability, mental disease and death.  Affidavits revealed the following: the death of Fratta's father at a young age was just one of many deaths he experienced before the age of 18, including but not limited to two cousins, a childhood friend, and a baby brother.  The late-term miscarriage of Fratta's young would be brother.  The death of his father that caused Fratta's mother to have a mental and emotional breakdown that shaped much of Fratta's young adulthood.  His childhood and young adulthood was influenced by his mother's unstable behavior as a caregiver.

• Fratta was treated very badly by his family members
because he was of Italian descent. His uncles treated him
like "scum". After the death of his father, Fratta's uncles
never visited him because he was Italian.

• Fratta had no real father figure in his life after the death of
his father.

• There were many other deaths in Fratta's family and Briggs
believes this was very hard on him, particularly after his
father died.

• Fratta was devastated when his father died. He was lost
and seemed to deal with the loss by keeping himself so busy
he did not have to think about it. Fratta started working for
the family when he was very young, just like his father.
Fratta needed to work to help support the family in his
father's absence.  The family seemed to break apart as a
result of Fratta's father's death.

• All of the men in Fratta's life were very strict
disciplinarians who showed little emotion and were cold to
each other.

• Fratta had at least two family members that were
institutionalized. His aunt was put in the hospital for a
nervous breakdown. Another was placed in a sanitarium.

• Fratta was a physically small child growing up. He was
picked on often and became very insecure about his size as a
result.

• Fratta has a large family. On his mother's side alone there
are 19 cousins. None of them were contacted regarding this
case. Everyone grew up around each other and would have
had information about Fratta's childhood.

The affidavit of Victoria Briggs, also set out in the exhibit volume attached to

Fratta's 11.071 Application, is further evidences that Fratta's trial counsel never attempted

to contact her or his family to discuss how Fratta upbringing or family history.  Had she

been contacted she would have made herself available to testify.  The mitigation evidence Fratta's jury never heard was information that would have been particularly helpful to the jury's decision about whether he would be a future danger to society and in its ultimate decision to put him to death.  Much of the punishment case presented by the State consisted of details pertaining to Fratta's personality, sexual preferences, his cold demeanor after the death of his wife, and his paranoia towards family and friends.  This evidence could have been effectively rebutted by the defense to help the jury understand or at the very least minimize the impact of the extraneous, stigmatizing acts alleged by the State.  Fratta's defense attorneys could not make a tactical decision not to call the family members that were available to testify because they were never interviewed or called.  While trial counsel may argue that Fratta did not provide the names of these witnesses in preparation for the punishment phase, this argument has been repeatedly held to be unavailing. *See Rompilla v. Beard,* 545 U.S. 374, 360 (2005)(even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, counsel is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial); *See also Ex parte Martinez,* 195 S.W.3d 713, 729 (Tex. Crim. App. 2006)(same).

Trial counsel's failure to investigate anyone of the numerous witnesses or attempt to investigate Fratta's family history, given the monumental materiality of this testimony to the issue of future dangerousness and to explain the myriad of extraneous bad acts alleged at punishment, was objectively deficient conduct.  The failure to interview and call anyone of these witnesses was objectively deficient conduct, as they were available and

willing to testify at the punishment phase of trial. *Ex parte Welborn,* 785 S.W.2d at 395,

*Milburn v. State,* 15 S.W.3d at 270, *Shanklin v. State,* 190 S.W.3d at 165-66.

If trial counsel were to claim that the failure to investigate or present these witnesses

was tactical, this assertion is devoid of merit because "a decision to interview a potential

witness is not a decision related trial strategy; rather, it is a decision related to adequate

preparation for trial." *Chambers v. Armentrout,* 907 F.2d at 828.  Since neither trial attorney

interviewed any of the 28 witnesses, any tactical decision that might be asserted could not,

as a matter of law, be objectively reasonable. *Milburn v. State,* 15 S.W.3d at 270, *Smith v.*

