United States District Court
Southern District of Texas
**ENTERED**
September 20, 2017
David J. Bradley, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT ALAN FRATTA, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-3438 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

## **MEMORANDUM AND ORDER**

On November 9, 1994, Farah Fratta was shot to death as she got out of her car. The police suspected the involvement of her husband Robert Fratta with whom she was engaged in a bitter divorce.  It took months, however, to connect Fratta to the offense through the gunman, Howard Guidry, and the getaway driver, Joseph Prystash.   All three men were eventually convicted of capital murder and sentenced to death.  For over two decades, the three men have engaged in numerous challenges to their convictions and death sentences.  Constitutional error resulted in federal habeas relief being granted to Fratta and Guidry.  Both men were retried, and both are now again on death row.

Fratta has sought state appellate and post-conviction remedies relating to his second capital conviction and death sentence.  Respondent Lorie Davis has moved for summary judgment.  Having reviewed the record, pleadings, and the law, and giving special consideration to the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the Court finds that Frrata has not shown an entitlement to federal habeas relief.  The Court, therefore, will **grant** Respondent's motion for summary judgment, **deny** Fratta's petition, and **dismiss** this case.  The Court will not certify any issue for consideration by the Court of Appeals for the Fifth Circuit.

# BACKGROUND

The State of Texas first charged Fratta with capital murder in 1995. Randolph McDonald and Vivian King represented Fratta at his retrial in 2009.[1] On direct appeal from Fratta's second trial, the Texas Court of Criminal Appeals summarized the facts underlying his conviction as follows:

> After several months of searching for someone to murder his estranged wife, Farah Fratta, [Fratta] found Joseph Prystash, who obtained the assistance of a third person, Howard Guidry. On November 9, 1994, the date of the murder, [Fratta] took the couple's three children to Wednesday-evening church classes and attended a parents' meeting at the church. Although the children regularly attended classes there, it was unusual for [Fratta] to stay for the parents' meeting. [Fratta] repeatedly left the meeting to make and receive telephone calls in the church office. Farah was shot and killed in her garage as she arrived home and stepped out of her car, shortly before [Fratta] was scheduled to return the children to her. She died approximately two years after she filed for divorce and less than three weeks before the scheduled divorce and custody trial date.
>
> The state's theory concerning motive was that the prolonged divorce and child custody proceedings formed the underlying basis for [Fratta's] desire to have his wife killed. Several witnesses testified that initially, [Fratta] did not want the divorce. He complained that sex with Farah was not exciting, but he thought that they could resolve their problems without a divorce if Farah would agree to an "open marriage."
>
> A social worker who was assigned by the family court to evaluate [Fratta] and Farah in connection with the custody proceedings testified that she interviewed [Fratta] in April 1993 and Farah in March 1993. At that time, [Fratta] did not want primary custody of the children, and Farah was in favor of an extended visitation schedule for appellant. However, [Fratta] and Farah were at odds because [Fratta] wanted to restrict Farah's ability to change residences with the children to within a 100-mile radius, while Farah did not want a restriction on her ability to move, and [Fratta] wanted joint managing control over decisions about the children's lives, such as medical and educational decisions, while Farah wanted sole control.
>
> As the divorce proceedings dragged on, [Fratta] grew increasingly bitter and angry toward Farah. He complained to friends that he was broke all the time because he had to pay child support, and he said he wanted primary custody of the children so that Farah would have to pay him. At other times, he said that he

---

[1] The Court will generally refer to King and McDonald collectively as "trial counsel," unless necessary to identify one of the attorneys.

would not have to pay child support if he killed her. He complained that Farah would "win" because her parents had money. He regularly called her "the bitch."

During a deposition in December 1993, Farah explained why the divorce petition had been filed on grounds of cruelty. Afterward, [Fratta] told a friend that he was angry about the accusations she made against him, which he said were false, and he did not want other people to hear the things she had said. [Fratta] began actively seeking someone to kill Farah. He solicited many of his friends and acquaintances to kill her or to recommend someone who could kill her. Initially, most of his friends thought that he was joking or blowing off steam, but as he continued to talk about it over time, some of them came to believe that he was serious.

Prystash was not part of [Fratta's] regular circle of friends, but on several occasions in the weeks leading up to the offense, the two men were observed speaking privately together at a health club where they were both members. Prystash's girlfriend, Mary Gipp,[2] overheard Prystash communicating with [Fratta] by telephone. In addition, she often saw Prystash talking to her next-door neighbor, Guidry, on the balcony outside her apartment. On the evening that Farah was murdered, Gipp came home from work to find Guidry, dressed in black, sitting on the steps in front of her apartment. Prystash arrived a few minutes later but he soon left again. When he returned to Gipp's apartment that night, Guidry was with him.

The details of the offense were developed primarily through Gipp's testimony describing her observations and her conversations with Prystash, the testimony of some of Farah's neighbors who observed parts of the offense and saw a suspect leaving the scene, witnesses who spoke with and observed [Fratta] around the time of the offense, and law-enforcement officers who investigated the crime scene. Further evidence included telephone and pager records showing the times and locations of communications between appellant, Farah, Prystash, and Guidry on the evening of the offense and autopsy and ballistics reports.

*Fratta v. State*, No. AP-76,188, 2011 WL 4582498, at *2 (Tex. Crim. App. Oct. 5, 2011)

(footnote added).  The jury convicted Fratta of capital murder and sentenced him to death.

A Texas jury decides a capital defendant's sentence by answering special-issue questions.

In this case, the jury had to answer: (1) will the defendant be a future danger to society; (2) did

the defendant kill the victim, intend to kill her, or anticipate that a human life would be taken;

---

2        At the time of Fratta's second trial, Gipp had married and went by the name Mary McNeill.  For the sake of continuity with portions of the record in this case, the prior proceedings, and the related cases, the Court will refer to her as Gipp.

and (3) do sufficient circumstances mitigate against a death sentence?  *See* TEX. CRIM.CODE art. 37.071 § 2(b).  The State presented punishment-phase evidence about Fratta's sexual deviance, his anger about the divorce, and his efforts to find a hitman to kill his wife.  Witnesses described Fratta as controlling, possessive, and domineering with women.  A clinical psychologist described the "sick" relationship Fratta wanted with his wife and characterized Fratta as oppositional, evasive, and narcissistic.  Testing suggested that Fratta had an intractable degree of paranoia and psychopathy, resulting in psychopathic deviant behavior and a practice of lying with no conscience.  The expert diagnosed Fratta with antisocial personality disorder.  Fratta's children testified about the effect their mother's murder had on them, and the callous, emotionless demeanor their father showed toward them.  Farah's boyfriend at the time of the murder also provided testimony about Fratta's angry and heartless actions both before and after the murder.  Farah's parents testified about losing their daughter and the effect it had on Fratta's children.

The defense called Dr. Rhan Bailey, a psychiatrist who tested Fratta and found significant brain impairment in his psychosocial development, particularly considering how Fratta viewed his normal sexual development.  Dr. Bailey also found some evidence of paranoid disorder, and possibly delusional thought, which could be evidence of mild brain impairment.  Dr. Bailey testified that events in his childhood, such as his father's death and his mother suffering a miscarriage, affected his growth and development.  Dr. Bailey also found evidence of paranoia, a mood disorder, and low self-esteem countered by bravado.  Dr. Bailey observed that Fratta had suicidal thoughts in the past.  After reviewing his medical and prison records, Dr. Bailey opined that Fratta would not pose a future societal threat.

A custodian of prison records described reports indicating that Fratta was not a danger to himself or others.  A defense investigator testified that she could not find many friends and relatives to testify in Fratta's behalf.  She provided the defense with college transcripts and records from when Fratta worked in the prison garment factory.  A prison employee testified that Fratta did not commit any serious disciplinary infractions while working in prison.  Fratta's prison records included only one infraction, which contained a notation that it should be erased because of a due process violation.  A friend testified about how Fratta's father suffered a heart attack when they were hunting and Fratta had to carry him out of the woods.  He testified that Fratta once saved the life of a small child.

In rebuttal, the State presented the substance of Fratta's jail phone calls while awaiting trial, which lead to the introduction of a contraband nude photo he obtained during the course of his second trial.  A detective who interviewed Fratta after Farah's death described him as flippant and not having the demeanor of someone who mourned the loss of his children's mother.

The jury answered Texas' special issue questions in a manner requiring the imposition of a death sentence.

Fratta again challenged his conviction and sentence through the state habeas and appellate process.  Throughout state review, Fratta repeatedly tried to bring *pro se* claims to the attention of the courts.  The Court of Criminal Appeals affirmed Fratta's conviction and death sentence in 2011.  *Fratta v. State*, No. AP-76,188, 2011 WL 4582498 (Tex. Crim. App. Oct. 5, 2011).  The Court of Criminal Appeals adopted the lower court's findings and conclusions and, in 2014, denied habeas relief. *Ex Parte Fratta*, No. WR-31,536-04, 2014 WL 631218 (Tex. Crim. App. Feb. 12, 2014).  The instant federal action followed.

## FRATTA'S FEDERAL CLAIMS
## AND THE APPLICABLE STANDARDS OF REVIEW

Fratta raises nineteen claims in his federal petition for a writ of habeas corpus:

1.   Insufficient evidence supported Fratta's capital conviction.

2.   The trial court constructively amended the indictment through the jury instructions.

3.   New evidence demonstrates a fundamental miscarriage of justice allowing full federal review of all claims.

4.   Fratta is actually innocent of capital murder and the State suppressed evidence of his innocence.

5.   Trial counsel provided ineffective representation by failing to object to the law of parties charge.

6.   Trial counsel provided ineffective assistance by not properly objecting to testimony about Guidry.

7.   Trial counsel should have done more to prevent Prystash's statements to Gipp from coming before the jury.

8.   Trial counsel failed to investigate the circumstances surrounding Gipp's interaction with the police.

9.   Trial counsel should have impeached Gipp with prior inconsistent statements.

10.   Trial counsel did not sufficiently impeach Prystash's credibility.

11.   Trial counsel did not do enough to exclude or impeach testimony by other witnesses.

12.   Trial counsel did not act zealously enough in trying to exclude testimony about Fratta's deviant sexual desires.

13.   Trial counsel should have objected to a hypothetical the State used during the voir dire of one prospective juror.

14.   Trial counsel should have objected to allegedly false testimony.

15.   Trial counsel did not make the correct objections to the State's repeated interjection of facts outside the record during summation.

16.   The cumulative prejudicial effect of the ineffectiveness claims violated the Constitution.

17.   State misconduct caused a conflict of interest between Fratta and one of his attorneys.

18.   An actual conflict of interest developed between Fratta and one defense attorney.

19.    Trial counsel ineffectively investigated, prepared, and presented witnesses during the punishment phase of trial.

Respondent moves for summary judgment.  Instrument No. 67.  Because Fratta raises most of his claims for the first time in federal court, Respondent contends that procedural defects prevent plenary federal consideration of all unexhausted issues.  Alternatively, Respondent asserts that all Fratta's claims lack merit.  Fratta has filed a reply and a cross-motion for summary judgment on claims one and two.  Instrument No. 76.

Federal habeas review is secondary to the state court process and limited in scope. Because States "hold the initial responsibility for vindicating constitutional rights," *Engle v. Isaac*, 456 U.S. 107, 128 (1982), how an inmate litigates his claims determines the course of federal habeas adjudication.  Federalism guarantees the States "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (internal citations and quotations omitted).  Under 28 U.S.C. § 2254(b)(1), a federal habeas petition "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]"  The exhaustion doctrine precludes federal consideration of any claim raised for the first time in federal court.

As a corollary to exhaustion, the procedural-bar doctrine requires inmates to litigate their claims in compliance with state procedural law.  *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  A federal procedural bar results when the inmate fails to follow well-established state procedural requirements for attacking his conviction or sentence.  *See Lambrix*, 520 U.S. at 523; *Coleman*, 501 U.S. at 732.  A federal court may review an inmate's unexhausted or procedurally barred claims only if he shows: (1) cause and actual prejudice; or (2) that "a constitutional

violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]'"  *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

If an inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA allows federal review but limits its depth.  A petitioner cannot meet his AEDPA burden by merely alleging constitutional error.  Instead, "focus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), an inmate must show that the state court's adjudication of the alleged constitutional error "was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'"  *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (quoting 28 U.S.C. § 2254(d)(1)); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").

## ANALYSIS

The Court will first adjudicate the claims Fratta exhausted in compliance with state procedural law.  The Court will then decide whether federal law permits review of Fratta's procedurally deficient claims.  Alternatively, the Court will address the merits of Fratta's procedurally barred claims.

## I.      FRATTA'S EXHAUSTED CLAIMS

Fratta raised claims seventeen, eighteen, and nineteen in state court.  In claims seventeen and eighteen, Fratta alleges that a conflict of interest developed between himself and his trial attorneys.   Claim nineteen argues that trial counsel provided constitutionally ineffective representation in the investigation, preparation, and presentation of punishment-phase testimony. Because the state courts adjudicated the merits of Fratta's exhausted claims, AEDPA's deferential standards guide this Court habeas review.

### A.      Structural and Actual Conflict of Interest (claims seventeen and eighteen)

#### 1.      Background

On direct appeal, Fratta claimed that the trial court failed to protect his constitutional rights when a conflict of interest developed between himself and one of his attorneys.  Fratta also argued that the conflict of interest did not require a showing of harm, yet if it did, the conflict impeded the preparation and presentation of closing arguments.  The Court of Criminal Appeals provided the following background to Fratta's conflict-of-interest arguments:

> The jury returned a verdict of guilty on Friday, May 15, 2009. The trial court received the verdict and announced a recess until Tuesday, May 26, 2009. Around that time, an investigator from the district attorney's office requested that the sheriff's office monitor and record telephone calls that [Fratta] placed from the jail.
>
> On the evening of Thursday, May 21, the prosecutor telephoned [Fratta's] first-chair counsel, Randy McDonald, to notify him of her intent to introduce a recorded telephone conversation dating from May 14 and some photographs that were seized from [Fratta's] jail cell on May 21 as a result of [Fratta's] comments during that conversation. She told McDonald that [Fratta] had stated in the conversation that he had received some nude photographs of someone from King. Based on that conversation, deputies searched [Fratta's] cell and seized the photographs he had described, along with some other items identified as contraband. The prosecutor informed McDonald that she intended to introduce the telephone conversation and the photographs into evidence, but that she would redact [Fratta's] reference to King. McDonald's investigator obtained a CD copy of the recorded conversation from the district attorney's office on Friday afternoon

but was unable to play it. McDonald obtained a working copy of the recording and copies of the photographs on the following Monday, May 25, which was Memorial Day.

King first learned of the telephone conversation and photographs when she went to McDonald's office around noon on Monday. At that time, she listened to the telephone conversation and reviewed the photographs. King then scanned through her e-mails in an effort to identify "Betsy," the person to whom [Fratta] had been speaking. King discovered that, in the past, she had received e-mails from someone named Betsy Gomez that were potentially useful as evidence. King's legal assistant would print them out at her office and place them in an envelope marked "attorney-client privileged communication work product," which she would carry to the courtroom and place on defense counsel's table. King and [Fratta] would usually go over these materials together during trial, but if they did not have time to review them in the courtroom, then [Fratta] might take an envelope of materials with him to review later. Based on this practice, King surmised that an envelope containing these photographs had been left on counsel's table and that [Fratta] had carried it back to the jail.

On Tuesday, May 26, the state presented its case-in-chief at punishment and rested. The record for that day contains no mention of the telephone conversation and photographs. When the court recessed for the day, the defense anticipated presenting its case-in-chief the following morning. However, on the morning of Wednesday, May 27, outside the presence of the jury, King requested and received an opportunity to make a record concerning the telephone conversation and photographs. She explained her practice of consulting with [Fratta] about newly received materials that were potentially useful as evidence. In support of King's explanation, the trial judge acknowledged her prior discussions with King concerning the logistical difficulty of finding opportunities for [Fratta's] attorneys to consult with him during the trial about materials that might be helpful in preparing his defense, and her awareness that King had been working around that difficulty by having [Fratta] review such materials while they were in court and while [Fratta] was in the holdover cell.

The prosecutor indicated that the record should reflect that [Fratta] took the envelope and its contents back to the jail of his own accord and not on the instruction of his attorneys. She reasoned that providing obscene material to an inmate could be a class C misdemeanor and so the record needed to establish that [Fratta's] attorneys did not provide it to him in jail: "so that no one has to answer for any criminal liability down the line, . . . I think we also need to establish that he did that all on his own." [Fratta] made a statement affirming that he alone was responsible for the decision to carry the envelope containing the photographs back to the jail. He added that he did not believe that the photographs were obscene or that he was committing an offense by possessing them. King also challenged the state's characterization of the photographs as obscene and indicated that she was still not sure whether the photographs had any potential value as evidence for the defense.