*State,* 894 S.W.2d 876, 880 (Tex. App. - Amarillo, 1995)("Trial counsel's abdication of his

basic threshold responsibility to ascertain facts and seek out and interview potential

witnesses is the antithesis of sound trial strategy.").  Trial counsel's failure to interview and

contact these witnesses, even though they were available and willing to testify, and the

failure to investigate any of Fratta's family history in order to prepare a punishment case

that provided jurors with any mitigating evidence to help explain Fratta's personality

disorders or unusual behavior, both before and after the death of his wife, was objectively

deficient. *See Ex parte Gonzales,* 204 S.W.3d 391, 396-97 (Tex. Crim. App. 2006)(trial

attorneys failure to investigate and present mitigating evidence in capital murder case), *see*

*also Ex parte Briggs,* 187 S.W.3d 458, 469 (Tex. Crim. App. 2005).

Trial counsel's decision not to call any of the 28 witnesses presented was objectively

deficient conduct because it was not informed by a reasonable investigation.  The Supreme

Court has stressed that strategic choices are entitled to deference only to the extent they are

based on *informed* decisions. *Strickland* v. *Washington,* 466 U.S. at 690-91.  A reviewing

court's "principal concern" is not whether an attorney's conduct was strategic, "but rather whether the investigation supporting counsel's decision .. , *was itself reasonable." Wiggins v. Smith, 539* U.S. at 522-23 (emphasis in original). For all the foregoing reasons, trial counsel's decision not to call or investigate Fratta's family history and upbringing was objectively deficient conduct.

Future dangerousness is a special issue that focuses on a defendant's character for violence, not merely the quantity or quality of the institutional restraints put on that person. *Coble v. Slate,* 330 S.W.3d 253, 268-69 (Tex. Crim. App. 2010), *reh'g denied* (Jan. 12, 2011). "This Court's case law has construed the future-dangerousness special issue to ask whether a defendant would constitute a continuing threat ' whether in or out of prison' without regard to how long the defendant would actually spend in prison if sentenced to life." *Id., citing Estrada* v. *State,* 313 S.W.3d 274 (Tex. Crim. App. 2010). The United States Supreme Court recently held that "a state capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Id.,* citing *Kansas v. Marsh,* 548 U.S. 163, 173-74 (2006). Therefore, a jury is asked to focus on the defendant's individual character and the probability that he would commit acts of violence in the society in which he found himself. *Id.* The most important criterion the jury must decide when focusing on the future dangerousness issue is whether the defendant would pose a risk of violence in the future, in a structured prison community. *Id.* Importantly, as this Court has observed, "the 'future dangerousness' special issue ensures that no defendant,

regardless of how heinous his capital crime, will be sentenced to death unless the jury finds that he poses a real threat of future violence. *Coble v. State,* 330 S.W.3d 253, 268.

As set forth in the report and *curriculum vitae* made part of the exhibit Volume attached to Fratta's 11.0171 Application, Dr. Jon Sorenson, has a doctoral degree in criminal justice and is employed as a professor in criminal justice at Prairie View University.  He has received grants from the Texas Department of Family and Protective Services, The Texas Department of State Health Services and the Clark Foundation for the National Associates Program on State Sentencing and Corrections.  He has published over fifty articles in peer-reviewed publications, three of which were cited by the United States Supreme Court in *Ring v. Arizona,* 536 U.S. 584 (2002).  In this capacity, he has conducted psychological evaluations and risk assessments of numerous offenders charged in capital cases.  He is familiar with the significant body of research regarding future dangerousness, specifically regarding institutionalization.

Dr. Sorenson was contacted by Carmen Laffey pretrial to conduct an evaluation and risk assessment on Fratta, to determine if there were any factors present that would have constituted mitigating evidence in the punishment stage.  As set out in his affidavit, Dr. Sorenson's reviewed medical, jail and prison records in anticipation of testifying to Fratta's likelihood of being a future danger in prison.  Ultimately, Dr. Sorenson formed an opinion, based on statistical data, that he was overwhelmingly in favor of "Mr. Fratta being little or no risk at all to committing future acts of violence."  Based on his findings, Dr. Sorenson prepared a presentation for jurors to better understand the statistical analysis he used to determine that Fratta would not be a future danger to society or prison officials.