King then proposed to have her legal assistant, who was present, make a statement about printing out the photographs at the office and carrying them to the courtroom in envelopes. The prosecutor interjected, cautioning that King's legal assistant could be exposed to criminal liability and so she should not make a statement to the court without legal representation. At that point, King expressed that the threat of criminal liability was extremely intimidating and stressful, placed an undue burden on her, and affected [Fratta's] right to a fair trial. She complained that, after learning of the telephone conversation on Monday, she had been unable to work on [Fratta's] defense because she was too distracted by trying to figure out what had happened with the photographs and how best to defend herself. She requested a mistrial.

The prosecutor explained that she had no intention of discussing how the photographs came to be in [Fratta's] possession or in pursuing an investigation against defense counsel, but that the sheriff's office was also involved and so King's legal assistant should not make a statement in court, where the bailiff was an agent of the sheriff, without knowing what she might be getting herself into. The trial court denied the motion for a mistrial and ruled that there would be no mention before the jury of how [Fratta] came into possession of the photographs. The trial court also made findings that none of the attorneys had acted in bad faith or committed professional misconduct.

Following that proceeding, the trial continued before the jury. The defense presented its punishment-phase case-in-chief and rested. The state then presented its rebuttal. When the jury was excused, the court and the parties anticipated that proceedings before the jury would resume at noon the following day, May 28, with the state completing its rebuttal, and the parties beginning closing arguments around 3:00 p.m.

However, late in the morning of Thursday, May 28, 2009, the defense again requested a mistrial, and the court conducted a hearing outside the presence of the jury. Defense counsel presented a newspaper article that had run that morning with the headline, "Fratta Lawyer May Face Inquiry." First-chair counsel McDonald stated that, given the article's representation that a spokesman from the district attorney's office had indicated that King might be investigated for providing contraband to [Fratta], this article created a conflict of interest between [Fratta] and counsel by placing King in the position of trying to defend her own actions and [Fratta's] at the same time. McDonald requested that the court poll the jurors about whether they had seen the article. In addition, he requested a continuance. Initially, the trial court denied these requests. The court reiterated that no reference to King as the source of the photographs would be allowed at trial.

King then expressed that she was not ready to present a closing argument because she had been distracted by having to defend herself on Monday and Wednesday; her office was in chaos because her legal assistant was ready to quit after being threatened with criminal charges at the Wednesday proceeding and seeing the newspaper article; King was upset because she had been chastised by one of the prosecutors for her handling of the matter on Wednesday; the prospect

of the sheriff's office's involvement placed her in conflict with every bailiff in the courthouse; and although she had intended to write her closing argument Thursday morning, she had spent all morning fielding questions from attorneys and reporters about the newspaper article. King stated that she could no longer effectively represent [Fratta] and that she did not know what the appropriate remedy should be. She requested a mistrial and a continuance. She indicated that if she did not receive a continuance, the case would have to go forward without her:

> I have not been able to concentrate on anything but myself and my integrity, where my focus should be on [appellant]. And it should not be on what's going to happen to me now . . . . So, I'm letting the Court know that I can no longer effectively represent [Fratta] at this time. I don't know what the right remedy is. I don't know if I should be asking for a continuance . . . my only interest here is to . . . diligently represent my client. And I think that's been impeded.

> \* \* \*

> I don't know what the remedy is, but I'm asking for a mistrial at this time. And maybe a continuance. I think I have a right to a least prepare an argument for him. At this point, I can't argue. And if we go forward, that's fine, but I will not be able to participate in argument.

At that time, although the trial court did not expressly grant any motions or requests on the record, the court commenced an in-chambers poll of the jurors about whether they had seen the newspaper article. McDonald represented [Fratta] during the juror poll. Afterward, the court announced that closing arguments would not begin that day. Instead, the presentation of evidence would be completed and then the lawyers would be given "an opportunity to take a step back from this issue, regroup, refocus, and move forth." The state then completed its rebuttal. The jury was excused for the day, and the parties, with McDonald speaking for the defense, discussed the jury charge.

On the morning of Friday, May 29, 2009, the parties informed the court that they were ready for the jury. The court read the jury charge. After the state presented its initial closing argument, King presented the first part of the defense's argument. Following arguments, the jury began deliberating.

On Saturday, May 30, 2009, while the jury was still deliberating, King entered exhibits in support of a bill of exception. She submitted the marked envelope that contained the seized photographs, and a print-out of an e-mail that was representative of e-mails that her legal assistant had been carrying to the courtroom for her to review with [Fratta] during the trial. Later that day, the jury reached a verdict. The court reconvened on Monday, June 1, 2009, for sentencing. After sentencing, King and McDonald addressed the court about obtaining an order to facilitate the return of [Fratta's] property to him in prison.

*Fratta v. State*, No. AP-76,188, 2011 WL 4582498, at *10-13 (Tex. Crim. App. Oct. 5, 2011).

With that factual background, Fratta's appellate claim argued that a disabling conflict of interest had developed between his interests and those of King. Fratta's arguments in state court centered on how the alleged conflict prevented King from preparing closing arguments in the penalty phase. The Court of Criminal Appeals found that Fratta's "right to the effective assistance of counsel was not violated," primarily because he did "not allege a conflict of interest or ineffective assistance of counsel with respect to his first-chair counsel, McDonald." *Id*. at 13. With Fratta's focus on closing arguments, the Court of Criminal Appeals found "no indication that McDonald was unwilling or unable to prepare and present the defense's closing argument if King could not go forward. Moreover, after King stated that she had not had an opportunity to prepare her closing argument, the court gave her additional time. The following morning, the defense announced ready, and King presented her closing argument." *Id*. at 14. Finally, the Court of Criminal Appeals found that the trial counsel did not abuse its discretion in denying a mistrial because, even assuming a conflict had developed, the trial court remediated any concern about King's ability to deliver a closing argument by allowing her more time for preparation.

On state habeas review, Fratta returned to the conflict-of-interest issue, specifically relying on three constitutional arguments. First, Fratta argued that the State's action prevented him from receiving effective assistance under *United States v. Cronic*, 466 U.S. 648 (1984), which unlike *Strickland* does not require a showing of actual prejudice: (1) if the petitioner "is denied the presence of counsel at a critical stage"; (2) if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; or (3) "where counsel is called upon to render assistance under circumstances where competent counsel very likely could not." *Bell v. Cone*, 535 U.S. 685, 695-96 (2002). Fratta relied on "the second and third criteria set out in

*Cronic* where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing and also where counsel is asked to render effective assistance under circumstances where competent counsel very likely could not." State Habeas Record at 20. Fratta's state habeas claim broadened his allegations of conflict beyond impeding the punishment phase closing arguments, and instead complained that the specter of criminal charges made King "effectively unavailable for the punishment phase." State Habeas Record at 21. Fratta argued that, since King had primary responsibility for the punishment-phase preparation, this left McDonald with only one day to ready a case for the sentencing hearing. State Habeas Record at 21-22.

Second, Fratta argued that "an actual conflict of interest adversely affected" his trial attorneys' performance under *Cuyler v. Sullivan*, 446 U.S. 335, 348-49 (1980). An "actual conflict" exists when counsel "is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). An "adverse effect" requires proof that "some plausible alternative defense strategy or tactic could have been pursued but was not because of the actual conflict impairing counsel's performance." *Id.* Fratta argued that the State made criminal accusations against King in the penalty phase which put her in a position to defend herself at the expense of not defending Fratta. Fratta argued that the State used the issue with the photograph as a tactic either to "impugn Fratta in front of the jury" or "attack the reputations of trial counsel with the unexpected destruction of his team's ability to fight for him at punishment." State Habeas Record at 26. This alleged misconduct created a conflict requiring reversal.

Third, Fratta argued that, even if the state habeas court did not presume prejudice under *Cronic* or *Cuyler*, he had still met the *Strickland* deficient performance prong. King told the trial

court that she had spent time preparing to defend herself, not Fratta, leaving the punishment preparation to McDonald.  Fratta argued that "[t]he record is clear that McDonald did not believe in mitigation and did not have time to prepare for the punishment phase."  State Habeas Record at 28.[3]

Both trial attorneys submitted affidavits on state habeas review. The affidavits provide insight into how the defense responded to the State's discovery of Fratta's contraband. McDonald stated that King was preoccupied with defending herself against the allegations making it necessary for him to take over punishment proceedings.  According to McDonald, King was so distraught at one point during punishment that she left the courtroom for some time to compose herself.  McDonald said he "went forward and handled the cross-examination of witness I had not prepared for testimony."  State Habeas Record at 211.

King's affidavit stated that, instead of preparing for the punishment phase, she "ended up spending about 10 hours working on defending [her]elf from possible prosecution."  State Habeas Record at 203.  King explained how the contraband photographs came into Fratta's possession.  King expressed that the circumstances, including news articles about the photographs, impeded her performance.  She stated: "I was completely distracted by the pressure to protect my honor, my integrity, and my intentions.  I spent the majority of my time on self protection.  This is time I would have spent on Mr. Fratta's defense.  I did the best that I could under the circumstances."  State Habeas Record at 204-05.

The state habeas court reviewed the record, considered habeas counsel's affidavits, and issued explicit findings and conclusions rejecting Fratta's allegations of conflict.  As an initial

---

[3]      The state habeas court granted funds for a mitigation specialist, an investigator, and a psychologist to substantiate this claim.

matter, the state habeas court found that Fratta had not shown that "there was State misconduct concerning the State's obtaining or offering the photos found in [his] jail cell . . . ." State Habeas Record at 543.  The state habeas court found that both trial attorneys "rendered effective assistance," particularly because "trial counsel investigated and presented mitigating evidence" using an expert and investigators.  Both trial attorneys "presented witnesses, elicited mitigating evidence, demonstrated a familiarity with the facts and the law, cross-examined State's witnesses, made appropriate objections, and persuasively argued to the jury."  State Habeas Record at 529-30.  The state habeas court found that "the habeas assertion of counsel King that she was distracted by having to protect her honor and the habeas assertion of counsel McDonald that he took over in punishment because of counsel King's preoccupation with defending herself" were "non-dispositive on the issue of alleged ineffective assistance of counsel at punishment."  State Habeas Record at 530.

Turning to Fratta's specific arguments, the state habeas court held that, because of the Court of Criminal Appeals' ruling on direct review, it did not need to address any previously raised aspect of Fratta's conflict claim.  Alternatively, the state habeas court ruled, as the Court of Criminal Appeals did on appeal, that Fratta had not "allege[d] a conflict of interest or ineffective assistance of counsel concerning first-chair counsel McDonald."  State Habeas Record at 542.  Focusing again on the closing arguments, the state habeas court observed that the trial court gave the defense additional time to prepare.  State Habeas Record at 542.

The state habeas court found that the circumstances did not create a conflict of interest. Emphasizing that "there was no misconduct on the State's part," "there was no investigation conducted of trial counsel King," and "the State repeatedly informed the trial court that the State did not believe that counsel King intentionally gave the photos to the applicant in violation of jail

rules," the state habeas court found that there was "no structural conflict created between [Fratta] and counsel King that rendered counsel ineffective . . . ." State Habeas Record at 530. In particular, the state habeas court found that the circumstances did "not fit within any of the three classifications set forth in *United States v. Cronic*, 466 U.S. 648 (1984) that would necessitate a reversal on grounds of ineffective assistance of counsel without a showing of harm." State Habeas Record at 530.

### 2.    Fratta's Arguments on Federal Review

Fratta raises two claims on federal habeas review based on the factual scenario outlined above. First, Fratta complains that the State's handling of the contraband photographs created a conflict of error which requires no showing of prejudice under *Cronic* (claim seventeen). Second, Fratta contends that an actual conflict of interest existed under *Cuyler* (claim eighteen). Given the extensive factual findings and legal conclusions from both appellate and habeas review, Fratta's AEDPA burden is not light. The Supreme Court has made clear that, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 102.

### 3.    Structural Conflict of Interest (claim seventeen)

As previously discussed, the Supreme Court has held that the *Cronic* exception presumes prejudice only applies in three situations. *See Bell v. Cone*, 535 U.S 685, 695-96 (2002). Fratta argues that "[t]he case now presented is one that lends itself to both the second and third criteria set out in *Cronic*, where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing and also where counsel is asked to render effective assistance under

circumstances where competent counsel very likely could not." Instrument No. 51 at 164. As an initial matter, the Supreme Court has not confronted "the specific question presented by this case," which signifies that the state court's decision could not be "contrary to" any holding from that Court. *Lopez v. Smith,* 135 S.Ct. 1, 4 (2014). Fratta must show that the state courts were unreasonable in finding that the two *Cronic* exceptions do not apply.

Fratta's claim is weakened by his reliance on false assertions. For example, Fratta contends that King was "effectively unavailable for the punishment phase." Instrument No. 51 at 164. Fratta also claims that King "was unavailable for all purposes," she "le[ft] Fratta to fend for himself," and that "[t]here is no evidence in the record that [King] assisted McDonald in the preparation or presentation of any punishment witness." Instrument No. 51 at 164, 165, 166. Fratta says that "[s]ince McDonald was put in a position to defend his co-counsel and her assistant, there was no one left to defend the rights of Fratta or prepare for the punishment phase of trial." Instrument No. 51 at 168. Fratta's statements are belied by the record showing that King cross-examined two of the State's witnesses, presented extensive testimony from defense witnesses (including from an expert), made various arguments before the trial court such as for an instructed verdict, and delivered a meaningful closing argument. Hyperbolic statements that are not bore out by the record cannot overcome the heavy deference given state court decisions. Overwrought embellishment untethered from the reality of trial lessens the credibility of Fratta's claims of constitutional error.

Further, Fratta's melodramatic arguments on federal review do not match the concerns his trial attorneys expressed concerning the possibility of prosecution for contraband. The record clearly shows that the discovery of contraband in Fratta's possession that unwittingly passed through counsel's hands created emotional turmoil for King. King "ended up spending about 10

hours working on defending [her]self from possible prosecution." State Habeas Record at 203. The record, however, contains mixed statements about the amount of distress the circumstances caused King. Fratta's arguments at trial and on appeal centered on counsel's ability to prepare an adequate closing argument. *See Fratta*, 2011 WL 4582498, at *14 ("Moreover, King's specific concern was that she had not had an opportunity to prepare and present a closing argument."). The trial court ameliorated those concerns by allowing King additional time to prepare and make a closing statement. King delivered a closing statement. Tr. Vol. 36 at 28-43.

Fratta has not shown that the unique circumstances precluded the defense from subjecting the prosecution's case to meaningful adversarial testing or that a reasonable attorney could not provide constitutionally competent representation. The record does not contain evidence of a complete meltdown in the defense team that precluded meaningful representation. The state court decisions rested on the assumption that, as first chair counsel, McDonald provided competent legal assistance not materially hindered by the possibility (though denied by the prosecution) that King could face criminal charges. Fratta has not shown that he meets the two *Cronic* exceptions. In addition, Fratta unfairly discounts the meaningful contribution King added to his punishment defense. The state court was not unreasonable in requiring Fratta to prove actual prejudice for any deficient legal representation.

### 4.    Actual Conflict of Interest (claim eighteen)

Fratta renews his allegation that the actual conflict between his interests and King's creates a presumption of prejudice under *Cuyler*. A *Cuyler* claim requires that "an actual conflict of interest [that] adversely affected [the] lawyer's performance." *Cuyler*, 446 U.S. at 348. A conflict of interest may include a situation where the lawyer's personal interests clash with those of the client. *See Walberg v. Israel*, 766 F.2d 1071, 1075 (7th Cir. 1985). The State may be the

agent that creates the conflict: "If the state is not a passive spectator of an inept defense, but a cause of the inept defense, the burden of showing prejudice is lifted. It is not right that the state should be able to say, 'sure we impeded your defense--now prove it made a difference.'" *Id.* at 1076.

As an initial matter, the Court of Criminal Appeals recognized that Fratta did "not allege a conflict of interest or ineffective assistance of counsel with respect to his first-chair counsel, McDonald. There was no indication that McDonald was unwilling or unable to prepare and present the defense's closing argument if King could not go forward." *Fratta*, 2011 WL 4582498, at *13. Aside from McDonald's ability to provide an effective defense, Fratta has not shown that an actual conflict of interests developed between himself and King. The State explicitly told the court that it did not intend to prosecute King. The prosecutor expressed "how frustrating it is to hear Ms. King say that she believes that the prosecution is acting to intimidate her assistant or violate the rights of this defendant," because "I have never represented that it was my intent to make any allegations against defense counsel or their assistant, that it was my intent to follow up with an investigation, or that it was my intent to proceed with any type of criminal charge." Tr. Vol. 33 at 32.[4] The trial court later said that no one "has done anything that I feel is unprofessional or unethical . . . ." Tr. Vol. 33 at 36. The state habeas court reaffirmed that "there was no misconduct on the State's part with the handling of the information concerning [Fratta's] jail phone calls and the contraband photos or the State's introduction of such evidence at punishment." State Habeas Record at 530. On that basis, the state habeas court found "that there was no structural conflict created between [Fratta] and counsel King . . . ." State Habeas Record at 530.