Dr. Sorenson concluded that a number of factors were present that were mitigating in nature:

> • Fratta is "middle-aged male with minimal history of disciplinary infractions while incarcerated ... who demonstrated positive adjustment to his incarceration."
>
> • Fratta is a college educated, 52-year-old man who has already served 14 years in prison without any assault or serious rule violation.
>
> • "Numerous studies indicate that the incidents of prison rule violations and disciplinary infractions greatly decreases with age as does the rate of inmate homicide and staff assault. Further, studies also show that the probability of future acts of violence decreases as the amount of time served by an inmate increases."
>
> • There was a less than 2% chance that Fratta would ever actually commit another act of violence in prison.

Even though Dr. Sorenson waited outside the courtroom to testify at Fratta's punishment stage, the jury never heard from him because he was never called. Although he waited in the hallway, had previously prepared and organized a presentation to educate jurors on the factors to consider in future dangerousness determinations and to give them his opinion that Fratta had a high probability of never being a future danger, *he was not called.* No experts were called by the defense at the punishment phase of Fratta's trial on the issue of future dangerousness.

Trial counsel's decision not to call Dr. Sorenson to testify was objectively deficient because the issue of future dangerousness was tantamount to the life or death of Fratta and no other evidence was presented on this issue to the jury. As discussed *supra,* a decision

to call a witness must be informed by a reasonable investigation.  Neither trial attorney ever met with Dr. Sorenson to prepare for the punishment phase of trial.  In fact, Laffey only met with Dr. Sorenson on one occasion.  Since neither attorney met with Dr. Sorenson, and because the mitigation specialist in this case only met with him on one occasion, there can be no sound tactical decision not to call him as a witness where no reasonable investigation was conducted. *See Wiggins v. Smith,* 539 U.S. at 522.  Because trial counsel's failure to call Dr. Sorenson or any expert on future dangerousness, where it is one of the essential issues for jurors to determine in the punishment of a capital murder trial, it was objectively deficient conduct.  This failure cannot be redressed by trial counsel who may say that Dr. Bailey satisfied this because first, Dr. Bailey was never prepared properly.  Second, Dr. Bailey does not conduct research on penal institution actuarial factors that tend to work in favor of or against an inmate being a future danger.  Fratta was prejudiced by trial counsel's objectively deficient conduct in that the jurors never heard any evidence from the defense on the issue of future dangerous.  Laffey, as a mitigation specialist, opined that Dr. Sorenson's testimony would have been beneficial to the jury in assessing Fratta's risk of future dangerousness.

Carmen Laffey, the mitigation specialist in this case, identified a significant history of anabolic steroid use by Fratta.  Having identified this issue, it was never investigated or presented at the punishment phase of his trial.  As recounted by Laffey, Fratta's defense attorneys either did not believe in mitigation evidence or met only rarely on the issue of mitigation.  Laffey recalled that she met with trial attorneys only twice to discuss mitigation and punishment evidence for Fratta in his capital murder case.

Fratta started competing in professional body building in the late 1970's.  Fratta's history of steroid use first began with injectable anabolic steroids in the 1980's.  He continued to take oral steroids, including Anadrol, Winstral and Dianabols for several years.  In 1991 a physician began injections of Cypionate and Propionate steroids.  On at least one occasion, the combination of steroids caused his blood pressure to skyrocket and his nose to bleed.  Fratta provided all this information to Laffey, to use at the punishment phase.  He also provided releases for medical records to be collected in order to substantiate his recollections.  Fratta's trial attorneys did not investigate, prepare or present evidence of steroid abuse and never discussed with him why this information was not used at the punishment stage.

Attached to the exhibit volume filed with Fratta's 11.071 Application are numerous articles from reliable, scientific sources that long-term steroid abuse, like that presented here, can cause any number of the relevant personality traits possessed by Fratta.  Specifically, this information would have been essential to rebut the State's claim that Fratta's paranoia, delusional personality, and bizarre sexual desires, were unchangeable traits that made him as much of a future danger in 1994 as he would be in the present.  The State emphasized through Dr. Bailey that these were unchangeable personality traits that Fratta possessed which controlled his actions as much today as they did in 1994.  33 RR 98.