---

[4]     King, in fact, admitted in a hearing that the State had not said that they would not prosecute her, but she was left with the subjective impression that they may. Tr. Vol. 33 at 30; Tr. Vol. 34 at 17.

To the extent that King felt subjective fear of prosecution for herself or her assistant, the record amply shows that she still actively participated in Fratta's defense. King engaged in cross-examination, questioned witnesses, argued before the trial court, and delivered a meaningful summation. Even if the contraband became an individual concern for King to an extent that is not reflected in her performance on the record, McDonald still ably represented Fratta's interests. Fratta has not shown that the state courts were unreasonable in finding no actual conflict of interests because of the contraband.

### B.    *Strickland* Deficient Performance and Prejudice (claim nineteen)

Fratta complains that counsel provided ineffective representation with respect to the preparation and presentation of evidence in the punishment phase of trial. Because no structural or actual conflict of interest impeded counsel's representation, Fratta must prove *Strickland*'s deficient performance and actual prejudice prongs. Because Fratta presented his allegations of ineffective assistance to the state courts, he must meet a demanding burden for habeas relief to become available. When the state courts have already adjudicated the merits of a *Strickland* claim, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, 562 U.S.at 101. Under the AEDPA, federal courts employ a "doubly deferential judicial review," that gives wide latitude to state adjudications. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Cullen v. Pinholster*, 563 U.S. 170, 201 (2011). "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 104.

Fratta argues that trial counsel's representation faltered in the investigation, preparation, and presentation of evidence in five specific areas, each of which he supports with evidence:

- mitigating evidence about Fratta's family history, based on an affidavit from Fratta describing his upbringing, State Habeas Record at 127-28, a chart listing family members not interviewed by the defense team, State Habeas Record at 183-85, a timeline of Fratta's life, State Habeas Record at 186-91, an affidavit provided by a cousin, State Habeas Record at 192-94;

- expert testimony on the issue of future dangerousness, based on an affidavit prepared by Dr. Jon Sorenson, a professor of Criminal Justice Studies at Prairie View A&M University, State Habeas Record at 82-83;

- mitigating evidence of steroid use, based on journal articles about steroid use among violent offenders, State Habeas Record at 131-81 and an affidavit from a neuropsychologist, State Habeas Record at 271;

- expert testimony on neuropsychology, based on a forensic psychiatric evaluation, State Habeas Record at 255-66; and

- preparation of trial witnesses Dr. Rhan Bailey; Lisa D'Cunha; and Steve Rogers.

The state habeas court considered the pleadings, the records, and the evidence submitted by Fratta and issued explicit factual findings and legal conclusions finding no error in counsel's handling of each putative punishment theory. The state court identified the correct legal standards and applied them to Fratta's allegations. Fratta must show that the state habeas court's decision was unreasonable, and in doing so, demonstrate that it was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 102.

## 1.     Family History

Fratta first claims that trial counsel should have presented additional evidence about his family background. Fratta argues that trial counsel neglected to present testimony that "Fratta's family has a long history of mental illness, alcoholism, and multiple deaths that had a profound effect on Fratta." Instrument No. 51 at 176-77. Fratta alleged in state court that "trial counsel are ineffective for failing to present the testimony of twenty-eight out-of-state relatives . . . ." State Habeas Record at 545. Fratta attached a list of uncalled witnesses to his federal habeas

petition.  State Habeas Record at 183-91.  Fratta, however, only provided an affidavit from a maternal cousin, Victoria Blanche Ward Briggs.  State Habeas Record at 192-94.  Based on Briggs' affidavit, Fratta claims that trial counsel should have interviewed family members and called them to testify about various family deaths, a family history of alcoholism, and discrimination by family members because of his father's Italian heritage, among other issues.

As an initial matter, Fratta did not give the state courts sufficient information to ascertain whether trial counsel provided deficient performance, much less that caused prejudice, with regard to the uncalled witnesses for whom he did not submit affidavits.  Fratta did not provide contact information for the uncalled family members (some of whom had passed away at the time of trial),[5] indicate what testimony they could have provided on his behalf, or show that they were available to testify.  State Habeas Record at 534. The state habeas court found that "there is no showing that anyone, other than Briggs, would have been willing to testify concerning their relationship, if any, with [Fratta and] no showing that their testimony would have been beneficial to [Fratta] if they had been willing to testify . . . ."  State Habeas Record at 534.  A habeas petitioner "must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial." *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *see also Greer v. Thaler*, 380 F. App'x 373, 386 (5th Cir. 2010); *Carty v. Quarterman*, 345 F. App'x 897, 903 (5th Cir. 2009).  Fratta "must name the [uncalled witnesses] witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).

---

[5]     Of the names on the list he provided on habeas review, the state habeas court found that "three of the relatives died prior to [Fratta's] 2009 trial, one died in an unknown year, the whereabouts of five are unknown, [and] one shows only the notation alive without an address . . . ."  State Habeas Record at 534.

Constitutional error cannot rest on the naked assertion that trial counsel should have done more, for "speculations as to what [uncalled] witnesses would have testified is too uncertain." *Alexander*, 775 F.2d at 602; *see also Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) ("[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative.").

Even to the extent that Fratta substantiated his claim with information from Brigg's affidavit, he has not shown that the state habeas court's adjudication was unreasonable. Fratta states that many family members died during his youth, including his father. The state habeas court, however, observed that counsel was not ineffective "for not presenting evidence of the normal life occurrence of the deaths of various family members from [Fratta's] extended family," particularly because Fratta did "not present evidence that he was close, if at all, to these family members or evidence of any substantial effect, if any, effect of their deaths on him especially as an adult." State Habeas Record at 532. In fact, Fratta's chart listed six deaths that "occurred <u>after</u> the applicant murdered the complainant," rendering them irrelevant to his mitigating case. State Habeas Record at 532. With regard to testimony about his father's death, "trial counsel presented expert testimony about the possible effects of the death of [Fratta's] father when [Fratta] was seventeen and about the difficulty [Fratta] had when his mother had a miscarriage when [he] was twelve because he had already developed a psychological tie with his expected brother." State Habeas Record at 532. Fratta has not described what testimony was available to counsel that would have exceeded the scope of the trial testimony.

Fratta has provided greater substantiation with respect to his claim that trial counsel should have adduced evidence of his family's history of alcoholism and mental illness. In Briggs' affidavit she "assert[ed] that [Fratta's] great-great grandfather drank heavily; that her

Case 4:13-cv-03438   Document 80   Filed in TXSD on 09/18/17   Page 25 of 77

brother had a problem with alcohol; that her uncle drank; and that an aunt was placed in a rehab facility for alcoholism." State Habeas Record at 532. Fratta, however, provided no explanation about "the extent of the contact, if any, [Fratta] had with such relatives," especially because the record did not contain evidence that Fratta himself "had a problem with alcohol, and there being no evidence that alcohol played a part in [his] hiring someone to murder his wife." State Habeas Record at 532-33.

Fratta similarly provided no substantiation, and draws no meaningful connection, between other alleged problems with Fratta's family, such as post-traumatic stress disorder other relatives experienced in war, and his own life. State Habeas Record at 532-33. Brigg's comments about family discrimination because of Fratta's heritage were unpersuasive and unsubstantiated. State Habeas Record at 533. Fratta had also made "no showing that Briggs' information - as shown in her habeas affidavit - would have added to [his] mitigation evidence." State Habeas Record at 534.

Aside from failing to substantiate his allegations, Fratta's new evidence conflicts with testimony adduced by counsel. Fratta's friend testified in the punishment phase that "he had never witnessed physical abuse or substance abuse in [Fratta's] family, that he was not aware of [Fratta himself] having any alcohol or drug-related issues; that [Fratta's] home was a fairly normal, loving home; that there was nothing to indicate that [Fratta] was not loved or supported and that [Fratta] was very intelligent." State Habeas Record at 535. This testimony was consistent with that presented in Fratta's first trial. State Habeas Record at 535-36.

On that record, Fratta has not shown that the state habeas court was unreasonable in finding no *Strickland* error in the presentation of mitigating testimony relating to Fratta's family history. Importantly, when considered in light of the trial evidence, Fratta has not shown the

25 / 77

state court was unreasonable in finding that counsel's handling of mitigating evidence did not result in *Strickland* prejudice.

### 2.        Expert Testimony on Future Dangerousness

Fratta also complains that trial counsel provided deficient representation in the handling of expert testimony.  Trial counsel retained Dr. Jon Sorenson, a professor of Criminal Justice, as an expert witness on the issue of future dangerousness.  Dr. Sorenson did not interview or examine Fratta.  Dr. Sorenson evaluated medical, jail, and prison records and concluded that Fratta would not pose a future societal danger.  The defense, however, did not put his testimony before the jury.  Trial counsel stated on the record that they decided not all him as a witness "unless the State called an expert from the prison." Tr. Vol. 33 at 36.  Fratta faults trial counsel's efforts because "Dr. Sorenson, the only witness called to rebut the State's evidence that Fratta was a future danger sat in the hallway of the courthouse and was *never called to testify at punishment.*"  Instrument No. 51 at 165.

Fratta, however, does not acknowledge that trial counsel presented testimony that he would not be a future danger through another expert witness.  Unlike Dr. Sorenson, Dr. Bailey engaged in a personal evaluation of Fratta.  The state habeas court described the "overall theme" of Dr. Bailey's testimony as "that [Fratta] was not a future danger."  State Habeas Record at 539, 545.   With trial counsel's choice to rely on Dr. Bailey unless the circumstances required otherwise, the state habeas court correctly deferred to the strategic decision not to call Dr. Sorenson.  State Habeas Record at 536.  Under well-established law, tactical decisions such as that one are "virtually unchallengable."  *Strickland*, 466 U.S. at 690.

### 3.        Steroid Use and Neuropsychological Expert

Fratta was a long term user of steroids.  A neuropsychologist who had never examined Fratta provided an affidavit in state habeas court stating that "it seems that anabolic steroid abuse is a key factor that warrants further investigation and evaluation."  State Habeas Record at 271. The expert observed that steroid use may have "specific neuropsychiatric effects" such as "increased aggression and manic behavior."  State Habeas Record at 271.  Other "behavioral characteristics can be manifested as increased libido, grandiose thinking, irritability, and impulsivity."  State Habeas Record at 271.

The expert, however, had never examined Fratta and could provide no concrete information about the effect of steroids on Fratta individually.  Even with the detached information about the effects of steroid use, the state habeas court found Fratta's arguments unpersuavsive: "The Court finds that the evidence shows that [Fratta], who was angry about custody proceedings and having to pay child support, made long-term, calculated plans to have the complainant murdered; there is no evidence that [Fratta's] sexual desires or fetishes allegedly, resulting from steroid use, prompted [him] to hire someone to kill his wife or prevented [him] from knowing that his actions were wrong."  State Habeas Record at 536. Without a connection between the steroid use, Fratta's neuropsychological state, and the crime he committed, the state habeas court found that "trial counsel are not ineffective for not presenting evidence that [Fratta's] alleged steroid use allegedly affected his brain and created bizarre sexual desires -- evidence that would have likely alienated the jury in light of the circumstances of the offense."  State Habeas Record at 536.  On federal habeas review, Fratta has not provided any more substantial link between his steroid use and his life or otherwise shown that the state habeas court's decision was unreasonable.

### 4.    Adequate Preparation of Trial Witnesses

Fratta complains that trial counsel did not adequately prepare three punishment phase witnesses: Dr. Rhan Bailey, Lisa D'Cunha, and Steve Rogers.  Fratta complains that Dr. Bailey "was never prepared by trial counsel" which resulted in testimony that "tended to hurt the defense rather than help it . . . ."  Instrument No. 51 at 190.  Lisa D'Cunha introduced medical records from Fratta's incarceration, but Fratta wishes trial counsel had redacted a portion of the records suggesting that he engaged in malingering for secondary gain.  Steve Rogers testified that Fratta worked in the garment factory, but his testimony also allowed the State to show that he had been caught with a weapon in 1998.

The state habeas court provided specific reasons for rejecting each of these complaints. Dr. Bailey provided unhelpful testimony on cross-examination by the State, but the defense tried to cure any problems on redirect.  State Habeas Record at 538-39.  D'Cunha's testimony was limited to her role as the TDCJ custodian of records; her testimony "was limited to the records and trial counsel are not ineffective for allegedly 'failing to prepare' her."  State Habeas Record at 536-37.  The defense mitigated Roger's testimony by calling a witness to show that Fratta was cleared of the weapon possession infraction.  State Habeas Record at 537.

Taken together, Fratta has shown that defense witness provided some unhelpful testimony among that which benefitted the defense – a factor that trial attorneys must commonly take into consideration when preparing a defense.  Fratta's allegation of inadequate preparation, however, does not provide any specific and achievable means by which the trial attorneys could have excised the negative information.  The weighing of the costs and benefits of presenting testimony are strategic decisions, not subject to "the harsh light of hindsight," which is "precisely what *Strickland* and AEDPA seek to prevent."  *Richter*, 562 U.S. at 89 (quoting *Bell v. Cone*,

535 U.S. 685, 702 (2002)).  Fratta has not shown that trial counsel provided deficient, prejudicial performance in preparing the defense witnesses.

### 5.      Actual Prejudice

Whether taken individually or collectively, Fratta has not shown a reasonable probability of a different result had trial counsel performed differently.   Fratta was angry at his wife, characteristic of his "controlling, possessive, and domineering [attitude toward] women."  State Habeas Record at 522.   Expert testimony described Fratta as intractably narcissistic and oppositional with varying degrees of paranoia and psychopathy.  Fratta was antisocial.  Over a period of time, Fratta repeatedly asked people to kill his wife.  He arrogantly tried to cover up his calculated murder.  Fratta did not express sorrow for the victim's death, much less remorse for his actions.  Against that testimony, trial counsel made a zealous effort to defend against a death sentence.  The quality and quantity of the new defense approaches suggested by Fratta do not show a reasonable probability of a different result had trial counsel performed differently.  The state habeas court was not unreasonable in concluding that Fratta's allegations of ineffective representation did not merit habeas relief.

## II.      FRATTA'S PROCEDURALLY DEFICIENT CLAIMS

Fratta did not present claims one through sixteen in a procedural manner that allows for plenary federal consideration.  Fratta raised claims one and two in *pro se* pleadings that the Court of Criminal Appeals refused to consider.  In finding that Fratta had not properly presented his *pro se* arguments, the Court of Criminal Appeals stated:

> Throughout these proceedings, [Fratta] has filed *pro se* pleadings and letters in an attempt to supplement his attorneys' efforts.   [Fratta] is not entitled to hybrid representation. S*ee Scheanette v. State*, 144 S.W.3d 503, 505 n. 2 (Tex. Crim. App. 2004).  Thus, we do not address his *pro se* points.

*Fratta*, 2011 WL 4582498, at *1.  Texas courts have long held that inmates possess no right to hybrid representation and that any *pro se* brief supplementing that filed by counsel provides "nothing for review."  *Rudd v. State*, 616 S.W.2d 623, 625 (Tex. Crim. App. 1981).[6]  Texas' prohibition on hybrid representation is an adequate and independent bar to federal review.  *See Pippin v. Dretke*, 434 F.3d 782, 792-93 (5th Cir. 2005); *Powell v. Cockrell*, 35 F. App'x 386 (5th Cir. 2002).

Further, raising a claim in an unauthorized *pro se* pleading does not suffice to present a claim before the highest state court for exhaustion purposes.  To fairly present the claims, "the applicant must present his claims in a procedurally correct manner."  *Beazley v. Johnson*, 242 F.3d 248, 263 (5th Cir. 2001) (quotation omitted).  Raising a claim in an unauthorized *pro se* brief "is insufficient for exhaustion purposes."  *Satterwhite v. Lynaugh*, 886 F.2d 90, 93 (5th Cir. 1989); *see also Powell v. Cockrell*, 35 F. App'x 386 (5th Cir. 2002).  This Court cannot consider the merits of claims one and two unless Fratta shows cause and actual prejudice or a fundamental miscarriage of justice.

Fratta also did not exhaust claims three through sixteen, resulting in a procedural bar of their merits. Fratta contends that his innocence and the suppression of evidence precludes application of the procedural bar.  Fratta also argues that ineffective representation by his state habeas attorney allows for full federal review.