Trial counsel's responsibility to present all available evidence and arguments on his client's behalf is especially true when it involves the investigation and presentation of mitigation evidence in the punishment stage of trial. *See Williams* v. *Taylor,* 529 U.S. 362,

395·39 (1999).  "The sentencing stage of any case, regardless of the potential punishment, is the time at which for many defendants the most important services of the entire proceeding can be performed.  Where the potential punishment is life imprisonment [or death] ... the sentencing proceeding takes on an added importance." *Vela v. Estelle,* 708 F.2d 954, 964 (5th Cir. 1983).  "Counsel must make a significant effort, based on a *reasonable investigation and logical argument,* to mitigate his client's punishment." *Patrasso v. Nelson,* 121 F.3d 297, 303·04 (7th Cir. 1997).

Consistent with these obligations the numerous articles presented on anabolic steroid abuse and its effects on the human brain and particularly on personality traits of those who abuse them underscores how this information would have assisted the jury to put in proper perspective those traits.  The steroid abuse and its effects on Fratta could have made the State's case for future dangerousness significantly *less* persuasive while making a case for life significantly *more* persuasive.  For all these reasons, trial counsel's failure to investigate or present this material at the punishment stage of Fratta's capital murder trial was objectively deficient conduct. *See Wright v. State,* 223 S.W.3d at 43-44, *Ex parte Briggs,* 187 S.W.3d at 467.

Trial counsel failed to investigate, prepare or present a neuropsychology expert to discuss the effects of steroid abuse on the brain and other mental disorders; both presented in this case.  A neuropsych screening of Fratta could have revealed information about the long-term effects of steroid abuse has on the mind and the body.  The damages of steroid abuse are documented in the articles attached to the exhibit volume, that show that abuse of steroids does affect the brain and personality.  Trial counsel was objectively deficient in

failing to investigate, prepare or present an expert on this relevant mitigation evidence at the punishment phase of Fratta's trial.  Viewed through the prism of controlling legal authority *supra,* trial counsel's failure to consult with and call an expert witness in the area of neuropsychology was objectively deficient conduct that could not have been the result of a reasoned trial strategy.

Trial Counsel's Failure to Prepare The Following Trial Witnesses:

### a. Dr. Rhan Bailey

Dr. Rhan Bailey was a defense witness called during the punishment phase of trial. Dr. Bailey testified that he is currently under contract with the State of Texas to evaluate sex offenders and determine the risk of future dangerousness if they were released from prison. 33 RR 52.  Dr. Bailey conducted psychological testing on Fratta and concluded he had "paranoid disorder thought" and some delusional thinking. 33 RR 67.  Fratta had "mild brain impairment" according to Dr. Bailey and some paranoia and mood disorder. 33 RR 68-75.  On cross examination, the prosecution made clear that none of what Dr. Bailey presented to the jury "reduces the moral blameworthiness" of Fratta, to which he agreed. 33 RR 89.  The State focused on the fact that narcissism was a prominent trait in Fratta and discussed the possibility of exposing Fratta to other unknown victims. 33 R 89-97.  The prosecution even eluded, without objection to "fights" by Fratta while he was in prison, that it was a risk to take him off death row and again reiterated that Dr. Bailey's testimony did not diminish Fratta's moral blameworthiness. 33 RR 103.  Finally the prosecution discussed unusual sexual behavior of Fratta and got Dr. Bailey to confirm that the

personality disorders that were exhibited by Fratta were not viewed as changeable because it is how a person is "wired". 33 RR 102.

Based on the Laffey's affidavit (attached to Fratta's 11.071 Application) this witness was never prepared by trial counsel.  Since the testimony elicited by Dr. Bailey tended to hurt the defense rather than help it, it revealed a total lack of preparation on the part of trial counsel in presenting him the jury.  In addition, Dr. Bailey gave the jury information about personality disorders that he later testified would be a *"future danger"* thereby buttressing the State's case and not the defense.