If a valid procedural bar exists, the Court can only review Fratta's claims if he shows: (1) cause and actual prejudice; or (2) that a fundamental miscarriage of justice has occurred.  The

---

[6]     Numerous cases discuss the Texas courts' policy against considering *pro se* pleadings when the appellant is represented by counsel.  *See Smith v. Collins*, 977 F.2d 951, 962 (5th Cir. 1992); *Satterwhite v. Lynaugh*, 886 F.2d 90, 93 n.3 (5th Cir. 1989); *Ex parte Russeau*, 2010 WL 3430765, at *1 (Tex. Crim. App. Aug. 25, 2010); *Patrick v. State*, 906 S.W.2d 481, 498 (Tex. Crim. App. 1995); *Turner v. State*, 805 S.W.2d 423, 425 n.1 (Tex. Crim. App. 1991); *Landers v. State*, 550 S.W.2d 272, 280 (Tex. Crim. App. 1977).

Court will address Fratta's efforts to overcome the procedural bar of claims one through sixteen, and in so doing, will also alternatively consider the merits of his defaulted claims.

### A. Actual Innocence as a Gateway to the Merits

In his third claim, Fratta argues that he can overcome the procedural defects in his unexhausted claims by showing a fundamental miscarriage of justice under *Schlup v. Delo*, 513 U.S. 298, 315-16 (1995).[7]  A "fundamental miscarriage of justice" exists if a "constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Murray*, 477 U.S. at 496.  A defendant tried for an alleged offense is presumed innocent unless and until the State proves his guilt beyond a reasonable doubt.  "Society's resources have been concentrated at [a criminal trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens."  *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *see also McFarland v. Scott*, 512 U.S. 849, 859 (1994) (a "criminal trial is the 'main event' at which a defendant's rights are to be determined").  However, "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears."  *Herrera v. Collins*, 506 U.S. 390, 399 (1993).  A convicted defendant invoking federal habeas jurisdiction "comes before the habeas court with a strong – and in the vast majority of the cases conclusive – presumption of guilt."  *Schlup*, 513 U.S. at 326; *see also Herrera*, 506 U.S. at 399-400.  What a federal court has "to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved."  *Moore v. Dempsey*, 261 U.S. 86, 88 (1923).

---

[7]      Fratta does not rely on claim three as a substantive basis for habeas relief, nor could he.  *See Burton v. Stephens*, 543 F. App'x 451, 458 (5th Cir, 2013) ("The Supreme Court has not recognized actual innocence as an independent ground for federal habeas corpus relief.").

Nevertheless, "a persuasive showing that [an inmate] is actually innocent of the charges against him" acts as a safety valve against unfair applications of the procedural-bar rule. *See Schlup v. Delo*, 513 U.S. 298, 315-16 (1995); *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001); *Bousley v. United States*, 523 U.S. 614, 623 (1998). A *Schlup* actual-innocence argument, "[t]o be credible . . . requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324.[8] The new evidence must be "material, not merely cumulative or impeaching." *Lucas v. Johnson*, 132 F.3d 1069, 1075 n. 3 (5th Cir. 1998); *see also Calderon v. Thompson*, 523 U.S. 538, 563 (1998)*; Foster v. Thaler*, 369 F. App'x 598, 602-03 (5th Cir. 2010). Given these hurdles, successful actual-innocence arguments are "extremely rare." *Schlup*, 513 U.S. at 324.

Fratta claims that he is actually innocent because new evidence proves that the State identified the wrong men as the shooter and get-away driver. On the night of Farah's murder, eyewitnesses reported hearing shots fired and then seeing a young black man fleeing the scene after being picked up in a silver-gray car with a burned-out headlight. Fratta argues that the State suppressed evidence proving that someone other than Guidry and Prystash were the men involved in carrying out the killing Fratta ordered. Fratta's alternate construction of events centers on his argument that James Podhorsky, Fratta's friend who featured prominently in the police investigation, drove Christopher Vernon Barlow to Farah's house to carry out the murder.

---

[8]     A circuit split exists regarding whether a petitioner shows actual innocence by adducing evidence that "was not discoverable at the time of trial or whether it is sufficient that the evidence be newly presented." *In re Warren*, 537 F. App'x 457, 460 (5th Cir. 2013) (citing *Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir. 2006)). The Fifth Circuit has not yet conclusively determined whether the evidence that a petitioner relies on to prove actual innocence must be "new," *see Wright*, 470 F.3d at 591, though it has stated that it must not be previously "within the reach of [an inmate's] personal knowledge or reasonable investigation." *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008).

Fratta argues that Barlow "matched the eyewitness description of the young, black, shorter male that neighbors saw at the scene when Farah was shot." Instrument No. 51 at 41. Because the indictment required the State to prove that "Joseph Prystash or Howard Guidry . . . kill[ed] Farah Fratta by shooting [her] with a deadly weapon," Fratta claims that Podhorsky or Barlow's involvement in the crime exculpates him of capital murder. Fratta, however, has not met the stringent showing necessary to prove actual innocence.[9]

Fratta's actual-innocence arguments rest on police investigative reports prepared well-before trial which he contends that the State suppressed. Fratta has attached some police reports to his amended petition. Fratta, however, also references exhibits attached to the federal petition filed by his co-defendant Howard Guidry (*Guidry v. Davis*, 4:13-cv-1885, Instrument No. 1) from which some of the briefing on this point is taken word-for-word. Fratta's petition does not include all of the exhibits from the *Guidry* case that he references.[10] With Fratta's reference to Guidry's pleadings, Instrument No. 76 at 34, the Court takes judicial notice of the papers in the *Guidry* case and will consider the whole of the evidence relating to the police investigation.

Fratta bases his claim on two factors: (1) Podhorsky drove "a grey/black Corvette with silver front fenders that matched the general description of the getaway car" and (2) "latent fingerprints obtained from the driver's door and left front fender of the car Farah Fratta drove into her garage on the night of the murder . . . matched Barlow's." Instrument No. 51 at 41-42.

---

[9]    Fratta also makes a cursory argument that "[n]ew evidence showing that Fratta's gun was not the murder weapon and Guidry was not the shooter constitutes solid, reliable proof that Fratta is actually innocent of the capital crime with which he was charged." Instrument No. 51 at 39. Fratta, however, does not adduce any new, reliable forensic evidence. Instead, Fratta points to (1) differences between the forensic testimony in his first and second trials and (2) that the trial court did not allow into evidence a ballistics report. The Court will not address those arguments at length because they do not serve as the basis for an actionable actual innocence argument. *See Moore*, 534 F.3d at 465

[10]    For example, Fratta refers to exhibits eight and thirteen as police and court reports that include information about Barlow, but does not attach any such numbered exhibits to his petition. The exhibits, however, are attached to Guidry's petition.

The Corvette in Podhorsky's possession was apparently registered to Barlow. Fratta claims that, after the "[p]olice discovered the hatchback Corvette was registered to Barlow," they "ran an A.F.I.S. search on latent prints obtained from the driver's door and left front fender *of the car Farah Fratta drove* into her garage on the night of the murder."   Instrument No. 51 at 42 (emphasis added).   Fratta, however, had not shown that the evidence potentially relating to Podhorsky's car or Barlow's fingerprints is exculpatory or can otherwise credibly serve as the basis for a valid actual-innocence claim.

Almost immediately after the murder, the police investigated the possibility that James Podhorsky carried out Fratta's request to kill his wife.   The police took a statement from Podhorsky the day after the murder (November 10, 1994).   (*Guidry*, Instrument No. 2, Exhibit 10).   Podhorsky told the police that the night before his "Corvette was locked up in [his] garage and no one drives it but [him]." (*Guidry*, Instrument No. 2, Exhibit 10).   Because a headlight was out and the Corvette "could appear to be a hatchback model car to those unfamiliar with vehicles," the police towed Podhorsky's car "for processing."   (*Guidry*, Instrument No. 2, Exhibit 14).

Podhorky's Corvette, however, differed in important respects from the vehicle seen by eyewitnesses.   Eyewitnesses described the getaway vehicle as silver or gray.   The form Podhorsky signed giving the police permission to search the Corvette described it as "black in color."   (*Guidry*, Instrument No. 2, Exhibit 11).   A police report described it as "gray/black." Podhorsky's car may have appeared superficially similar to the one eyewitnesses described, but Podhorsky testified at trial that his Corvette was "extremely loud . . . mainly set up for a dragstrip race car. . . . You would hear the car coming."   Tr. Vol. 25 at 201.   The eyewitness

description of the getaway vehicle in no way mentioned the sound of a loud car pulling away from the Fratta residence.

Importantly, Fratta has also not provided credible evidence that Barlow's fingerprints were found on Farah's car. Fratta's *Brady* claim focuses on on a November 15, 1994, police report that identified a set of prints as coming from Barlow. Instrument No. 52, Exhibit 5. Fratta assumes that the police recovered those fingerprints from "the driver's door and left front fender of the car *Farah Fratta* drove." Instrument No. 51 at 42 (emphasis added). The November 15, 1994, report, however, does not identify the vehicle from which the police took the finegrprints linked to Barlow. Instead, the report says that the latent fingerprints were on a card "marked rear edge of driver's door" and "left front fender, ahead of wheel." The report does not identify from what vehicle the police recovered the fingerprints.[11]

It appears more likely that the November 15, 1994, police report refers to fingerprints found on the Corvette. A police report from November 10, 1994, indicates that Podhorsky gave permission and the police "requested a search for any traces of blood as well as latent prints" from the Corvette. Instrument No. 52, Exhibit 5; *Guidry*, Instrument No. 2, Exhibit 14. The police searched the Corvette, recovered a handgun from the car, and observed blood inside. When the police "processed the [Corvette] for latent prints[,] [s]everal of value were obtained." Instrument No. 52, Exhibit 5. On November 13, 1994, "[a]ll latent prints [from the Corvette] were subsequently forwarded to A.F.I.S. for further processing." Instrument No. 52, Exhibit 5.

---

[11] Respondent assumes that the November 15, 1994, report refers to Farah's car, but argues that it was not her own vehicle, but a "demo" car from a dealership which could have had fingerprints from many people on it. Instrument No. 67 at 51. Respondent sees no reason to be troubled by Barlow, who superficially looked like the perpetrator and who owned a car driven by someone Fratta had asked to kill his wife, leaving his fingerprints on the car Farah drove. Respondent, however, does not mention the consistent testimony that the police could not identify fingerprints on the car nor does Respondent discuss the police report at length. Respondent's speculative briefing misses much stronger arguments.

The report on which Fratta bases his argument states that a police officer received the A.F.I.S. envelope "request for latent print search" on November 15, 1994.  While the report identifies Barlow as the individual whose prints were found, it does not specify from which vehicle the police lifted them.

Trial testimony, however, clarified that the police did not obtain any usable prints from Farah's car.  An initial report stated that "some latent prints of possible value were taken from [Farah's] car."  Instrument No. 52, Exhibit 5 at 14.  At Fratta's second trial, the prosecution asked Jerry David Ferrell, a police investigator, about evidence collected from the crime scene.  Officer Ferrell testified that the police tried to collect latent fingerprints from Farah's car, and "[s]ome of marginal value were obtained from the car."  Tr. Vol. 23 at 259.  Ferrell testified that he "didn't effect any identification based on the latent prints that [the police obtained] from the crime scene."  Tr. Vol. 23 at 259.  Officer Ferrell elaborated: "They were of marginal quality.  So, it was a stretch at best.  And we weren't able to effect any identifications on the latents that we got."  Tr. Vol. 23 at 260.[12]  Fratta does not provide any evidence to call into question the testimony that the police did not obtain usable prints from Farah's car.  Fratta can only speculate that the police recovered Barlow's print from Farah's car (from which the police could not extract useable prints), suppressed that information from the defense, and at different trials provided false testimony about not recovering useful prints from the crime scene.

Even without considering the fatal defects in Fratta's allegations of actual innocence, a fundamental miscarriage of justice requires more than a showing of weaknesses in the case or that alternative theories exist.  An inmate must show "that it is more likely than not that no

---

[12]        In Guidry's trial, testimony likewise showed that no usable prints were found.  *Guidry*, Tr. Vol. 20 at 236.  In Fratta's first trial Ferrell also testified that the State had not been able to identify any of the fingerprints on Farah's car.  *Fratta v. Dretke*, 4:04-mc-315, Instrument 14, Tr. Vol. 21 at 339.

reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 321. Arguments for actual innocence "must be considered in light of the proof of petitioner's guilt at trial[.]" *Herrera*, 506 U.S. at 417. A reviewing court does not look at the "new" evidence in isolation. Instead, the court makes "a holistic judgment about 'all the evidence,'" including "how reasonable jurors would react to the overall, newly supplemented record." *House v. Bell*, 547 U.S. 518, 539 (2006) (quoting *Schlup*, 513 U.S. at 328).

The State presented strong evidence linking Prystash and Guidry to the murder. Months after the crime Guidry possessed a gun which bore similar "class characteristics" to the weapon that killed Farah. Phone records showed repeated communication between Fratta and Mary Gipp's cellphone around the time of the murder. Prystash drove a car more similar to the one viewed by eyewitnesses than Podhorsky's. Prystash later acted suspiciously, doing things such as changing the broken headlight and getting rid of his car soon after the murder. Gipp provided extensive testimony about the planning of the murder and the events that transpired afterwards. Prystash told Gipp that they had killed Farah. Given the entirety of the trial evidence, and the weakness of the evidence proffered on habeas review, the Court finds that Fratta has not shown that he is actually innocent of capital murder.[13]

---

[13] The Court does not write upon a blank page. While not a consideration in the analysis above, the Court observes that Fratta's allegations of actual innocence exist against a detailed background created by years of judicial review from three separate cases. An actual innocence claim is not "bound by the rules of admissibility that would govern at trial" and may include evidence "that was either excluded or unavailable at trial." *Schlup*, 513 U.S. at 327-28. In this broad review, a court considers all the evidence "old and new, incriminatory and exculpatory . . . ." *House v. Bell*, 547 U.S. 518, 536 (2006). Considering the decades-long development of issues relating to Farah's murder, it bears mentioning that "Prystash confessed that he had received a gun and instructions from [Fratta], solicited Guidry to shoot Farah, and drove Guidry to and from Farah's home." *Prystash v. Davis*, 854 F.3d 830, 833-34 (5th Cir. 2017). No court has found any police overreaching in taking Prystash's confession. Prystash's confession harmonized with Gipp's version of events (both admissible and otherwise). Fratta's allegations of innocence ring hollow when compared with the full record in this case and the description of the crime found in the judicial opinions that have reviewed this crime. While the Court does not include that broad review into its actual-innocence analysis, doing so would easily and summarily dispense with Fratta's *Schlup* argument as completely lacking any serious merit.

### B.      Suppression of Evidence to Forgive Procedural Default

In his fourth claim, Fratta argues that the State suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  A *Brady* violation may establish cause to excuse procedural default.  *See Banks v. Dretke*, 540 U.S. 558, 691 (2004); *Strickler v. Greene*, 527 U.S. 263 (1999).  Three essential elements compose a valid *Brady* claim: "'The evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"  *Id*. (quoting *Strickler*, 527 U.S. at 281-82). Cases often add a fourth requirement: "nondiscovery of the allegedly favorable evidence was not the result of a lack of due diligence." *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003); *see also Graves v. Cockrell*, 351 F.3d 143, 153–54 (5th Cir. 2003). "When evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility for failing to conduct a diligent investigation." *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002).

Fratta alleges that the police withheld the police reports on which he bases his actual-innocence argument.  The trial record does not strongly support Fratta's allegation that the State suppressed evidence.  In a pretrial hearing, the prosecution explained that it had turned over 323 pages from "their trial binder" that included "the offense reports, as well as the lab reports that were the basis for this initial investigation." Tr. Vol. 3 at 58-59.[14]  Also, the State's file in this

---

[14]      The prosecution specifically stated that the disclosure included "some DNA evidence . . . ." Tr. Vol. 3 at 59.  Defense counsel, however, objected that they had not received any DNA evidence. Tr. Vol. 3 at 59.  The prosecution reminded trial counsel that the disclosed material included information about "some items that were taken from a Corvette seat that was swabbed for DNA analysis." Tr. Vol. 3 at 60.  Defense counsel then asked if the material was taken from "Podhorsky's Corvette." Tr. Vol. 3 at 60.  While the defense complained that they did not have the results of the DNA testing, the trial judge assured them that it was in the binders. Tr. Vol. 3 at 60.  The prosecutor then assured the defense that the three binders of disclosed material included "extraneous offense reports." Tr. Vol. 3 at 61.  The prosecutor told the defense that the State would not use the material at trial because "[i]t's simply not relevant." Tr. Vol. 3 at 59.

case was open and available for counsel to review.  While state habeas counsel averred that the relevant police reports were not found in trial counsel's files, Instrument No. 76, Exhibit 1, that does not mean that they were not in the State's file to which counsel had access.