### b. Lisa D'Cunha

Lisa D'Cunha was called as a defense witness to introduce medical records from the Texas Department of Criminal Justice ("TDCJ"). 33 RR 137-38.  It is clear that she was called to testify that Fratta had never harmed himself or others while in TDCJ however the State was able to present the witness for the purpose of showing that Fratta was manipulative. 33 RR 145.  The State used D'Cunha to tell the jury about an incident contained in the records where Fratta claimed he would sleep all the time and was depressed. 33 RR 145.  The notes in the file indicated he was requesting a cell with a window.  The notes conclude "the patient did not appear depressed.  This appears to be manipulation for secondary gain." 33 RR 145.  In light of the personality traits that were consistently shown by the State to be a possible future danger, this harmed Fratta.  Trial counsel's preparation for this witness or a review of the medical records would have revealed this information and permitted the redaction from the records.

### c. *Steve Rogers*

Steve Rogers was a prosecution witness the State had determined they were not going to call as a witness. 33 RR 162.  King made a last minute decision to call Rogers even though she did not prepare him to testify.  King called him to provide information on Fratta's work in the garment area of prison after the judge would not allow Laffey to elaborate on this topic.  Although some general information was presented that Fratta was a trusted inmate permitted to work in garments, the State elicited from Rogers that Fratta had been caught with a weapon in his cell back in 1998 that resulted in him being removed from the trusted position in garments. 33 RR 167.  King was left to argue that the weapon had never been used, which Rogers agreed to this fact. 33 RR 170.  The State offered on cross that a weapon can also be obtained in the restricted death row area. 33 RR 170.  Finally, King referred to the object as a "shank" in front of the jury. 33 RR 181.  It was later revealed that the alleged weapon was actually a piece of the bed that had come loose before Fratta was assigned to that particular cell.

Mark Robertson, a TDCJ inmate who was housed in the cell when the piece of metal broke off of the bed attests to the fact that Fratta never removed the item or maintained it as a weapon.  Fratta's trial attorneys never investigated or presented Robertson to the jury.  For this reason, Fratta's jury was left with the impression that Fratta was caught with a "shank" in his cell, lost his privileges, and that weapons can be obtained even on death row.

D.    CONCLUSION

In a recent Texas capital murder case that originally resulted in death but was reversed, remanded and ultimately pled to a life sentence, there was significant mitigation evidence never properly presented to jurors who sought death, and the Fifth Circuit

observed the following in reversing the conviction: When, as with *Walbey*, a "petitioner's claim stems from counsel's decision to limit the scope of their investigation into potential mitigating evidence ... [and] counsel attempt[ s] to justify [the 1 limited investigation as reflecting a tactical judgment," the deference owed to such a strategic judgment turns on "the adequacy of the investigations supporting those judgments." "[Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *See* Affidavit of Mark Robertson (Attached to Fratta's 11.071 Application).

The question "is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence ... was *itself reasonable."* "[C]ounsel should consider presenting ... [the defendant's] medical history, educational history, employment and training history, *'family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences." That is, "generally accepted standards of competence require that counsel conduct an investigation regarding the accused's background and character." *Walbey* v. *Quarterman,* 309 Fed. Appx. 795, 800 (5th Cir. 2009) (internal quotations omitted).

The prejudice prong of *Strickland* requires this Court to determine whether trial counsel's deficient conduct was sufficient to undermine its confidence in the jury 's punishment verdict, that is, whether there is a reasonable probability that, but for this objectively deficient conduct, the result of the punishment stage would have been different. *Strickland v. Washington,* 466 U.S. at 694; *Kyles v. Whitley,* 514 U.S. at 430.   In

determining if Fratta has met this burden, this Court cannot require him to show he would have received a lesser sentence but for trial counsel's errors. *See Everage v. State,* 893 S.W.2d 219, 222 (Tex. App. – Houston [1st Dist.], 1995).   The prejudice Fratta must demonstrate is by less than a preponderance of evidence, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of trial." *Strickland v. Washington,* 466 U.S. at 693.   The prejudice prong of *Strickland* can be satisfied on the basis of a single error on trial counsel's part in the punishment stage of trial. *See Ware v. State, 875* S.W.2d 432, 488 (Tex. App. - Austin 1998)(failure to elicit testimony to support argument that defendant be given probated sentence); *Oliva v. State,* 942 S.W.2d 727, 733-34 (Tex. App. - Houston Dist.), 1997)(failure to object to State's final argument that defendant had not shown any remorse or regret for what he had done).   If the prejudicial effect of anyone or all of counsel's objectively deficient conduct is sufficient to undermine this Court's confidence in the outcome of the punishment stage, Fratta must be given a new punishment hearing. *See Kyles v. Whitley,* 514 U.S. at 441.