The state habeas record contains material "that was available to Mr. Fratta's counsel," State Habeas Record at 17, including a police report with the following notation: "Inspected Podhorsky's Corvette. Discovered that the passenger side front headlight was inoperable. This along with the fact that the car had silver front fenders and could appear to be a hatchback model car a decision was made to tow it for processing."  State Habeas Record at 55.   But the defense not only had information about Podhorsky's car before trial; the defense used it at trial.   Trial counsel asked Podhorsky on cross-examination about his car.   In closing arguments, the trial counsel reminded jurors that Podhorsky had been a suspect and that the police had searched for fingerprint and DNA evidence in his car.

The defense knew that Podhorsky drove a Corvette that was somewhat similar to the car seen by eyewitnesses.  The State divulged that it had recovered evidence from the Corvette.  The record does not contain information about Barlow.  Fratta, however, has not shown that the defense did not have, or have access to, information about the police's investigation into fingerprints.  At any rate, as discussed in the section above, Fratta's allegations about the police finding Barlow's prints on Farah's car are not credible, particularly because Fratta has not shown falsity in the trial testimony about the police being unable to take usable prints from Farah's car. The Court finds that Fratta cannot overcome the procedural bar of his claims under *Brady*

because he has not brought forth credible allegations that the State suppressed material evidence.[15]

### C.    Ineffective State Habeas Representation to Provide Cause and Actual Prejudice

Fratta raises numerous claims relating to trial counsel's efforts that he has not exhausted in state court.  In his final attempt to overcome the procedural bar, Fratta argues that the Court should be able to reach the merits of his unexhausted *Strickland* claims because state habeas counsel provided ineffective representation under *Martinez v. Ryan*, 566 U.S. 1 (2012).[16]   A federal habeas petitioner bringing an unexhausted *Strickland* claim who relies on *Martinez* to show cause initially must make important showings before the Court can consider the underlying defaulted claim.  First, an inmate must show that "his claim of ineffective assistance of counsel at trial is substantial -- *i.e.*, has some merit . . . ."  *Cantu v. Davis*, 665 F. App'x 384, 386 (5th Cir. 2016); s*ee also Allen v. Stephens*, 805 F.3d 617, 626 (5th Cir. 2015); *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir. 2014); *Preyor v. Stephens*, 537 F. App'x 412, 420-21 (5th Cir. 2013); *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013).  A *Strickland* claim is "insubstantial" if it "does not have any merit" or is "wholly without factual support.  *Martinez*, 132 S. Ct. at 1318. This "substantiality standard [is] equivalent to the standard for obtaining a [Certificate of

---

[15]      Fratta asks the Court to stay the proceedings to exhaust his claims.  The Court's review indicates that Fratta does not rely on "potentially meritorious" claims requiring a stay under *Rhines v. Weber*, 544 U.S. 269 (2005). Fratta complains that Guidry's case, which raised similar and numerous unrelated claims, was stayed.  The Court's review indicates no reason for a stay in this case.  For the same reasons that Fratta's *Brady* claim does not provide cause, the Court would deny relief if its merits were fully available for federal review.

[16]      Insofar as Fratta seems to suggest that *Martinez* will forgive the procedural bar of claims one, two, and three, none of which raise *Strickland* claims, *Martinez* created only "a narrow exception" for the "procedural default of a claim of ineffective assistance at trial." *Martinez*, 132 S.Ct. at 1315; *see Reed v. Stephens*, 739 F.3d 753, 778 nn. 16 & 20 (5th Cir. 2014) (declining to extend *Martinez* beyond ineffective-assistance claims).  In the alternative, the Court had reviewed the merits of those claims and, if fully available for federal review, the Court would nonetheless deny habeas relief.

Appealability].'" *Crutsinger v. Stephens*, 576 F. App'x 422, 430 (5th Cir. 2014).  In other words, a petitioner shows his claim is substantial by stating a valid claim of the denial of a constitutional right.  *See* 28 U.S.C. § 2253(c).  Second, an inmate must "show that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza*, 738 F.3d at 676.

In assessing whether state habeas counsel was ineffective the Court applies traditional *Strickland* jurisprudence in which courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  A habeas petitioner "must rebut this presumption by *proving* that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison,* 477 U.S. 365, 384 (1986).  In exercising the presumption, courts recognize that habeas counsel "'who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.'" *Vasquez v. Stephens*, 597 F. App'x 775, 780 (5th Cir. 2015) (quoting *Smith v. Robbins,* 528 U.S. 259, 288 (2000)).  In order to prove ineffective assistance, the defendant must demonstrate that "'a particular nonfrivolous issue was clearly stronger than issues that counsel did present.'" *Vasquez*, 597 F. App'x at 780 (quoting *Robins*, 528 U.S. at 288); *see also Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").

Even after showing cause flowing from habeas counsel's representation, an inmate still must demonstrate "actual prejudice." *Canales v. Stephens*, 765 F.3d 551, 571 (5th Cir. 2014);

*see also Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013).  The Court's ultimate question is whether a prisoner has shown a reasonable probability that he would have been granted state habeas relief "had his habeas counsel's performance not been deficient."  *Newberry v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014); *see also Barbee v. Davis*, 660 F. App'x 293 (5th Cir. 2016).

### 1.      Background

Before turning to habeas counsel's failure to raise the unexhausted claims, the Court will review the circumstances surrounding Fratta's state habeas representation.  Patrick F. McCann and Carmen M. Roe represented Fratta on state habeas review.  The record before the Court does not give full insight into the efforts state habeas counsel made to prepare a state habeas application.  The record, however, does provide general information showing that state habeas counsel investigated various potential claims, including relating to the guilt/innocence phase of trial.  State habeas counsel filed a motion to unseal material related to jury selection.  State habeas counsel moved for, and received, additional time to file the state habeas application so as to accomplish more investigation. The request specified that state habeas counsel wished for additional time to review the records and transcript, as well as to investigate extra-record claims.  State habeas counsel requested and received funds to retain a licensed psychiatrist.  State habeas counsel employed the services of two investigators, one a "licensed fact investigator" and one a dedicated mitigation specialist.

State habeas counsel prepared the habeas application against a backdrop of already raised claims.  Appellate counsel had filed the brief on direct appeal before state habeas counsel submitted the habeas application.  Presumably, appellate counsel's selection of issues informed habeas counsel's selection of habeas claims.  Also, by that point Fratta had raised several other

issues in *pro se* pleadings before the Court of Criminal Appeals, which had not yet ruled on their procedural viability.

State habeas counsel prepared a 57-page state habeas application raising four claims. State Habeas Record at 3-60.  Fratta himself, however, repeatedly and strongly complained to the state habeas court about his habeas attorneys' efforts.  The seriousness of his allegations against counsel must be considered in light of the fact that Fratta has continually been an obstreperous client at every stage of legal proceedings.  Fratta has repeatedly attempted to raise issues *pro se*, some of which are included in his current federal petition.  Even though appellate counsel raised thirty-two points of error in the Court of Criminal Appeals, Fratta repeatedly complained about his "ineffective and incompetent counsel" who "refused to file" various "vital issues." Instrument No. 61, Exhibit 38.  Fratta submitted his own supplemental appellate brief to the Court of Criminal Appeals raising thirteen new points of error.  Fratta wrote a letter to the Court of Criminal Appeals arguing that "PROOF of [appellate counsel's] ineffectiveness is the INADEQUATE brief . . . compared with my . . . pro se Volume One brief, and also my initial . . . pro se supplemental brief."  Instrument No. 61, Exhibit 48.  Fratta not only criticized his attorneys, but state court judges as well.  For example, Fratta filed three motions for reconsideration of his direct appeal because the "corrupt judges" had made so many factual errors that they "looked foolish."  Instrument No. 61, Exhibit 42.  Fratta demeaned the judge who presided over his state habeas proceedings as "a pompous, arrogant, racist black female man-hating lesbian who in particular hates me."  Instrument No. 61, Exhibit 43.

By November 2011, Fratta had moved *pro se* to withdraw the application filed by state habeas counsel and substitute his own.  The state habeas court held two hearings regarding Fratta's desire to proceed *pro se*.  Finally, on August 22, 2013, the state habeas court granted

Fratta's motion, dismissed his habeas attorneys, and allowed him to represent himself on state habeas review.  Once Fratta was granted leave to represent himself, he unsuccessfully requested that he be provided a computer with a printer, two cell phones, and various other materials to set up a working "law office."  State Habeas Record at 454, 491.  Despite his *pro se* status, Fratta never filed a supplemental habeas application.  Instead, Fratta requested that the state habeas court take two actions.  First, Fratta asked the state habeas court to rule on the issues he raised in his *pro se* direct appeal pleadings.  State Habeas Record at 429.  Second, Fratta argued that the state habeas court should ignore the application filed by appointed habeas counsel because it did not amount to a true habeas application.  Fratta asked the state habeas court to dismiss the state application, appoint new counsel, and allow the filing of a new habeas application.  State Habeas Record at 505.  The state habeas court did not grant Fratta's two requests.  The trial-level habeas court entered findings of fact and conclusions of law recommending that the Court of Criminal Appeals deny the claims raised in the application filed by appointed counsel.

Against that background, Fratta now faults state habeas counsel for not raising several ineffective-assistance-of-trial claims.  Specifically, Fratta contends that habeas counsel should have raised *Strickland* claims based on trial counsel's ineffective representation for:

- not objecting that the law of parties charge that constructively amended the indictment. (claim 5)
- allowing the State to introduce allegedly false, incriminating testimony. (claim 6)
- not preventing the introduction of Prystash's hearsay testimony through Mary Gipp. (claim 7)
- failing to investigate whether Gipp only provided the State evidence under duress. (claim 8)
- not impeaching Gipp with her prior inconsistent statements. (claim 9)
- not impeaching Prystash's credibility. (claim 10)

- failing to exclude and impeach the testimony of the State's witnesses James Podhorsky, James Ray Thomas, Mike Eden, and others. (claim 11)

- not preventing testimony that Fratta forced his wife to engage in deviant sex acts. (claim 12)

- not objecting when the State allegedly encouraged a juror to presuppose that the State had a stronger case than the case it was allowed to put on. (claim 13)

- not making a proper due process objection to police testimony and false and misleading closing argument about Guidry's presence at a grocery store near Farah's home proximate to the murder. (claim 14)

- not objecting when the prosecutor repeatedly interjected facts outside the record. (claim 15)

Fratta also raises a separate claim that the cumulative effect of his ineffective-assistance-of-trial-counsel claims violated his constitutional rights. (Claim 16).

This Court will decide whether Fratta has shown cause and prejudice in state habeas counsel's failure to raise the unexhausted *Strickland* claims. In doing so, the Court must touch upon the merits of his underlying *Strickland* claims. While the Court's focus is on the *Martinez* arguments, the Court would alternatively deny the merits of his unexhausted claims for essentially the same reasons that follow.

Before turning to his arguments, the Court observes that Fratta only specifically addresses the cause component of the *Martinez* inquiry. Fratta makes no effort to show that, had habeas counsel raised the unexhausted claims, the state courts would have granted habeas relief. Failure to plead, much less prove, the *Martinez* "actual prejudice" prong is also fatal to Fratta's efforts to overcome the procedural bar of his unexhausted claims.

2.      **Claim Five**

In claim five, Fratta argues that trial counsel should have objected to the inclusion of a law-of-parties charge because it constructively amended the indictment.  From the early stages of this case, it was understood that the prosecution would rely on Texas' law of parties.   Trial counsel moved to preclude a death sentence in this case because of the State's reliance on that theory.  Clerk's Record at 250-51. After both sides rested in the guilt/innocence phase, the trial court discussed the jury charge with the attorneys, specifically its application to the burglary count.  Trial counsel objected to the language of the burglary charge because it did not "track[] the language in the indictment."  Tr. Vol. 29 at 216.  The discussion, however, was continued off the record, leaving it uncertain what objections trial counsel made to the jury charge.  Tr. Vol. 29 at 220.

Fratta asserts that habeas counsel should have complained that trial counsel did not make various objections to the jury instructions on party liability, all related to the idea that the law of parties instruction constructively amended the indictment.   According to Fratta's theory, the evidence did not draw a connection between him and Guidry yet the indictment said that he "with the intent to promote or assist the commission of the offense of murder of Farah Fratta, solicited, encouraged, directed, aided or attempted to aid … Guidry in shooting Farah Fratta."  In essence, Fratta contends that no evidence supported the party-liability theories.

The Texas Court of Criminal Appeals has held that "[r]egardless of whether it is pl[eaded] in the charging instrument, liability as a party is an available legal theory if it is supported by the evidence." *In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013); *see also Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005) ("It is well-settled under Texas state law that law of parties need not be set out in the indictment.").  The

46 / 77

record suggests that the State understood the defense to attack the relationship between the charge's language and the evidence.  While the defense did not specifically use the phrasing "constructively amended the indictment," the thrust of the discussion on the record revolves around Texas' law regarding that concept.  *Compare* Tr. Vol. 29 at 216-17 (the State arguing that a "hypothetically-correct jury charge is one that's authorized by the indictment but accurately tracks the statute") *with Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013) ("When reviewing the sufficiency of the evidence, the essential elements of the offense are those of a hypothetically correct jury charge: "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.").

Counsel made efforts to remove the law of parties as a basis for Fratta's conviction. Clerk's Record at 250.  Still, the jury instructions and evidence strongly allowed for Prystash to be the link between Fratta and the gunman Guidry, even if they did not know one another.  While in the context of a different claim, the Court of Criminal Appeals on direct appeal discussed the extensive evidence showing the connection between the three men in the conspiracy to kill Farah.  *Fratta*, 2011 WL 4582498.  Fratta has not shown that the Court of Criminal Appeals would not rely on the same factual basis to find a sufficient connection to permit the parties instruction.  Additionally, the same background, considered in the full context of the trial record and state law, demonstrates the weaknesses in Fratta's fifth habeas claim.  Trial counsel could reasonably choose not to raise the objection in claim five, and state habeas counsel could reasonably choose not to include it in the habeas application.  Further, Fratta has not shown that the state habeas court would have granted relief had habeas counsel raised the claim.

### 3.    Claim Six

Fratta claims that state habeas counsel should have raised a *Strickland* claim relating to counsel's handling of Gipp's testimony.  Fratta contends that counsel should have objected to: (1) Gipp's testimony that Prystash was the "middleman" because it conflicted with her testimony from Prystash's trial; (2) the prosecutor's questions that led to Gipp testifying that she "knew" that the men had killed Farah; (3) Gipp's testimony about Prystash's car being used in the murder because she did not personally see him drive it to Farah's house; and (4) introduction of Gipp's note with a gun's serial numbers as hearsay.  Fratta, however, has not shown that habeas counsel missed viable, and ultimately meritorious, grounds for relief.

As an initial matter, Fratta fails to acknowledge efforts trial counsel made to exclude Gipp's testimony.  Fratta's pleadings give the impression that trial counsel wholly failed to challenge Gipp's testimony.  Early in the case, trial counsel emphasized that "there are a lot of hearsay statements . . . we're concerned about all the hearsay statements" because "[a]t the previous trial, . . . Gipp [was] allowed to put in a lot of, in our opinion, hearsay."  Tr. Vol. 3 at 37.  Trial counsel filed a pre-trial motion to exclude hearsay from Gipp.  Clerk's Record at 528. The defense also sought to prevent "[a]ny BACK DOOR hearsay statements of any witness including Mary Gipp" and "[a]ny DOUBLE hearsay statements from Mary Gipp or any other witness."   Clerk's Record at 439.    Trial counsel repeatedly and vigorously objected to statements at trial on hearsay grounds.  In many of the instances Fratta points to in his petition trial counsel actually objected, sometimes on other grounds, and was unsuccessful in excluding Gipp's testimony.  A review of the trial record confirms that trial counsel zealously tried to limit or exclude Gipp's testimony.  A state habeas attorney seeking to emphasize stronger grounds for relief, therefore, could reasonably forgo challenging trial counsel's efforts in that regard.