Viewed through this prism, trial counsel's numerous errors caused a breakdown in the adversarial system of justice in the punishment stage of Fratta's capital murder trial. Had the defense called Dr. Sorenson there would have been at least some evidence put before this jury that Fratta was not a future danger.   There is a reasonable probability that if jurors would have heard some evidence on the issue of future dangerousness, which significantly impacts one of two special issues that have to be answered, they might have struck a different balance in this case.   There was also significant mitigation evidence of Fratta's family and upbringing that was never presented to the jury.   Not only did the jury

never hear about his troubled childhood, the jury heard that he came from a normal, all American home.  The jury never heard evidence of Fratta's significant steroid abuse and how it affected his personality, brain functioning and sexual drives.  The wealth and magnitude of the errors alleged in this proceeding show in compelling terms that a total lack of investigation, preparation and presentation had a substantial influence on trial counsel's errors.  Given the synergistic effect of trial counsel's deficient conduct in failing to call Dr. Sorenson, in calling but failing to prepare Dr. Bailey and Lisa D'Cunha, in failing to investigate, prepare and present evidence of significant steroid abuse over many years and finally the failure to present an expert to help explain the evidence presented harmed Fratta.  Fratta was prejudiced by trial counsel's failure to interview and call the witnesses who were ready, willing and available to testify at the punishment stage.  The total failure to call Dr. Sorenson was also prejudicial since Fratta received death, even though he has no criminal history, and no violent or major rule infractions in the 14 years he served on death row.  For all the foregoing reasons, Fratta was prejudiced by trial counsel's objective deficient conduct at punishment.

## PRAYER

WHEREFORE, Robert Alan Fratta, requests that this Court:

1.     Order him acquitted upon finding the evidence insufficient to sustain the verdict.

2.     Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

3. Grant him an evidentiary hearing at which he may present evidence in support of the foregoing claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to conduct reasonable discovery and brief the issues of fact and of law raised by this petition or such hearing.

4. Grant an evidentiary hearing on procedural issues, including exhaustion of remedies, procedural default, and should Respondent seek dismissal of the petition or of any claims on procedural grounds.

5. Grant leave to file additional briefing related to procedural issues, including but not limited, exhaustion of state court remedies, procedural default, statute of limitations, and federal "relating-back" doctrines under *Mayle v. Felix*, 545 JU.S. 644 (2005).

6. Grant such other relief as law and justice require.

Respectfully submitted,

HILDER & ASSOCIATES, P.C.

By:    */s/ James G. Rytting*
Philip H. Hilder
State Bar No. 19620050
James Rytting
State Bar No. 24002883
819 Lovett Boulevard
Houston, Texas 77006
Telephone (713) 655-9111
Facsimile (713) 655-9112
ATTORNEYS FOR PETITIONER

## **VERIFICATION**

I, James Rytting, state that to the best of my knowledge, the facts alleged in support of the claims in this case are true and correct, under penalty of perjury, as proscribed by Title 18 U.S.C. § 1746; and I hereby sign on behalf of Petitioner, Robert Alan Fratta.

/s/ *James G. Rytting*_____
James G. Rytting

## **CERTIFICATE OF SERVICE**

On May 27, 2016, a copy of Mr. Fratta's petition for writ of habeas corpus was served upon Respondent by ECF filing or U.S. Mail, return receipt requested, addressed to Ellen Stewart-Klein, Assistant Attorney General, Capital Litigation, P.O. Box 12548, Capitol Station, Austin, Texas 78711.

/s/ *James G. Rytting*_____
James G. Rytting