Further, Fratta has not shown that state habeas counsel missed viable arguments with respect to each challenged area of trial counsel's representation relating to Gipp.  Fratta primarily argues that trial counsel "allowed the State to introduce false, incriminating testimony that the State crafted to circumvent the trial court's rulings and rules of evidence."  Instrument No. 51 at 70.  As previously discussed, the State based its case partially on incriminating statements Prystash made to Gipp.[17]   Fratta claims that a comparison between Gipp's testimony in his Prystash's trial and that from his own second shows that she was testifying falsely in 2009.[18] Fratta has shown some differences in Gipp's testimony after years had transpired between the

---

[17]     The court adjudicating Prystash's federal petition for a writ of habeas corpus recently summarized Gipp's testimony at Prystash's trial as follows:

> The prosecution relied heavily on Gipp's confirmation of the murder plot, both through her testimony about what Prystash told her and her observations of him during that time period. Gipp's testimony verified much of Prystash's confession. About six months before the murder, Fratta gave Prystash a gun. Tr. Vol. 17 at 186. A couple of months before the murder, Prystash told Gipp that Fratta "had asked him if he wanted to kill [Farah]." *Id.* at 177. The two men met often, and Prystash told Gipp that they were planning "[t]o have Farah killed." *Id.* at 178. They spoke every day in the week before Farah's murder. *Id.* at 174.
>
> A few days before the killing, Prystash told Gipp that the murder was to happen on November 9 because Fratta "was going to church" with the children. *Id.* at 179. Prystash said that their neighbor Guidry would be the shooter and that they would kill Farah at her house. *Id.* at 179, 185. Prystash reported that "Guidry was going to get a thousand dollars, and [he, Prystash] was going to get a Jeep." *Id.* at 179-80.
>
> After Gipp arrived at home on November 9, Prystash and Guidry left together, both dressed in black clothing. Prystash took Gipp's telephone with him when he left. *Id.* at 193. Prystash and Guidry returned two hours later. *Id.* at 196. Prystash walked into the bedroom and unloaded the shells from a gun. *Id.* at 197. When she asked, Prystash told Gipp that Farah had been killed. *Id.* at 201.
>
> Prystash said that he dropped Guidry off at the Fratta home. Guidry was waiting in the garage when Farah arrived. *Id.* at 217. Prystash said that "Farah was shot twice; and that the first time in the head and when she flew back, then [Guidry] shot her again." *Id.* at 217. Prystash then picked Guidry up in his "Silver Nissan." *Id.* at 218.

*Prystash v. Stephens*, No. CV H-05-1546, 2016 WL 1069680, at *5 (S.D. Tex. Mar. 17, 2016), *aff'd  sub nom. Prystash v. Davis*, 854 F.3d 830 (5th Cir. 2017).

[18]     For instance, Gipp provided unobjected-to testimony that Prystash "was the middleman to find someone that would kill Farah."  Tr. Vol. 27 at 41.

trials.   He has not, however, shown that she lied at his trial, much less that the State manufactured her testimony.   For instance, even if Gipp did not use the word "middleman" in Fratta's first trial or Prystash's trial, her testimony in those cases amply described his role in the murder scheme in a manner which would have supported the use of that term. Fratta's argument that trial counsel should have challenged Gipp's statements as false is without basis when considering the whole of her testimony in this and other cases.

State habeas counsel did not miss obvious arguments relating to other areas of Gipp's testimony.   Respondent persuasively argues that, while some of Prystash's statements may have been hearsay, Gipp's knowledge of them and ability to ascertain that the men had carried out the plot were admissible.   Gipp knew Prystash's vehicle and could provide testimony about it, including the inference that Prystash used it in carrying out the murder because it matched the description of the getaway vehicle.   While the note was not admissible on some grounds, the text written thereon was a recorded recollection which Gipp could have read. Any *Strickland* claim based on the note, however, would ultimately be unsuccessful because information about the gun also came before the jury through other sources, including the victim's father.

While Fratta has shown that an attorney may have made the indicated additional objections, he has not shown that the "State crafted" any "false, incriminating testimony" upon which a reasonable attorney could have made a meritorious objection.   Instrument No. 51 at 70. Recognizing other dynamic efforts trial counsel made to limit or exclude Gipp's testimony, a reasonable habeas attorney could chose not to raise the instant *Strickland* claim.   Moreover, it is not reasonable probably that the habeas court would grant relief on that proposed claim, particularly in light of the Court of Criminal Appeals' resolution of challenges to Gipp's testimony on direct appeal.   Given the lack of substantive factual underpinnings, and in light of

the fact that Fratta has not made any convincing argument that actual prejudice flowed from the alleged errors, Fratta has not shown that state habeas counsel's representation provides cause to allow federal review, nor that a meritorious ineffective-assistance-of-trial counsel claim exists.

### 4.    Claim Seven

In claim seven, Fratta complains that trial counsel should have prevented the introduction of Prystash's hearsay testimony through Gipp.  Fratta argues that trial counsel should have argued that Prystash's hearsay statements could be categorized as testimonial, and thus excludable, because Gipp "was probing Prystash for information that police and prosecutors could use against Prystash and Fratta," and because Prysatsh's statements were neither credible nor reliable.  Instrument No. 51 at 88-90.  On its face, this argument seems to have some currency as this Court and the Fifth Circuit concluded in the first federal habeas action that "the Confrontation Clause was violated when Prystash's statements to Gipp were admitted at Fratta's trial."  *Fratta v. Quarterman*, 536 F.3d 485, 507 (5th Cir. 2008).  The Fifth Circuit, however, refused to render an opinion about using Gipp's statements in any retrial, other than to observe that, unlike in the first proceeding, *Crawford v. Washington*, 541 U.S. 36 (2004) would govern their admissibility.  *Fratta*, 536 F.3d at 507 n.15.[19]

---

19    Specifically, the Fifth Circuit stated:

> We note that should the State seek to re-try Fratta, the question of the admissibility of the custodial confessions and Prystash's statements to Gipp will not be governed by the reliability framework established in *Roberts*. Instead, the Confrontation Clause analysis will focus on whether these statements are "testimonial." *See Crawford*, 541 U.S. at 61-62, 124 S.Ct. 1354; *Davis v. Washington*, 547 U.S. 813, 823-24, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Since neither party has argued that the statements should or should not be considered "testimonial," or even argued that this question has any relevance to Fratta's habeas petition, *cf. Jackson v. McKee*, 525 F.3d 430, 437-38 (6th Cir.2008), we of course offer no opinion on this issue.

*Fratta*, 536 F.3d at 507 n.15.

Fratta's appellate counsel raised a detailed and comprehensive attack on Gipp's recitation of Prystash's statements.  In a manner similar to the arguments in claim seven, appellate counsel asserted that the hearsay statements "were testimonial in nature" because Prystash "reasonably knew that he was making incriminatory admissions that could be used to prosecute him for capital murder" and "[t]his incriminatory information was being collected and preserved by Mary Gipp which could be used to prosecute Prystash and which could serve as her 'get out of jail free card.'"  Fratta's Appellate Brief at 44-45.  Appellate counsel also argued that the hearsay statements were not admissible because "some of the statements which the trial court permitted were non-inculpatory, some of the statements involved blame-shifting, and the remainder . . . do not possess particularized guarantees of trustworthiness."   Fratta's Appellate Brief at 54. Appellate counsel filed the appellate brief well before state habeas counsel submitted the habeas application on June 20, 2011.  State habeas counsel would not be ineffective for not duplicating appellate counsel's efforts by casting the Confrontation Clause claims as *Strickland* arguments.

The Court of Criminal Appeals found that *Crawford* did not bar Gipp's recitation of Prystash's statements.  Given the Court of Criminal Appeals' decision on appellate review, Prystash's complaint that trial counsel should have objected to Gipp's testimony is not substantial, habeas counsel was not ineffective for not advancing it, and it is not reasonably likely that the state habeas court would have granted relief on this claim.

### 5.    Claim Eight

Emphasizing Gipp's role as a crucial witness for the State, Fratta's eighth claim argues that "[t]rial counsel was therefore obligated to attack the validity of Gipp's testimony, including investigating evidence that Gipp was harassed and physically abused by Deputies and Detectives until she gave a statement and produced physical evidence critical to the State's case."

Instrument No. 51 at 98.  In arguing that Gipp only talked to the police out of duress, Fratta relies on complaints made by his co-defendants,[20] citations to a television program, and police reports of Gipp's immunity deal.  Fratta, however, does not provide any direct statement from Gipp verifying any physical abuse or similar overreaching by police officers.  For the most part, Fratta's argument only rests on the supposition that the police improperly influenced Gipp's testimony when they attempted to "gratuitously disrupt [Gipp's] life as [they] pleased." Instrument No. 51 at 98.  Fratta's claim that state habeas counsel should have raised a *Strickland* claim on the handling of Gipp's testimony is hollow without substantiation that police misconduct caused her to provide information.

Still, Fratta argues that trial counsel's performance was deficient because of not cross-examining Gipp about "threats to prosecute Gipp for capital murder if she did not turn State's witness," "invasions and gratuitous destruction of Gipp's property," "unannounced and unmemorialized interrogations of Gipp at her home and at police stations, and. threats to prosecute Gipp's brother, Keith."  Instrument No. 51 at 100-01.  Also, Fratta argues that trial counsel should have investigated and questioned Gipp about her immunity deal and how "one or more Sheriff's deputy [sic] had disclosed that Gipp had been struck or otherwise assaulted or

---

[20]     Even though his subsequent briefing discusses the police officers' interaction with Guidry and Prystash, Fratta's eighth claim faults counsel for not 'investigat[ing] the conditions under which Gipp was interrogated." Instrument No. 51 at 96.  Fratta only seems to discuss his co-defendants to establish "[a] pattern of witness abuse," not serve as an independent basis for a *Strickland* claim.  If Fratta intended his *Strickland* arguments to cover trial counsel's investigation into Fratta's co-defendants, he has not shown deficient performance or actual prejudice by any prior attorney in that regard.  Also, even though the heading for Fratta's eighth claim only identifies a *Strickland* claim based on the failure to "investigate the conditions under which Gipp was interrogated and fail[ure] to cross examine Gipp about the duress under which she agreed to provide state's evidence," Instrument No. 51 at 96, Fratta's briefing goes on to allege that the State did not disclose, and counsel failed to ask about, the full extent of her immunity deal with the State.  The Court's review does not disclose that he has met *Strickland* performance or prejudice, at either the trial or habeas level, with regard to those allegations if he intends them to constitute a ground for relief.

53 / 77

threatened by one or more of the detectives or deputies who interviewed Gipp."  Instrument No. 51 at 101.

"Because decisions regarding cross-examination are strategic, they usually will not support an ineffective assistance claim."  *United States v. Bernard*, 762 F.3d 467, 472 (5th Cir. 2014) (citation omitted).  Here, in particular, Fratta's briefing leaves the incorrect impression that trial counsel made no effort to flesh out the circumstances surrounding Gipp's statements to the police.  The State questioned Gipp extensively, but the prosecutor did not discuss Gipp's interaction with the police before being subpoenaed to testify before a grand jury.  Trial counsel, however, extensively questioned Gipp about how she came to provide the police information, resulting in information similar to that alleged in Fratta's *Strickland* claim.  In her direct testimony, Gipp had already said that the State was going to "charge [her] with capital murder."  Tr. Vol. 27 at 85.  Trial counsel elicited testimony that the police searched Gipp's apartment, that they had opened all her Christmas presents, and that "several detectives . . . came [to her apartment] several times."  Tr. Vol. 27 at 148.[21]  While Fratta's arguments essentially assume that trial counsel should have asked Gipp if she was "harassed," trial counsel actually asked that question, to which Gipp responded: "I wouldn't call it harassment."  Tr. Vol. 27 at 149.  Trial counsel also asked Gipp about her immunity agreement with the police.  Tr. Vol. 27 at 158-59, 165.

Alleged threats to Gipp's brother and physical violence against Gipp were the only two areas arguably not covered by trial counsel's questioning.  Fratta, however, has not provided any

---

[21]     Trial counsel had already told jurors in opening arguments that the police "were talking to Mary Gipp routinely. They were going over to her house and interviewing her routinely over and over again."  Tr. Vol. 22 at 45.

evidence to substantiate those allegations, much less to show that they caused Gipp to give the police false information.

"Speculating about the effect of tinkering with the cross-examination questions is exactly the sort of hindsight that *Strickland* warns against."  *Castillo v. Stephens*, 640 F. App'x 283, 292 (5th Cir. 2016).  A reasonable habeas attorney could chose not to advance Fratta's eighth claim that is only weakly supported by unverified information.  This Court has reviewed the vigorous and extensive cross-examination by trial counsel and independently concludes that Fratta's ineffective assistance claim satisfies neither prong of *Strickland* analysis.  Fratta has not shown a reasonable probability of a different result had habeas counsel raised the claim (or if trial counsel had engaged in the suggested cross-examination).

### 6.    Claim Nine

Fratta claims that Gipp's testimony through the trials and retrials of himself and his co-defendants was "rife with serious contradictions and omissions."  Instrument No. 51 at 111.  Fratta claims that trial counsel should have probed Gipp on cross-examination about prior inconsistencies during the various times she told her story in police statements, trial proceedings, and investigative interviews.  Fratta emphasizes the following differences in her testimony:

- Gipp provided different accounts in Guidry's 2007 trial and a 1996 interview with an investigator about whether Prystash and Guidry were together after the murder
- Gipp described the weapon and having "wooden" grips in a police statement but testified that the grips were black in Guidry's retrial
- Gipp told the police in her statement that she came home at 4:30 p.m. but testified in Guidry's 2007 trial that she returned at 5:30 p.m.
- In her police statement, Gipp said that she either saw Prystash throw away the gun casings or he said he threw them away.  At Guidry's 2007 trial, she testified that she saw Prystash throw them away.

- Gipp testified once that, when she returned home before the murder, she asked Guidry where Prystash was, but in another trial testified that Guidry had asked her that question, and in another trial did not mention the question at all.

- Gipp said in Guidry's 2007 trial that she told police when they first spoke with her that she was willing to testify before a grand jury, but did not provide that testimony in other trials.[22]

The trial testimony provided the jurors some information about inconsistencies in Gipp's testimony.  For example, when Gipp testified that the gun grip was wood, the prosecutor began to ask what color she told the police that the gun was.  Tr. Vol. 27 at 70.  Trial counsel, however, quickly objected.  Tr. Vol. 27 at 70.  Gipp then testified that she had previously described the gun as silver.  Tr. Vol. 27 at 70-71.   Trial counsel's cross-examination discussed the different guns Gipp saw, including her description of one as "black."  Tr. Vol. 27 at 166-67.  At Fratta's trial, Gipp expressed some uncertainness about what time she arrived home and did not give a confident answer.  Tr. Vol. 27 at 45, 127-28.

Trial counsel extensively cross-examined Gipp on other matters and highlighted other inconsistencies and weaknesses in her testimony.   Trial counsel's closing argument sharply criticized Gipp, portraying her as a self-interested liar whose shifting testimony was not reliable.  Tr. Vol. 30 at 105-07.   While Fratta has identified some additional areas in which Gipp's testimony varied over the decades since the murder, he has not identified any line of questioning which a reasonable attorney would have unquestionably pursued.  After reviewing these alleged inconsistencies, the Court concludes that most of these inconsistencies concern minor details and are insufficient to overcome the presumption of effective representation.  At best, many of the discrepancies are relatively insignificant, if they constitute discrepancies at all.  Given trial

---

[22]    Fratta lists the alleged inconsistencies in a manner fundamentally identically to a similar claim in Guidry's most recent federal petition.

counsel's vigorous cross-examination, the relatively minor inconsistencies, and the fact that rational jurors may attribute differences in testimony to the mere passage of time,[23] Fratta has not met the *Strickland* standard for trial or habeas counsel with respect to the cross-examination of Gipp.

### 7.    Claim Ten

Fratta argues that habeas counsel should have raised a claim faulting trial counsel for not impeaching Prystash's statements to Gipp.  In his federal habeas challenging, Prystash claimed to suffer from mental illness and fetal alcohol syndrome.  Also, Prystash had a criminal record. In her police statement, Gipp told officers that Prystash claimed to have committed a different murder.  Fratta claims that trial counsel should have used Prystash's alleged mental illness and criminal background to impeach his account of participating in Farah's murder.

Respondent contends that Fratta has not shown how state habeas counsel could have proven that trial counsel should have impeached Prystash's hearsay statements.  Respondent argues that Fratta relies on speculation (1) that any impeachment evidence existed and (2) that such material would be admissible in his trial.  Respondent, however, does not acknowledge that the Texas Rules of Evidence 806 which states that "[w]hen a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness."  The intent of Rule 806 is "to permit impeachment and rehabilitation by any means that could be used if the declarant were a witness."  *Bee v. State*, 974 S.W.2d 184, 190 (Tex. App. -San Antonio 1998, no pet.).

---

[23]      Elsewhere in his petition Fratta states that, by the time of Fratta's second trial, "[w]itnesses had aged and memories were not fresh and vivid."  Instrument No. 51 at 120.

Still, the Court finds that a reasonable attorney could strategically decide not to challenge Prystash's testimony on the grounds asserted in the habeas petition. Fratta admits that Prystash only "may" suffer from schizophrenia and fetal alcohol syndrome. Instrument No. 51 at 118. No evidence conclusively diagnosed Prystash with those conditions, but less in a manner which would be admissible at Fratta's trial. Although Prystash previously told Gipp he had killed before, his commission of other murders could as easily harm as help the defense, convincing jurors of his culpability in killing Farah. At their core, none of the unverified impeachment evidence unquestionably makes hearsay statements from Prystash less credible. Fratta has not shown that habeas counsel provided deficient representation by not more aggressively attacking Prystash's credibility through a *Strickland* claim.

### 8.    Claim Eleven

Fratta complains that, because many years had passed since the murders, trial counsel should have made efforts to "exclude and impeach the testimony of state witnesses Jimmy Podhorsky, James Ray Thomas, Mike Eden and Other State's Witnesses." Instrument No. 51 at 120. Fratta does not provide any specifics about what testimony suffered from the passage of time, but suggests that additional discovery and investigation would reveal that the witnesses lacked personal knowledge at the time of trial. Fratta has not pointed to any challenge to the testimony of witnesses that would have provided a viable basis for a *Strickland* claim on state habeas review.[24]

---

[24] Even if Fratta had provided information about in what areas recollections had degraded with time, Respondent observes that "[t]hat trial counsel did not want to have these witnesses' memories refreshed by the prosecution with their former testimony was undoubtedly a valid strategic concern. Whatever gains might be made in showing a witness's memory had faded would have been undone by any of their former testimony coming into evidence." Instrument No. 67 at 68.

Fratta makes more specific allegations against eyewitness testimony provided by Lauren and Daren Hoelscher (who observed the gunman and the getaway car) and testimony provided by Farah's father, Lex Bacquer.[25]   Fratta challenges trial counsel's questioning of the Hoelschers' because it did not address the fact that they had been hypnotized in an effort to add detail to their eyewitness accounts.   In Fratta's first habeas proceedings, however, the state habeas court found that "the hypnosis attempt was not successful" and "no new information had been obtained."   State Habeas Record at 785.   The state habeas court also found that "hypnosis did not elicit any new information from the Hoelschers; that hypnosis did not produce an identification of the shooter; and that the procedures used during the hypnosis are thus not relevant."   State Habeas Record at 787.   Given those findings, state habeas counsel could reasonably decide not to challenge trial counsel's failure to object to the Hoelshers' testimony because they had been hypnotized.   Impeaching the Hoelshers would have helped the defense little, because the hypnosis was not successful and did not alter their account of events.

Fratta also contends that state habeas counsel should have raised a claim relating to trial counsel's questioning of Bacquer.   At trial, Bacquer testified that Farah had given him a gun belonging to Fratta for safe-keeping after they separated. Tr. Vol. 29 at 133.   At Fratta's request, Bacquer gave the gun back to Fratta the summer before Farah was murdered.  Tr. Vol. 29 at 124.  In a lineup, Bacquer identified that gun as the one the police recovered from Guidry.  Tr. Vol. 29 at 134.  Fratta claims that Bacquer lacked the necessary forensic experience and expertise to identify that unique weapon.  Still, Bacquer was personally familiar with the weapon.  Even if counsel could call into question his ability to identify the weapon, the State presented records from the Bureau of Alcohol Tobacco and Firearms showing that Fratta was the registered owner

---

[25]       Other times in the related cases the surname of Farah's father is spelled "Baquer."

of the gun that was recovered from Guidry's backpack.  Tr. Vol. 28 at 65.  Given that evidence, a reasonable habeas attorney could understandably choose not to challenge trial counsel's cross-examination of the victim's father on that point, and no prejudice would result.

### 9.    Claim Twelve

In claim twelve Fratta complains that state habeas counsel should have raised a complaint that the trial attorneys should have prevented jurors from hearing testimony about the sexually deviant demands he made on Farah.  Trial counsel made efforts to exclude that testimony.  By the time habeas counsel was preparing the habeas application, appellate counsel had already filed a detailed challenge to the sexual-deviance testimony.  The Court of Criminal Appeals, however, found that the statements were relevant and admissible.  Further, the Court of Criminal Appeals recognized that trial counsel sought, and the trial court granted, an instruction informing jurors that the "allegations were offered for the purpose of determining motive, and not for their truth." *Fratta*, 2011 WL 4582498, at *8.  State habeas counsel cannot be held ineffective for failing to raise a *Strickland* claim faulting trial counsel for not objecting to admissible evidence, and Fratta does not convincingly show that basing any challenge to the evidence on different grounds than that considered on appeal would have led to a different result.  State habeas counsel did not provide ineffective representation by raising a *Stickland* claim on that basis and Fratta has not shown that habeas relief would have been granted had habeas counsel done so.

### 10.    Claim Thirteen

Fratta claims that state habeas counsel should have raised a *Strickland* claim because "trial counsel failed to prevent the State from encouraging at least one accepted juror from presupposing that the State had a stronger case than the case it was allowed to put on." Instrument No. 51 at 144.  Fratta argues that the State used a hypothetical example during voir

dire to illustrate that a defendant or his accomplices cannot be compelled to testify. Fratta argues that the hypothetical "impress[ed] on jurors there was evidence proving Fratta guilty that the State could not put on." Instrument No. 51 at 144. Fratta also argues that "the juror could draw inferences supportive of the State's cases because co-defendants exercised their Fifth Amendment rights." Instrument No. 57 at 145. Fratta, however, only points to one prospective juror to whom the State posed the indicated hypothetical, Tr. Vol. 13 at 198, and that prospective juror did not serve at trial.

Given that only conjecture assumes what inferences the prospective juror may have entertained, and the only prospective juror to whom the State posed the challenged question did not serve at trial, Fratta has not shown that state habeas counsel failed to advance a claim that had some merit.

### 11.  Claim Fourteen

The federal courts granted habeas relief from Fratta's first conviction, in part, because of constitutional error in the introduction of Guidry's confession. The State made no effort to rely on that confession in the second trial. Guidry's involvement in the crime, however, was still a central issue. Fratta complains that trial counsel did not sufficiently object when the State connected Guidry to the murder through phone calls between Gipp's cell phone and a pay phone outside a grocery store.

After confessing to the crime in 1995, Guidry took the police to the grocery store payphone he visited around the time of the murder. The State wanted to introduce into evidence a photograph showing Guidry at the grocery store with police officers. Trial counsel made an oral motion in limine to prevent the State from presenting evidence about Guidry's presence at the grocery store. Tr. Vol. 29 at 3. The trial court ruled that, while "there should be no mention

or no suggestion in any way that Guidry said or did anything," the State could present the photographs which, in tandem with the phone records, suggested that Guidry had been at the grocery store on the night of the murder.  During the State's closing argument, the defense repeatedly objected whenever the prosecutor tried to say that Guidry "showed" the police anything at the grocery store.  Tr. Vol. 30 at 138-40.  Fratta claims that the defense did not do enough, but should have made due process objections that the State had manufactured evidence by drawing a connection between Guidry's 1995 visit to the grocery store and the phone records.

Trial counsel made efforts to limit the damaging effect of connecting Guidry, through phone records, to the crimes.  Trial counsel repeatedly, and successfully, objected to the prosecution's discussion of Guidry "show[ing]" the police anything at the grocery store.  The *Strickland* inquiry eschews the distorting effect of hindsight that would suggest alternative objections or strategies.  Fratta has not shown that a reasonable habeas attorney would raise a claim on the factual scenario in claim fourteen or that the claim is somewhat-meritorious.  Further, Fratta has not shown actual prejudice from either state habeas or trial counsel on this claim.[26] This claim is not available for plenary federal review.

### 12.    Claim Fifteen

Finally, Fratta faults state habeas counsel for not raising a *Strickland* claim based on the prosecution's discussion of extraneous facts.  During the guilt/innocence phase, trial counsel repeatedly, and sometimes successfully, objected that the prosecutor had intentionally interjected extra-record facts into closing argument.  Fratta now points to various points in which he wished trial counsel would have objected, or made a stronger objection.  Fratta specifically contends

---

[26]    Fratta has not shown that the prosecution violated the federal constitution through testimony that Guidry accompanied the police to the payphone.

that, in addition to the common-law basis for trial counsel's objections, the defense would have approached the bench to argue that the repeated references to matters outside the record violated the federal due process clause.

Having considered each statement in context, and in light of the fact that the trial court sustained many objections, the Court finds that a reasonable state habeas attorney could decide not to advance such a *Strickland* claim.  Fratta has not made a convincing argument that the trial prosecutor committed a due process violation through closing summation, much less one that would infect Fratta's trial with unfairness.  Trial counsel repeatedly and vigorously objected during closing argument.  Fratta has not shown that the newly minted objections would have been any more successful than the efforts counsel made.  Additionally, habeas counsel's failure to raise the indicated *Strickland* claim did not result in actual prejudice.

Fratta has not shown that trial or habeas counsel provided prejudicial ineffective representation with regard to the alleged due process errors in the prosecution's summation. Fratta has also not shown that the state habeas courts would have granted relief had counsel raised this claim.

### 13.    Actual Prejudice

In claim sixteen, Fratta claims that "trial counsel's cumulative errors deprived Fratta of his sixth amendment right to effective assistance of counsel."  Instrument No. 51 at 156.  Fratta begins his argument by asserting that "[w]hile each claim is sufficient to demonstrate [ineffective assistance of counsel], the proper *Strickland* analysis requires reviewing courts to calculate the cumulative impact of trial counsel's errors.  In this case, the cumulative impact clearly satisfies *Strickland v. Washington*'s deficiency and prejudice prongs."  Instrument No. 51 at 156-57. Fratta's subsequent briefing, however, extensively discusses racial concerns in Texas' historic

method of selecting grand jurors. Fratta has not raised any related *Strickland* claim nor explained how the selection of grand jurors has any bearing on the cumulative effect of his allegations of trial counsel's errors.[27]

Fratta provides nothing more than conclusory statements about the combined effect of trial counsel's alleged errors. The Court has already found that state habeas counsel did not provide ineffective representation by failing to raise each individual claim challenging trial counsel's representation. Fratta, therefore, has not provided anything to cumulate.

To the extent that Fratta has alleged error throughout counsel's representation, "[t]he Constitution demands reasonable competence, not perfect advocacy." *Castillo v. Stephens*, 640 F. App'x 283, 292 (5th Cir. 2016). The Court has considered each of Fratta's unexhausted claims of ineffective representation. Taken the effect of all alleged errors as a whole, Fratta has not shown actual prejudice from trial counsel's alleged deficiencies. Fratta, therefore, has not shown actual prejudice that would allow the Court to reach the merits of his underlying claims. A procedural bar, therefore, forecloses federal review of the unexhausted issues.

### D.    Alternate Review of Claims One and Two

Even though a procedural bar conclusively precludes federal relief on claims one and two, the Court will alternatively review their merits. Both claim one and two depend on the specific language which the State used to indict and convict Fratta. The indictment specifically allowed for Fratta's conviction if: (1) Fratta caused the death of Farah by shooting her with a firearm and employed Prystash to commit the murder; (2) Fratta caused the death of Farah by

---

27    To the extent that Fratta intends to raise a claim relating to the grand jury system, state habeas counsel raised a claim discussing the grand jury selection process. The state habeas court held that Fratta "fail[ed] to show that his rights to equal protection were violated based on an alleged purposeful exclusion of certain identifiable groups from serving on the grand jury as a result of the key man system." State Habeas Record at 547. Fratta has not shown that the state habeas court's decision was unreasonable.

shooting her with a firearm and employed Guidry to commit the murder; or (3) Fratta shot Farah

with a firearm during the commission of a burglary.  Clerk's Record at 2; Tr. Vol. 22 at 20-22.[28]

The State never alleged that Fratta himself killed Farah.  To that end, the trial court instructed

jurors on what Fratta describes as "aiding and abetting instruction," known in Texas as the law of

parties.  Instrument No. 51 at 15.  Specifically, the jury instructions stated:

> A person is criminally responsible for an offense committed by the conduct of
> another if acting with intent to promote or assist the commission of the offense he
> solicits encourages directs aids or attempts to aid the other person to commit the
> offense. Mere presence alone will not constitute one a party to an offense.

Clerk's Record at 559; TEX. PENAL CODE § 7.01 and 7.02.

In claim one, Fratta complains that the evidence was insufficient under *Jackson v.*

*Virginia*, 443 U.S. 307 (1979) to support his conviction under any of the theories listed in the

indictment.  In claim two, Fratta complains that the jury instruction on Texas' law of parties

constructively amended the indictment and violated the Fifth Amendment.  The Court finds that,

if the merits were fully available, Fratta has not shown an entitlement to federal habeas relief on

claims one and two.

### 1. Sufficiency of the Evidence (claim one)

The jury instructions in this case listed each of the three counts against Fratta in the

disjunctive, allowing jurors to decide his guilt under any of the theories.  In an explanation

paragraph, the jury instructions told jurors how to apply Texas' law of parties to the three counts:

---

[28]     The State also indicted Fratta for one other count, but the trial court granted the defense's motion for an
instructed verdict on that issue.  Tr. Vol. 29 at 167-73.  Count three of the indictment allowed from Fratta's
conviction if he caused the death of Farah by shooting her with a deadly weapon and he employed Guidry to commit
the murder for remuneration.  Clerk's Record at 2.

Before you would be warranted in finding the defendant guilty of capital murder, you must find from the evidence beyond a reasonable doubt that on the occasion in question the defendant, Robert Alan Fratta, intentionally employed Joseph Prystash and/or Howard Guidry to kill Farah Fratta; and the defendant Robert Alan Fratta, paid or promised to pay Joseph Prystash and/or Howard Guidry to kill Farah Fratta as alleged in the indictment; and Joseph Prystash and/or Howard Guidry agreed to kill Farah Fratta pursuant to such employment by the defendant, Robert Alan Fratta, and that Joseph Prystash and/or Howard Guidry did then and there kill Farah Fratta by shooting Farah Fratta with a deadly weapon, namely, a firearm pursuant to such agreement for remuneration by the defendant, Robert Alan Fratta and that the defendant, with intent to promote or assist the commission of the offense of murder of Farah Fratta, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash and/or Howard Guidry in shooting Farah Fratta with the specific intention of thereby killing Farah Fratta; or

You must find from the evidence beyond a reasonable doubt not only that on the occasion in question the defendant was in the course of committing or attempting to commit the felony offense of burglary of a building owned by Farah Fratta, as alleged in this charge, but also that the defendant specifically intended to cause the death of Farah Fratta, by shooting Farah Fratta, with a deadly weapon, namely, a firearm; or you must find from the evidence beyond a reasonable doubt that the defendant, Robert Alan Fratta, with the intent to promote or assist in the commission of the offense of burglary of a building, if any, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash and/or Howard Guidry in shooting Farah Fratta, if he did, with the intention of thereby killing Farah Fratta.  If you have a reasonable doubt as to the existence of any of the foregoing elements, then you cannot convict the defendant of capital murder.

Clerk's Record at 559-60.

The application paragraphs which followed in the jury charge described the predicates for a capital conviction.  Under Texas law, the application paragraph is the part of the charge that "applies the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations." *Vasquez v. State*, 389 S.W.3d 361, 366-67 (Tex. Crim. App. 2012). The application paragraph "specifies the factual circumstances under which the jury should convict or acquit," and is the "heart and soul" of the court's charge. *Id*.   Fratta reviews the evidence relating to each charge as specified in the application paragraph of the jury charge

and argues: (1) no evidence suggested that Fratta himself or Prystash shot Farah as required by the first count;[29] (2) Fratta never spoke with Guidry or knew of any connection between Prystash and Guidry so he could not have employed Guidry to commit the crime as required by the second count;[30] and (3) while the third count specifically incorporated the law of parties, no evidence indicated that Fratta was personally involved in a burglary, that Prystash committed a

---

[29]     The application paragraph relating to the first count stated:

> Now, if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about  the 9th day of November, 1994, the defendant, Robert Alan Fratta, did then and there unlawfully,  intentionally, or knowingly cause the death of Farah Fratta, *by shooting Farah Fratta with a deadly weapon, namely, a firearm, and the defendant did employ Joseph Prystash to commit the murder for remuneration or the promise of remuneration*, namely, a motor vehicle; *or* if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 9th day of November, 1994, *Joseph Andrew Prystash* did then and there unlawfully, intentionally, or knowingly cause the death of Farah Fratta, by shooting Farah Fratta with a deadly weapon, namely a firearm, and *the defendant did employ Joseph Prystash to commit the murder for remuneration or the promise of remuneration*, namely, a motor vehicle, and that the defendant, Robert Alan Fratta, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash to commit the offense, if he did . . . .

Clerk's Record at 560-61 (emphasis added).

[30]     The application paragraph relating to the second count stated:

> or if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 9th day of November, 1994, the defendant, Robert Alan Fratta, did then and there unlawfully, intentionally or knowingly cause the death of Farah Fratta, by shooting Farah Fratta with a deadly weapon, namely, a firearm, and that the defendant *did employ Howard Guidry to commit the murder for remuneration or the promise of remuneration*, namely, money; *or* if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 9th day of November, 1994, *Howard Guidry did then and there unlawfully, intentionally or knowingly cause the death of Farah Fratta, by shooting Farah Fratta with a deadly weapon*, namely, a firearm, and the defendant did employ Howard Guidry to commit the murder for remuneration or the promise of remuneration, namely, money, and that the defendant, Robert Alan Fratta, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Howard Guidry to commit the offense, if he did . . . .

Clerk's Record at 561 (emphasis added).

burglary, or that Fratta personally directed Guidry to commit a burglary. [31]  In sum, Fratta argues that insufficient evidence allowed for his conviction for capital murder as described in the indictment, and reflected by the application paragraphs of the jury charge.

Under *Jackson v. Virginia*, 443 U.S. 307 (1979), a reviewing court affirms a jury's conviction if, considering all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have returned a verdict unfavorable to the defendant.  In assessing the sufficiency of the evidence, "federal habeas courts should independently analyze the governing statute, the indictment, and the jury charge to measure the constitutional sufficiency of the evidence and determine what are the essential elements required by the *Jackson* sufficiency inquiry."  *Bledsue v. Johnson*, 188 F.3d 250, 260 (5th Cir. 1999).  The federal constitutional issue in this case is "whether the evidence was constitutionally sufficient to convict [petitioner] of the crime charged." *Id*. at 262 (quoting *Brown v. Collins*, 937 F.2d 175, 181 (5th Cir. 1991)). This demanding inquiry is highly deferential to, and resolves any conflicting evidence in favor

---

[31]    The application paragraph for the third count stated:

> or if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 9th day of November, 1994, the defendant, *Robert Alan Fratta, did then and there unlawfully, while in the course of committing or attempting to commit the burglary of a building* owned by Farah Fratta, intentionally cause the death of Farah Fratta by shooting Farah Fratta with a deadly weapon, namely, a firearm; *or* if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 9th day of November, 1994, *Joseph Andrew Prystash and/or Howard Guidry did then and there unlawfully, while in the course of committing or attempting to commit the burglary of a building* owned by Farah Fratta, intentionally cause the death of Farah Fratta by shooting Farah Fratta with a deadly weapon, namely, a firearm, and that the defendant, *Robert Alan Fratta, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash and/or Howard Guidry to commit the offense*, if he did, then you will find the defendant guilty of capital murder, as charged in the indictment.

Clerk's Record at 561-62 (emphasis added).

of, the jury's verdict. *See United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002); *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990).

Here, the jury instructions provided numerous possible theories under which the jury could convict Fratta. The prosecution estimated that there were "about 25" different ways in which "the State can prove his guilt." Tr. Vol. 30 at 39. The jury returned a general verdict, meaning that the jury could have based Fratta's conviction on any theory pleaded in the indictment. Because the Supreme Court has determined that "there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict," *Schad v. Arizona*, 501 U.S. 624, 632 (1991), "[i]f the evidence was sufficient to support one theory, the fact that the evidence was insufficient to support another of the theories does not negate the verdict." *United States v. Garza-Robles*, 627 F.3d 161, 166 (5th Cir. 2010).

The prosecution encouraged jurors to rely on the murder-in-the-course-of-a-burglary theory:

> What is the easiest way for you to get to your guilty verdict? Easiest way, really, is on the burglary paragraphs. I mean, it's really the quickest and most direct because in that circumstance what you have to ask yourself is: Did Robert Fratta aid or assist or promote or direct or encourage or solicit? And from the evidence you know that he did.

Tr. Vol. 30 at 41. The burglary portion of the jury charge allowed for Fratta's conviction if the jury found that

> Joseph Andrew Prystash *and/or* Howard Guidry did then and there unlawfully, while in the course of committing or attempting to commit the burglary of a building owned by Farah Fratta, intentionally cause the death of Farah Fratta by shooting Farah Fratta with a deadly weapon, namely, a firearm, and that the defendant, Robert Alan Fratta, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Joseph Andrew Prystash *and/or* Howard Guidry to commit the offense . . .

Tr. Vol. 30 at 21.  The prosecutor told jurors that "the 'and's' and 'or's' matter," so even though "we know [Fratta himself did not kill Farah] because he was at church" he could still be "a party to either Joseph Prystash or Howard Guidry."  Tr. Vol. 30 at 39.  Thus, the application paragraph relating to burglary required the State to prove that (1) Prystash *or* Guidry committed a burglary while killing Farah and that (2) Fratta was culpable under the law of parties for "solicit[ing], encourage[ing], direct[ing], aid[ing] or attempt[ing] to aid" Prystash *or* Guidry in killing her.

The physical evidence indicated that the killer shot Farah from inside the garage.  The prosecution argued that the killer committed a burglary by entering Farah's garage with the intention of killing her.  Tr. Vol. 30 at 30.[32]  Fratta argues that insufficient evidence pointed to Guidry as the killer, and thus the one who committed a burglary as he entered Farah's garage.

Viewed in a light favorable to the prosecution, the Court finds that sufficient evidence pointed to Guidry as the man who shot Farah.  Gipp's testimony put Guidry and Prystash together on the night of the murder:

> she often saw Prystash talking to her next-door neighbor, Guidry, on the balcony outside her apartment. On the evening that Farah was murdered, Gipp came home from work to find Guidry, dressed in black, sitting on the steps in front of her apartment. Prystash arrived a few minutes later but he soon left again. When he returned to Gipp's apartment that night, Guidry was with him.

*Fratta*, 2011 WL 4582498, at *2.  Guidry was dressed in a manner consistent with the eyewitness' description of the man hiding in the shrubs near Farah's garage after shots rang out.  Guidry's general physical characteristics broadly matched the eyewitness' description of the

---

[32]      Anticipating that the defense would argue that Fratta still had an ownership in Farah's house, the prosecution informed jurors that "just because you have a property interest doesn't mean you can give somebody permission to go in an kill someone."  Tr. Vol. 30 at 32.  Additionally, the temporary orders in the Fratta's divorce proceedings gave Farah "exclusive right to possession."  Tr. Vol. 30 at 32.

killer.  Also, "telephone and pager records show[ed] the times and locations of communications between Fratta, Farah, Prystash, and Guidry on the evening of the offense . . . ."  *Id.*  Gipp testified that "Prystash gave Guidry the murder weapon to dispose of . . . ."  *Id.*  Fratta's briefing concedes that "the police arrested Guidry . . . and recovered several guns" one of which matched "a slug retrieved from a life-preserver jacket hanging on the wall of the garage in which she was shot."  Instrument No. 51 at 6.  The Court of Criminal Appeals observed on direct appeal that "the murder weapon was found in Guidry's possession when he was arrested . . . ."  *Fratta*, 2011 WL 4582498 at 6.  The evidence sufficiently allowed jurors to conclude that Guidry was the shooter and that he entered Farah's garage to kill her, satisfying the burglary element.

Even so, Fratta still argues that he was not culpable under the law of parties for soliciting Farah's murder.  Fratta claims that he never communicated with Guidry, much less encouraged him to commit burglary and murder.  The State, in fact, conceded in a pretrial hearing that "Fratta and Guidry didn't know each other."  Tr. Vol. 20 at 73.  Fratta, however, has not shown under Texas law that the law of parties requires a personal relationship between the actors involved in a common scheme.  "The evidence must show that at the time of the offense the parties were acting together, each contributing some part towards the execution of their common purpose."  *Burdine v. State*, 719 S.W.2d 309, 315 (Tex. Crim. App. 1986).  Texas law focuses on the conduct of the parties in assessing culpability under the law of parties.  The State may secure a conviction if the conduct of the principal actor results in the commission of an offense, and another party solicited that conduct.  *See Boyer v. State*, 801 S.W.2d 897, 899 (Tex. Crim. App. 1991).  Fratta has not shown that Texas' law of parties requires that, in acting together, the each culpable individual know each other or directly oversee each other's actions.  *Cf. United States v. Payne*, 99 F.3d 1273, 1280 (5th Cir. 1996) (finding under federal conspiracy law that the

government does not need to establish that the "overlapping participants . . . knew each other or knew what each was doing").

The jury instructions allowed for Fratta's conviction if Fratta employed *either* Prystash *or* Guidry. Sufficient evidence showed that Fratta solicited Prystash to kill his wife. Notwithstanding, the evidence also connected Fratta to Guidry through Prystash. Fratta has not shown that, if all the parties are acting pursuant to a common scheme and with the same intention, party liability under Texas law cannot extend to individuals whose relationship depends on an intermediary. The Court presumes correct the state habeas court's finding that Fratta "hired co-defendants Joseph Andrew Prystash and Howard Paul Guidry to kill [his] estranged wife . . . Prystash served as the driver/middleman and Guidry was the shooter." State Habeas Record at 515. Under the *Jackson* standard, sufficient evidence allowed for Fratta's conviction for capital murder in the course of a burglary.

With sufficient evidence supporting one prosecutorial theory, the Court does not need to consider whether a reasonable jury could have found Fratta guilty of the other charges. The Court finds, however, that the jury instructions allowed for Fratta's conviction if he employed Prystash or Guidry and one of the two men killed her. Particularly in light of Gipp's testimony, the evidence was clearly sufficient to show that Fratta engaged Prystash in the scheme to murder his wife and that Guidry killed her. Texas' law of parties, in conjunction with the jury instructions as a whole, would sufficiently allow for Fratta's conviction. Accordingly, the Court would deny Fratta's first ground for relief if he had presented it in a procedurally adequate manner.

72 / 77

## 2.      Constructive Amendment of the Indictment (claim two)

Fratta contends that the State constructively amended the indictment against him by relying on Texas' law of parties.  Fratta recognizes that such an instruction typically "does not give rise to claims that the government constructively amended an indictment . . . ."  Instrument No. 51 at 24.  Fratta, however, claims that reliance on Texas' law of parties created "unfair surprise to the defendant" and that the government did not "carry the burden of proving the crime."  Instrument No. 51 1at 24.  Fratta contends that party liability created previously unanticipated and unprovable possibilities for his conviction.

The Sixth Amendment requires only that a "reasonable construction of the indictment would charge the offense for which the defendant has been convicted." *McKay v. Collins,* 12 F.3d 66, 69 (5th Cir.1994).  "This standard should be applied with practical, not technical considerations." *Holiday v. Stephens*, 587 F. App'x 767, 774 (5th Cir. 2014).  The Fifth Circuit has observed that a state charging instrument is fatally defective only when "under no circumstances could a valid conviction result from facts provable under the indictment," *Liner v. Phelps*, 731 F.2d 1201, 1203 (5th Cir. 1984), and "the indictment is so defective that it deprives the state court of jurisdiction." *McKay*, 12 F.3d at 68.

Reliance on the law of parties did not constructively amend the indictment in this case. "[U]nder Texas state law that law of parties need not be set out in the indictment." *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005).  "[I]f the evidence supports a charge on the law of parties, the trial judge may include an instruction on the law of parties despite the lack of such an allegation in the indictment." *Coleman v. State*, 2009 WL 4696064, at *10 (Tex.

Crim. App. Dec. 9, 2009).[33]   Here, Fratta knew from the indictment that the State would prosecute him based on his relationship with Prystash, and Prystash's relationship with Guidry. The State made it clear early in the proceedings that it would rely on the law of parties.  Fratta has not shown any constitutional error in the relationship between Texas' law of parties and the indictment.[34]

Fratta raises two additional notable concerns about the relationship between the indictment and the jury charge in this case.[35]   First, Fratta contends that the charge altered the finding required for conviction by altering the culpable mental state from "intentional and knowing," as found in the indictment, to "intentional *or* knowing."   The statutory definition of murder requires a showing of intentionally *or* knowingly causing an individual's death, TEX. PENAL CODE. § 19.02(b)(1), and a capital murder in the course of a burglary required a "intentional" mens rea.   TEX. PENAL CODE ANN. § 19.03.   Despite the difference in language, Texas courts have held that "[i]t is well established that the State may plead in the conjunctive and charge in the disjunctive."  *Cada v. State*, 334 S.W.3d 766, 771 (Tex. Crim. App. 2011); *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).   A trial court is authorized to instruct a jury that it may find that the defendant committed an offense by one or more specified means, even if the offense is charged in the conjunctive.  *See Schad v. Arizona*, 501 U.S. 624,

---

[33]   Fratta argues that a trial court "can add the law of parties [in the jury instructions even if not in the indictment] . . . but cannot add actual parties that were not referred into [*sic*] the indictment."  Instrument No. 76 at 31.  Fratta does not provide any support for that purported legal requirement.

[34]   Even if the State constructively amended the indictment, Fratta would have to show that the error was a crucial, critical, and highly significant factor that rendered the trial as a whole fundamentally unfair.  *See Bailey*, 744 F.2d at 1168.  Given the solid evidence of Fratta's guilt, any error did not harm the defense.  To the extent that Fratta argues that the "[e]vidence did not justify supplementing the murder for hire allegation in the Indictment with a law of parties charge," Instrument No. 51 at 25, his arguments are subsumed by his sufficiency of the evidence claim.

[35]   Insofar as Fratta's briefing also identifies other potential errors in the jury charge, the Court finds that they do not merit federal habeas relief.

631 (1991) ("We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone."); *Capps v. Collins*, 900 F.2d 58, 59 n. 2 (5th Cir. 1990) ("Use of the conjunctive rather than the disjunctive in the indictment did not oblige the state to prove both.")    Fratta has not shown that the use of the disjunctive in the jury instructions constructively amended the indictment.

Also, Fratta complains that, when the indictment alleged that he "intentionally and knowingly cause[d] the death of Farah," the jury charge allowed for his conviction if he "unlawfully, intentionally or knowingly cause[d]" her death.  Fratta argues that the introduction of the term "unlawfully" lowered the *mens rea* for his crime and constructively amended the indictment. Texas courts have held that the use of the term "unlawfully" in similar jury instructions "was mere surplusage."  *Green v. State*, 785 S.W.2d 955, 956 (Tex. App. 1990), *aff'd,* 829 S.W.2d 222 (Tex. Crim. App. 1992).  The term is not "a mental state" but "merely a conclusion encompassing the criminal conduct charged."  *Grice v. State*, 635 S.W.2d 890, 893 (Tex. App. 1982); *see also Garrett v. State*, 702 S.W.2d 724, 725 (Tex. App. 1985); *Guerrero v. State*, 666 S.W.2d 350, 353 (Tex. App. 1984); *Tatum v. State*, 666 S.W.2d 181, 183 (Tex. App. 1983).  Including the word "unlawfully" in the jury charge "adds nothing."  *Guerrero*, 666 S.W.2d at 353.  Here, the abstract portion of the charge stated that an offense occurs only if the defendant "intentionally" or "knowingly" acted, not "unlawfully."

Taken as a whole, the jury instructions did not amend the indictment or confuse jurors into believing that they could convict Fratta under a statutorily impermissible mental state.  For the reasons described above, the Court would deny Fratta's constructive-amendment-of-the-indictment claim if the merits were fully available for federal review.

## CERTIFICATE OF APPEALABILITY

Under AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA").  *See* 28 U.S.C. § 2253(c).  Fratta has not yet requested that this Court grant him a COA, though this Court can consider the issue *sua sponte*.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal."  *Slack v. McDaniel*, 529 U.S. 473, 482 (2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Fifth Circuit holds that the severity of an inmate's punishment, even a sentence of death, "does not, in and of itself, require the issuance of a COA."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  The Fifth Circuit, however, anticipates that a court will resolve any questions about a COA in the death-row inmate's favor.  *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).  The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  On the other hand, a district court that has denied habeas relief on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its

procedural ruling.  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  Unless the prisoner meets the COA standard, "no appeal would be warranted."  *Slack*, 529 U.S. at 484.

Fratta's petition raises issues worthy of judicial review.  Nevertheless, having considered the merits of Fratta's petition, and in light of AEDPA's standards and controlling precedent, this Court determines that a COA should not issue on any of Fratta's claims.

## CONCLUSION

For the reasons described above, the Court **grants** Respondent's motion for summary judgment, **denies** Fratta's petition, **denies** Fratta's cross-motion for summary judgment, and **dismisses** this case **with prejudice**.  The Court will not certify any issue for appellate review.

The Clerk will provide copies of this Order to the parties.

SIGNED at Houston, Texas, this 18th day of September, 2017.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE